**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**

| | |
|---|---|
| KALSHIEX LLC,<br><br>*Plaintiff*,<br><br>vs.<br><br>WILLIAM ORGEN, in his official capacity as Chairman of the Tennessee Sports Wagering Council; MARY BETH THOMAS, in her official capacity as the executive director of the Tennessee Sports Wagering Council; TENNESSEE SPORTS WAGERING COUNCIL; and JONATHAN SKRMETTI in his official capacity as Attorney General of Tennessee,<br><br>*Defendant*s. | Case No.: _____<br><br>**COMPLAINT FOR PERMANENT INJUNCTION AND DECLARATORY RELIEF** |

## INTRODUCTION

1.      This action challenges the State of Tennessee's intrusion into the federal government's exclusive authority to regulate derivatives trading on exchanges overseen by the Commodity Futures Trading Commission ("CFTC").  7 U.S.C. § 2(a)(1)(A).  Plaintiff KalshiEX LLC ("Kalshi") believes the Attorney General of Tennessee (the "Tennessee AG") will imminently bring an enforcement action against Kalshi on behalf of the Tennessee Sports Wagering Council ("SWC") with the intent to prevent Kalshi from offering event contracts for trading on its federally regulated exchange.  Defendants have repeatedly represented that they believe Kalshi is operating unlawfully under the Tennessee Sports Gaming Act, and stated that Kalshi must have a license issued by the SWC to offer sports-event contracts in the state.  And when Kalshi informed representatives of the Tennessee AG that it believed Tennessee was preparing to take action against Kalshi, and asked those same representatives to confirm if Kalshi's

belief was incorrect, the Tennessee AG declined to do so. On January 9, 2026, the SWC sent Kalshi a cease-and-desist letter demanding that Kalshi "cease offering sports events contracts to customers in Tennessee *immediately*."

2. Tennessee's intent to regulate Kalshi intrudes upon the federal regulatory framework that Congress established for regulating derivatives on designated exchanges. The state's efforts to regulate Kalshi are both field-preempted and conflict-preempted. This Court should therefore issue both a preliminary and a permanent injunction, as well as declaratory relief.

3. Kalshi is a federally designated derivatives exchange, subject to the CFTC's exclusive jurisdiction. It offers consumers the chance to trade in many types of event contracts, including, as relevant here, sports-event contracts. These contracts are subject to exclusive federal oversight, and—critically—they are *lawful* under federal law.

4. Commodity futures regulation has long been under the exclusive purview of the federal government. In 1936, Congress passed the Commodity Exchange Act ("CEA"), which enacted a federal regulatory framework for derivatives. In 1974, Congress established a federal agency called the CFTC to oversee it.

5. The text, purposes, and statutory history of the CEA leave no question that Congress sought to preempt state regulation of derivatives on exchanges overseen by the CFTC, known as "designated contract markets" or "DCMs." The text of the statute gives the CFTC "exclusive jurisdiction" over trading on federally regulated exchanges. 7 U.S.C. § 2(a)(1)(A). During the drafting process of the 1974 amendments to the CEA, Congress deleted a provision that would have granted states concurrent jurisdiction over futures trading. *See* 120 Cong. Rec. 30464 (1974) (statements of Sens. Curtis and Talmadge). One of Congress's avowed goals in creating the CFTC was to avoid the "chaos" that would result from subjecting exchanges to a

patchwork of 50 different—and potentially conflicting—state laws. *Commodity Futures Trading Commission Act: Hearings Before the S. Comm. on Agriculture & Forestry on S. 2485, S. 2578, S. 2837, and H.R. 13113,* 93d Cong. 685 (1974) (hereinafter "Senate Hearings") (statement of Sen. Clark). As the conference report to the 1974 amendments explained, they were designed to "preempt the field insofar as futures regulation is concerned." H.R. Rep. No. 93-1383, at 35 (1974) (Conf. Rep.). And the statute gives the CFTC comprehensive authority over regulated exchanges, including the authority to approve or reject certain categories of event contracts as against the public interest.

6.     For that reason, courts have easily found state laws preempted in similar contexts. *See, e.g.*, *Am. Agric. Movement, Inc. v. Bd. of Trade of Chicago*, 977 F.2d 1147, 1156 (7th Cir. 1992), *abrogated on other grounds by Time Warner Cable v. Doyle*, 66 F.3d 867 (7th Cir. 1995); *Bibbo v. Dean Witter Reynolds, Inc.*, 151 F.3d 559, 563-64 (6th Cir. 1998). The CFTC itself agrees. It recently informed the U.S. Court of Appeals for the D.C. Circuit that, "*due to federal preemption*, event contracts *never violate state law* when they are traded on a DCM" like Kalshi. Appellant Br. *27, *KalshiEx LLC v. CFTC*, 119 F.4th 48 (D.C. Cir. 2024) (emphasis added).

7.     Commentators have likewise concluded with no difficulty that the CEA "resulted in the preemption of all other would-be regulators at every level of government." Philip F. Johnson, The Commodity Futures Trading Commission Act: Preemption as Public Policy, 29 Vand. L. Rev. 1, 2 (1976). And commentators have specifically recognized that "the CEA preempts state bucket-shop laws and other anti-gambling legislation." Kevin T. Van Wart, Preemption and the Commodity Exchange Act, 58 Chi.-Kent L. Rev. 657, 721 (1982).

