**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**

| | |
|---|---|
| KALSHIEX LLC,<br><br>*Plaintiff*,<br><br>vs.<br><br>WILLIAM ORGEL, in his official capacity as Chairman of the Tennessee Sports Wagering Council; MARY BETH THOMAS, in her official capacity as the executive director of the Tennessee Sports Wagering Council; TENNESSEE SPORTS WAGERING COUNCIL; and JONATHAN SKRMETTI in his official capacity as Attorney General of Tennessee<br><br><br><br>*Defendant*s. | Case No.: 3:26-cv-00034<br><br>Judge: Aleta A. Trauger<br><br><br><br>**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**<br><br>**(EMERGENCY HEARING REQUESTED)** |

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

BACKGROUND ........................................................................................................ 1

    A.    The Exclusive Federal Scheme for Regulating Futures on Regulated Exchanges. ...................................................................................................... 1

    B.    Kalshi's Registration as a CFTC-Designated Contract Market Under Federal Law. ............................................................................................... 5

    C.    The Tennessee Regulatory Scheme for Gambling. ................................... 7

    D.    The Tennessee Sports Wagering Council's Cease-and-Desist Letter to Kalshi. ...................................................................................................... 7

ARGUMENT ............................................................................................................. 9

    A.    Kalshi Is Likely to Succeed Because Tennessee's Efforts to Regulate Kalshi's Event Contracts Are Preempted by Federal Law and Prohibited by Tennessee Law. ...................................................................................... 9

        1.    Federal Law Preempts SWC's Efforts to Regulate Kalshi's Event Contracts. ............................................................................... 9

            a.    *The Sports Gaming Act is Field Preempted as to Kalshi's Event Contracts.* ............................................................. 10

            b.    *Tennessee Laws Are Conflict-Preempted as Applied to Kalshi.* ...................................................................................... 16

        2.    Tennessee Law Prohibits SWC's Threats of Enforcement Against Kalshi. ................................................................................. 19

    B.    Kalshi Will Suffer Irreparable Harm Without a Temporary Restraining Order and Preliminary Injunction. .................................................... 21

    C.    The Balance of the Equities and Public Interest Favor Preliminary Relief. ........ 24

CONCLUSION .......................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**                                                                     **Page(s)**

*ACLU of Ky. v. McCreary Cnty.*,
    354 F.3d 438 (6th Cir. 2003) ................................................................21

*Aluminum Workers Int'l Union v. Consol. Aluminum Corp.*,
    696 F.2d 437 (6th Cir. 1982) ................................................................25

*Am. Agric. Movement, Inc. v. Bd. of Trade of Chi.*,
    977 F.2d 1147 (7th Cir. 1992) ................................................5, 6, 16, 17

*ARH v. Coventry Health & Life Ins. Co.*,
    714 F.3d 424 (6th Cir. 2013) ................................................................25

*Arizona v. United States*,
    567 U.S. 387 (2012)................................................................10, 18, 25

*Associated Builders & Contractors v. Mich. Dep't of Lab. & Econ. Growth*,
    543 F.3d 275 (6th Cir. 2008) ................................................................25

*Atl. Specialty Ins. Co. v. Norris Bros. Excavating, LLC*,
    No. 2:24-CV-00058, 2025 WL 2054349 (M.D. Tenn. July 22, 2025) ...................................9

*Blue Lake Rancheria v. Kalshi Inc.*,
    No. 25-cv-06162, 2025 WL 3141202 (N.D. Cal. Nov. 10, 2025) ...................................15, 16

*California v. Azar*,
    911 F.3d 558 (9th Cir. 2018) ................................................................23

*Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.*,
    511 F.3d 535 (6th Cir. 2007) ................................................................23

*Chamber of Com. of U.S. v. Edmondson*,
    594 F.3d 742 (10th Cir. 2010) ................................................................23

*Churchill Downs Tech. Initiatives Co. v. Mich. Gaming Control Bd.*,
    -- F.4th --, 2025 WL 3637925 (6th Cir. Dec. 16, 2025) ...................................22, 24, 25

*City of New York v. Permanent Mission of India to U.N.*,
    618 F.3d 172 (2d Cir. 2010)................................................................11

*Crosby v. Nat'l Foreign Trade Council*,
    530 U.S. 363 (2000)................................................................10, 16, 18

*Dahl v. Bd. of Trs. of W. Mich. Univ.*,
    15 F.4th 728 (6th Cir. 2021) ................................................................24

*Deja Vu of Nash., Inc. v. Metro. Gov't of Nash. & Davidson Cnty.*,
   274 F.3d 377 (6th Cir. 2001) ............................................................24

*Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*,
   458 U.S. 141 (1982)......................................................................10

*FTC v. Ken Roberts Co.*,
   276 F.3d 583 (D.C. Cir. 2001) .......................................................12

*H.H. v. Quin*,
   No. 3:25-cv-01360, 2025 WL 3299430 (M.D. Tenn. Nov. 26, 2025)...................25

*Hines v. Davidowitz*,
   312 U.S. 52 (1941).................................................................10, 17

*INS v. Cardoza-Fonseca*,
   480 U.S. 421 (1987)......................................................................14

*Int'l Trading, Ltd. v. Bell*,
   556 S.W.2d 420 (Ark. 1977) ..........................................................13

*KalshiEx LLC v. CFTC*,
   119 F.4th 58 (D.C. Cir. 2024) ........................................................12

*KalshiEX LLC v. CFTC*,
   No. 23-cv-3257, 2024 WL 4164694 (D.D.C. Sep. 12, 2024)......................1, 2, 4, 5

*KalshiEX LLC v. Flaherty*,
   No. 25-cv-02152, 2025 WL 1218313 (D.N.J. Apr. 28, 2025)...................... *passim*

*KalshiEX, LLC v. Hendrick*,
   No. 2:25-cv-00575, 2025 WL 3286282 (D. Nev. Nov. 24, 2025).........................12

*KalshiEX LLC v. Martin*,
   793 F. Supp. 3d 667 (D. Md. 2025) .................................................12

*La. Pub. Serv. Comm'n v. FCC*,
   476 U.S. 355 (1986)......................................................................14

*Leist v. Simplot*,
   638 F.2d 283 (2d Cir. 1980)....................................................13, 16, 17

*Martin-Marietta Corp. v. Bendix Corp.*,
   690 F.2d 558 (6th Cir. 1982) .........................................................24

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*,
   456 U.S. 353 (1982)................................................................13, 14

iii

*Morales v. Trans World Airlines, Inc.*,
    504 U.S. 374 (1992)................................................................................21

*Mumford v. Basinski*,
    105 F.3d 264 (6th Cir. 1997) ..............................................................23

*Nat'l Meat Ass'n v. Harris*,
    565 U.S. 452 (2012)................................................................................19

*Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*,
    305 F.3d 566 (6th Cir. 2002) ..............................................................23

*Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*,
    461 U.S. 190 (1983)................................................................................10

*Rice v. Bd. of Trade of Chi.*,
    331 U.S. 247 (1947)................................................................................13

*Valle del Sol Inc. v. Whiting*,
    732 F.3d 1006 (9th Cir. 2013) ............................................................21

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008)....................................................................................9

*Ex parte Young*,
    209 U.S. 123 (1908)................................................................................23

*Zielasko v. Ohio*,
    873 F.2d 957 (6th Cir. 1989) ..............................................................23

**Statutes**

7 U.S.C. § 1................................................................................................20

7 U.S.C. § 1a..............................................................................................3

7 U.S.C. § 2..................................................................................3, 5, 11, 14

7 U.S.C. § 7..................................................................................................3, 14

7 U.S.C. § 7a-2 ................................................................................ *passim*

7 U.S.C. § 8................................................................................................24

7 U.S.C. § 13a-2 ........................................................................................15

7 U.S.C. § 16..........................................................................................11, 15

31 U.S.C. § 5362........................................................................................16

iv

Tenn. Code Ann. § 4-49-102 ...........................................................................................7

