# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### AT NASHVILLE

| | | |
|---|---|---|
| KALSHIEX LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 3:26-cv-00034 |
| | ) | |
| WILLIAM ORGEL, ET AL., | ) | Judge: Aleta A. Trauger |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................1

BACKGROUND .................................................................................................2

    I.    Legal Background ................................................................................2

        A.    Sports Wagering in Tennessee ................................................2

        B.    Federal Regulatory Framework .............................................4

    II.    Factual Background ............................................................................7

    III.    Procedural Background .......................................................................8

STANDARD OF REVIEW ...................................................................................9

ARGUMENT .....................................................................................................10

    I.    Kalshi Is Not Likely to Succeed on the Merits .................................10

        A.    Kalshi is unlikely to demonstrate a cause of action or overcome Tennessee's sovereign immunity ....................................................10

        B.    Kalshi's sports-event contracts are not "swaps" under the CEA ...14

        C.    There is no preemption .................................................................23

        D.    Kalshi's state law arguments are meritless ..................................32

    II.    There Is No Irreparable Harm ...........................................................32

    III.    The Balance of Equities and the Public Interest Weigh against Granting a Preliminary Injunction ...............................................................................34

    IV.    Suggestion of Sufficient Bond .........................................................35

CONCLUSION ..................................................................................................35

CERTIFICATE OF SERVICE ............................................................................37

**TABLE OF AUTHORITIES**

**Cases**

*Ah Sin v. Wittman*,
198 U.S. 500 (1905) ..............................................................................................2, 27

*Alexander v. Sandoval*,
532 U.S. 275 (2001) ........................................................................................11, 12, 13

*Am. Dairy Queen Corp. v. Brown-Port Co.*,
621 F.2d 255 (7th Cir. 1980) ......................................................................................34

*Arbaugh v. Y&H Corp.*,
546 U.S. 500 (2006) ...................................................................................................25

*Arizona v. United States*,
567 U.S. 387 (2012) .............................................................................................24, 30

*Armstrong v. Exceptional Child Ctr., Inc.*,
575 U.S. 320 (2015) ........................................................................................11, 12, 13

*Blue Lake Rancheria v. Kalshi Inc.*,
No. 25-cv-06162, 2025 WL 3141202 (N.D. Cal. Nov. 10, 2025)..................................28

*Carcieri v. Salazar*,
55 U.S. 379 (2009) .....................................................................................................27

*Chamber of Com. of U.S. v. Whiting*,
563 U.S. 582 (2011) ...................................................................................................29

*Churchill Downs Tech. Initiatives Co. v. Mich. Gaming Control Bd.*,
767 F. Supp. 3d 556 (W.D. Mich. 2025)......................................................................13

*Churchill Downs Tech. Initiatives Co. v. Mich. Gaming Control Bd.*,
162 F.4th 631 (6th Cir. 2025) .................................................................................13, 33

*Cipollone v. Liggett Grp., Inc.*,
505 U.S. 504 (1992) .............................................................................................26, 28

*Cleveland Newspaper Guild, Loc. 1 v. Plain Dealer Pub. Co.*,
839 F.2d 1147 (6th Cir. 1988) .....................................................................................34

*Collins Inkjet Corp. v. Eastman Kodak Co.*,
781 F.3d 264 (6th Cir. 2015)........................................................................................33

*Commw. v. KalshiEX, LLC*,
No. 2584-cv-2525 (Mass. Super. Ct. Jan. 20, 2026)........................................................9

*Crosby v. Nat'l Foreign Trade Council*,
530 U.S. 363 (2000) .............................................................................................24, 30

*Crugher v. Prelesnik*,
761 F.3d 610 (6th Cir. 2014) ..................................................................................11, 13

*D.T. v. Sumner Cnty. Sch.*,
942 F.3d 324 (6th Cir. 2019)........................................................................................32

*Daunt v. Benson*,
956 F.3d 396 (6th Cir. 2020) .......................................................................................34

*Davis v. Passman*,
442 U.S. 228 (1979) ...................................................................................................10

*Dayton Power & Light Co. v. FERC*,
126 F.4th 1107 (6th Cir. 2025)................................................................24, 29, 30, 31

Case 3:26-cv-00034   Document 34   Filed 01/20/26   Page 3 of 44 PageID #: 285

*De Canas v. Bica*,
424 U.S. 351 (1976) ...............................................................................................29

*DeVillier v. Texas*,
601 U.S. 285 (2024) ..............................................................................................13

*Diaz v. Mich. Dep't of Corr.*,
703 F.3d 956 (6th Cir. 2013) ...............................................................................13

*Enchant Christmas Light Maze & Mkt. Ltd. v. Glowco, LLC*,
958 F.3d 532 (6th Cir. 2020) ..................................................................................9

*EOG Res., Inc. v. Lucky Land Mgmt., LLC*,
134 F.4th 868 (6th Cir. 2025) ...............................................................................10

*Epic Sys. Corp. v. Lewis*,
584 U.S. 497 (2018) ..............................................................................................20

*F.T.C. v. Ken Roberts Co.*,
276 F.3d 583 (D.C. Cir. 2001) .........................................................................26, 30

*FDA v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000) ..............................................................................................20

*Fenner v. Gen. Motors, LLC*,
113 F.4th 585 (6th Cir. 2024) .........................................................23, 26, 29, 31

*Florida Lime & Avocado Growers, Inc. v. Paul*,
373 U.S. 132 (1963) ..............................................................................................29

*Freightliner Corp. v. Myrick*,
514 U.S. 280 (1995) ..............................................................................................26

*Garlock, Inc. v. United Seal, Inc.*,
404 F.2d 256 (6th Cir. 1968) ...............................................................................32

*Gregory v. Ashcroft*,
501 U.S. 452 (1991) ..............................................................................................23

*Hillsborough Cnty. v. Automated Med. Labs, Inc.*,
471 U.S. 707 (1985) ..............................................................................................28

*Hines v. Davidowitz*,
312 U.S. 52 (1941) ................................................................................................29

*Int'l Paper Co. v. Ouellette*,
479 U.S. 481 (1987) ..............................................................................................26

*Inv. Co. Inst. v. CFTC*,
720 F.3d 370 (D.C. Cir. 2013) ................................................................................4

*Inv. Co. Inst. v. CFTC*,
891 F. Supp. 2d 162 (D.D.C. 2012) ...........................................................5, 20, 21

*Jarrett v. Kassel*,
972 F.2d 1415 (6th Cir. 1992) .........................................................................11, 12

*KalshiEX LLC v. Flaherty*,
No. 25-CV-02152-ESK-MJS, 2025 WL 1218313 (D.N.J. Apr. 28, 2025) ...............9, 35

*KalshiEX LLC v. Martin*,
793 F. Supp. 3d 667 (D. Md. 2025) ................................................................ Passim

*KalshiEX, LLC v. Hendrick*,
No. 2:25-CV-00575, 2025 WL 3286282 (D. Nev. Nov. 24, 2025) ........................ Passim

*Kansas v. Garcia*,
589 U.S. 191 (2020) .........................................................................25, 29, 31

iv

*Keen v. Helson*,
  930 F.3d 799 (6th Cir. 2019) ...........................................................................10, 11
*Klein & Co. Futures, Inc. v. Bd. of Trade of City of New York*,
  464 F.3d 255 (2d Cir. 2006) .....................................................................................12
*Kokkonen v. Guardian Life Ins. Co. of Am.*,
  511 U.S. 375 (1994) .................................................................................................11
*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
  572 U.S. 118 (2014) .................................................................................................10
*Lindsey v. Whitmer*,
  124 F.4th 408 (6th Cir. 2024) .................................................................................11
*Loper Bright Enters. v. Raimondo*,
  603 U.S. 369 (2024) .................................................................................................22
*Louisiana-Pac. Corp. v. James Hardie Bldg. Prods. Inc.*,
  No. 3:18-CV-00447-JPM, 2018 WL 7272047 (M.D. Tenn. Dec. 20, 2018) .................34
*Maryland v. Louisiana*,
  451 U.S. 725 (1981) .................................................................................................23
*McKenna v. Dillon Transport, LLC*,
  97 F.4th 471 (6th Cir. 2024).....................................................................................27
*Mead Johnson & Co. v. Abbott Labs.*,
  201 F.3d 883 (7th Cir. 2000) ...................................................................................35
*Medina v. Planned Parenthood S. Atl.*,
  145 S. Ct. 2219 (2025).............................................................................................12
*Medtronic, Inc. v. Lohr*,
  518 U.S. 470 (1996) .............................................................................................23, 26
*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*,
  456 U.S. 353 (1982) ...................................................................................................5
*Mich. Corr. Org. v. Mich. Dep't of Corr.*,
  774 F.3d 895 (6th Cir. 2014) .........................................................................11, 12, 13
*Middlesex Cnty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*,
  453 U.S. 1 (1981) .....................................................................................................13
*Mirion Techs. (Canberra), Inc. v. Sunpower, Inc.*,
  No. 2:17-CV-669, 2017 WL 5090436 (S.D. Ohio Nov. 6, 2017) .................................34
*Movement, Inc. v. Bd. of Trade of Chicago*,
  977 F.2d, 1147 (7th Cir. 1992) .................................................................................21
*Murphy v. NCAA*,
  584 U.S. 453 (2018) ..............................................................................................2, 18
*N. Am. Derivatives Exch. v. Nevada Gaming Control Bd.*,
  2:25-CV-00978, 2025 WL 2916151 (D. Nev. Oct. 14, 2025)................................ Passim
*NAACP v. Town of E. Haven*,
  70 F.3d 219 (2d Cir. 1995) .......................................................................................33
*Nw. Cent. Pipeline Corp. v. State Corp. Comm'n of Kan.*,
  489 U.S. 493 (1989) .................................................................................................24
*Oklahoma v. Castro-Huerta*,
  597 U.S. 629 (2022) .................................................................................................25
*Oneok, Inc. v. Learjet, Inc.*,
  575 U.S. 373 (2015) ........................................................................................ Passim

v

*Ontario v. City of Detroit,*
  874 F.2d 332 (6th Cir. 1989) ........................................................................26
*Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n,*
  461 U.S. 190 (1983) ..............................................................................24, 29
*Pennhurst State Sch. & Hosp. v. Halderman,*
  465 U.S 89 (1984) ........................................................................................32
*Posey v. Garland,*
  No. 1:23-cv-00051, 2023 WL 5435609 (E.D. Tenn. Aug. 23, 2023) ............32
*Pub. Citizen v. U.S. Dept. of Justice,*
  491 U.S. 440 (1989) ....................................................................................27
*Pub. Serv. Co. of New Hampshire v. Town of W. Newbury,*
  835 F.2d 380 (1st Cir. 1987)........................................................................33
*Sec'y of State v. St. Augustine Church,*
  766 S.W.2d 499 (Tenn. 1989) .......................................................................2
*Seminole Tribe of Fla. v. Florida,*
  517 U.S. 44 (1996) ......................................................................................13
*Skidmore v. Swift & Co.,*
  323 U.S. 134 (1944) ....................................................................................22
*Smith v. Mich. Dep't of Corr.,*
  159 F.4th 1067 (6th Cir. 2026) ....................................................................11
*Steel Co. v. Citizens for Better Env't,*
  523 U.S. 83 (1998) ......................................................................................25
*Tafflin v. Levitt,*
  493 U.S. 455 (1990) ....................................................................................25
*Torres v. Precision Indus., Inc.,*
  995 F.3d 485 (6th Cir. 2021)........................................................................23
*U.S. Forest Serv. v. Cowpasture River Pres. Ass'n,*
  590 U.S. 604 (2020) ..............................................................................23, 26
*United States v. King,*
  834 F.2d 109 (6th Cir. 1987) .........................................................................2
*United States v. Texas,*
  144 F.4th 632 (5th Cir. 2025)......................................................................24
*W. Virginia v. Env't Prot. Agency,*
  597 U.S. 697 (2022) ..........................................................................18, 20, 27
*Waskul v. Washtenaw Cnty. Cmty. Mental Health,*
  979 F.3d 426 (6th Cir. 2020) .......................................................................12
*Whitman v. Am. Trucking Associations,*
  531 U.S. 457 (2001) ..........................................................................17, 18, 20
*Whole Woman's Health v. Jackson,*
  595 U.S. 30 (2021) ......................................................................................14
*Will v. Mich. Dep't of State Police,*
  491 U.S. 58 (1989) ................................................................................14, 23
*Winter v. Nat. Res. Def. Council, Inc.,*
  555 U.S. 7 (2008) ........................................................................................35