8.     In April 2025, a federal court in the District of New Jersey granted Kalshi's preliminary injunction to prevent similar state overreach. The court enjoined state officials from

attempting to prohibit Kalshi's event contracts, explaining that it was "persuaded [] Kalshi's sports-related event contracts fall within the CFTC's exclusive jurisdiction" and "at the very least field preemption applies" to prevent states from regulating trading on DCMs like Kalshi. *KalshiEX LLC v. Flaherty*, No. 25-cv-02152-ESK-MJS, 2025 WL 1218313, at *6 (D.N.J. Apr. 28, 2025). Moreover, the court recognized that even the "express preemption provisions" of 7 U.S.C. § 16 "do[] not foreclose implied preemption elsewhere within the CEA." *Id.* at *5. *But see KalshiEX LLC v. Martin*, 793 F. Supp. 3d 667 (D. Md. 2025); *KalshiEX, LLC v. Hendrick*, No. 2:25-cv-00575, 2025 WL 3286282 (D. Nev. Nov. 24, 2025).

9.     The district court in New Jersey also found that Kalshi faced irreparable harm because:

> the prospect of facing civil or criminal enforcement or complying and compromising the integrity of its contracts imperils the reputation Kalshi has cultivated over several years . . . at minimum—Kalshi has identified harms to its reputation and goodwill that are both likely without injunctive relief and not able to be remedied following trial.

*Flaherty*, 2025 WL 1218313, at *7 (describing the circumstances as a "Hobson's choice" for Kalshi where "leaving it subject to state enforcement or obligating it to shift its business practices [are] consequences that are not cleanly undone").

10.     In ruling for Kalshi, the district court in New Jersey emphasized that even if Kalshi's contracts were "unlawful" under federal law "that would subject Kalshi to the review of the CFTC—not state regulators." *Flaherty*, 2025 WL 1218313, at *5.

11.     An enforcement action by the Tennessee AG designed to prohibit Kalshi from offering contracts that federal law permits would intrude on the comprehensive federal scheme for regulating designated exchanges.  Kalshi is a federally designated and approved derivatives exchange, subject to the CFTC's exclusive jurisdiction.  It offers consumers the chance to invest

in many types of event contracts, including, as relevant here, sports-event contracts. These contracts are subject to extensive oversight by the CFTC, and—critically—they are *lawful* under federal law. The CFTC has the authority to initiate the review of, and under certain circumstances bar the trading of, contracts listed on Kalshi's federally regulated exchange. But the CFTC has declined to do so, instead allowing Kalshi to offer its sports-event contracts for trade on its exchange.

12. Yet, even though Kalshi's contracts are subject to the CFTC's exclusive jurisdiction, Defendants have made clear that they (mistakenly) believe the contracts are instead subject to—and unlawful under—Tennessee's Sports Gaming Act. SWC has said as much in a letter it sent to the CFTC in which it claimed that sports-event contracts of the nature Kalshi offers "violate[] the Act" and requested that the CFTC "not permit the offering of" such contracts. Ex. 1 at 2. And Defendant Skrmetti, in his official capacity as Tennessee's Attorney General and on behalf of the State of Tennessee, has signed multiple amicus briefs that claim Kalshi is violating comparable state laws by offering sports-event contracts. Ex. 2 at 28; Ex. 3 at 37. The briefs argue that states, not the CFTC, have sole power to regulate Kalshi's sports-event contracts. Ex. 2 at 13-16; Ex. 3 at 17-25. The Tennessee Sports Gaming Act contemplates civil sanctions for unlawful gaming transactions—which Defendants posit Kalshi's sports-event contracts are. The threat of enforcement is heightened by the fact that Defendants have refused to provide Kalshi with assurances of non-enforcement, despite Kalshi's endeavors to initiate dialogue to assuage any of the state's concerns. *See* Ex. 5 at 1.

13. Defendants' conduct leaves no doubt that Defendants intend to seek enforcement against Kalshi unless Kalshi stops offering its sports-event contracts—which, again, are offered for trade on its federally regulated exchange without objection from the CFTC—in Tennessee. In

doing so, Defendants would seek to subject Kalshi to the patchwork of state regulation that Congress created the CFTC to prevent, and to interfere with the CFTC's exclusive authority to regulate derivatives trading on the exchanges it oversees.

14.     Defendants' anticipated actions are preempted under the Supremacy Clause of the U.S. Constitution—both because Congress has expressly and impliedly occupied the field of regulating futures trading on CFTC-approved exchanges, and because Defendants' acts would squarely conflict with federal law.  Kalshi is entitled to declaratory and injunctive relief to prevent Tennessee authorities from enforcing their preempted state laws against Kalshi.