Tenn. Code Ann. § 4-49-105 ...........................................................................................7

Tenn. Code Ann. § 4-49-106 ...........................................................................................7

Tenn. Code Ann. § 4-49-111 .........................................................................................19

Tenn. Code Ann. § 4-49-117 ...........................................................................................7

Tenn. Code Ann. § 4-49-129 ......................................................................................7, 22

Tenn. Code Ann. § 39-17-501 ..................................................................................*passim*

Tenn. Code Ann. § 39-17-509 .................................................................................20, 21

Tenn. Code Ann. § 47-9-102 .........................................................................................20

Tenn. Code Ann. § 56-3-302 .........................................................................................20

Tenn. Code Ann. § 56-9-106 .........................................................................................20

**Other Authorities**

17 C.F.R. pt. 16 ...............................................................................................................14

17 C.F.R. pt. 38 ...............................................................................................................14

17 C.F.R. § 1.31 ..............................................................................................................14

17 C.F.R. § 38.3 ................................................................................................................3

17 C.F.R. § 38.5 ................................................................................................................5

17 C.F.R. § 38.100 ..........................................................................................................14

17 C.F.R. § 38.150 ..........................................................................................................19

17 C.F.R. § 38.151 .....................................................................................................19, 24

17 C.F.R. § 38.152 ............................................................................................................6

17 C.F.R. § 38.250 ............................................................................................................6

17 C.F.R. § 38.255 .....................................................................................................19, 24

17 C.F.R. § 38.450 ..........................................................................................................14

17 C.F.R. § 38.950 ..........................................................................................................14

17 C.F.R. § 38.1101 ................................................................................................14

17 C.F.R. § 40.2 .................................................................................................4, 14

17 C.F.R. § 40.11 ...............................................................................................4, 14

120 Cong. Rec. 30464 (1974) ....................................................................................13

*Commodity Futures Trading Commission Act: Hearings Before the S. Comm. on Agric. & Forestry on S. 2485, S. 2578, S. 2837, and H.R. 13113,* 93d Cong., 2d Sess. (1974) ......................................................................................2

Fed. R. Civ. P. 65 ........................................................................................................9

H.R. Rep. No. 93-975 (1974).......................................................................12, 14, 17

H.R. Rep. No. 93-1383 (1974) (Conf. Rep.).........................................................3, 13

H.R. Rep. No. 97-565, pt. 1 (1982).......................................................................11, 15

Kevin T. Van Wart, *Preemption and the Commodity Exchange Act,* 58 Chi.-Kent L. Rev. 657 (1982) ...............................................................................12

Philip F. Johnson, *The Commodity Futures Trading Commission Act: Preemption as Public Policy*, 29 Vand. L. Rev. 1 (1976) .........................................................10

*Responsible Risk Management,* Kalshi: Help Center (last visited Jan. 10, 2026), ...................................................7

*Review of Commodity Exchange Act and Discussion of Possible Changes: Hearings Before the H. Comm. on Agric.,* 93d Cong., 1st Sess. (1973) ........................................................................................2

S. Rep. No. 93-1131 (1974) ..................................................................................3, 13

## INTRODUCTION

Defendants are unconstitutionally threatening to prohibit event contract trading on Kalshi, even though those contracts are federally authorized and Kalshi is overseen by the Commodity Futures Trading Commission ("CFTC")—the federal agency endowed with "exclusive jurisdiction" to regulate trading on Kalshi—and Tennessee law prohibits Defendants from attempting to enforce against Kalshi. These threats violate the Commodity Exchange Act ("CEA") and Tennessee law and subject Kalshi to irreparable harm that requires preliminary relief.

On Friday, January 9, the Tennessee Sports Wagering Council ("SWC") sent Kalshi a cease-and-desist letter threatening Kalshi with criminal and civil penalties. *See* Affidavit of Nicole D. Valente ("Valente Aff.") Ex. 1 ("C&D Letter"), at 2. The SWC's letter demands "immediate and unqualified compliance," contends that Kalshi is committing a "felony," and makes clear that failure to comply "will" result in "referral to law enforcement." *Id.* at 3. Kalshi thus filed suit the same day on the ground that SWC's efforts to regulate Kalshi are unlawful.

Upon filing suit, counsel for Kalshi contacted counsel for Defendants to inform them of the suit, to note that Kalshi intends to seek a preliminary injunction, and to request that Defendants forbear enforcement during the pendency of Kalshi's request for a preliminary injunction, which would spare the parties and this Court from the need to conduct emergency proceedings on a temporary restraining order. On January 11, counsel for Defendants indicated that they would refuse to stay enforcement even for the short period needed to resolve the preliminary injunction. Kalshi therefore respectfully requests that this Court issue a temporary restraining order and preliminary injunction enjoining Defendants from enforcing preempted state law against Kalshi.

## BACKGROUND

### A. The Exclusive Federal Scheme for Regulating Futures on Regulated Exchanges.

Derivative contracts are financial tools that traders use to mitigate risk. *See KalshiEX LLC*

*v. CFTC*, No. 23-cv-3257, 2024 WL 4164694, at *1-2 (D.D.C. Sep. 12, 2024). Event contracts are a type of derivatives contract—they are financial instruments that identify a future event with several possible outcomes, a payment schedule for the outcomes, and an expiration date. *See id.* at *2. Event contracts are typically traded on an exchange, and their value is determined by the market. *See id.* This means that the price of an event contract fluctuates from the time of its creation to its expiration date in accordance with the changing likelihood of the event's occurrence, creating a uniquely sensitive financial instrument that tracks real-world market perceptions. *See id.* During the period of a contract, individuals can buy and sell the contract at its changing prices; no user is locked into a contract, and she may trade her contract in accordance with her desire to hedge her economic risk. Compl. ¶¶ 26-27, Dkt. No. 1. The ultimate value of an event contract is determined at its expiration date—most commonly, the event's occurrence or a set date upon which the contract terminates. *See KalshiEX*, 2024 WL 4164694, at *2.

Congress passed the CEA in 1936 to regulate derivatives exchanges but chose not to preempt state regulation of those exchanges. In 1974, Congress amended the CEA to establish the CFTC as the federal agency empowered to oversee and regulate exchanges under the CEA and to grant the CFTC "exclusive jurisdiction" to regulate trading on those exchanges. This was intended to "[b]ring[] all futures trading under federal regulation." *Commodity Futures Trading Commission Act: Hearings Before the S. Comm. on Agric. & Forestry on S. 2485, S. 2578, S. 2837, and H.R. 13113*, 93d Cong., 2d Sess. 848 (1974) (hereinafter "Senate Hearings"). Congress recognized that the federal regulation needed to "prevent any possible conflicts over jurisdiction." *Review of Commodity Exchange Act and Discussion of Possible Changes: Hearings Before the H. Comm. on Agric.*, 93d Cong., 1st Sess. 128 (1973). Subjecting exchanges to "different State laws would just lead to total chaos." Senate Hearings at 685 (statement of Sen. Clark).

2

Congress also deliberately reinforced the CFTC's exclusive jurisdiction. After House drafters introduced a state-law savings clause, the Senate added language making clear that the clause applied "except as hereinabove provided" in the granting of exclusive jurisdiction to the CFTC. S. Rep. No. 93-1131, at 31 (1974). The language ensured that "where the jurisdiction of the Commodity Futures Trading Commission is applicable, it supersedes State as well as Federal agencies." *Id.* at 23. The Senate also "struck" the existing CEA provision that preserved states' authority to regulate derivatives transactions. H.R. Rep. No. 93-1383, at 35 (1974) (Conf. Rep.). As the conference report explained, the amendments were designed to "preempt the field insofar as futures regulation is concerned." *Id.*

The CFTC's regulatory framework is extensive, comprehensive, and exclusive. To obtain approval from the CFTC, an exchange must first apply for and receive the CFTC's designation as a contract market. 7 U.S.C. §§ 2(e), 7(a); 17 C.F.R. § 38.3(a). The exchange's application must detail its capacity to comply with all CFTC rules and regulations through a series of written submissions and exhibits. 17 C.F.R. § 38.3(a)(2). The CFTC then reviews the application and renders a decision on the exchange's designation. *Id.* § 38.3(a)(1). Once the CFTC designates an entity as a contract market—known as a "DCM"—the CFTC has "exclusive jurisdiction" over derivatives traded on the market, including "accounts, agreements (including any . . . 'option')" and "transactions involving swaps or contracts of sale of a commodity for future delivery." 7 U.S.C. § 2(a)(1)(A). This exclusive jurisdiction extends to event contracts. *See id.* §§ 1a(47)(A)(ii), (iv), (vi).