**Statutes**

7 U.S.C. § 1a ................................................................................5, 14, 15, 16
7 U.S.C. § 2 ............................................................................................ Passim
7 U.S.C. § 7 ...................................................................................................6
7 U.S.C. § 7a-2 ..................................................................................... Passim
7 U.S.C. § 16 ..........................................................................................26, 30
7 U.S.C. § 25 ..........................................................................................12, 13
15 U.S.C. § 3001 ...........................................................................................2
18 U.S.C. § 1084 .........................................................................................18
25 U.S.C. § 2701 .........................................................................................18
Pub. L. No. 111-203, 124 Stat. 1376 (2010) ...............................................5
Tenn. Code Ann. § 4-49-102 ...........................................................2, 3, 4, 8
Tenn. Code Ann. § 4-49-104 .......................................................................4
Tenn. Code Ann. § 4-49-106 .......................................................................2
Tenn. Code Ann. § 4-49-111 ...................................................................3, 31
Tenn. Code Ann. § 4-49-112 .....................................................................31
Tenn. Code Ann. § 4-49-113 .....................................................................19
Tenn. Code Ann. § 4-49-114 .......................................................................3
Tenn. Code Ann. § 4-49-118 ....................................................................3, 4
Tenn. Code Ann. § 4-49-119 ....................................................................3, 4
Tenn. Code Ann. § 4-49-117 ....................................................................4, 8
Tenn. Code Ann. § 4-49-127 .................................................................8, 9, 35
Tenn. Code Ann. § 39-14-203 ...................................................................27
Tenn. Code Ann. § 39-17-501 .................................................................2, 32
Tenn. Code Ann. § 39-17-509 ...................................................................32
Tenn. Const. art. XI, § 5 ..............................................................................2

**Rules**

Fed. R. Civ. P. 65(c) ..................................................................................35

**Regulations**

17 C.F.R. § 40.11 .................................................................6, 24, 30, 32, 34
17 C.F.R. § 40.2 .........................................................................................25
*Core Principles and Other Requirements for Designated Contract Markets*,
  75 Fed. Reg. 80572 (proposed Dec. 22, 2010) .......................................31
*Further Definition of "Swap," "Security-Based Swap," and "Security-Based Swap Agreement";
  Mixed Swaps; Security-Based Swap Agreement Recordkeeping*,
  77 Fed. Reg. 48208 (Aug. 13, 2012) ......................................................22
*Provisions Common to Registered Entities*,
  76 Fed. Reg. 44776 (July 27, 2011) .........................................................6
Tenn. R. & Regs. 1350-01-.06 .....................................................................4

**Other Authorities**

156 Cong. Rec. S5902-01 .........................................................................6, 21

# INTRODUCTION

Online sports wagering is legal in Tennessee. But those wishing to offer wagers must obtain a license and pay taxes under the Tennessee Sports Gaming Act, Tenn. Code Ann. §§ 4-49-101 to -133. KalshiEX LLC ("Kalshi") seeks to operate an unlicensed, untaxed sportsbook. Through the guise of "sports-event contracts," Kalshi claims its betting products are "swaps" under the federal Commodity Exchange Act ("CEA") subject only to the exclusive regulatory jurisdiction of the Commodity Futures Trading Commission ("CFTC"). 7 U.S.C. §§ 1, *et seq*. As a result, Kalshi claims it need not become licensed or have to pay Tennessee taxes.

But the CEA does not allow Kalshi to operate an unlicensed, untaxed sportsbook. As one district court has already observed, Kalshi's sports-event contracts "are sports wagers and everyone who sees them knows it." *KalshiEX, LLC v. Hendrick*, No. 2:25-CV-00575, 2025 WL 3286282, at *8 (D. Nev. Nov. 24, 2025). And, as another district court has already observed, even if Kalshi's sports-event contracts *are* "swaps," the CEA does not preempt state sports-wagering laws. *KalshiEX LLC v. Martin*, 793 F. Supp. 3d 667 (D. Md. 2025).

Kalshi is not entitled to a preliminary injunction. *First*, Kalshi is unlikely to succeed on the merits. As a preliminary matter, Supreme Court precedent makes clear Kalshi lacks a cause of action, so this suit is barred by sovereign immunity. Then, Kalshi's claim fails twice-over on the merits. Kalshi's sports-event contracts are not "swaps" under the CEA, and even if they were, the CEA does not preempt state gaming laws. *Second*, Kalshi will not suffer irreparable harm. Kalshi's failure to comply with Tennessee law is a self-inflicted injury. *Third*, the equities and public interest favor Defendants. Kalshi comes to this Court with unclean hands, which should foreclose equitable relief. Tennessee, pursuant to traditional state police power, *must* be allowed to protect consumers and businesses from illegal wagering.

1

# BACKGROUND

## I. Legal Background.

**A. Sports Wagering in Tennessee.** "Throughout our history, the regulation of gambling has been largely left to the state legislatures." *United States v. King*, 834 F.2d 109, 111 (6th Cir. 1987). In line with that tradition, the Supreme Court has long recognized that "[t]he suppression of gambling is concededly within the police powers of a state." *See Ah Sin v. Wittman*, 198 U.S. 500, 505–06 (1905); *see Murphy v. NCAA*, 584 U.S. 453, 458–59 (2018) (overturning the federal Professional and Amateur Sports Protection Act ("PAPSA")). Congress has also long determined that "the States should have the primary responsibility for determining what forms of gambling may legally take place within their borders." 15 U.S.C. § 3001(a)(1).

Tennessee has regulated gambling since at least 1834. *Sec'y of State v. St. Augustine Church*, 766 S.W.2d 499, 500 (Tenn. 1989). The Tennessee Constitution generally prohibits lotteries for any purpose, *see* Tenn. Const. art. XI, § 5, and the Tennessee General Assembly has criminalized various gambling-related offenses. *See* Tenn. Code Ann. §§ 39-17-501 to -509.

Pursuant to its police power, the General Assembly legalized interactive sports wagering[1] in 2019 following the Supreme Court's decision in *Murphy*. *See* 2019 Tenn. Pub. Acts, ch. 507, § 1. The Tennessee Sports Wagering Council (the "Council") regulates sports wagering and is responsible for enforcing and supervising compliance with the Tennessee Sports Gaming Act (the "Act"). Tenn. Code Ann. § 4-49-106(a). Under this framework, the Council performs licensing, compliance, enforcement, and responsible gaming duties. *See* Decl. of Mary Beth Thomas,

---

[1] "Interactive sports wagering" means "placing a wager on a sporting event via the internet, a mobile device, or other telecommunications platform." Tenn. Code Ann. § 4-49-102(14).

2

Council Executive Director ("Thomas Decl.") ¶ 6.[2] The Act defines "wager" or "bet" as "a sum of money that is risked by a bettor on the unknown outcome of one (1) or more sporting events, including, but not limited to, the form of fixed-odds betting, a future bet, live betting, a money line bet, pari-mutuel betting, parlay bet, pools, proposition bet, spread bet, or in any other form or manner as authorized by rule promulgated by the council."[3] Tenn. Code Ann. § 4-49-102(39).

Alongside its authorization of sports wagering, the Act contains numerous consumer-protection provisions that restrict the type of bets that may be offered and who may place them. (Thomas Decl. ¶¶ 8–10.) For example, the Act prohibits wagering on injuries, penalties, or the actions of individual collegiate athletes, and it does not permit in-game proposition bets on collegiate teams. Tenn. Code Ann. § 4-49-114. The Act also lists 14 categories of persons ineligible to place wagers, ranging from Council members to persons having the ability to directly affect a sport-event outcome, *id*., § 4-49-112, and it prohibits those under age 21 from wagering in Tennessee, *id*., §§ 4-49-118(a), 4-49-102(19). The Act also contains responsible-gaming requirements, including that licensed operators allow bettors to restrict themselves from placing wagers. *Id*. § 4-49-119. Additionally, the Act contains anti-money-laundering controls and does not allow the use of credit cards or cryptocurrency to fund accounts. *Id*. §§ 4-49-110, 4-49-125(f).

These safeguards are necessary to protect those who wager in Tennessee—particularly young adults and other vulnerable Tennesseans. (Thomas Decl. ¶ 11.) Sports gaming is highly addictive, particularly among young men, so protecting consumers aged 18 to 20 from exposure

---

[2] The Thomas Declaration has been contemporaneously filed in support of this Response.

[3] "Sporting event" is defined as "any professional sporting or athletic event, including motorsports and e-sports, any collegiate sporting or athletic event, or any Olympic sporting or athletic event sanctioned by a national or international organization. 'Sporting event' does not include horse racing." Tenn. Code Ann. § 4-49-102(33).

to sports gaming is an important state interest. (*Id.*) *See* Tenn. Code Ann. § 4-49-118. Additionally, more than 7,500 self-exclusion requests, which allow users to restrict themselves from accessing sports-gaming accounts, have been processed in Tennessee since the legalization of wagering. (Thomas Decl. ¶ 12.) It is in the public interest to protect these individuals. (*Id.*)

In Tennessee, sports wagering is taxed and licensed by the Council. Tenn. Code Ann. §§ 4-49-104(a), 4-49-117. Ten operators hold licenses in Tennessee. (Thomas Decl. ¶ 8.) All operators are held to high standards that ensure the integrity of sports wagering and consumer protection. (*Id.*) Applicants for licensure must undergo a review process to ensure proper protections required by the Act are in place. (*Id.* ¶ 7.) For example, applicants must submit financial information, operational assessments, technology integrity assessments, criminal history, and information about internal controls and security necessary to monitor and report unusual or suspicious activity. *See* Tenn. Code Ann. § 4-49-117; Tenn. R. & Regs. 1350-01-.06.