15.     Defendants' anticipated actions threaten immediate and irreparable harm, not just to Kalshi but to its customers and commercial counterparties.  Shutting down Kalshi's ability to offer event contracts in Tennessee would threaten Kalshi's viability and require devising complex technological solutions whose feasibility is entirely untested and unclear.  It would also impair Kalshi's existing contracts with consumers and business partners, subject Kalshi's users to uncertainty and loss, undermine confidence in the integrity of Kalshi's platform, threaten its prospective business relationships, and jeopardize Kalshi's status as a CFTC-approved exchange. For that reason, Kalshi intends to imminently seek an emergency temporary restraining order and preliminary injunction to avoid the immediate and irreparable harm that would result from Defendants' unlawful acts.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the action arises under the Supremacy Clause of the United States Constitution.  The federal question presented is whether Tennessee law is preempted by the CEA, 7 U.S.C. §§ 1 *et seq.*, as applied to Kalshi's event contracts.

17.     The Eleventh Amendment imposes no bar to this Court's jurisdiction in this suit for prospective declaratory and injunctive relief against state officials.  The Eleventh Amendment, as construed in *Ex parte Young*, 209 U.S. 123 (1908), "permits a private party to seek prospective injunctive relief against state officials in their official capacity before those officials violate the plaintiff's federal constitutional or statutory rights."  *Block v. Canepa*, 74 F.4th 400, 406 (6th Cir. 2023).

18.     Venue is proper under 28 U.S.C. §§ 1391(b)(1) and 1391(b)(2).  The Individual Defendants perform their duties in and thus reside in this District.  The SWC is subject to this Court's personal jurisdiction and thus resides in this district.  A substantial part of the events giving rise to the claim occurred in this District.

## PARTIES

19.     Plaintiff Kalshi is a financial services company with its principal place of business in New York.  Kalshi operates a derivatives exchange and prediction market where users can buy and sell financial products known as event contracts.  Its exchange market is federally regulated by the CFTC pursuant to the CEA, 7 U.S.C. §§ 1 *et seq.*

20.     Defendant William Orgen is sued in his official capacity as Chairman of the SWC.

21.     Defendant Mary Beth Thomas is sued in her official capacity as the executive director of the SWC.

22.     Defendant Tennessee Sports Wagering Council is sued as the state agency that regulates gaming in the State of Tennessee by overseeing the licensing and registration process for online sports wagering operators, sports wagering vendors, and fantasy sports operators as well as monitoring and enforcing compliance with the Tennessee Sports Gaming Act and its related rules.

As the state's gaming regulator, the SWC has jurisdiction over all persons participating in legal gaming.

23.     Defendant Jonathan Skrmetti is sued in his official capacity as Attorney General of Tennessee.

24.     Together, defendants William Orgen, Mary Beth Thomas, Tennessee Sports Wagering Council, and Jonathan Skrmetti would be responsible for enforcing any demand for Kalshi to comply with Tennessee state law that is preempted by federal law.

## FACTUAL ALLEGATIONS

### A. An Event Contract—Like Other Derivatives—Is a Recognized Financial Tool to Mitigate Risk.

25.     Derivatives contracts are financial tools used to mitigate risk. Event contracts are a quintessential example of a derivatives contract—they are a type of option. This form of derivatives contract identifies a future event with several possible outcomes, a payment schedule for the outcomes, and an expiration date. Most commonly, event contracts involve a binary question: Every "yes" position has an equal and opposite "no" position. For example, a derivatives contract might center around whether an earthquake will take place in Los Angeles County before December 31, 2026. A purchaser may trade on either the "yes" or the "no" position on the contract. If an earthquake does take place in Los Angeles County before the end of the calendar year, then the "yes" positions would be paid out.

26.     Event contracts are traded on an exchange. Traders exchange positions with other traders in the marketplace. Importantly, event contracts do not reflect a "bet" against the "house." Because traders do not take a position against the exchange itself, traders' ability to hedge risk requires counterparties willing to assume risk in the hope of seeing a return. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 358 (1982) ("The liquidity of a futures

contract, upon which hedging depends, is directly related to the amount of speculation that takes place."). Kalshi's exchange links traders seeking to hedge or seeking returns based on the uncertainty associated with financially significant events.

27. The value of an event contract is determined by market forces. An event contract's price will fluctuate between the time of its creation and the expiration date in accordance with changing market perceptions about the likelihood of the event's occurrence. During that period, individuals can buy and sell the contract at its fluctuating prices. The ultimate value of an event contract is determined at its expiration date. If the underlying event occurs, the holder of the "yes" position is entitled to its full value. But if the underlying event does not occur, the holder of the "no" position gets the payment.

28. Traders price event contracts by reference to available information at any given time. If new information comes to light portending an increase in the likelihood of the event's occurrence, then the event contract's price will increase. The market prices of event contracts thus reflect probabilistic beliefs about whether the underlying event will occur. Returning to the earthquake example, a "yes" contract that trades at 30 cents reflects that the market believes that there is a 30% chance of an earthquake this year. The 30% figure can be informed by datapoints the market deems significant, such as the time since the last earthquake in the area and the frequency of fault line tremors in preceding months surrounding Los Angeles County.

29. Event contracts are a valuable means to hedge against event-driven volatility. Event contracts reflect real-time risk assessment and thus provide a nuanced and finely tuned opportunity for traders to mitigate their exposure to real-world events in an uncertain market. There is no other financial instrument with the unique capability to capture the risks of an event with potential economic consequences.