DCMs are subject to the CFTC's extensive regulatory framework as set out in Part 38 of Title 17 of the U.S. Code and in CFTC regulations. Together, these provisions establish a comprehensive scheme for regulating DCMs. *See Flaherty*, 2025 WL 1218313, at *1-2

3

(summarizing CFTC's regulatory scheme).  The CEA prescribes a specific method by which the CFTC may approve new contracts on DCMs.  A DCM that abides by the requirements set forth in the CEA may list contracts on its exchange without pre-approval from the CFTC by self-certifying that the contracts comply with CFTC requirements.  7 U.S.C. § 7a-2(c)(1); 17 C.F.R. § 40.2(a).  The contracts are effective on the date 10 business days after the Commission receives the certification unless and until the CFTC initiates review of any contract.  *See* 7 U.S.C. § 7a-2(c)(2); 17 C.F.R. § 40.11(c).  The CFTC "shall approve a new contract" unless the CFTC finds that it would violate the CEA or CFTC regulations.  7 U.S.C. § 7a-2(c)(5)(B).  If a DCM offers a contract in violation of the CEA or CFTC regulations, the CFTC has an array of enforcement options, including revocation of licensing, civil penalties, and criminal enforcement.

In 2010, Congress amended the CEA to add a "Special Rule" specifically addressing event contracts.  The Special Rule authorizes the CFTC to review and prohibit specific types of event contracts that it determines to be "contrary to the public interest."  7 U.S.C. § 7a-2(c)(5)(C)(i).  The CEA specifically authorizes the CFTC to reject event contracts if the Commission deems them to be "contrary to the public interest" and if they "involve" an "activity that is unlawful under any Federal or State law," "terrorism," "assassination," "war," "gaming," or "other similar activity determined by the Commission, by rule or regulation, to be contrary to the public interest."  *Id.*; *see also* 17 C.F.R. § 40.11(a) (implementing Special Rule).  The decision to prohibit an event contract that falls within any of these categories is subject to the CFTC's evaluation of the "public interest."  *See KalshiEX*, 2024 WL 4164694, at *3 ("the CFTC may determine that an agreement, contract, or transaction is contrary to the public interest only if it involves" one of the enumerated categories).  The Special Rule further provides that no contract "determined by the Commission to be contrary to the public interest . . . may be listed or made available for clearing or trading on

4

or through a registered entity." 7 U.S.C. § 7a-2(c)(5)(C)(ii).

**B.  Kalshi's Registration as a CFTC-Designated Contract Market Under Federal Law.**

In 2020, the CFTC certified Kalshi as a DCM that offers event contracts, affirming that its platform complies with the CEA's regulatory requirements. *KalshiEX*, 2024 WL 4164694, at *4. Because Kalshi is a DCM, its event contracts are subject to the "exclusive jurisdiction" of the CFTC. 7 U.S.C. § 2(a)(1)(A). Federal law requires Kalshi to comply with a host of federal requirements designed to ensure market integrity. An exchange's status as a DCM "imposes upon it a duty of self-regulation, subject to the Commission's oversight," requiring the exchange to "enact and enforce rules to ensure fair and orderly trading, including rules designed to prevent price manipulation, cornering and other market disturbances." *Am. Agric. Movement, Inc. v. Bd. of Trade of Chi.*, 977 F.2d 1147, 1150-51 (7th Cir. 1992).

Kalshi offers many kinds of event contracts related to climate, technology, popular culture, sports, politics, and economics. Compl. ¶ 48. For example, Kalshi allows users to trade on whether India will meet its 2030 climate goals, or whether the market share for electric vehicles will be above 50% in 2030. *Id.* Kalshi also offers sports-event contracts. *Id.* ¶ 49. In December 2024, a Kalshi competitor self-certified sports-event contracts. Kalshi followed suit in January 2025, listing sports-event contracts that allow users to place positions on, for example, which teams will advance in the NCAA College Basketball Championship. *Id.* Shortly after Kalshi self-certified its sports-event contracts, the CFTC required that Kalshi submit a "Demonstration of Compliance," as to the Core Principles with respect to its initial sports-event contracts pursuant to 17 C.F.R. § 38.5(b). *Id.* ¶ 50; Declaration of Xavier Sottile ("Sottile Decl.") ¶ 8. Kalshi responded with lengthy memoranda detailing the compliance with applicable rules and regulations, and detailing the CFTC's jurisdiction over sports-event contracts traded on DCMs. *Id.* The CFTC took no further action and since has allowed thousands of Kalshi's sports-event contracts to be

listed, traded, and closed, with no hint that the agency views these contracts as falling outside of the CFTC's exclusive jurisdiction. Sottile Decl. ¶ 10; Compl. ¶ 51. Unless the CFTC takes action on Kalshi's sports-event contracts, they are authorized under federal law. 7 U.S.C. § 7a-2(c)(5).

Crucial differences between Kalshi's exchange and a sportsbook justify the different regulatory models under which they function. Sportsbooks bet against their customers: they win when bettors lose, and vice-versa. Sottile Decl. ¶ 32. Sportsbooks set the prices at which their customers can transact, building in a margin (a "vig") to keep the odds stacked in their favor. *Id.* Sportsbooks ban successful bettors, or sharply limit the amount that they can wager. *Id.* And sportsbooks control whether bettors can "cash out" their trades (at prices worse than prevailing betting lines would imply). *Id.* State gambling regulators oversee sportsbooks to prevent the abuses that arise out of this business model.

Kalshi is entirely different. It is a financial exchange where traders enter into contracts with other traders. Kalshi makes money by charging a fee for each trade—set by a publicly disclosed formula—and has no interest in whether any given trade is successful or not. Sottile Decl. ¶ 33. Kalshi does not set odds, but instead lets users trade at prevailing market prices. It does not ban or limit successful traders. *Id.* It allows traders to exit their position (at the prevailing market price) at any time before a contract settles, including by placing limit orders. *Id.* This is how boards of trade operate, and Congress has designated the CFTC to oversee them, with a focus on preventing market manipulation and disruption and ensuring market efficiency. *See* 17 C.F.R. §§ 38.250, 38.152; *Am. Agric. Movement*, 977 F.2d at 1156. [1]

---

[1] Other than abiding by the CFTC's Core Principles and other regulations, Kalshi provides its users with responsible trading tools that aid in avoiding compulsive behavior. Kalshi's tools allow users to set up a personalized maximum amount that can be deposited to Kalshi in each calendar month, request to be excluded from trading activities in Kalshi's market for a specific term of time, and

### C. The Tennessee Regulatory Scheme for Gambling.

Tennessee law generally prohibits gambling. The SWC regulates certain exceptions to the prohibition on gambling by licensing and permitting all individuals and entities that are involved with legalized gaming, and by monitoring and educating to ensure compliance with the state's gaming laws. *See* Tenn. Code Ann. § 4-49-105; Tenn. Code Ann. § 4-49-106. Particularly relevant to SWC's letter are Tennessee's laws on licensing and regulation of online casino gaming and "interactive sports wagering." Tennessee requires that any online gaming operator seek a license from the SWC. Tenn. Code Ann. § 4-49-117. Under Tennessee law, an "[o]nline sports wagering platform" includes entities that "manage, administer, or control sports wagering and any associated wagers accessible by any electronic means, including mobile applications and internet websites accessed via a mobile device or computer." Tenn. Code Ann. § 4-49-102(23). Interactive sports wagering is defined as "placing a wager on a sporting event via the internet, a mobile device, or other telecommunications platform." Tenn. Code Ann. § 4-49-102(14). Tennessee law only permits sports wagers outside of tribal reservations to be made by individuals through a licensed retail sports wagering facility or a licensed online sports wagering platform. Tenn. Code Ann. § 4-49-117. Offering gaming in Tennessee in a manner that violates the state's gaming laws can subject an operator to civil penalties. Tenn. Code Ann. § 4-49-129.