Regulation of sports wagering provides substantial financial benefits to the State as well. (Thomas Decl. ¶ 14.) Each licensee must pay an annual privilege tax of 1.85% of its gross handle.[4] *See* Tenn. Code Ann. § 4-49-104(a). In 2024, Tennessee received $97,160,565 in privilege tax, and since sports wagering was legalized in 2019, the State has collected $392,555,090 (as of November 2025). (Thomas Decl. ¶ 14.) In general, 80% of the tax supports public schools, 15% of the tax funds local emergency services or infrastructure projects, and 5% of the tax supports treatment services related to gambling. Tenn. Code Ann. §§ 4-49-104(e), 4-49-119(c).

**B. Federal Regulatory Framework.** The CFTC regulates certain derivatives, which are "contracts deriving their value from underlying assets." *Inv. Co. Inst. v. CFTC*, 720 F.3d 370, 372

---

[4] "Gross handle" means "the total amount of gross wagers less cancelled or voided wagers received by the licensee over a specified period of time." Tenn. Code Ann. § 4-49-102(12).

(D.C. Cir. 2013).  In general, derivatives include "futures contracts, options, and swap agreements" and "provide a way to transfer market risk or credit risk between two counterparties."  *Inv. Co. Inst. v. CFTC*, 891 F. Supp. 2d 162, 168, n.3 (D.D.C. 2012) (citations omitted).

The CEA governs the CFTC's regulation of derivatives.  Historically, the CEA provided for the federal regulation of commodity futures.[5]  *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 362 (1982).  Enacted in 1936, the CEA extended the coverage of the Grain Futures Act to include agricultural commodities other than grain, and to "detail[] provisions regulating trading in futures contracts."  *Id*.  In 1974, Congress created the CFTC and gave it "exclusive jurisdiction" to regulate eligible derivatives.  7 U.S.C. § 2.  The 1974 amendments intended to "separate the functions of the [CFTC] from those of the Securities and Exchange Commission and other regulatory agencies."  *Merrill Lynch*, 456 U.S. at 386.

Following the 2008 financial crisis, Congress enacted the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank").  *See* Dodd-Frank, Pub. L. No. 111-203, 124 Stat. 1376 (2010).  Dodd-Frank amended the CEA to bring "swaps" under the CFTC's jurisdiction.  *See id.* § 722, 124 Stat. 1376, 1672 (amending 7 U.S.C. § 2(a)(1)(A)).  In doing so, Congress sought to bring "previously dark markets in the complex derivative instruments at the heart of the [financial] crisis known as 'swaps'" into the light.  *Inv. Co. Inst.*, 891 F. Supp. 2d at 174 (citations omitted).  Relevant here, a "swap" is defined as "any agreement, contract, or transaction . . . that provides for any purchase, sale, payment, or delivery . . . that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence."  7 U.S.C. § 1a(47)(A)(ii).

---

[5] Generally, "commodity" includes various agricultural products that are enumerated in Section 1a(9) of the CEA and "all other goods and articles . . . and all services, rights, and interests . . . in which contracts for future delivery are presently or in the future dealt in."  7 U.S.C. § 1a(9).

All swaps must be traded on a designated contract market ("DCM"). *See* 7 U.S.C. § 2(e); *N. Am. Derivatives Exch. v. Nevada Gaming Control Bd.*, 2:25-CV-00978, 2025 WL 2916151, at *9, n.12 (D. Nev. Oct. 14, 2025) ("*Crypto*") (noting other forms of trading inapplicable to this case). CFTC-approved DCMs must comply with the "core principles" and applicable CFTC rules and regulations. 7 U.S.C. § 7(d)(1)(A). Historically, "a DCM had to get the CFTC's preapproval to list contracts by convincing the CFTC that its contracts satisfied an economic purpose test and were not contrary to the public interest." *Crypto*, 2025 WL 2916151, at *2. But in 2000, Congress gave DCMs the ability to "self-certify" that their contracts were legal. *Id.*; *see* 7 U.S.C. § 7a-2(c)(1).

As part of Dodd-Frank, Congress passed a "Special Rule" authorizing the CFTC to classify certain event contracts as "contrary to the public interest" if they involve certain subject matters, including "gaming." *See* 7 U.S.C. § 7a-2(c)(5)(C)(i). Congress strove to "prevent derivatives contracts that . . . exist predominantly to enable gambling through supposed 'event contracts.'" 156 Cong. Rec. S5902-01, S5906 (daily ed. July 15, 2010) (statement of Sen. Lincoln).

In 2011, the CFTC promulgated Rule 40.11 under this authority. *Crypto*, 2025 WL 2916151, at *10. Rule 40.11 expressly prohibits any event contract that "involves, relates to, or references . . . gaming, or an activity that is unlawful under any State or Federal law" from being traded on a DCM. 17 C.F.R. § 40.11(a). The CFTC noted "that its prohibition of certain 'gaming' contracts is consistent with Congress's intent to 'prevent gambling through the futures markets' and to 'protect the public interest from gaming and other events contracts.'" *Provisions Common to Registered Entities*, 76 Fed. Reg. 44776, 44786 (July 27, 2011) (citations omitted).

Most recently, the CFTC cautioned DCMs like Kalshi about the risks of "sports-related event contracts." (*See* Thomas Decl. ¶ 19, Ex. B (CFTC Advisory Letter No. 25–36 (Sept. 30,

2025)) ("CFTC Advisory").)  Specifically, the CFTC warned DCMs to "be prepared for all foreseeable conditions that may result from facilitating the trading and clearing of sports-related event contracts."  *Id*.  The agency reiterated the illegality of event contracts involving activities enumerated in the Special Rule, including those involving "gaming" or activities that are unlawful under State law.  *See id*. at 2, n.4.

## II.    Factual Background.

Kalshi is registered with the CFTC as a DCM and lists numerous "event contracts" for trading on its exchange, including "sports-event contracts."  Dkt. 1 ¶ 3.  Typically, these sports-event contracts include a binary question, with the choice to trade on the  "yes" or "no" position.  *Id*. ¶ 25.  The value of an event contract is determined by market forces, and, like sportsbook odds, pricing is determined by available information at a given time.  *See id.* ¶¶ 27–28.  Also like a sportsbook, whether a sports-event contract is successful depends on the outcome of the sports event (*i.e.*, which team wins, total points scored, etc.).  *See id.* ¶¶ 27, 31.

Kalshi began offering its sports-event contracts in January 2025, and "allow[ed] users to place positions on, for example, which teams will advance in the NCAA College Basketball Tournaments or who will win the U.S. Open Golf Championship."  *Id*. ¶ 49.  More recently, Kalshi has started offering bets that mirror typical proposition bets on players' performances (such as how many assists, points, or rebounds an NBA player will have) and parlay wagers (a combination of various wagers).  *See* Dustin Gouker, *Kalshi Launches NBA Player Props*, EVENT HORIZON (Nov. 18, 2025), https://tinyurl.com/4ztrxhtu; Ben Blatt and Amy Fan, *Is Sports Betting Illegal in Your State? Not if You Call It a 'Prediction Market,'* N.Y. TIMES (Oct. 5, 2025), https://tinyurl.com/59fny2jp.

Kalshi has marketed itself as a sportsbook, advertising that "You can now bet on sports in all 50 states with Kalshi"; that "Sports Betting [is] Legal in all 50 States on Kalshi"; and that Kalshi is "The First Nationwide Legal Sports Betting Platform."  *See* Dustin Gouker, *Ten Times Kalshi Said People Could Bet on Things*, EVENT HORIZON (Apr. 3, 2025), https://tinyurl.com/uy4ac9f2; *see also* Dustin Gouker, *Yes, Kalshi Is Still Marketing Itself As A Betting Platform*, EVENT HORIZON (Aug. 27, 2025), https://tinyurl.com/3b68u2aa.  More recently, Kalshi has advertised that one can "Put real $$ on Football" and that it is "Legal in all 50 States."  *See* Decl. of Randall Bechtel, Council Director of Investigations and Sports Integrity ("Bechtel Decl.") ¶ 8, Ex. F.[6] Kalshi's sports platform is nearly identical to other sportsbooks licensed in Tennessee, like FanDuel, DraftKings, BetMGM, and bet365.  (Bechtel Decl. ¶¶ 8–9, Ex. B–E.)  For example, Kalshi's offerings related to the Oklahoma vs. Alabama college football game in December 2025 were similar to the odds offered by DraftKings, FanDuel, BetMGM, and bet365, with offerings on which team will win, the over-under, and the spread.[7]  (*Id*.)

### III.  Procedural Background.

This litigation arose when the Council issued a cease-and-desist letter to Kalshi on January 9, 2026, demanding that Kalshi immediately stop offering sports-event contracts in Tennessee, and that it void all pending contracts entered into by persons located in Tennessee and return deposits made by those in Tennessee.  (Thomas Decl. ¶ 17, Ex. A.)  The Council believes Kalshi is illegally

---

[6] The Bechtel Declaration has been contemporaneously filed in support of this Response.

[7] Kalshi sports-event contracts plainly constitute wagers under the Act, something that Kalshi has not disputed.  Indeed, when Kalshi customers purchase sports-event contracts, they risk a sum of money on the unknown outcome of a sporting event.  *See* Tenn. Code Ann. § 4-49-102(39) (definition of "wager").  And anyone who accepts a sum of money risked on the outcome of a sporting event without a valid license issued by the Council violates the Act, and is subject to various fines, civil penalties, and injunctive relief.  *See id*. §§ 4-49-127(b)(2); 4-49-129(a), (b).

operating an unlicensed and untaxed sportsbook. (*Id.*) *See* Tenn. Code Ann. §§ 4-49-117; 4-49-127. The letter threatened to pursue various civil remedies, as well as to refer Kalshi to district attorneys for criminal prosecution, in the event Kalshi does not cease its illegal activities. (Thomas Decl. ¶ 17.) Kalshi has not complied with the Council's demands.[8] (*Id.*)

Kalshi filed suit[9] on January 9, 2026, and a motion for a temporary restraining order and preliminary injunction on January 12, 2026. Dkt. 1; Dkt. 6, 7. On January 12, this Court entered a temporary restraining order pending the hearing on Kalshi's motion for a preliminary injunction, which is scheduled for February 2, 2026. Dkt. 22, 31.

**STANDARD OF REVIEW**

Plaintiffs seek the "extraordinary and drastic remedy" of a preliminary injunction. *Enchant Christmas Light Maze & Mkt. Ltd. v. Glowco, LLC*, 958 F.3d 532, 539 (6th Cir. 2020) (citation omitted). A preliminary injunction "should not be granted unless the movant, by a clear showing,

---

[8] Kalshi suggests the Council advances a theory that "*all* event contracts amount to unlawful gambling." Dkt. 7 at 8. For the avoidance of doubt, the Council has jurisdiction only to enforce the Act, and does not contend that all event contracts amount to unlawful gambling.