30.     For example, last year, the real-estate investment firm Arrived stated its intent to utilize Kalshi's event contracts to hedge the risk of a government shutdown impacting its business.[1]

31.     Sports events can have significant economic consequences for a broad ecosystem of stakeholders.  Advertisers, sponsors, television networks, local communities, and state-based sportsbooks all stand to gain or lose substantial sums depending on the outcomes of sports events.  Sports-event contracts thus offer these entities opportunities to hedge their exposure.  For example, sponsors of a particular team or athlete can use event contracts to hedge against the risk that the team or athlete underperforms.  Or operators of fantasy sports platforms and sportsbooks, which take on significant financial risk related to sporting events, can use sports-event contracts to reduce their exposure.

32.     For example, this past year, the daily fantasy sports platform Underdog Sports stated its intent to use Kalshi as a tool to "hedge against volatility" on its own platform.[2]

33.     Event contracts are also a valuable means of communicating information to the public because contract prices reflect prevailing market opinions and conditions.  Prediction markets thus serve as sensitive information-gathering tools that can provide insights for stakeholders—including businesses, individuals, governments, and educational institutions.  This is not theoretical.  Kalshi has recently announced partnerships with CNN and CNBC, which make

---

[1] *See* Ryan Frazier, LINKEDIN (last accessed Jan. 9, 2026), https://www.linkedin.com/posts/activity-7386091007588749312-rhxN/ [https://perma.cc/CQN6-JK3M]; *see also* Michael J. de la Merced, *Kalshi, a Prediction Market, Raises $1 Billion in a New Round*, N.Y. TIMES (Dec. 2, 2025), https://www.nytimes.com/2025/12/02/business/dealbook/kalshi-prediction-market-billion.html [https://perma.cc/VUY8-HCDT].
[2] *See* Brett Smiley, *Underdog Sports Preparing To Use Kalshi, Prediction Markets For Its Own Risk Management*, YAHOO (Oct. 20, 2025), https://sports.yahoo.com/article/underdog-sports-preparing-kalshi-prediction-163221401.html [https://perma.cc/LH6U-Y4TJ].

use of its market data in their reporting.[3]  And Kalshi has recently launched a platform, Kalshi

Research, to share market data with academics and promote research derived from the same.[4]  Data

generated through prediction markets can also help to set rates and prices for assets whose value

depends on the occurrence or non-occurrence of the underlying event.  *See* 7 U.S.C. § 5(a)

(derivatives contracts, including event contracts, "are affected with a national public interest by

providing" both a means for hedging risk and "disseminating pricing information through trading

in liquid, fair and financially secure trading facilities").

### B. Congress Delegated the Power to Regulate Event Contracts That Are Offered by a Regulated Exchange to the CFTC.

34.     Futures contracts have long been regulated by the federal government.  In 1936,

Congress passed the CEA, which provides for federal regulation of all commodities and futures

trading activities and requires that all futures and commodity options are traded on organized,

regulated exchanges.

35.     In 1974, Congress established the CFTC as the federal agency empowered to

oversee and regulate exchanges under the CEA.  Proponents of the 1974 Act were concerned that

the "states . . . might step in to regulate the futures markets themselves," thus subjecting futures

exchanges to "conflicting regulatory demands."  *Am. Agric. Movement*, 977 F.2d at 1156.  One

Senator remarked that "different State laws would just lead to total chaos."  Senate Hearings at

685 (statement of Sen. Clark).  As a solution, the House Committee on Agriculture put "all

---

[3] *See* James Faris, *Prediction giant Kalshi strikes a new media partnership with CNBC, days after its CNN deal*, Business Insider, https://www.businessinsider.com/kalshi-cnbc-deal-cnn-data-integration-partnership-2025-12 [https://perma.cc/B5BG-56WP]; R.T. Watson, *Kalshi inks exclusive CNBC deal as prediction markets surge into mainstream media*, The Block, https://www.theblock.co/post/381415/kalshi-exclusive-cnbc-deal-prediction-markets-surge-mainstream-media [https://perma.cc/726H-39UH].

[4] *See Kalshi launches new research arm*, Kalshi News, https://news.kalshi.com/p/kalshi-launches-research-arm-prediction-markets [https://perma.cc/MD5J-NGP9].

exchanges and all persons in the industry under the same set of rules and regulations for the protection of all concerned." H.R. Rep. No. 93-975, at 79 (1974). The Senate reaffirmed the CFTC's exclusive power by deleting a provision of the CEA that would have preserved the states' authority over futures trading. *See* 120 Cong. Rec. 30464 (1974) (statements of Sens. Curtis and Talmadge).

36. The public can only trade derivatives on a board of trade that the CFTC has designated as a contract market, or DCM. 7 U.S.C. §§ 2(e), 6(a)(1), 7(a); 17 C.F.R. § 38.3(a). An entity must first submit an application to the CFTC detailing how the entity complies with the Core Principles of the CEA. 17 C.F.R. § 38.3(a)(2). Among other things, the proposed contract market must show that it can and will (1) comply with all CFTC requirements imposed by rule or regulation, (2) establish, monitor, and enforce compliance with the rules, (3) list only contracts that are not readily susceptible to manipulation, (4) have the capacity and responsibility to prevent manipulation, price distortion, and disruptions through market surveillance, compliance, and enforcement, and (5) adopt position limitations for each contract to reduce the threat of market manipulation. 17 C.F.R. §§ 38.100, 38.150, 38.200, 38.250, 38.300. Proposed exchanges must provide detailed information demonstrating their capacity to abide by the CEA. *Id.* § 38.3(a)(2). The CFTC then reviews the application and renders a decision on the purported market's designation within 180 days of submission. 17 C.F.R. § 38.3(a)(1).