### D. The Tennessee Sports Wagering Council's Cease-and-Desist Letter to Kalshi.

In December 2025 and early January 2026, counsel for Kalshi repeatedly reached out to the Tennessee Attorney General's Office noting that Kalshi "would appreciate the opportunity to have a dialogue with the AG's Office" about its event contracts. Valente Aff., Ex. 5, Ex. 6. On

---

to take a trading break. Once a consumer chooses a risk management practice, it cannot be lifted or changed until the expiration date is reached. *Responsible Risk Management*, Kalshi: Help Center (last visited Jan. 10, 2026), https://help.kalshi.com/account/responsible-risk-management.

January 6, the Chief Deputy Attorney General of Tennessee responded that she did not "have anything to share with Kalshi at this time" while promising that she would be open to a conversation "[i]f circumstances change." *Id.* Ex. 5.

Days later, the SWC sent Kalshi a cease-and-desist letter claiming that "the sport events contracts offered on Kalshi's exchange are Wagers" subject to the Tennessee Sports Gaming Act "and are being offered illegally in violation of Tennessee law and regulations." *Id.* Ex. 1, at 2. The letter directed Kalshi to "cease offering sports events contracts to customers in Tennessee *immediately*." *Id*. (emphasis in original). The SWC claimed that Kalshi's contracts constitute sports wagering because they "give consumers the option to purchase contracts corresponding to one of two outcomes of an event." *Id*. The SWC further claimed that "[t]he sports events contracts offered on Kalshi's exchange are not compliant with" the Tennessee Sports Gaming Act "and are an immediate and significant threat to the public interest of Tennessee." *Id*. The SWC added that "[e]ven if it did offer these protections, Kalshi does not have the required license issued by the SWC and does not pay the privilege tax mandated by statute." *Id*.

Although the cease-and-desist letter is limited to Kalshi's sports-event contracts, the theory it advances would mean that *all* event contracts amount to unlawful gambling, even though the CEA clearly authorizes event contracts and subjects them to the CFTC's exclusive jurisdiction. SWC claims that Tennessee law "prohibit[s] any kind of gambling," defined as "risking anything of value for a profit whose return is to any degree contingent on chance," and Kalshi's event contracts are not subject to an exception. *Id.* at 2-3 (quoting Tenn. Code Ann. § 39-17-501(2)).

The SWC ordered Kalshi to "cease offering sports events contracts to customers in Tennessee *immediately*, void all pending sports events contracts entered into by any person located in Tennessee, and refund all funds on deposit to any person located in Tennessee no later than

8

January 31, 2026." *Id.* at 2 (emphasis in original).  The letter accused Kalshi of committing a "felony" and warned that failure to comply "will" result in referral "to law enforcement." *Id.* at 3.

This cease-and-desist letter left Kalshi no choice but to file suit on the ground that federal law preempts Tennessee's efforts to regulate Kalshi.  Kalshi respectfully requests that this Court enter a temporary restraining order and preliminary injunction.

## ARGUMENT

Federal Rule of Civil Procedure 65 governs the issuance of a preliminary injunction and temporary restraining order.  *Atl. Specialty Ins. Co. v. Norris Bros. Excavating, LLC*, No. 2:24-CV-00058, 2025 WL 2054349, at *2 (M.D. Tenn. July 22, 2025).  To obtain such relief, the moving party must demonstrate that: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of relief; (3) the balance of equities tips in its favor; and (4) the injunction is in the public interest.  *See Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008).  For the same reasons the District of New Jersey granted Kalshi a preliminary injunction in a similar case,[2] Kalshi satisfies each element of the inquiry.

**A. Kalshi Is Likely to Succeed Because Tennessee's Efforts to Regulate Kalshi's Event Contracts Are Preempted by Federal Law and Prohibited by Tennessee Law.**

1. Federal Law Preempts SWC's Efforts to Regulate Kalshi's Event Contracts.

A "fundamental principle of the Constitution" is that "Congress has the power to preempt

---

[2] *KalshiEX LLC v. Flaherty*, No. 25-cv-02152, 2025 WL 1218313, at *6 (D.N.J. Apr. 28, 2025). In April 2025, the District of New Jersey enjoined New Jersey gaming authorities from enforcing state law against Kalshi's event contracts. Judge Kiel explained that the court was "persuaded [] Kalshi's sports-related event contracts fall within the CFTC's exclusive jurisdiction" and "at the very least field preemption applies" to prevent states from regulating trading on DCMs like Kalshi. *Id.* The court further noted that Kalshi had received a "similar cease-and-desist-letter" in another state underscoring the "harms to [Kalshi's] reputation and goodwill." *Id.* at *7. The court rejected the defense that the contracts were "unlawful" under federal law, noting that even if that were true (it is not), "that would subject Kalshi to the review of the CFTC—not state regulators." *Id.* at *5.

state law." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000). Federal law can preempt state law either expressly or impliedly. One manner of preemption is known as field preemption, which occurs where Congress manifests an intent to exclusively occupy an entire field of regulation. *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982). Alternatively, federal law can preempt state law where compliance with both is impossible or where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," known as conflict preemption. *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941). It is well-settled that the CEA and its implementing regulations have "resulted in the preemption of all other would-be regulators at every level of government." Philip F. Johnson, *The Commodity Futures Trading Commission Act: Preemption as Public Policy*, 29 Vand. L. Rev. 1, 2 (1976). Tennessee's gambling laws are no exception.

    a.   *The Sports Gaming Act is Field Preempted as to Kalshi's Event Contracts.*

Field preemption can be either express or implied. *See Crosby*, 530 U.S. at 372 n.6 (the preemption "categories" "are not 'rigidly distinct,'" and "'field' preemption may fall into any of the categories of express, implied, or conflict preemption"). Congress's intent to occupy a field can be apparent in the statutory text and history. *See, e.g.*, *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 203-13 (1983). Courts can also infer field preemption from a scheme of "federal statutory directives" that "provide a full set of standards . . . designed [to function] as a 'harmonious whole.'" *Arizona v. United States*, 567 U.S. 387, 401 (2012) (quoting *Hines*, 312 U.S. at 72). "Where Congress occupies an entire field . . . even *complementary* state regulation is impermissible." *Id.* (emphasis added). Congress has preempted the field of regulating trading on DCMs, both expressly in the text of the CEA and implicitly by creating a comprehensive structure for regulating DCMs that leaves no room for state regulation.

10

Every marker of congressional intent confirms that Congress has preempted the field.

*Statutory Text*:  The text of the 1974 amendments to the CEA could hardly be clearer. Congress established the CFTC and granted it "*exclusive jurisdiction*" over all "accounts," "agreements," and "transactions involving swaps or contracts of sale of a commodity for future delivery" that are "traded or executed on a contract market designated" by the CFTC.  7 U.S.C. § 2(a)(1)(A) (emphasis added).  Kalshi's event contracts are traded on a contract market designated by the CFTC, and the CFTC therefore has "exclusive jurisdiction" to regulate these contracts.

Congress in the 1974 Act did not preempt regulation of *all* derivatives contracts.  Instead, Congress cabined federal preemption to contracts traded *on DCMs*.  The statute preserves concurrent state regulation for commodities and futures contracts traded *outside of DCMs*. 7 U.S.C. §§ 2(a), 16(e); H.R. Rep. No. 97-565, pt. 1, at 44 (1982) (acknowledging that federal and state agencies may police "those who offer fraudulent *off-exchange* investments" and other "transactions *outside* those preserved exclusively for the jurisdiction of the CFTC.") (emphasis added).  Thus, federal preemption of the Tennessee law as to Kalshi does not call into question the state's regulation of casinos or other gambling establishments, none of which are DCMs.