[9] This is not Kalshi's first attempt to enjoin state regulators from scrutinizing its sports-event contracts. In *Martin*, the Maryland District Court denied Kalshi's motion for preliminary injunction on the grounds that the CEA does not preempt state gambling laws. *Martin*, 793 F. Supp. 3d 667. In *Hendrick*, the Nevada District Court dissolved a previously-entered preliminary injunction on the grounds that Kalshi's sports-event contracts are not "swaps." *Hendrick*, 2025 WL 3286282. The same court denied a similar motion for preliminary injunction by Crypto.com, Kalshi's competitor, on similar grounds. *Crypto*, 2025 WL 2916151. And while Kalshi had some early success in New Jersey, *Flaherty* relied heavily on the preliminary injunction that was later dissolved in *Hendrick*. *KalshiEX LLC v. Flaherty*, No. 25-CV-02152-ESK-MJS, 2025 WL 1218313 (D.N.J. Apr. 28, 2025). Each of these cases is on appeal. Kalshi also has pending motions for preliminary injunction in Ohio, New York, and Connecticut. *KalshiEX, LLC v. Schuler*, No. 2:25-cv-1165 (S.D. Oh.); *KalshiEX LLC v. Williams*, No. 1:25-cv-8846 (S.D.N.Y.); *KalshiEX LLC, v. Cafferelli*, No. 3:25-cv-02016 (D. Conn.). Most recently, a state court in Massachusetts entered a preliminary injunction *against* Kalshi, finding that the CEA does not preempt state law. *Commw. v. KalshiEX, LLC*, No. 2584-cv-2525 (Mass. Super. Ct. Jan. 20, 2026). The *Martin*, *Hendrick*, *Crypto*, *Flaherty*, and *Commw.* decisions are provided for the Court's reference in the attached Appendix.

9

carries the burden of persuasion." *Id.* To carry that burden, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *EOG Res., Inc. v. Lucky Land Mgmt., LLC*, 134 F.4th 868, 874 (6th Cir. 2025) (citation omitted). Each factor is a "prerequisite" for obtaining preliminary relief. *Id*. at 885.

## ARGUMENT

Kalshi does not meet the requirements for a preliminary injunction. It is unlikely to succeed on the merits for three reasons: (A) Kalshi does not have a cause of action to bring this suit, nor can it overcome Tennessee's sovereign immunity, (B) its sports-event contracts are not "swaps" subject to the CFTC's jurisdiction, and (C) the CEA does not preempt enforcement of the Act. Further, Kalshi will not suffer irreparable harm, and the remaining factors weigh against an injunction. Denial of the preliminary injunction is warranted.

## I. Kalshi Is Not Likely to Succeed on the Merits.

### A. Kalshi is unlikely to demonstrate a cause of action or overcome Tennessee's sovereign immunity.

1. Cause of Action. Kalshi lacks a cause of action to assert their pre-enforcement preemption challenge. To bring a federal-question claim, there must be "a legislatively conferred cause of action [which] encompasses [that] particular plaintiff's claim." *Lexmark Int'l, Inc. v. Static Control Components, Inc*., 572 U.S. 118, 127 (2014); *see Keen v. Helson*, 930 F.3d 799, 802 (6th Cir. 2019). Thus, Kalshi must be a part of the "particular class of persons [that] ha[s] a right to sue under this substantive [federal] statute." *Lexmark*, 572 U.S. at 127. That is because "[s]tatutory rights and obligations are established by Congress, and it is entirely appropriate for Congress, in creating these rights and obligations, to determine in addition, who may enforce them and in what manner." *Davis v. Passman*, 442 U.S. 228, 241 (1979). To bring a private request for

10

a pre-enforcement injunction, a plaintiff's claim must be "authorized by [the] Constitution [or] statute." *Kokkonen v. Guardian Life Ins. Co. of Am.,* 511 U.S. 375, 377 (1994).

The Sixth Circuit has been emphatic about the necessity of addressing the cause of action question. For example, "even in a case involving relief sought under *Ex parte Young*, courts must [still] determine whether Congress intended private parties to enforce [federal law] by private injunction." *Mich. Corr. Org. v. Mich. Dep't of Corr.*, 774 F.3d 895, 905 (6th Cir. 2014); *see Crugher v. Prelesnik*, 761 F.3d 610, 615 (6th Cir. 2014) (same). The Sixth Circuit recently ruled that even if "decades of circuit precedent" "assumed" a cause of action exists, absent binding precedent, when a court is "confronted directly with the question [it] must carefully assess the cause of action's validity." *Smith v. Mich. Dep't of Corr.*, 159 F.4th 1067, 1076–77 (6th Cir. 2025). Kalshi has no cause of action—it has not shown an express, implied, or equitable "private cause[] of action" to maintain this suit. *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001).

a. No Express Cause of Action. Kalshi invokes the Supremacy Clause as its only cause of action. Dkt. 1 ¶¶ 67–73. But that is directly foreclosed by Supreme Court precedent. *Armstrong v. Exceptional Child Ctr., Inc.,* 575 U.S. 320 (2015), ruled that the Supremacy Clause "does not create a cause of action." *Id*. at 324–25. The Clause itself does not "give affected parties a constitutional . . . right to enforce federal laws against the States." *Id*. at 325. It does not confer any federal rights—the Clause is just a "rule of decision." *Id*. at 324; *see Lindsey v. Whitmer*, 124 F.4th 408, 415 (6th Cir. 2024). Kalshi invokes the Supremacy Clause itself, Dkt. 1, ¶¶ 67–73, which *Armstrong* prohibits. 575 U.S. at 324-25; *see Whitmer*, 124 F.4th at 415.

b. No Implied Cause of Action. Even though Kalshi does not rely on this ground, *see* Dkt. 1, ¶¶ 67–73, it bears emphasizing that Kalshi also "do[es] not have an implied private cause of action" to enforce the CFTC's jurisdiction. *Jarrett v. Kassel*, 972 F.2d 1415, 1422 (6th

11

Cir. 1992).  A plaintiff "only ha[s] a cause of action under a federal statute if the statute's text provides . . . one."  *Keen*, 930 F.3d at 800.  To create one, the law's text must "display[] an intent to create" both a "private right" and "a private remedy."  *Sandoval*, 532 U.S. at 286; *see Mich. Corr. Org.*, 774 F.3d at 903.  The Sixth Circuit has already decided that the CEA does not create an implied right of action generally.  *See Jarrett*, 972 F.2d at 1420.  Rather, there are only implied rights of action in specific sections *not* invoked by Kalshi.  *Id*.  So, Kalshi's suit cannot proceed on these grounds.  *Id*.; *see Sandoval*, 532 U.S. at 288.

c.  <u>No Equity Cause of Action</u>.  As explained above, Kalshi  directly invokes the foreclosed idea of a direct action under the Supremacy Clause.  *See supra* at 11.  But even if this Court were to analyze Kalshi's claims under *Ex parte Young*, it still cannot succeed.  *Armstrong* stated that an equitable *Ex parte Young* action might be available for certain preemption claims. But the Court limited that remedy, emphasizing that when Congress vests enforcement authority elsewhere, it may "establish Congress's 'intent to *foreclose* equitable relief,'" like an *Ex parte Young* injunction.  *Armstrong*, 575 U.S. at 328 (cleaned up) (emphasis added); *cf. Medina v. Planned Parenthood S. Atl.*, 145 S. Ct. 2219 (2025) (recognizing the same in the context of Spending-Clause legislation).

Congress in 7 U.S.C. § 25(a)(2) and § 25(b)(5) provides the "exclusive remedy" for violations of the CEA.  Those sections deal with losses by individual traders, *see* § 25(a)(1)(A)– (D), and the liability of trading organizations for failing to follow certain rules, *see* § 25(b)(1)–(4). The statute expressly "limit[s] claims to those of a plaintiff who actually traded in the commodities market."  *Klein & Co. Futures, Inc. v. Bd. of Trade of City of New York*, 464 F.3d 255, 259–60 (2d Cir. 2006).  "By including this express remedy, Congress surely intended to preclude others." *Waskul v. Washtenaw Cnty. Cmty. Mental Health*, 979 F.3d 426, 467 (6th Cir. 2020) (Readler, J.,

12

concurring in part and dissenting in part) (cleaned up). The Sixth Circuit, in similar circumstances, has found "it difficult to believe 'that Congress intended to preserve'" a background right of action when there are "so many specific statutory remedies, including the two [express remedy] provisions." *Diaz v. Mich. Dep't of Corr.*, 703 F.3d 956, 962 (6th Cir. 2013) (quoting *Middlesex Cnty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 20 (1981)). That means Congress has "displace[ed]" Kalshi's claim for "equitable relief." *Armstrong*, 575 U.S. at 329; *see Crugher*, 761 F.3d at 615; *Mich. Corr. Org.*, 774 F.3d at 903–05; *cf. Sandoval*, 532 U.S. at 286.

True, a district court recently found that a *different* gambling statute did not displace an equity cause of action. *See Churchill Downs Tech. Initiatives Co. v. Mich. Gaming Control Bd.*, 767 F. Supp. 3d 556, 569–70 (W.D. Mich. 2025), *aff'd*, 162 F.4th 631 (6th Cir. 2025). But central to that court's reasoning was the notion that the statute lacked an "exclusive remedy." *Id*. at 569. But the CEA *does* have "exclusive remedy" provisions. *See* 7 U.S.C. § 25(a)(2), 25(b)(5). Kalshi "cannot, by invoking [courts'] equitable powers, circumvent" that limit. *Armstrong*, 575 U.S. at 328. And this Court has "no warrant to revise Congress's scheme simply because it did not 'affirmatively' preclude the availability of a judge-made action at equity." *Id*. at 329.

That is not to say that judicial review is forever precluded. It just means that Kalshi must follow the normal rule that federal constitutional rights are "invoked defensively in cases arising under other sources of law, or asserted offensively pursuant to an independent cause of action designed for that purpose." *DeVillier v. Texas*, 601 U.S. 285, 291 (2024). It would be free to assert preemption as a defense to any Tennessee proceeding.

2. <u>Sovereign Immunity</u>. For that same reason, Kalshi's inability to properly invoke *Ex parte Young*, this suit is barred by Tennessee's sovereign immunity. Tennessee is not "amenable to the suit of an individual" brought without its consent. *Seminole Tribe of Fla. v. Florida*, 517

13

U.S. 44, 54 (1996). And a claim against "a state official in his or her official capacity" is treated as a claim against "the State itself." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989).

True, in certain circumstances, *Ex parte Young* allows "a narrow exception [to sovereign immunity] grounded in traditional equity practice." *Whole Woman's Health v. Jackson*, 595 U.S. 30, 39 (2021); *see* Dkt. 1 ¶ 17. Under the narrow *Ex parte Young* exception, a plaintiff may seek a federal judicial order when they are about to be subjected to unconstitutional action by a state officer. *Whole Woman's Health*, 595 U.S. at 39. But as discussed, this suit does not fit the specific criteria necessary to qualify for the narrow *Ex parte Young* exception. *See supra* at 12–13.