37. Once the CFTC designates an entity as a contract market, the CEA gives the CFTC "exclusive jurisdiction" over the derivatives traded on the market. Those derivatives include "accounts, agreements (including any transaction which is of the character of, or is commonly known to the trade as, an 'option', 'privilege', 'indemnity', 'bid', 'offer', 'put', 'call', 'advance guaranty', or 'decline guaranty'), and transactions involving swaps or contracts of sale of

a commodity for future delivery." 7 U.S.C. § 2(a)(1)(A). This exclusive jurisdiction extends to "event" contracts. *See id.* § 1a(47)(A)(ii), (iv), (vi).

38.     Once the CEA designates a board of trade as a DCM, the market is subject to an extensive framework for CFTC oversight. Part 38 of Title 17, Chapter 1 of the Code of Federal Regulations comprehensively regulates DCMs, ensuring that these markets continue to comply with the CEA. Exchanges must meet detailed requirements to maintain their designations as DCMs. 17 C.F.R. pt. 38. Among other things, DCMs must abide by recordkeeping requirements that specify the form, manner, and duration of retention. 17 C.F.R. §§ 38.950, 1.31. DCMs must meet reporting obligations like furnishing daily reports of market data on futures and swaps to the CFTC. *Id.* § 38.450, pt. 16. Part 38 also imposes specific liquidity standards, disciplinary procedures, dispute resolution mechanisms, board of directors requirements, auditing demands, and more.

39.     The CEA allows DCMs to list contracts on its exchange without pre-approval from the CFTC. To do so, a DCM self-certifies that a given contract complies with the CEA and CFTC regulations by filing a "written certification" with the CFTC at the time of listing. 7 U.S.C. § 7a-2(c)(1); 17 C.F.R. § 40.2(a). The CFTC may initiate review of any contract under its purview. *See* 7 U.S.C. § 7a-2(c)(2); 17 C.F.R. § 40.2(c). The CFTC also may require a DCM to submit a "written demonstration" that it is "in compliance" with one or more Core Principles at any time. 17 C.F.R. § 38.5(b).

40.     Alternatively, exchanges have the option of submitting contracts to the CFTC for approval prior to listing. 7 U.S.C. § 7a-2(c)(4)(A); 17 C.F.R. §§ 40.3(a), 40.11(c). The CFTC "shall approve a new contract" unless the CFTC finds that it would violate the CEA. 7 U.S.C.

§ 7a-2(c)(5)(B). Substantially all contracts listed by DCMs for trading are self-certified by the listing DCMs; it is extremely rare for a DCM to seek CFTC approval of individual contracts.

41.     The CEA's enforcement process rounds out the comprehensive federal framework that regulates futures derivatives sold on DCMs. The CEA gives the CFTC discretion as to how to police and enforce violations of the CEA for DCMs. The CFTC includes an Enforcement Division, which may initiate investigations and, with the approval of a majority of the CFTC, pursue enforcement actions in federal court or administrative proceedings. If the Division concludes that there has been a violation of the CEA, it may recommend to the Commission that it seek a wide range of enforcement measures, including (1) civil monetary penalties, (2) restitution, (3) disgorgement, (4) suspension, denial, revocation, or restriction of registration and trading privileges, and (5) injunctions or cease-and-desist orders. *See* CFTC Division of Enforcement, Enforcement Manual (May 20, 2020), https://www.cftc.gov/media/1966 [https://perma.cc/2AFV-2KHK], at § 3.3. If the Division suspects that an entity has engaged in criminal violations, the Division may also refer the matter to the Department of Justice or the appropriate state authority for prosecution. *Id.*

42.     The CFTC regulates derivatives that reference physical commodities like "wheat, cotton, rice, corn, oats." 7 U.S.C. § 1a(9) The CFTC also regulates derivatives on "excluded commodit[ies]" like interest rates, other financial instruments, economic indices, risk metrics, and—as particularly relevant here—events, which the CEA defines as any "occurrence, extent of an occurrence, or contingency" that is "beyond the control of the parties to the relevant contract" and "associated with" economic consequences. *Id.* § 1a(19)(iv); *see* 7 U.S.C. § 1a(9).

43.     In 2010, Congress amended the CEA to add "swaps" to the CFTC's exclusive jurisdiction and to define event contracts as a type of swap. *See id.* § 1a(47)(A)(ii), (iv), (vi); *see*

*KalshiEX LLC v. CFTC*, No. 23-3257, 2024 WL 4164694, at *2-3 (D.D.C. Sept. 12, 2024). "Event contracts" are "agreements, contracts, transactions, or swaps in excluded commodities." 7 U.S.C. § 7a-2(c)(5)(C)(i).