For CFTC-designated exchanges like Kalshi, however, the CFTC has "exclusive jurisdiction."  7 U.S.C. § 2(a)(1)(A).  Courts have easily found that statutes containing similar language preempt parallel state law regulation.  *See City of New York v. Permanent Mission of India to U.N.*, 618 F.3d 172, 187 (2d Cir. 2010) ("A federal agency 'may preempt state regulation and hence render unenforceable state or local laws that are otherwise not inconsistent with federal law' provided the agency is 'acting within the scope of its congressionally delegated authority.'").  The U.S. District Court for the District of New Jersey recently granted Kalshi a preliminary injunction on the ground that "Kalshi's sports-related event contracts fall within the CFTC's

exclusive jurisdiction." *Flaherty*, 2025 WL 1218313, at *6. The CFTC itself agrees. It recently informed the D.C. Circuit that, "*due to federal preemption*, event contracts *never violate state law* when they are traded on a DCM" like Kalshi. Appellant Br. at 27, *KalshiEX LLC v. CFTC*, 119 F.4th 58 (D.C. Cir. 2024) (emphases added). Commentators have likewise concluded with no difficulty that "the CEA preempts state bucket-shop laws and other anti-gambling legislation" as applied to trading on DCMs. Kevin T. Van Wart, *Preemption and the Commodity Exchange Act*, 58 Chi.-Kent L. Rev. 657, 721 (1982).[3]

*Statutory Purpose*: Congress in the 1974 Act sought to prevent exchanges from being subjected to fragmented regulatory demands that could differ by jurisdiction. One "aim" of the 1974 Act was to "avoid unnecessary, overlapping and duplicative regulation." *FTC v. Ken Roberts Co.*, 276 F.3d 583, 588 (D.C. Cir. 2001). As one sponsor of the 1974 Act explained, "different State laws would just lead to total chaos." Senate Hearings at 685 (statement of Sen. Clark).

Congress thus placed "all exchanges and all persons in the industry under the same set of rules and regulations for the protection of all concerned." H.R. Rep. No. 93-975, at 82 (1974). The Conference Report confirmed Congress's intent to preempt the field: "Under the exclusive grant of jurisdiction to the Commission, the authority in the Commodity Exchange Act (and the

---

[3] A district court in Maryland reached a different conclusion, but Kalshi has appealed that decision to the Fourth Circuit, and the defendants have agreed to refrain from any enforcement action against Kalshi while the issue is appealed. *See KalshiEX LLC v. Martin*, 793 F. Supp. 3d 667, 671 (D. Md. 2025), *appeal docketed*, No. 25-1892 (4th Cir. Aug. 6, 2025). A district court in Nevada recently dissolved a preliminary injunction it had previously granted to Kalshi. The Nevada court did not dispute that the CEA preempts state gaming law as applied to trading swaps and futures contracts on DCMs, but instead concluded that Kalshi's sports-event contracts do not qualify as swaps or futures subject to CFTC jurisdiction. *See KalshiEX, LLC v. Hendrick*, No. 2:25-cv-00575, 2025 WL 3286282, at *11-12 (D. Nev. Nov. 24, 2025). That conclusion was mistaken and conflicts with the CFTC's clear exercise of jurisdiction over Kalshi's contracts. Kalshi has appealed that decision to the Ninth Circuit, where briefing is in progress. *See KalshiEX, LLC v. Hendrick*, No. 25-7516 (9th Cir. Nov. 28, 2025).

regulations issued by the Commission) *would preempt the field insofar as futures regulation is concerned*." H.R. Rep. No. 93-1383, at 35 (1974) (Conf. Rep.) (emphasis added).

Courts agree that Congress intended to preclude states from exercising parallel authority over commodity futures trading in exchanges designated by the CFTC. Judge Friendly explained that the CEA "preempts the application of state law" regarding trading on federal exchanges. *Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980), *aff'd sub nom. Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353 (1982); *see Int'l Trading, Ltd. v. Bell*, 556 S.W.2d 420, 424 (Ark. 1977) (exclusive jurisdiction clause "is a clear indication that Congress intended no regulation in this field except under the authority of the act"). The SWC's effort to regulate Kalshi's event contracts cannot be reconciled with that clear congressional purpose.

*Drafting History*: The drafting history of the 1974 Act eliminates all doubt as to Congress's intent to preempt state laws like those Defendants have threatened to enforce against Kalshi. To "assure that Federal preemption is complete," the Senate deleted the provision the Supreme Court had previously interpreted to preserve the states' authority over futures trading. 120 Cong. Rec. 30464 (1974) (statement of Sen. Curtis); *see Rice v. Bd. of Trade of Chi.*, 331 U.S. 247, 255 (1947). And after House drafters introduced a state-law savings clause, the Senate added language making clear that the clause applied "except as hereinabove provided" in the grant of exclusive jurisdiction to the CFTC. S. Rep. No. 93-1131, at 31 (1974). The language ensured that "the Commission's jurisdiction, where applicable supersedes State as well as Federal agencies." *Id.* at 6. These changes "wholly and unequivocally eliminated each of the bases" the Supreme Court had previously relied on "to hold that the CEA did not preempt state regulation." Van Wart, *supra*, at 692-93. "Few principles of statutory construction are more compelling than the proposition that Congress does not intend *sub silentio* to enact statutory language that it has earlier discarded in

13

favor of other language." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 442-43 (1987). The Senate's decision to omit provisions allowing concurrent state jurisdiction over trading on DCMs is yet further proof of Congress's intent to preempt parallel state regulation.

*Comprehensive Regulatory Scheme*: The comprehensive nature of the regulatory scheme Congress created for DCMs is further evidence that Congress intended to foreclose concurrent state jurisdiction. *See La. Pub. Serv. Comm'n v. FCC,* 476 U.S. 355, 368-69 (1986).

As the Supreme Court has found, the CEA establishes "a comprehensive regulatory structure to oversee the volatile and esoteric futures trading complex." *Merrill Lynch,* 456 U.S. at 356 (quoting H.R. Rep. No. 93-975, at 1 (1974)). An exchange may only offer futures contracts after undergoing an extensive review process and receiving the CFTC's designation as a DCM. 7 U.S.C. §§ 2(e), 7(a); 17 C.F.R. § 38.100. Once an exchange is designated as a DCM, the CFTC enjoys "exclusive jurisdiction" over the derivatives traded on the market.[4] 7 U.S.C. § 2(a)(1)(A). Congress elected to allow DCMs to list contracts—including event contracts—by self-certifying that they comply with the CEA's requirements. 7 U.S.C. § 7a-2(c)(1); 17 C.F.R. § 40.2(a)(3)(iv). Congress then gave the CFTC the back-end authority to conduct a review of a contract if it believes the contract may run afoul of any statute or regulation. *See* 7 U.S.C. § 7a-2(c)(2); 17 C.F.R. § 40.11(c). Failure to abide by the CFTC's contract determinations can result in civil and criminal penalties, which the CFTC may pursue at its discretion.

Of particular relevance here, the Special Rule specifically authorizes the CFTC to bar certain event contracts deemed to be "contrary to the public interest" ***and*** "involv[ing]" certain

---

[4] DCMs are subject to an extensive framework of CFTC oversight, involving recordkeeping requirements, 17 C.F.R. §§ 38.950, 1.31, reporting obligations, *id.* § 38.450, pt. 16, liquidity standards, *id.* § 38.1101(a)(2), and penalties for noncompliance, *id.* pt. 38.