### B. Kalshi's sports-event contracts are not "swaps" under the CEA.

Kalshi's claim that Tennessee law is preempted by the CEA necessarily fails because the CEA does not even apply to its sports-event contracts. The CFTC's "exclusive jurisdiction" extends "to accounts, agreements . . . and transactions *involving swaps* or contracts of sale of a commodity for future delivery . . . traded or executed on a contract market designated pursuant to section 7 of [the CEA]." 7 U.S.C. § 2(a)(1)(A) (emphasis added). To make this argument, Kalshi contends that its sports-event contracts are swaps that fall within the CEA's ambit. Dkt. 7 at 3 (citing "swap" definition for event contracts); *see also* Bechtel Decl. ¶ 10, Ex. H. But Kalshi's sports-event contracts are not "swaps." The plain text of the CEA shows that Kalshi's sports-event contracts do not come under the CFTC jurisdiction. This straightforward (1) textual reading is confirmed by (2) statutory context, (3) legislative history, and (4) CFTC regulation.[10]

---

[10] If Kalshi should change gears and contend that its sports-event contracts are something other than swaps, such as "options" or "futures" or "excluded commodities," *see* 7 U.S.C. §§ 2(a), 1a(19); Dkt. 7 at 16, n.5, the Court should reject such a contention—for the same reasons the court did in *Hendrick*. *See* 2025 WL 3286282, at *10–12, n.8. Kalshi has consistently said its sports-event contracts are swaps. (*See* Bechtel Decl. ¶ 10, Ex. H.)

14

1. <u>Text</u>. In order for a sports-event contract to be considered a "swap" under the CEA, the contract must be (a) "dependent on the occurrence, nonoccurrence, or extent of the occurrence of an event or contingency" that is (b) "associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). Kalshi's sports-event contracts are neither.

a. <u>Occurrence vs. Outcome</u>. Kalshi allows users to purchase contracts based on the *outcomes* of sporting events. (Bechtel Decl. ¶ 8, Ex. A.) Kalshi says as much in its complaint. Dkt. 1 ¶ 46 (referencing event-based *outcomes*). But an "outcome" of an event differs from the "occurrence" of an event, and a "swap" must depend on the event's "occurrence" (or nonoccurrence or extent of occurrence). The words in the relevant part of the swap definition are not themselves defined, but at the time Congress added "swap" to the CEA, "occurrence" generally meant "something that occurs" or the "action or instance of occurring." *Merriam-Webster's Collegiate Dictionary* (11th ed. 2003); *see also Black's Law Dictionary* (9th ed. 2009) (defining "occurrence" as "[s]omething that happens or takes place"). And the word "event" "usually implies an occurrence of *some importance* and frequently one having antecedent cause." *Merriam-Webster's Collegiate Dictionary* (11th ed. 2003) (synonyms for occurrence)(emphasis added); *see also American Heritage Dictionary of the English Language* (4th ed. 2000) (defining "event" as "a significant occurrence or happening."). By contrast, an "outcome" is "something that follows as a result or consequence." *Merriam-Webster's Collegiate Dictionary* (11th ed. 2003); *see also American Heritage Dictionary of the English Language* (4th ed. 2000) (similar).

Taking these definitions together, Kalshi's sports-event contracts cannot be "swaps" because they are not dependent on the sports event *taking place* (i.e., its occurrence)—it is dependent on a *result* of the sports event (i.e., its outcome). For instance, late last year Kalshi offered various contracts relating to the Oklahoma vs. Alabama game in the College Football

15

Playoff. (*See* Bechtel Decl. ¶ 8, Ex. B–E.) Kalshi users could "trade" on which team would win the game, whether Oklahoma would cover the spread, and whether the total score would exceed a certain number of points—not on whether the game itself occurred. (*Id*.) Like traditional sports bets, the trades Kalshi offers turn on the *outcome* of the game. *See Crypto*, 2025 WL 2916151, at *8 ("But who wins the Kentucky Derby is an outcome of that event, not a separate event in and of itself."); *see also Hendrick*, 2025 WL 3286282, *6 ("Kalshi's event contracts are based on the outcomes of sporting events or on things that happen during a sporting event."). Nor do such contracts depend on the occurrence of a "contingency." *Crypto*, 2025 WL 2916151, at *8, n.9. Kalshi's sports-event contracts are therefore not "swaps" within the meaning of the CEA. *See id*. at *9 ("Crypto's live presentation industry event contracts are not swaps because, as Crypto self-certified to the CFTC, these contracts turn on the outcome of the live event, not on the 'occurrence, nonoccurrence, or the extent of the occurrence' of a live event."); *Hendrick*, 2025 WL 3286282, at *6 (Kalshi's sports-event contracts "are not swaps within the CEA's meaning.").[11] This distinction alone is enough to resolve this case. *See Crypto*, 2025 WL 2916151, at *11.

        b. <u>Financial, economic, or commercial consequence</u>. Even if Kalshi's sports-event contracts were based on the occurrence of events, the contracts would still not be *associated with* a potential financial, economic, or commercial consequence. 7 U.S.C. § 1a(47)(A)(ii). To "associate" means to "connect in the mind or imagination," *American Heritage Dictionary of the English Language*, (4th ed. 2000). A "consequence" is "[s]omething that follows from an action or condition." *Id*. So, for sports-event contracts to qualify as a swap, the outcome of the event

---

[11] This conclusion makes logical sense. Swaps are used for hedging risk, and it is unrealistic to think, for example, that Baker Mayfield's rushing total or Mike Evans's receiving total in the Tampa Bay vs. Carolina NFL game provide any genuine hedging basis. (*See* Bechtel Decl. ¶ 8, Ex. G.)

must be logically connected with a financial, economic, or commercial result that *naturally follows* from the sports outcome. This requires more than simply *having* some incidental or down-the-line financial implication resulting from an event; there must be an inherent connection. *See Hendrick*, 2025 WL 3286282, at *6.

The financial and economic interests given in the other subparts of the "swap" definition confirm this interpretation, as each of these subparts "refer(s) almost exclusively to financial measures, indices, or instruments." *See id*. at *7 (applying *noscitur a sociis* canon). Additionally, if the "swap" definition in subpart (ii) is interpreted as Kalshi asks, then practically anything would qualify as a swap, rendering other subparts of the "swap" definition superfluous. *See id.* at *9 (applying canon against superfluity).

The economic consequences Kalshi offers, *see* Dkt. 1 ¶ 31, are exactly the kind of attenuated, incidental, down-the-line consequences that a plain-text reading prohibits. There is a significant difference between *having* a potential financial, economic, or commercial consequence and being *associated with* (i.e. inherently joined or connected to) a potential financial, economic, or commercial consequence. *See Hendrick*, 2025 WL 3286282, at *6. The problem with Kalshi's interpretation is that it knows no limiting principle. Regardless of whether Oklahoma or Alabama covers the spread, the same economic activity will occur. After all, advertisers will run ads no matter how many points Alabama or Oklahoma score. The same is true on bets about individual players' in-game performances.[12]

2. <u>Statutory Context</u>. Congress does not "hide elephants in mouseholes." *Whitman v. Am.*

---

[12] Kalshi previously conceded that sporting-event outcomes are not associated with potential financial, economic, or commercial consequences. *See Hendrick*, 2025 WL 3286282, at *7, n.3. Kalshi's previous position was correct—the outcomes of sporting events "carry no economic risks," have "no inherent economic significance," and have no "economic consequences outside of the game itself." *Id*.

*Trucking Associations*, 531 U.S. 457, 468 (2001). Congress "does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions." *Id*. Put another way, under the major-questions doctrine, "[e]xtraordinary grants of regulatory authority are rarely accomplished through 'modest words,' 'vague terms,' or 'subtle device[s].'" *W. Virginia v. Env't Prot. Agency*, 597 U.S. 697, 723 (2022) (quoting *Whitman*, 531 U.S. at 468). Instead, Congress speaks clearly when it "wishes to assign to an agency decisions of vast economic and political significance." *W. Virginia*, 597 U.S. at 716 (citations omitted). A "colorable textual basis" is not enough. *See id.* at 722. Courts also look to "'common sense as to the manner in which Congress [would have been] likely to delegate' such power to the agency at issue." *Id*. at 722–23 (citation omitted).

This case invokes the major-questions doctrine because sports wagering is undoubtedly an issue of "vast economic and political significance." As noted in *Murphy*, "Americans have never been of one mind about gambling, and attitudes have swung back and forth." 584 U.S. at 458. Sports gambling in particular "has long had strong opposition. Opponents argue that it is particularly addictive and especially attractive to young people with a strong interest in sports." *Id*. at 460. And Congress has *expressly* legislated this area numerous times. For example, the federal Wire Act of 1961 prohibits wagering on sporting events across state lines unless permitted under state law. *See* 18 U.S.C. § 1084(a)–(b). The Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. § 2701, *et seq*., exists in part "to provide a statutory basis for the operation of gaming by Indian tribes" *Id*. § 2702. And PASPA, before it was overturned in *Murphy*, made "it 'unlawful' for a State or any of its subdivisions 'to sponsor, operate, advertise, promote, license, or authorize by law or compact . . . a lottery, sweepstakes, or other betting, gambling, or wagering scheme based . . . on' competitive sporting events." *Murphy*, 584 U.S. at 461 (citing 28 U.S.C. § 3702).

18

Economically, it is estimated that in 2024 alone, legal-sports-betting revenue was up 24.8% to $13.78 billion, as Americans *legally* wagered $149.9 *billion* on sports.[13] (Thomas Decl. ¶ 15.)

Within this historical and statutory context, Kalshi's position cannot survive under the major-questions doctrine. Here, Kalshi implies that when Congress brought "swaps" under the CFTC's purview through Dodd-Frank, it simultaneously intended to upset the balance between state and federal regulation of gaming and give the CFTC the authority to regulate the same. If the premise of Kalshi's position—that its sports-event contracts are "swaps"—is correct, then *all* sports wagering would necessarily be swept "into the CFTC's exclusive jurisdiction even though the states historically have regulated gambling through their police power." *Crypto*, 2025 WL 2916151, at *9. This is because the CEA makes it "unlawful for any person, other than an eligible contract participant, to enter into a swap unless the swap is entered into on, or subject to the rules of, a [DCM]." 7 U.S.C. § 2(e).

If Kalshi is correct and Congress intended to include within the definition of "swap" *any* contract based on any sporting-event outcome that has some potential downstream financial or economic consequence, then this would mean that practically all sports wagers would be swaps. To be sure, the typical sports wager is an enforceable contract where a sum of money is risked on the outcome of a sporting event. *See, e.g.*, Tenn. Code Ann §§ 4-49-113 (wagers as contracts); 4-49-102(39) (definition of "wager"). And under Kalshi's broad definition, any wager could theoretically have some downstream, tangential financial consequence. *See supra* at 16–17. It follows, then, that if all sports wagers are swaps and all swaps must be traded on a DCM, that all sports wagers must be made on a DCM. This cannot be what Congress intended.

---

[13] *See* American Gaming Association's 2025 State of the States, *available at* https://tinyurl.com/54uaasxa (last accessed January 11, 2026).

Had Congress intended to give the CFTC such vast regulatory authority over sports wagering—something already traditionally regulated by the states—then "it surely would have said so." *Crypto*, 2025 WL 2916151, at \*10; *see also FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000) ("Congress could not have intended to delegate a decision of such economic and political significance to an agency in so cryptic a fashion."). The Court "must be guided to a degree by common sense" in determining whether Congress intended such a sea-changing decision. *See Brown & Williamson*, 529 U.S. at 133. It defies reason to find that Congress intended to make this delegation without saying so. *See Whitman*, 531 U.S. at 468; *W. Virginia*, 597 U.S. at 722–23.