44.     The CFTC has also recognized that "event contracts," including contracts on "the outcome of particular entertainment events," "can be designed to exhibit the attributes of either options or futures contracts." *Concept* Release, 73 Fed. Reg. 25,669, 25,669-70 (May 7, 2008). An "occurrence"-based futures contract or option results in a payment based on a specified occurrence or extent of an occurrence—for example, the occurrence or severity of a hurricane. Where event contracts pay out based on financially significant occurrences, they are "of the character of" futures and options, as understood by derivatives markets. *See id*. § 1a(36) (defining "option").

45.     Also, in 2010, Congress amended the CEA to add a "Special Rule" governing event contracts.  Congress provided that the CFTC "may"—but need not—conclude that event contracts are "contrary to the public interest" if they "involve" an "activity that is unlawful under any Federal or State law," "terrorism," "assassination," "war," "gaming," or "other similar activity determined by the Commission, by rule or regulation, to be contrary to the public interest." 7 U.S.C. § 7a-2(c)(5)(C).

## C. After an Extensive Regulatory Process, the CFTC Registered Kalshi as a Contract Market That Operates Under Federal Law.

46.     Kalshi is a CFTC-regulated exchange and prediction market where users can trade on the outcome of real-world events.  In 2020, the CFTC unanimously designated Kalshi as a contract market, affirming that its platform complied with the CEA.  Since then, Kalshi has been fully regulated as a financial exchange under federal law, alongside entities like the Chicago Mercantile Exchange and the Intercontinental Exchange.

47.     Kalshi specializes in event contracts, offering a secure and federally approved exchange where individual, retail, and institutional participants can hedge their risks on event-based outcomes.

48.     Kalshi offers many kinds of event contracts related to an array of substantive areas like climate, technology, health, crypto, popular culture, and economics.  For example, Kalshi's platform currently allows users to trade on whether India will meet its 2030 climate goals, or whether the market share for electric vehicles will be above 50% in 2030.  Kalshi offers contracts on the outcomes of Supreme Court decisions, congressional votes, weather events, technological benchmarks, markers of cultural influence, and Federal Reserve interest rate decisions.

49.     Among its menu of event contracts, Kalshi offers sports-event contracts.   On January 22, 2025, Kalshi self-certified, pursuant to section 7a-2(c)(1) of the CEA, the first of a number of sports contracts that are now available on its exchange.  Those certifications contain extensive information, including in confidential appendices not available to the public, for the CFTC's review.  Kalshi's sports-related contracts allow users to place positions on, for example, which teams will advance in the NCAA College Basketball Tournaments or who will win the U.S. Open Golf Championship.

50.     Shortly after Kalshi self-certified its first sports-event contracts, the CFTC requested that Kalshi submit a "Demonstration of Compliance" with the CEA pursuant to 17 C.F.R. § 38.5(b).  A Demonstration of Compliance is "a written demonstration, containing supporting data, information and documents" that a DCM is required to file upon request from the CFTC to explain how the DCM "is in compliance with one or more core principles as specified in the request."  17 C.F.R. § 38.5(b).  Kalshi responded with lengthy memoranda detailing the

listing's compliance with applicable rules and regulations and the CFTC's jurisdiction over sports-event contracts traded on DCMs.

51.     The CFTC took no further action and has since allowed thousands of Kalshi's sports-event contracts to be listed, traded, and closed, with no hint that the agency views these contracts as falling outside of its jurisdiction.  Had the CFTC deemed Kalshi's contracts impermissible, it would have had the responsibility to "object[]" to the contracts.  7 U.S.C. § 7a-2(c)(3)(B)(ii).  But it did not.  Unless and until the CFTC takes action on Kalshi's sports-event contracts—all of which have been self-certified under the CEA—they are authorized under federal law.  *Id.* § 7a-2(c)(5).

### D. The Tennessee Sports Wagering Council's Statements Concerning Sports-Event Contracts.

52.     On April 14, 2025, the SWC sent the CFTC a letter claiming that "sports event contracts currently being offered in Tennessee by Commodity Futures Trading Commission (CFTC) regulated entities," such as Kalshi's sports-event contracts, "are being offered in violation of Tennessee law and regulations."  Ex. 1 at 1.  SWC asked that the CFTC "not permit"—*i.e.*, decertify—these sports event contracts.  *Id.* at 2.

53.     SWC claimed that Kalshi's sports-event contracts constitute unlawful sports wagering under the Tennessee Sports Gaming Act because Kalshi "accepts a sum of money risked on the outcome of a sporting event without a valid license issued by the SWC."  *Id.* at 2.

54.     SWC further contended that Kalshi's sports-event contracts "are not compliant" with protections "mandated by the Tennessee Legislature" and permitting them would be a failure to "respect the policy decisions" of the Legislature.  *Id.*  Per SWC, these protections range broadly from age restrictions on users to anti-money laundering controls.  *Id.*

55.     Violations of the Tennessee Sports Gaming Act and the state regulations that SWC cited in the letter contain civil penalties of up to $50,000 per transaction.  Tenn. Code Ann. § 4-49-129; Tenn. Comp. R. & Regs. 1350-02-.03.  Millions of transactions have taken place in the thousands of contracts offered on Kalshi's exchange.  As such, SWC's suggestion that each of Kalshi's sports-event contracts is an unlawful transaction is tantamount to threatening Kalshi with astronomical penalties that, if effectuated, would devastate its business.