14

types of activities. 7 U.S.C. § 7a-2(c)(5)(C)(i). The Special Rule is not mandatory—the CFTC "may" prohibit a contract involving a listed activity *or* it may determine that such a contract would not be contrary to the public interest. *Id.* Congress thus left the decision to one federal authority—not 50 separate states and the District of Columbia. *See Blue Lake Rancheria v. Kalshi Inc.*, No. 25-cv-06162, 2025 WL 3141202, at *7 (N.D. Cal. Nov. 10, 2025) (because the CFTC has "exclusive jurisdiction," "the only enforcement mechanism belongs to the [CFTC]").

Congress dictated an enforcement role for states—but that role expressly *excludes* the right to enforce state laws against DCMs. The CEA authorizes appropriate officials "of any State" to bring suit regarding "any act or practice constituting a violation of any provision of this chapter or any rule, regulation, or order of the [CFTC] thereunder"—but a proviso to this provision allows states to enforce the CEA against parties "*other than a [designated] contract market*." 7 U.S.C. § 13a-2(1) (emphasis added). Congress added this proviso because it "wanted the power to enforce the CEA *with respect to organized exchanges* to remain solely in the CFTC." *Van Wart*, *supra*, at 708. Congress further made clear that the CEA does not "supersede or preempt" the application of state law to entities that are "required to be registered or designated" with the CFTC but "fail or refuse" to do so. 7 U.S.C. § 16(e)(1)(C). In other words, Congress granted the CFTC exclusive power to regulate contracts traded on the exchanges it oversees but permitted federal and state agencies to police "those who offer fraudulent *off-exchange* investments" and other "transactions *outside* those preserved exclusively for the jurisdiction of the CFTC." H.R. Rep. No. 97-565, pt. 1, at 44 (1982) (emphasis added). This comprehensive regulatory scheme for regulating trading on licensed exchanges evinces a strong congressional intent to preempt the field.

Other federal laws reinforce this intent. The Unlawful Internet Gaming Enforcement Act of 2006 ("UIGEA") generally prohibits use of the internet to transmit wagers between states

"where such bet or wager is unlawful," 31 U.S.C. § 5362(10)(A), but provides that the term "bet or wager" "*does not include*" transactions conducted on "a registered entity . . . under the Commodity Exchange Act," *id.* § 5362(1)(E) (emphasis added). UIGEA underscores Congress's understanding that, under the CEA, state gambling laws do not reach trading on DCMs. *See Blue Lake Rancheria*, 2025 WL 3141202, at *6 (Kalshi's "internet contracts are not bets or wagers under the UIGEA and therefore do not constitute 'unlawful internet gambling' even if the contracts are received, placed or transmitted from persons" where gambling is unlawful under local law).[5]

      b.  *Tennessee Laws Are Conflict-Preempted as Applied to Kalshi.*

Tennessee gambling laws are also conflict-preempted as applied to Kalshi because it would be "impossible" for Kalshi "to comply with both state and federal law," and because Tennessee's laws stand "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" in the CEA. *Crosby*, 530 U.S. at 372-73. In at least three respects, subjecting Kalshi's event contracts to Tennessee law would conflict with the CEA.

*First*, Congress passed the 1974 Amendments to the CEA to bring futures markets regulation "under a uniform set of regulations." *Am. Agric. Movement,* 977 F.2d at 1156; *see also Leist*, 638 F.2d at 295-96. "As Congress recognized in enacting the 1974 Act, a contract market could not operate efficiently, and perhaps not at all, if varying and potentially contradictory legal standards governed its duties to investors." *Am. Agric. Movement,* 977 F.2d at 1156. The Seventh Circuit found that "[w]hen application of state law would directly affect trading on or the operation

---

[5] And, as discussed below, Tennessee's own laws recognize that Congress preempted the field of regulating trading on federal exchanges. Tennessee law defines "gambling" to *exclude* "any futures or commodities trading" as "lawful business transaction[s]." Tenn. Code Ann. §§ 39-17-501(2)(A), 39-17-501(5). Trading on Kalshi's exchange is "futures or commodities trading" under the plain terms of the CEA, meaning that Tennessee's laws are wholly inapplicable.

of a futures market, it would stand 'as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,' and hence is preempted." *Id.* at 1156-57 (citation modified).

In *Leist*, the Second Circuit likewise held that the CEA preempts state law. As Judge Friendly explained, the CEA's exclusive jurisdiction clause sought to "separate the functions of the new CFTC from those of the SEC and other regulators," bringing "[a]ll commodities trading in futures . . . within federal regulation under the aegis of the new [CFTC]." 638 F.2d at 314 (citing H.R. Rep. No. 93-975, at 3 (1974)). *Leist* addressed whether the 1974 amendments to the CEA preserved a private cause of action. That raised the question of whether the cause of action was one "traditionally relegated to state law, so that it would be inappropriate to infer a cause of action based solely on federal law." *Id.* at 322. The court found that this needed "little space," because the "federal government has been vitally concerned with trading in futures since 1922; indeed, the courts have held that [Section] 2(a)(1) of the CEA preempts the application of state law." *Id.*

Defendants' actions conflict with Congress's goal to avoid subjecting regulated exchanges to multiple conflicting legal regimes. Defendants intend to deploy state laws to regulate Kalshi's DCM—exactly what Congress did not want states to regulate. Although the C&D Letter highlights Kalshi's sports-event contracts, Defendants' description of Tennessee law would mean that *all* of Kalshi's contracts are unlawful gambling. *See* Valente Aff. Ex. 1 at 3 (citing Tenn. Code Ann. § 39-17-501). The application of such state laws is the precise outcome Congress sought to avoid in 1974, and the conflict is made even clearer when considering the possibility that 49 other states might attempt to subject Kalshi to their own varying state laws (as several have). That state-by-state regulation would erect "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines,* 312 U.S. at 67.

*Second*, a state law stands as an "obstacle" to a federal regulatory scheme if Congress

chooses a specific enforcement method to achieve federal goals and a state law hampers "the careful balance struck by Congress." *Arizona*, 567 U.S. at 406. Where Congress "entrust[s]" the federal government with "discretion" over violations of federal law, a state regime that allows for state prosecutions of the same actions is "preempted by federal law." *Id.* at 407-10. Otherwise, a state could bring charges "even in circumstances where federal officials in charge of the comprehensive scheme determine that prosecution would frustrate federal policies." *Id.* at 402.

That is exactly the risk posed by Defendants' actions. Under federal law, once Kalshi was approved as a DCM, Kalshi was authorized to list its event contracts by self-certifying that these contracts comported with federal law. After Kalshi self-certified its sports-event contracts in January 2025, the CFTC asked Kalshi to submit a demonstration that these contracts complied with the CEA. Compl. ¶ 50; Sottile Decl. ¶ 8. Kalshi responded with lengthy memoranda addressing why its contracts complied with the CEA, after which the CFTC took no action. Compl. ¶ 51; Sottile Decl. ¶¶ 8-10. The CFTC's Enforcement Division was authorized to investigate and initiate an enforcement action if it concluded Kalshi was violating federal law, but it has not done so. And Congress in the CEA authorized the CFTC to review Kalshi's contracts if it concluded they may involve "gaming" and are "contrary to the public interest." 7 U.S.C. § 7a-2(c)(5)(C)(i). But again, exercising discretion delegated by Congress, the CFTC has declined to initiate review. Compl. ¶ 58.

The discretion Congress accorded to the CFTC to determine whether particular contracts are "contrary to the public interest" would be utterly meaningless if any state—let alone every state—could subject DCMs to criminal penalties under state law, even in cases like this one, where the CFTC has declined to act. Subjecting Kalshi to state criminal laws would not just disrupt "the congressional calibration of force," *Crosby*, 530 U.S. at 380—it would render the CFTC's

judgment an afterthought, displacing the carefully calibrated federal enforcement scheme with mandatory state penalties that differ from state to state.