This rings especially true given that sports wagering was largely illegal across the country when Dodd-Frank was enacted, and for similar reasons, Kalshi's interpretation violates the canon against implied repeal. *See Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018). It strains credulity to think that Congress, in enacting Dodd-Frank, intended to repeal the Wire Act, IGRA, and PASPA and instead legalize sports gambling nationwide. Had Congress wanted to bring this topic of vast economic and political significance into the CFTC's regulatory purview, it surely would have said so more explicitly. *See Martin*, 793 F. Supp. 3d at 683.

3. <u>Legislative History</u>. Dodd-Frank was enacted in direct response to the 2008 financial crisis primarily "[t]o promote the financial stability of the United States by improving accountability and transparency in the financial system." 124 Stat. 1376. Indeed, prior to the financial crisis, over-the-counter derivatives like swaps "were generally regarded as a beneficial financial innovation that distributed financial risk more efficiently and made the financial system more stable, resilient, and resistant to shocks," but the 2008 financial crisis "essentially reversed this view." *Inv. Co. Inst.*, 891 F. Supp. 2d at 173–74 (internal citations omitted). As a result,

20

"Congress, in Dodd-Frank, 'charg[ed] the CFTC with the task of illuminating previously dark markets in the complex derivative instruments at the heart of the crisis known as 'swaps.'" *Id*. at 174 (citations omitted). "Congress thus aimed Dodd-Frank at systemic risks in the financial sector that undermined U.S. financial stability, and [Dodd-Frank's] language should be interpreted through that lens." *Hendrick*, 2025 WL 3286282, at *7.

Kalshi asserts that when Congress gave the CFTC the power to oversee and regulate exchanges in 1974, it was "concerned that the 'states . . . might step in to regulate the futures markets themselves,' thus subjecting futures exchanges to 'conflicting regulatory demands.'" Dkt. 1 ¶ 35 (quoting *Am. Agri. Movement, Inc. v. Bd. of Trade of Chicago*, 977 F.2d, 1147, 1156 (7th Cir. 1992)). Kalshi notes that the Senate "reaffirmed the CFTC's exclusive power by deleting a provision of the CEA that would have preserved the states' authority over futures trading." *Id*.

But this legislative history is far afield. It long predates the actual text involved in this case which was passed as part of Dodd-Frank. And in looking to the relevant time period, it is clear that Congress wanted to "prevent gambling through futures markets" and "protect the public interest from gaming contracts and other events contracts." 156 Cong. Rec. at S5906 (statement of Sen. Lincoln). Specifically, Congress sought to "prevent derivatives contracts that are contrary to the public interest because they exist predominantly to enable gambling through supposed 'event contracts.'" *Id*. at S5906-07. Senator Lincoln even expressed concern with respect to sports wagering, noting that it "would be quite easy to construct an 'event contract' around sporting events such as the Super Bowl, the Kentucky Derby, and Masters Golf Tournament. These types of contracts would not serve any real commercial purpose. Rather, they would be used solely for gambling." *Id*. at S5907. These concerns emphasize that the plain text of the CEA does not include sports-event contracts as "swaps."

4.  Regulatory History.  It is not surprising that the CFTC has not taken any action with respect to Kalshi's sports-event contracts.  (*See* Thomas Decl. Ex. B.)  After all, the CFTC is not a gaming regulator, and since the sports-event contracts are not actually swaps, they do not fall within the CFTC's exclusive jurisdiction.  Although CFTC's position defining "swaps" is not entitled to deference, *see Loper Bright Enters. v. Raimondo,* 603 U.S. 369, 392 (2024), it supports a conclusion that Kalshi's sports wagers are not swaps, and represents a reasoned argument the Court can look to for guidance.  *See Skidmore v. Swift & Co.,* 323 U.S. 134, 140 (1944).

In 2012, the CFTC issued a rule to clarify and further define what constitutes a swap under the CEA regulatory framework.  *See Further Definition of "Swap," "Security-Based Swap," and "Security-Based Swap Agreement"; Mixed Swaps; Security-Based Swap Agreement Recordkeeping*, 77 Fed. Reg. 48208 (Aug. 13, 2012).  The CFTC came up with a list of common transactions that consumers enter into as part of their "household and personal lives" that may have attributes of a swap, but the agency believed are *not* covered by the CEA.  *Id*. at 48246.

Sports wagers fall into this category.  In determining the types of common transactions that are not swaps, the CFTC gave three characteristics to consider: (1) the transactions "do not contain payment obligations, whether or not contingent, that are severable from the agreement, contract, or transaction;" (2) "the transactions are not traded on an organized market or over-the-counter;" and (3) the transactions "involve an asset of which the consumer is the owner or beneficiary, or that the consumer is purchasing, or they involve a service provided, or to be provided, by or to the consumer."  *Id*. at 48247.  Sports wagers have all these characteristics, and accordingly, are not swaps.  *Hendrick*, 2025 WL 3286282, at *8.  They do not contain severable payment obligations, they were not offered on DCMs until Kalshi began improperly self-certifying that they comply with the CEA and CFTC rules, and they involve consumer entertainment.  *Id*.

22

## C. There is no preemption.

Even if Kalshi's sports-event contracts are "swaps," Kalshi still cannot succeed on the merits of its claim because there is no preemption. When analyzing any preemption question, courts "start[] with the basic assumption that Congress did not intend to displace state law." *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981). "In *all* pre-emption cases," courts presume that Congress did not preempt state law, "*particularly*" in cases involving "a field which the States have traditionally occupied." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 85 (1996) (internal quotation marks omitted) (emphasis added). This creates a "strong presumption" against preemption. *Torres v. Precision Indus., Inc.*, 995 F.3d 485, 491 (6th Cir. 2021). This strong presumption exists because "States are independent sovereigns in our federal system" such that courts "have long presumed that Congress does not cavalierly pre-empt state-law causes of action." *Medtronic*, 518 U.S. at 485. When "a field which the States have traditionally occupied" is involved, "the presumption against preemption 'operates with special force.'" *Fenner v. Gen. Motors, LLC*, 113 F.4th 585, 594 (6th Cir. 2024) (citation omitted). Congress must therefore "make its intention to do so 'un-mistakably clear in the language of [a] statute.'" *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991) (quoting *Will*, 491 U.S. 58, 65 (1989)). And that is no low hurdle: The text itself must contain "exceedingly clear language . . . to significantly alter the balance between federal and state power." *U.S. Forest Serv. v. Cowpasture River Pres. Ass'n*, 590 U.S. 604, 621–22 (2020).

Federal preemption can occur in three ways: express preemption, field preemption, or conflict preemption. *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 376–77 (2015). Kalshi does not contend that express preemption applies, Dkt. 1 ¶ 2, and instead argues for (1) field preemption and (2) conflict preemption. Neither succeeds.

23

1.  <u>There is no field preemption</u>.  "Field preemption exists where Congress legislates broadly enough 'to occupy an entire field of regulation, leaving no room for the States to supplement federal law.'"  *Dayton Power & Light Co. v. FERC*, 126 F.4th 1107, 1129 (6th Cir. 2025) (quoting *Nw. Cent. Pipeline Corp. v. State Corp. Comm'n of Kan.*, 489 U.S. 493, 509 (1989)).  When the federal government has occupied a field, that field is usually rooted in some sort of compelling public policy determination.  *See, e.g.*, *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190 (1983) (nuclear safety); *Arizona v. United States*, 567 U.S. 387 (2012) (immigration registration); *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000) (foreign affairs).  In performing a field-preemption inquiry, courts look to "the *target* at which the state law *aims* in determining whether that law is pre-empted."  *Oneok*, 575 U.S. at 385 (emphasis in original).  Two important limitations guide the field-preemption inquiry.  *First*, a federally occupied field can cover a narrow subject and still preserve state law causes of action generally.  *Id.* at 376.  And *second*, the Supreme Court has not found field preemption where there has been an analogous invitation for State participation.  *See United States v. Texas*, 144 F.4th 632, 723–24 (5th Cir. 2025) (Oldham, J., dissenting) (collecting field preemption cases and noting the lack of state participation), *vacated, en banc hearing granted,* 150 F.4th 656.

According to Kalshi, it can offer sports wagering by calling the bets "sports-event contracts."  Kalshi then "self-certifies" these "sports-event contracts" as eligible swaps listings.[14]

---

[14] The CFTC is *not required to act* on self-certified event contracts.  7 U.S.C. § 7a-2(c)(1); *see also Hendrick*, 2025 WL 3286282, at *4.  Instead, the CFTC *may* conduct a preapproval of an event contract at the request of a DCM or *may, but is not required to*, conduct a post-listing review.  7 U.S.C. §§ 7a-2(c)(4)–(5).  And the CFTC itself has confirmed that it has not been asked to, nor has it conducted any such review of any sports-event contracts.  *See* CFTC Advisory at 2, n.4. To the contrary, consistent with Congressional intent, the CFTC has expressly prohibited contracts involving, relating to, or referencing "gaming" from being listed on DCMs.  *See* 17 C.F.R. § 40.11.

*See* 7 U.S.C. § 7a-2(c)(1); 17 C.F.R. § 40.2(a)(3)(iv).  Once contracts are listed on a DCM, according to Kalshi, any regulation is subject to the CFTC's "exclusive jurisdiction."  Dkt. 7 at 11 ("Kalshi's event contracts are traded on a contract market designated by the CFTC, and the CFTC has 'exclusive jurisdiction' to regulate these contracts.").  Not so.  Neither the (a) plain text nor (b) context of 7 U.S.C. § 2(a)(1)(A)'s jurisdiction clause support finding field-preemption.

      a.  <u>Text</u>.  "Jurisdiction . . . is a word of many, too many, meanings." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 510 (2006) (quoting *Steel Co. v. Citizens for Better Env't,* 523 U.S. 83, 90 (1998)).  To Kalshi it means field preemption.  Dkt. 7 at 11.  But the Supreme Court has rejected equating a jurisdictional grant with field preemption.  In *Oklahoma v. Castro-Huerta* the Court was tasked with interpreting an "exclusive jurisdiction" clause.  *See* 597 U.S. 629, 641–42 (2022).  It found that the statutory language "exclusive jurisdiction" "*does not* preempt state law."  *Id*. at 643 (emphasis added).  That makes sense because there is a "deeply rooted presumption in favor of concurrent state" authority.  *Tafflin v. Levitt*, 493 U.S. 455, 459 (1990).  Field preemption is "rare."  *Kansas v. Garcia*, 589 U.S. 191, 208 (2020).  And *only* occurs when Congress has "left no room for supplementary state legislation."  *Id*. (quotation omitted); *see Oneok*, 575 U.S. at 385. The CEA's jurisdictional provision does not do that.

Rather than act as a field-preemption clause, the CEA's "exclusive jurisdiction" gives the CFTC sole regulatory authority over certain transactions separate *from other federal agencies*. The jurisdiction clause focuses on drawing the boundary between the CFTC's and the SEC's respective authority: "Except [for the CFTC's "exclusive jurisdiction"], *nothing* contained in this section shall (I) supersede or limit the jurisdiction at any time conferred on the [SEC] or other regulatory authorities under the laws of the United States or of any State, or (II) restrict the [SEC] and such other authorities from carrying out their duties and responsibilities in accordance with

such laws.") (emphasis added). 7 U.S.C. § 2(a)(1)(A). The grant of exclusive jurisdiction "was to avoid unnecessary, overlapping and duplicative regulation, especially as between the [SEC] and the new CFTC." *F.T.C. v. Ken Roberts Co.*, 276 F.3d 583, 588 (D.C. Cir. 2001) (citations and quotations omitted). This is not the type of "exceedingly clear language" needed "to significantly alter the balance between federal and state power." *Cowpasture River*, 590 U.S. at 621–22.