56.     On June 17, 2025 and December 22, 2025, Defendant Skrmetti signed amicus briefs in the United States Court of Appeals for the Third Circuit and the Fourth Circuit, respectively. Ex. 2 at 28; Ex. 3 at 37.  In the June 2025 amicus brief, Defendant Skrmetti, on behalf of the State of Tennessee, assumed "absent preemption" that Kalshi's sports-event contracts would constitute regulated sports betting under the Tennessee Sports Gaming Act.  Ex. 2 at 3.  In the December 2025 amicus brief, Defendant Skrmetti similarly argued that Kalshi's event contracts constituted "sports betting" that is subject to the Tennessee Sports Gaming Act, among other states' gambling laws.  Ex. 3 at 1.

57.     This marks a significant shift from the SWC's position in its April 2025 letter to the CFTC that acknowledged the CFTC's jurisdiction over Kalshi's event contracts.  Far from "ask[ing]" the CFTC to "respect the policy decisions made by the Tennessee Legislature and not permit the offering of sports event contracts," Ex. 1 at 2, the December 2025 amicus brief asserts that states, and not the CFTC, have the sole power to regulate Kalshi's sports-event contracts as a form of sports betting. Ex. 3 at 17-25.

58.     The CFTC took no action in response to that letter and instead has, in an exercise of its exclusive jurisdiction, permitted Kalshi to offer sports-event contracts for trade on its

exchange. As a result, Kalshi now understands Defendants intend to take matters into their own hands.

**E. Defendants Refuse to Provide Assurances of Non-Enforcement and Issue a Cease-And-Desist Letter to Kalshi.**

59. Kalshi has endeavored in good faith to reach an accommodation with Tennessee. Over the past several months, Kalshi's counsel has attempted to discuss the matter with the Tennessee AG, to no avail. Most recently, after Defendant Skrmetti signed the December 2025 amicus brief, the undersigned counsel called the Tennessee AG's Office (and left a voicemail) on December 30, 2025 and sent follow-up emails on December 31, 2025 and January 6, 2026. Ex. 4 at 1; Ex. 5 at 2. In its correspondence, Kalshi expressed its understanding that Tennessee was contemplating an action regarding Kalshi's sports-event contracts and offered to have a dialogue with the Attorney General's Office, much like it has with authorities in numerous other states. Ex. 5 at 2. Kalshi also asked that, in the event Kalshi's understanding was mistaken, the Tennessee Attorney General's Office confirm that it is not considering bringing an action against Kalshi. *Id.*

60. A representative from the Tennessee Attorney General's Office responded to Kalshi's January 6, 2026 email later that day. *Id.* at 1. That email acknowledged Kalshi's concerns (and that other of Kalshi's counsel had previously reached out regarding the same issue), but declined to address Kalshi's request that the Office confirm that it is not anticipating bringing an enforcement action against Kalshi. *Id.* The representative would not even commit to meeting with Kalshi to discuss Kalshi's sports-event contracts. *Id.*

61. On January 9, 2026 the SWC sent Kalshi a "Demand to Cease and Desist Offering Sports Event Contracts in Tennessee." *See* Ex. 6 (the "Cease-and-Desist Letter"). The Cease-and-Desist Letter demands that Kalshi "cease offering sports events contracts to customers in Tennessee *immediately*" and threatens (1) to impose monetary fines against Kalshi, (2) that the

SWC may seek injunctive relief against Kalshi, and (3) that the SWC will refer Kalshi to law enforcement if Kalshi does not comply with the SWC's unlawful demand. *Id.* at 2-3.

62.     Kalshi has no option but to seek judicial relief. SWC's letter and the amicus briefs suggest that Defendants believe Kalshi's sports-event contracts in Tennessee violate the Tennessee Sports Gaming Act and that Kalshi may be immediately subjected to action by the SWC. Ex. 1 at 2. Absent any assurances of non-enforcement—and in light of the Cease-and-Desist Letter and Defendants' public statements—Kalshi (and its users) face a threat of irreparable harm, leaving Kalshi with no choice to protect its commercial interests and those of its users except to bring this suit.

63.     Immediately following the filing of this complaint, Kalshi intends to inform the Tennessee AG of its filing, and Kalshi's intent to seek preliminary relief.

## REQUISITES FOR RELIEF

64.     As a result of Defendants' threatened conduct described above, there is an imminent threat that Defendants will take action, including, but not limited to, the enforcement of preempted state law threatened by Defendants' statements, will violate the Supremacy Clause of the U.S. Constitution, and will subject Kalshi and its customers to irreparable harm.

65.     An actual and substantial controversy exists between Plaintiff and Defendants as to their respective legal rights and duties. Defendants' conduct alleged herein, including threats to Kalshi, has already and will continue to result in irreparable injury to Plaintiff, including but not limited to economic hardship and impairment of existing contractual relationships.

66.     Plaintiff has no plain, speedy, or adequate remedy at law to address the wrongs described herein. Plaintiff therefore seeks declaratory and injunctive relief restraining Defendants

from enforcing Tennessee law that interferes with the operation and function of Plaintiff's futures market described herein.