*Third*, it is impossible for Kalshi to comply with the SWC's demands while continuing to adhere to the Core Principles on which Kalshi's designation as a DCM depends.  To secure a license in Tennessee, Kalshi would need to limit access to the exchange solely to persons making trades in Tennessee.  *See* Tenn. Code Ann. § 4-49-111 (requiring that operators verify that the user is "a person who is twenty-one (21) years of age or older and who is physically located in this state").  But the requirement to accept trades only within one state would be impossible for a nationwide exchange like Kalshi to comply with federal law, which requires it to "provide its members, persons with trading privileges, and independent software vendors with *impartial access* to its markets and services."  17 C.F.R. § 38.151(b) (emphasis added); *see also id.* § 38.150.  Attempting to comply with Tennessee's scheme would therefore present Kalshi with an impossible choice—either to accept trades exclusively from persons within Tennessee or to close its exchange to Tennessee in violation of its impartial access obligations. Sottile Decl. ¶ 52.  And subjecting Kalshi to state law would mean that 49 other states would be free to subject Kalshi to the same impossible choice, resulting in precisely the state-by-state patchwork that Congress in 1974 sought to avoid.  This is a classic example of impossibility preemption—where federal law "forbids what the state law requires."  *Nat'l Meat Ass'n v. Harris*, 565 U.S. 452, 460 (2012).

Moreover, Core Principle 4 requires Kalshi to "establish and maintain risk control mechanisms to prevent and reduce the potential risk of *price distortions and market disruptions*." 17 C.F.R. § 38.255 (emphasis added).  Abruptly voiding Kalshi's contracts to anyone in the state because of the SWC's threats would create that exact sort of market disruption.  Sottile Decl. ¶ 51.

2.  <u>Tennessee Law Prohibits SWC's Threats of Enforcement Against Kalshi.</u>

Tennessee law does not permit the SWC to enforce state gambling laws against Kalshi.

Tennessee has a broad prohibition on gambling pursuant to Tenn. Code Ann. §§ 39-17-501, *et seq.*, with certain enumerated exceptions. One of those exceptions from the definition of gambling is for "lawful business transactions," which is defined to include "any futures or commodities trading." Tenn. Code Ann. §§ 39-17-501(2)(a); 39-17-501(5). The Tennessee legislature clarified that this statute is "intend[ed] to preempt any other regulation of the area covered by this part [*i.e.*, gambling]." Tenn. Code Ann. §§ 39-17-509. Indeed, "no governmental . . . agency may enact or enforce a law that regulates or makes any conduct in the area covered by this part . . . the subject of a criminal or civil penalty or sanction of any kind." *Id*.

But that is exactly what the SWC purports to do. The SWC's letter claims that Kalshi's exchange and the sports-event contracts traded on that exchange are subject to the Tennessee Sports Gaming Act. But that is not true. While Section 501 does not define "futures or commodities trading," Kalshi's sports-event contracts are commodity contracts under Tennessee law. "Commodity contract" is defined in Tennessee's UCC, as "a . . . contract if the contract or option is: (A) Traded on or subject to the rules of a board of trade that has been designated as a contract market for such a contract pursuant to federal commodities laws." Tenn. Code Ann. § 47-9-102(a)(15); *see also* Tenn. Code Ann. § 56-9-106 (defining "commodity contract" by reference to the CEA).[6] Kalshi is a designated contract market pursuant to the Commodity Exchange Act, 7 U.S.C. § 1, *et seq*. Valente Aff., Ex. 4; *see* Sottile Decl. ¶ 16, 34, 49. Trading of Kalshi's sports-event contracts is "futures or commodities trading" under Tennessee law and therefore, exempted

---

[6] Kalshi's sports-event contracts are also futures under Tennessee law. *See* Tenn. Code Ann. §§ 56-3-302(19) (defining "future" as "an agreement, traded on a futures exchange, to . . . effect a cash settlement based on the actual or expected price, level, performance or value of, one (1) or more underlying interests"); 56-3-302(20) (defining "futures exchange" as a designated contract market authorized by the CFTC).

from the definition of "gambling" under "any other regulation" related to gambling, Tenn. Code Ann. § 39-17-509, including the Sports Gaming Act. And Tennessee law expressly prohibits SWC from "enforc[ing] a law that . . . makes conduct in the area covered by" Section 501, *et seq.*, "the subject of a criminal or civil penalty or sanction of any kind." Because SWC's enforcement threats are unlawful, Kalshi is likely to succeed on the merits and preliminary relief is appropriate.

## B. Kalshi Will Suffer Irreparable Harm Without a Temporary Restraining Order and Preliminary Injunction.

The SWC's cease-and-desist letter threatens Kalshi with a classic "Hobson's choice" giving rise to irreparable harm—either "continually violate [state] law and expose [itself] to potentially huge liability," or "suffer the injury of obeying the law during the pendency of the proceedings and any further review." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992). As the district court in New Jersey recognized in similar circumstances, Kalshi suffers irreparable harm along several dimensions. *Flaherty*, 2025 WL 1218313, at *6.

*First*, if Kalshi chooses not to comply with the SWC's unconstitutional threats, Kalshi and its officers face the extraordinary harms associated with the threat of civil liability and potentially even criminal prosecution. The Supreme Court has recognized that a party facing the threat of imminent enforcement under a preempted state statute suffers "irreparable injury." *Morales*, 504 U.S. at 381. The Sixth Circuit agrees that "a finding of irreparable injury is mandated" when a court finds that a "constitutional right is being threatened or impaired." *ACLU of Ky. v. McCreary Cnty.*, 354 F.3d 438, 445 (6th Cir. 2003); *see also Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013) ("credible threat of prosecution" under a preempted state statute amounts to irreparable harm). The SWC stated that "failure to comply with the SWC's demand" that "Kalshi cease offering sports events contracts to customers in Tennessee *immediately*, [and] void all pending sports events contract that were entered into by any person located in Tennessee" "***will***

***result*** in the imposition of fines," "in the SWC seeking injunctive relief in accordance with Tenn. Code Ann. § 4-49-129" and "in the referral of Kalshi's illegal gambling operation to law enforcement." Valente Aff. Ex. 1, at 2-3 (bold emphasis added).

*Second*, attempting to comply with the SWC's unconstitutional threat would subject Kalshi and its users to extensive harms that could not be remedied even if it ultimately prevailed in this litigation. Kalshi has over 50,000 users in Tennessee, with millions of dollars in open investments on the platform. Sottile Decl. ¶ 30. If Kalshi complied with the SWC's unlawful threat during the pendency of this litigation, it would forgo business in this market, with no prospect of recouping its losses even if it ultimately prevails, creating irreparable injury. *Churchill Downs Tech. Initiatives Co. v. Mich. Gaming Control Bd.*, -- F.4th --, 2025 WL 3637925, at *8 (6th Cir. Dec. 16, 2025) (finding "los[ing] access to its 18,000 Michigan users" constituted irreparable harm).

But the injury here actually goes much further than that considered in *Churchill Downs*, because SWC demands that Kalshi void all existing contracts involving a "person located in Tennessee" and issue refunds for any person "located in Tennessee." Valente Aff. Ex. 1, at 2. In *Churchill Downs*, the bets were offered by TwinSpires, the off-track betting company. 2025 WL 3637925 at *9. But, as described above, Kalshi is not a party to any event contract traded on its exchange. Sottile Decl. ¶¶ 33, 46. Therefore, people "located in Tennessee" are inevitably transacting with persons located in other states and the harms occasioned by SWC's demand to void and refund would be suffered not only in Tennessee, but in states nationwide (including New Jersey, where a federal court has already enjoined enforcement of state gaming laws against Kalshi on preemption grounds). *Id.* ¶ 46. By way of example, the C&D Letter would require a contract between a New York resident and a New Jersey resident to be voided and refunded simply because the New York resident crossed the Tennessee border. A mass and continual voiding and refunding

22

of this sort would have wide-ranging ramifications to the accounts of people with no ties to Tennessee. *Id*. It would also create a false signal in the market, resulting in distortion of prices that would impose substantial financial losses on the traders (irrespective of where they are located). *Id*. ¶ 51. Such an impairment of existing contractual obligations for Kalshi's users easily constitutes irreparable harm. *See Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.*, 511 F.3d 535, 550 (6th Cir. 2007) ("likely interference with customer relationships" resulting from breach of contract constitutes irreparable harm).