Confirming that jurisdiction in the CEA does *not* mean preemption, the CEA also includes savings clauses and express-preemption provisions. 7 U.S.C. §§ 2(a)(1)(A); 16(e)(2); 16(h); *see Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 492 (1987); *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 517 (1992); *Freightliner Corp. v. Myrick*, 514 U.S. 280, 288 (1995). *First*, the CEA expressly provides that "Except as hereinabove provided, nothing contained in this section shall (I) supersede or limit the jurisdiction at any time conferred on . . . regulatory authorities under the laws . . . of any State, or (II) restrict . . . such other authorities from carrying out their duties and responsibilities in accordance with such laws." 7 U.S.C. § 2(a)(1)(A). This shows Congress intended "continued exercise of state power, not to handicap or dilute it." *See Oneok*, 575 U.S. at 385. Such language does not create field preemption. *See Fenner*, 113 F.4th at 603; *Ontario v. City of Detroit*, 874 F.2d 332, 342–43 (6th Cir. 1989); *Medtronic*, 518 U.S. at 485. *Second*, the CEA contains two express-preemption clauses, 7 U.S.C. §§ 16(e)(2), 16(h), that are far afield, and on which Kalshi does not rely. "Congress's decision to expressly preempt state gaming laws for certain transactions and state-insurance laws for swaps—compared to its silence as to all others—is strong evidence that Congress did not intend to regulate so comprehensively as to exclude all state law." *Martin*, 793 F. Supp. 3d at 681 (citing *Cipollone*, 505 U.S. at 517; *Freightliner Corp.*, 514 U.S. at 288).

b. Context. Confirming this plain-text reading, Congress did not nationally legalize gambling in the CEA because it was otherwise illegal in numerous federal statutes. *See supra* at

18.  Congress did not impliedly repeal all these statutes.  After all, an implied repeal occurs only when "the latter Act covers the *whole subject* of the earlier one and is clearly intended as a substitute."  *McKenna v. Dillon Transport, LLC*, 97 F.4th 471, 476 (6th Cir. 2024) (quoting *Carcieri v. Salazar*, 55 U.S. 379, 395 (2009)) (emphasis added).  Similarly, Kalshi's theory of field preemption implicates the major-questions doctrine.  *See supra* at 18–20.  Sports wagering is undoubtedly an issue of "vast economic and political significance." *W. Virginia*, 597 U.S. at 716.  And Congress did not hide the elephant of nationwide legal sports gambling in the mousehole of swaps regulation.  *See supra* at 17–20.  Kalshi's contrary arguments do not bear scrutiny.

*First*, Kalshi's reading of the text leads to absurd results.  "Where the plain language of the statute would lead to patently absurd consequences that Congress could not possibly have intended, [courts] need not apply the language in such a fashion."  *Pub. Citizen v. U.S. Dept. of Justice*, 491 U.S. 440, 470 (1989) (Kennedy, J., concurring) (cleaned up).  Under Kalshi's reading, it could offer a "sports-event contract" on activities illegal under state law such as dog-fighting.  *See* Tenn. Code Ann. § 39-14-203 (criminalizing animal fighting).  In Kalshi's view, because the dog fight involves a DCM-listed contract, "that leaves no room for state regulation."  Dkt. 7 at 10.  The message from Kalshi is clear: *if a contract is listed on a DCM*, it can be regulated by no one but the CFTC irrespective of the circumstances.  *Id*. at 11 ("Congress cabined federal preemption to contracts traded *on DCMs*") (emphasis in original).  But it cannot be the case that listing a contract on a DCM abrogates such a wide sweep of state law, especially in areas so traditionally associated with the state's historic police power. *Ah Sin*, 198 U.S. at 505–06.  If so, the possibilities for Kalshi's offerings are endless—whether legal or illegal activity is involved.  Can the IRS utilize its powers to levy on the proceeds from one of Kalshi's contracts for back taxes?  Can the FBI and DOJ investigate and prosecute illegal activity taking place on Kalshi's platform?  Under Kalshi's

27

theory of field preemption, the answer is an emphatic "no." That cannot be what Congress intended. *Cipollone*, 505 U.S. at 517.

*Second*, Kalshi almost exclusively relies on the 1974 amendments to the CEA. Dkt. 7 at 11–13. But "swaps" were not covered by the CEA following the 1974 amendments, nor of course by the original 1936 Act. Not until Dodd-Frank did "swaps" even come within the CEA's purview. Thus, prior to 2010, the CFTC had no jurisdiction, exclusive or otherwise, over anything relating to "swaps." Kalshi's repeated overtures to the 1974 amendments are irrelevant. Whatever "exclusive jurisdiction" the 1974 amendments provided to the CFTC did not involve Kalshi's product at the heart of this case: traditional sports wagering. What matters to this case is Dodd-Frank and what followed. Kalshi's focus, however, is conspicuously elsewhere. So, its arguments are unavailing on the question of Congress's clear and manifest intent in the post-Dodd-Frank CEA. To the contrary, the applicable legislative history shows no preemptive intent. *See supra* at 20–21; *Martin*, 793 F. Supp. 3d at 683–84.

*Third*, Kalshi's final arguments relating to the CEA's "comprehensive regulatory scheme" similarly miss the mark.[15] Dkt. 7 at 14–15. Field preemption cannot be inferred from regulations alone. *See Hillsborough Cnty. v. Automated Med. Labs, Inc.*, 471 U.S. 707, 717 (1985). And the subject of this case—sports wagering—and the "target" of the CEA bear no relationship to Kalshi's compliance obligations to maintain its DCM status. *Oneok*, 575 U.S. at 385.

Adding it all up, nothing in the text or context of 7 U.S.C. § 2(a)(1)(A) field preempts state gaming laws. Rather, "[i]t is absurd to think that Congress intended for DCMs to turn into

---

[15] Kalshi's reliance on *Blue Lake Rancheria v. Kalshi Inc.*, No. 25-cv-06162, 2025 WL 3141202, at *7 (N.D. Cal. Nov. 10, 2025) is misplaced. *See* Dkt. 7 at 14–15. The *Blue Lake* decision dealt with application of the Unlawful Internet Gambling Enforcement Act to gaming on tribal lands and did not involve preemption. Even then, it was not well-reasoned, and it relied in part on the preliminary injunction that was later dissolved in *Hendrick*.

28

nationwide gambling venues on every topic under the sun to the exclusion of state regulation and with no comparable federal regulator without ever mentioning that was the goal when Congress added swaps to the CEA in 2010." *Hendrick*, 2025 WL 3286282, at *9.

2. <u>There is no conflict preemption</u>. The Act does not encroach upon the CEA's regulatory jurisdiction. It does not regulate derivatives trading, and in turn, the CEA does not regulate sports wagering. *See Pac. Gas & Elec.*, 461 U.S. at 213, 216; *De Canas v. Bica*, 424 U.S. 351, 362 (1976); 7 U.S.C. § 2(a)(1)(A). There is no conflict. Conflict preemption exists when a state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941), or when the state laws at issue conflict with federal laws, such as where "compliance with both federal and state regulations is a physical impossibility," *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–43 (1963). The "[i]mplied preemption analysis does not justify 'freewheeling judicial inquiry into whether a state statute is in tension with federal objectives,' as such an endeavor 'would undercut the principle that it is Congress rather than the courts that preempts state law.'" *Fenner*, 113 F.4th at 593–94 (quoting *Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 607 (2011)). It is a textbook rule that "[t]he mere fact that state laws . . . overlap to some degree with federal [laws] does not even begin to make a case for conflict preemption." *Garcia*, 589 U.S. at 211. That is why the Sixth Circuit requires "a high threshold" to succeed in a conflict preemption claim. *Dayton Power*, 126 F.4th at 1128 (citation omitted). A "state law is 'conflict' preempted *only* 'to the extent it *actually conflicts* with federal law.'" *Fenner,* 113 F.4th at 594 (citation omitted) (emphasis added).

a. <u>No Obstacle</u>. The Act does not represent an obstacle to the CEA. It does not regulate "accounts, agreements . . . , and transactions involving swaps or contracts of sale of a commodity for future delivery." 7 U.S.C. § 2(a)(1)(A). Instead, it works in tandem with the CEA,

which expressly provides for the operation of state sports-wagering laws in parallel enforcement with the CEA. *See* 7 U.S.C. §7a-2(c)(5)(C)(i)(V); 17 C.F.R. § 40.11(a)(1).[16] This is because "[b]oth the text and purpose of the [CEA] contemplate a regime in which other [governmental entities] may share power with the CFTC over activities that lie outside the scope of [the CFTC's exclusive jurisdiction]." *Ken Roberts Co.* 276 F.3d at 591.

That commonsense conclusion should resolve this case. Kalshi says the Act: (1) "subject[s] regulated exchanges to multiple conflicting regimes;" (2) "hampers the careful balance struck by Congress" relating to "specific enforcement method[s]" over swaps; and (3) "disrupt[s] the congressional calibration of force" potentially exerted by regulators. Dkt. 7 at 17–18. But to support these conclusions Kalshi relies on *field* preemption cases. *Id.*; *Crosby*, 530 U.S. 363; *Arizona*, 567 U.S. at 399. *Crosby* dealt with foreign affairs while *Arizona* dealt with immigration registration—both subjects within the province of the federal government. Those field preemption cases "bear[] little resemblance to gambling, which states have a strong interest in regulating, . . ., the regulation of gambling is precisely the kind of area of law that has been traditionally considered to be within the purview of state regulatory authority." *Martin*, 793. F. Supp. 3d at 685.

b. <u>No Impossibility</u>. The "high bar" Kalshi must clear to successfully argue impossibility requires that it prove that the "purpose of the [CEA] cannot otherwise be accomplished" and whether the Act "directly interfere[s] with the operation" of the CEA. *Dayton Power*, 126 F.4th at 1127–28. Kalshi "does not meet that high bar." *Id.* at 1128. Kalshi thinks it impossible to comply with the Act without risking non-compliance with the CFTC due to (1) its

---

[16] Indeed, the CFTC has already decided on a "blanket basis" that contracts involving "gaming" are expressly illegal. *Crypto*, 2025 WL 2916151, at *10. Because Kalshi's sports-event contracts are not eligible for listing on a DCM, they are not entitled to any preemptive effect. *See* 7 U.S.C. § 16(e)(1)(B)(i).

alleged inability to adhere to the "Core Principles on which Kalshi's designation as a DCM depends," (2) its alleged inability to verify geographic location, and (3) its CFTC obligation to provide "impartial access" to users. Dkt. 7 at 19. Not so.

"[T]he CFTC's Core Principles and [Tennessee's] gaming laws work in tandem." *Martin*, 793 F. Supp. 3d at 686. The Core Principles "seek to address the efficient functioning of the derivatives and futures markets[,] [and the Act is] focused on protecting the public from potential gambling issues." *Id.*; *see, e.g.,* Tenn. Code Ann. §§ 4-49-111, 4-49-112. Neither legal regime interferes with the other. *Dayton Power*, 126 F.4th at 1127–28. The Act does not regulate any matter within 7 U.S.C. § 2(a)(1)(A), and the CEA does not regulate anything within the Act. *See id.* § 7a-2(c)(5)(C)(i)(V).