## COUNT I

### (Supremacy Clause—Preemption by Commodity Exchange Act)

67.     Plaintiff incorporates all prior paragraphs by reference.

68.     The Supremacy Clause, Article VI, Clause 2, of the U.S. Constitution, provides:

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

69.     The Supremacy Clause mandates that federal law preempt state law in any field over which Congress has expressly or impliedly reserved exclusive authority to the federal government, or where state law conflicts or interferes with federal law.

70.     Congress explicitly gave the CFTC "exclusive jurisdiction" to regulate futures trading on approved exchanges.  7 U.S.C. § 2(a)(1)(A).  Without a unified approach to futures regulation, Congress feared that fragmented and uncoordinated state regulation would lead to "total chaos."  Senate Hearings, at 685 (statement of Sen. Clark).  Having analyzed the text, purpose, and history of the CEA, courts nationwide have agreed that Congress intended to preempt state law in futures trading on CFTC-regulated exchanges. *See, e.g., Am. Agric*. *Movement*, 977 F.2d at 1156; *Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980) (Friendly, J.); *Jones v. B.C. Christopher & Co.*, 466 F. Supp. 213, 220 (D. Kan. 1979); *Hofmayer v. Dean Witter & Co.,* 459 F. Supp. 733, 737 (N.D. Cal. 1978).

71. In threatening to enforce Tenn. Code Ann. §§ 4-49-101 *et seq.*, and any rules adopted thereunder against Kalshi, Defendants are impermissibly intruding on the CFTC's exclusive authority to regulate futures trading on CFTC-regulated exchanges. Indeed, federal law authorizes the CFTC to "determine" whether event contracts involving "gaming" should be restricted as "contrary to the public interest," 7 U.S.C. § 7a-2(c)(5)(C)(i)—authority that is completely incompatible with parallel state regulation of the same putative subject matter. Because federal law occupies the entire field of regulating trading on designated contract markets, Defendants' threatened actions are both expressly and impliedly field-preempted under the Supremacy Clause.

72. In addition, Defendants' threatened actions conflict with federal law and policy. Defendants seek to ban event contracts that federal law and the CFTC have authorized (and to subject the website on which such contracts are offered to abatement), which would plainly frustrate the CFTC's exclusive authority to regulate its designated exchanges. In addition, complying with Defendants' demand to immediately cease offering event contracts in Tennessee or face enforcement could conflict with the federal law governing DCMs, and would thus imperil Kalshi's CFTC approval. For that reason, the threatened actions are conflict-preempted under the Supremacy Clause.

73. Defendants may not enforce Tennessee's gambling laws against Kalshi because Kalshi is a federally regulated exchange that operates under the exclusive oversight of the CFTC and its enabling statute, the CEA, 7 U.S.C. §§ 1 *et seq.*

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Kalshi requests that judgment be entered in its favor and against Defendants as follows:

1. Enter a judgment declaring that Tenn. Code Ann. §§ 4-49-101 *et seq.*, any rules adopted thereunder, and any other Tennessee law that is used in a manner to effectively regulate Plaintiff's designated contract market violates the Supremacy Clause of the United States Constitution as applied to Plaintiff, and a declaratory judgment under 28 U.S.C. §§ 2201-2202 saying the same;

2. Enter both a preliminary and permanent injunction prohibiting Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, from enforcing Tenn. Code Ann. §§ 4-49-101 *et seq.*, any rules adopted thereunder, or any other Tennessee law that attempts to effectively regulate Plaintiff's exchange, against Plaintiff;

3. Enter both a preliminary and permanent injunction prohibiting Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, from enforcing Tenn. Code Ann. §§ 4-49-101 *et seq.*, any rules adopted thereunder, or any other Tennessee law that attempts to effectively regulate Plaintiff's designated contract market, or from threatening Plaintiff's business partners with the loss of their gaming licenses in Tennessee on account of their dealings with Plaintiff.

4. Any other relief within this Court's discretion that it deems just and proper.

24

DATED: January 9, 2026.

Respectfully submitted,

/s/ Britt K. Latham
Britt K. Latham
Robert E. Cooper, Jr.
Courtney A. Hunter
**BASS, BERRY & SIMS PLC**
21 Platform Way South, Suite 3500
Nashville, Tennessee 37203
Telephone: (615) 742-6200
Facsimile: (615) 742-6293
blatham@bassberry.com
bob.cooper@bassberry.com
courtney.hunter@bassberry.com

and

Neal Katyal (*pro hac vice* forthcoming)
Joshua B. Sterling (*pro hac vice* forthcoming)
William E. Havemann (*pro hac vice* forthcoming)
**MILBANK LLP**
1101 New York Avenue NW
Washington D.C. 20005
Telephone: 202-835-7500
Facsimile: 202-263-7586

Grant R. Mainland (*pro hac vice* forthcoming)
Andrew L. Porter (*pro hac vice* forthcoming)
Nicole D. Valente (*pro hac vice* forthcoming)
**MILBANK LLP**
55 Hudson Yards
New York, NY 10001
Telephone: 212-530-5000
Facsimile: 212-530-5219

*Attorneys for Plaintiff KalshiEX LLC*