Moreover, Kalshi does not have the capacity to comply with the threat to cease immediately as the SWC demands, and any attempt at complying would subject Kalshi to extraordinary technological challenges and costs. To comply with the SWC's "immediate[]" demand, Kalshi would need to undertake efforts to geolocate which of its users are in Tennessee and cease making its sports-event contracts available to them. But currently, Kalshi lacks a mechanism to identify which of its users are located in a particular state at any particular time. Sottile Decl. ¶ 20. Attempting to implement geolocation capabilities would take months and cost tens of millions of dollars annually. *Id.* ¶¶ 27-28. And because the Eleventh Amendment permits only *injunctive relief* against state officials enforcing unconstitutional state law, *see Ex parte Young*, 209 U.S. 123, 155 (1908); *Zielasko v. Ohio*, 873 F.2d 957, 959 (6th Cir. 1989), Kalshi would have no clear way of seeking damages if it ultimately prevailed creating further risk of irreparable harm. *See Mumford v. Basinski*, 105 F.3d 264, 267 (6th Cir. 1997); *Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002); *Chamber of Com. of U.S. v. Edmondson*, 594 F.3d 742, 770-71 (10th Cir. 2010); *California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018).

*Third*, Kalshi will face irreparable reputational harm if no injunction is granted. If Kalshi chooses not to comply on the ground that SWC's demands are unlawful, the threat of

prosecution—not to mention being labelled a willful violator of Tennessee law—would undermine the reputation that Kalshi has cultivated over many years and that resulted in Kalshi being the first event market designated by the CFTC. But bowing to the SWC's threat by abruptly ending its business in Tennessee and voiding and refunding millions of dollars' worth of trades would undermine users' confidence in Kalshi's exchange and make them fear that their own investments are at risk. Sottile Decl. ¶¶ 57-60. Recently, the Sixth Circuit affirmed a finding of irreparable harm based on exactly this kind of loss of "goodwill" that could not easily be regained even if Kalshi ultimately prevails. *Churchill Downs*, 2025 WL 3637925, at *8.

Moreover, the SWC's demands jeopardize Kalshi's status as a DCM—and thus pose an existential threat to Kalshi. Abruptly terminating its event-based contracts in Tennessee would risk violating the CFTC Core Principles to which Kalshi is subject, including the obligation to provide "impartial access" to its markets, 17 C.F.R. § 38.151(b), and the obligation to reduce the risk of "market disruptions," *id.* § 38.255. The CFTC could conclude that closing Kalshi's markets in Tennessee and voiding the contracts of any person "located in Tennessee" violates federal law and seek to revoke Kalshi's designation. 7 U.S.C. § 8(b). A preliminary injunction is needed to prevent Kalshi from suffering irreparable harm during the pendency of this litigation.

### C. The Balance of the Equities and Public Interest Favor Preliminary Relief.

"The last two factors merge here because a state government is the defendant." *Churchill Downs*, 2025 WL 3637925, at *8. It is "always in the public interest" to "enjoin[] the enforcement of a law that violates constitutional rights." *Id*. (quoting *Dahl v. Bd. of Trs. of W. Mich. Univ.*, 15 F.4th 728, 736 (6th Cir. 2021) (per curiam)); *see Martin-Marietta Corp. v. Bendix Corp.*, 690 F.2d 558, 568 (6th Cir. 1982)*; Deja Vu of Nash., Inc. v. Metro. Gov't of Nash. & Davidson Cnty.*, 274 F.3d 377, 400 (6th Cir. 2001). And just as the Sixth Circuit held that these factors were satisfied where a Michigan gambling statute was preempted by federal law, *Churchill Downs*, 2025 WL

3637925, at *8, the New Jersey court that addressed this question as to Kalshi's events contracts found that an injunction comports with the public interest. *Flaherty*, 2025 WL 1218313, at *7. Tennessee retains no reciprocal interest because it lacks any interest in enforcing a state law that is preempted. *See Churchill Downs*, 2025 WL 3637925, at *8-9; *Arizona*, 567 U.S. at 401.

Beyond that, the failure to issue an injunction here would "reach beyond the parties involved directly in the suit and impact the public's right[s]." *Associated Builders & Contractors v. Mich. Dep't of Lab. & Econ. Growth*, 543 F.3d 275, 278 (6th Cir. 2008) (citation and internal quotation marks omitted). Immediate compliance with Tennessee law to avoid penalties will harm Kalshi's users in Tennessee and impose intractable technological difficulties on a very short timeframe. Sottile Decl. ¶¶ 16-61. Abrupt cessation and voiding of contracts would make it difficult to inform users in Tennessee of their rights and obligations regarding ongoing event contracts and cut off users' access to their investments on Kalshi's exchange. *Id.* ¶¶ 41-46. And the harms occasioned by SWC's demands would be suffered by counterparties in states around the country (including New Jersey, where state gaming laws against Kalshi have been enjoined). *Id.* ¶ 46. Given that the Tennessee laws are clearly preempted by federal law as applied to Kalshi, the balance of the equities and public interest firmly favor preliminary relief.[7]

## CONCLUSION

The Court should grant a temporary restraining order and preliminary injunction.

---

[7] In the Sixth Circuit, "the district court possesses discretion over whether to require the posting of security" when entering a TRO. *ARH v. Coventry Health & Life Ins. Co.*, 714 F.3d 424, 431 (6th Cir. 2013); *Aluminum Workers Int'l Union v. Consol. Aluminum Corp.*, 696 F.2d 437, 446 (6th Cir. 1982). Defendants will suffer no nonspeculative damage by halting enforcement against Kalshi during the pendency of this litigation. *See H.H. v. Quin*, No. 3:25-cv-01360, 2025 WL 3299430, at *12 (M.D. Tenn. Nov. 26, 2025). Accordingly, Kalshi respectfully requests the Court grant a temporary restraining order and preliminary injunction without requiring a bond. In the alternative, only a *de minimis* bond is warranted.

Dated this 12th day of January, 2026.

Respectfully submitted,

/s/ Britt K. Latham
Britt K. Latham
Robert E. Cooper, Jr.
Courtney A. Hunter
**BASS, BERRY & SIMS PLC**
21 Platform Way South, Suite 3500
Nashville, Tennessee 37203
Telephone: (615) 742-6200
Facsimile: (615) 742-6293
blatham@bassberry.com
bob.cooper@bassberry.com
courtney.hunter@bassberry.com

and

Neal Katyal (*pro hac vice* forthcoming)
Joshua B. Sterling (*pro hac vice* forthcoming)
William E. Havemann (*pro hac vice* forthcoming)
**Milbank LLP**
1101 New York Avenue NW
Washington D.C. 20005
Telephone: 202-835-7500
Facsimile: 202-263-7586

Grant R. Mainland (*pro hac vice* forthcoming)
Andrew L. Porter (*pro hac vice* forthcoming)
Nicole D. Valente (*pro hac vice* forthcoming)
**Milbank LLP**
55 Hudson Yards
New York, NY 10001
Telephone: 212-530-5000
Facsimile: 212-530-5219

*Attorneys for Plaintiff*

## **CERTIFICATE OF SERVICE**

I hereby certify that the foregoing was served this 12th day of January, 2026, via U.S.

Mail and e-mail upon counsel for defendants as listed below:

       Michael N. Wennerlund
       Jonathan M. Shirley
       James P. Urban
       Timothy Simonds
       Assistant Attorney General
       Financial Division
       P.O. Box 20207
       Nashville, TN 37202
       Michael.wennerlund@ag.tn.gov
       Jonathan.shirley@ag.tn.gov
       James.urban@ag.tn.gov
       Timothy.simonds@ag.tn.gov

                  /s/ Britt K. Latham
                  Britt K. Latham