Geofencing technology is readily available and used by all entities licensed to offer sports-wagering products in Tennessee. (Thomas Decl. ¶ 9.) Kalshi is well aware of such technology, is sophisticated enough to implement it within its systems, and simply believes that it should not have to do so under its preemption theory. Such a position is incompatible with "impossibility" preemption analysis. *Garcia*, 589 U.S. at 211; *Fenner,* 113 F.4th at 594.

Lastly, the "impartial access" rules on which Kalshi relies require access for participants of all *economic* means, not geographic locations as Kalshi argues. *See Core Principles and Other Requirements for Designated Contract Markets*, 75 Fed. Reg. 80572 (proposed Dec. 22, 2010) (to be codified at 17 C.F.R. pts. 1, 16, and 38) ("The purpose of the proposed impartial access requirements is to prevent DCMs from using discriminatory access requirements as a competitive tool against certain participants. Access to a DCM should be based on the financial and operational soundness of a participant, rather than discriminatory or other improper motives."). Such "impartial access" rules present no impediment to Kalshi complying with the CEA and the Act.

### D. Kalshi's state law arguments are meritless.

Kalshi argues state law prohibits the Council from enforcing the Act against Kalshi under Tenn. Code Ann. § 39-17-509. Dkt. 7 at 19–21. But this argument *cannot* show any likelihood of success on the merits because Kalshi has not brought any state-law claims in their complaint— only preemption. Regardless, whatever merits may exist for such argument are irrelevant because federal courts are barred from considering claims that state officials violated state law in carrying out their official duties pursuant to the Eleventh Amendment. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 120 (1984). Indeed, "[t]he Amendment . . . is a specific constitutional bar against hearing even *federal* claims that otherwise would be within the jurisdiction of the federal courts." *Id*. (emphasis in original). "This constitutional bar applies to pendent claims as well." *Id.* Even if the Court could consider Kalshi's state-law claim, it would fail on the merits. True, "lawful business transaction" is excluded from the definition of "gambling," and can include "futures or commodities trading." Tenn. Code Ann. § 39-17-501(2), (5). But Kalshi's sports-event contracts *do not* constitute swaps subject to the CFTC's jurisdiction (or any other form of derivative subject to the CFTC's exclusive jurisdiction). *See supra* at 14–22. And even if they were, they would not be *lawful* business transactions because they are expressly prohibited from being listed on a DCM pursuant to 17 C.F.R. § 40.11(a).

## II. There Is No Irreparable Harm.

Kalshi has failed to carry its "burden of establishing a clear case of irreparable injury." *Garlock, Inc. v. United Seal, Inc.*, 404 F.2d 256, 257 (6th Cir. 1968). The injury "must be both certain and immediate, not speculative or theoretical." *D.T. v. Sumner Cnty. Sch.*, 942 F.3d 324, 327 (6th Cir. 2019) (quotations omitted). And "self-inflicted harm does not constitute irreparable harm for the purposes of a preliminary injunction." *Posey v. Garland*, No. 1:23-cv-00051, 2023

32

WL 5435609, at *10 (E.D. Tenn. Aug. 23, 2023) (collecting cases). As a preliminary matter Kalshi is not entitled to its claimed presumption of harm. Dkt. 7 at 21–22. The cases finding such a presumption "are almost entirely restricted to cases involving alleged infringements of free speech, association, privacy or other rights as to which temporary deprivation is viewed of such qualitative importance as to be irremediable by any subsequent relief." *Pub. Serv. Co. of New Hampshire v. Town of W. Newbury*, 835 F.2d 380, 382 (1st Cir. 1987). Kalshi has asserted no such right here.

Kalshi relies on *Churchill Downs* for the proposition that a likely loss of competitive position and goodwill satisfies the injury prong. [17] *Churchill Downs*, 162 F.4th at 642–43. But here, unlike *Churchill Downs*, Kalshi's harms are speculative at best. Kalshi offers a suite of products, with sports-events contracts only making up a portion of its business. *See* Dkt. 1 ¶ 48. There is no evidence that Tennessee users will quit Kalshi all together, or think any differently about Kalshi's products if it obtains a license to run its sportsbook. Kalshi could easily comply with both Tennessee law and the CEA if it wanted to. *See supra* at 29–31. All licensed sports-wagering operators in Tennessee bear everyday business costs already, including costs associated with geolocating their users. (Thomas Decl. ¶ 9.) Indeed, Crypto.com, Kalshi's competitor, has reportedly begun restricting access in other states after its loss in Nevada. *See* Tom Nightingale, *Crypto.com Pulls Sports Contracts in Several States amid Pushback*, SBC AMERICAS (Dec. 16, 2025), https://tinyurl.com/5ba6hp9v. Any such cost-of-doing-business "harm" is not irreparable.

Kalshi's allegations of customer harm are unavailing. Dkt. 7 at 22–23. Third-party harm does not constitute irreparable injury, rather the inquiry looks to *the movant's own rights*. *E.g.*,

---

[17] *Churchill Downs* relies exclusively upon *Collins Inkjet Corp. v. Eastman Kodak Co.*, 781 F.3d 264 (6th Cir. 2015) for this proposition and is inapposite. *Collins Inkjet* dealt with vastly different economic activity—a small market printer-supply company suing a large-market producer for anti-trust violations under the Sherman Act—than anything involved in this case. 781 F.3d at 267–68.

33

*Am. Dairy Queen Corp. v. Brown-Port Co.*, 621 F.2d 255, 259 n.4 (7th Cir. 1980); *NAACP v. Town of E. Haven*, 70 F.3d 219, 224 (2d Cir. 1995). That the contractual obligations of some Kalshi users could be impaired because Kalshi complies with Tennessee law is beside the point.

Similarly, Kalshi's allegations of reputational harm miss the mark. Dkt. 7 at 23–24. Kalshi is engaged in litigation across the country and has already been denied preliminary injunctions in two instances, *Hendrick* and *Martin*. The world is on notice of the dubious legality of Kalshi's sports-event contracts. In short, any reputational harm has already occurred, and preliminary relief will not change that. *See Mirion Techs. (Canberra), Inc. v. Sunpower, Inc.*, No. 2:17-CV-669, 2017 WL 5090436, at *12 (S.D. Ohio Nov. 6, 2017); *Louisiana-Pac. Corp. v. James Hardie Bldg. Prods. Inc.*, No. 3:18-CV-00447-JPM, 2018 WL 7272047, at *11 (M.D. Tenn. Dec. 20, 2018).

III.    **The Balance of Equities and the Public Interest Weigh against Granting a Preliminary Injunction.**

Because Kalshi sues Defendants in their official capacities, the remaining two factors for injunctive relief merge. *See Daunt v. Benson*, 956 F.3d 396, 422 (6th Cir. 2020). Here, the equites and public interest favor denying injunctive relief.

"[H]e who comes into equity must come with clean hands." *Cleveland Newspaper Guild, Loc. 1 v. Plain Dealer Pub. Co.*, 839 F.2d 1147, 1155 (6th Cir. 1988). Kalshi has not done so. Kalshi has self-certified its sports-event contracts, even though contracts involving, relating to, or referencing "gaming" or activities unlawful under state law are explicitly prohibited under 17 C.F.R. § 40.11(a). *See supra* at 6–7. Therefore, any harm Kalshi has suffered or will suffer is of its own making. Kalshi should not be able to hide behind the self-certification process and claim harm when a state enforces its laws. This Court should deny Kalshi the relief it seeks because it has approached the Court with unclean hands. *Plain Dealer Pub. Co.*, 839 F.2d at 1155.

A court should give serious consideration to the public-interest element. *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 26–27 (2008). As discussed above, the Council does crucial work in ensuring the integrity of sports gaming and ensuring that vulnerable consumers are protected. *See supra* at 2–4. An injunction would prevent the Council from exercising its statutory duty to protect consumers and ensure a fair, accountable, and lawful sports wagering market. (Thomas Decl. ¶ 18.) Moreover, when unlicensed entities offer sports wagering in Tennessee, they draw customers away from licensed operators, harming the public fisc. (*Id.* ¶ 14.) This means less money for schools, emergency services, infrastructure projects, and addiction services. (*Id.*)

## IV.     Suggestion of Sufficient Bond.

If an injunction is granted, Defendants request the imposition of an $875,000 bond under Fed. R. Civ. P. 65(c). "When setting the amount of security, district courts should err on the high side." *Mead Johnson & Co. v. Abbott Labs.,* 201 F.3d 883, 888 (7th Cir. 2000). The Act mandates the imposition of a fine for unlawfully accepting wagers in the amount of $10,000 for the first offense, $15,000 for the second offense, and $25,000 for all subsequent offenses. Tenn. Code Ann. § 4-49-127. Kalshi has been offering sports-event contracts since January 22, 2025, and has admitted it has over 50,000 Tennessee users. Dkt. 1 ¶ 49; Dkt. 7 at 22. Even if Kalshi only accepted *one* sports wager a day from the time it began offering sports-event contracts to the day it filed this lawsuit, it could be subject to a fine of $8,775,000. An $875,000 bond is less than 10% of that amount and would represent only a modicum of Kalshi's unlawful activity anyway. *See Flaherty*, 2025 WL 1218313, at *8 (looking to statutory penalty in setting bond amount).

## CONCLUSION

For the reasons stated, the Court should deny Plaintiff's Motion for Preliminary Injunction and Temporary Restraining Order.

35

Respectfully submitted,

**JONATHAN SKRMETTI**
**Attorney General and Reporter**


/s/ *Michael Wennerlund*
MICHAEL WENNERLUND, BPR #31332
JONATHAN SHIRLEY, BPR #37738
JAMES P. URBAN, BPR #33599
Office of the Attorney General
P.O. Box 20207
Nashville, TN  37201
(615) 741-8950 (M. Wennerlund phone)
(615) 741-3521 (J. Shirley phone)
(615) 741-3739 (J. Urban phone)
Michael.Wennerlund@ag.tn.gov
Jonathan.Shirley@ag.tn.gov
James.Urban@ag.tn.gov

*Counsel for Defendants*

36

**CERTIFICATE OF SERVICE**

I hereby certify that a true and exact copy of the foregoing was filed using the Court's

CM/ECF system on January 20, 2026, which electronically served a copy to all counsel of record:

Britt K. Latham
Robert E. Cooper, Jr.
Courtney A. Hunter
**BASS, BERRY & SIMS PLC**
21 Platform Way South, Suite 3500
Nashville, TN 37203
blatham@bassberry.com
bob.cooper@bassberry.com
courtney.hunter@bassberry.com

Neal Katyal
Joshua B. Sterling
William E. Havemann
**MILBANK LLP**
1101 New York Avenue NW
Washington D.C. 20005

Grant R. Mainland
Andrew L. Porter
Nicole D. Valente
**MILBANK LLP**
55 Hudson Yards
New York, NY 10001

*/s/ Michael Wennerlund*
Michael Wennerlund

37