# APPENDIX

Defedants' Reponse in Opposition to Plaintiff's Motion for
Preliminary Injunction and Temporary Restraining Order

Case No.: 3:26-cv-00034

793 F.Supp.3d 667
United States District Court, D. Maryland.

KALSHIEX LLC, Plaintiff,

v.

John A. MARTIN, et al., Defendants

Case No. 25-cv-1283-ABA
|
Signed August 1, 2025

**Synopsis**
**Background:** Financial services company that operated derivatives exchange and prediction market filed suit against Maryland Lottery and Gaming Control Agency and Maryland Lottery and Gaming Control Commission (MLGCC), seeking declaration that federal Commodity Exchange Act (CEA) preempted Maryland's gaming laws as applied to company, by preventing company from offering sports-event contracts in Maryland on company's designated contract market (DCM) platform. without registering as sports wagering licensee. Company moved for preliminary injunction preventing civil and criminal enforcement of Maryland's gaming laws against company.

**Holdings:** The District Court, Adam B. Abelson, J., held that:

company lacked likelihood of success on field-preemption theory, and

company lacked likelihood of success on conflict-preemption theory.

Motion denied.

**Procedural Posture(s):** Motion for Preliminary Injunction.

**Attorneys and Law Firms**

Joshua B. Sterling, Pro Hac Vice, William Ernest Havemann, Neal Kumar Katyal, Milbank LLP, Washington, DC, Mackenzie Austin, Pro Hac Vice, Milbank LLP, Los Angeles, CA, for Plaintiff.

Erik James Delfosse, Alan P. Goodwich, Max F. Brauer, Office of the Attorney General- State of Maryland, Securities Division, Baltimore, MD, for Defendants.

Bryan Newland, Pro Hac Vice, Ronald Shreve Connelly, Powers Pyles Sutter & Verville PC, Washington, DC, Elizabeth A. Bower, Pro Hac Vice, Joseph H. Webster, Pro Hac Vice, Hobbs Straus Dean & Walker LLP, Washington, DC, Michael C. Hoenig, Pro Hac Vice, Yuhaaviatam of San Manuel Nation, Washington, DC, Scott David Crowell, Pro Hac Vice, Crowell Law Office-Tribal Advocacy Group, Sedona, AZ, for Amici Indian Gaming Association, National Congress of American Indians, California Nations Indian Gaming Association, Arizona Indian Gaming Association, Oklahoma Indian Gaming Association, United South and Eastern Tribes Sovereignty Protection Fund, Tribal Alliance of Sovereign Indian Nations, Blue Lake Rancheria, Chicken Ranch Rancheria of Me-Wuk Indians of California, Elk Valley Rancheria, Enterprise Rancheria of Maidu Indians of California, Guidiville Rancheria of California, Ho-Chunk Nation of Wisconsin, Jamul Indian Village of California, Kalispel Tribe of Indians, Karuk Tribe, Klamath Tribes, Lytton Rancheria of California, Middletown Rancheria of Pomo Indians of California, Morongo Band of Mission Indians, Pechanga Band of Indians, Penobscot Nation, Picayune Rancheria of Chukchansi Indians of California, Pueblo of Acoma, Puyallup Tribe, Redding Rancheria, Rincon Band of Luiseo Mission Indians, Santa Ynez Band of Chumash Mission Indians, Seminole Tribe of Florida, Shoalwater Bay Indian Tribe, Suquamish Indian Tribe of the Port Madison Reservation, Table Mountain Rancheria, White Earth Nation, Yuhaaviatam of San Manuel Nation.

**MEMORANDUM OPINION**

Adam B. Abelson, United States District Judge

**\*671** Plaintiff KalshiEX LLC ("Kalshi") is a financial services company that operates a derivatives exchange and prediction market. Kalshi has moved to enjoin the Maryland Lottery and Gaming Control Agency, and the Maryland Lottery and Gaming Control Commission, from pursuing civil and criminal enforcement of Maryland's gaming laws against Kalshi for offering sports-event contracts in Maryland without registering as a sports wagering licensee. Kalshi argues that Maryland's gaming laws are preempted by the federal Commodity Exchange Act, and thus cannot be enforced with respect to Kalshi's sports-event contracts

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works. 1

when offered in Maryland on its designated contract market platform. For the reasons explained below, Kalshi has failed to show a likelihood of success on the merits of its claim that the Commodity Exchange Act preempts Maryland's gaming laws. The motion for a preliminary injunction will be denied.

## I. BACKGROUND

A derivative is "a financial instrument or contract whose price is 'directly depending upon (i.e.[,] derived from)' the value of one or more underlying assets–for example, commodities (like corn and wheat), securities, or debt instruments." *KalshiEX LLC v. Commodity Futures Trading Commission*, No. 23-cv-3257-JMC, 2024 WL 4164694, at *1 (D.D.C. Sep. 12, 2024), *stay denied*, 119 F.4th 58 (D.C. Cir. 2024) (citing *Futures Glossary: A Guide to the Languages of the Futures Industry*, CFTC, https://perma.cc/63HY-DD7E). An event contract is a kind of derivative the "payoff" of which is "based on a specified event, occurrence or value." *Id.* at *2 (citing *Contracts & Products: Event Contracts*, CFTC, https://perma.cc/CG2B-EYWY). "These contracts are generally binary[;] the buyer may take a 'yes' position that the specified event will take place whereby the seller implicitly takes the 'no' position." *KalshiEX LLC v. Mary Jo Flaherty, et al.*, No. 25-cv-2152-ESK-MJS, 2025 WL 1218313, at *1 (D.N.J. Apr. 28, 2025) (citing *id.* at *1). The contract can be purchased or sold any time before its expiration date for a specific value, and upon expiration, the seller will pay the buyer if the event occurs. *Id.*

 **\*672**  The Commodity Exchange Act ("CEA"), 7 U.S.C. § 1 *et seq.*, is "a comprehensive regulatory structure to oversee the volatile and esoteric futures trading complex." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 355-56, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982). The CEA provides the Commodity Futures Trading Commission (the "CFTC"), subject to certain exceptions, with "exclusive jurisdiction" with respect to "accounts, agreements ..., and transactions involving swaps or contracts of sale of a commodity for future delivery," where such transactions are "traded or executed" in particular markets or platforms, including a "contract market designated pursuant to section 7 of this title." 7 U.S.C. § 2(a)(1)(A). The section providing for such "exclusive jurisdiction" contains the following savings clause:

> Except as hereinabove provided, nothing contained in this section shall (I) supersede or limit the jurisdiction at any time conferred on the Securities and Exchange Commission or other regulatory authorities under the

laws of the United States or of any State, or (II) restrict the Securities and Exchange Commission and such other authorities from carrying out their duties and responsibilities in accordance with such laws. Nothing in this section shall supersede or limit the jurisdiction conferred on courts of the United States or any State.

7 U.S.C. § 2(a)(1)(A).

The statute was amended to govern "swaps" in 2010, pursuant to the Dodd-Frank Act. *See DTCC Data Repository (U.S.) LLC v. CFTC*, 25 F. Supp. 3d 9, 12 (D.D.C. 2014) (explaining that, "in the wake of the financial crisis," Congress amended the CEA and "established an oversight and reporting regime for swaps"); *Inv. Co. Inst. v. CFTC*, 891 F. Supp. 2d 162, 174 (D.D.C. 2012), *as amended* (Jan. 2, 2013), *aff'd*, 720 F.3d 370 (D.C. Cir. 2013) ("Congress, in Dodd-Frank, charged the CFTC with the task of illuminating previously dark markets in the complex derivative instruments at the heart of the [2008 financial] crisis known as swaps.") (cleaned up).

The CEA defines a "swap" as any agreement, contract or transaction that "provides for any purchase, sale, payment, or delivery (other than a dividend on an equity security) that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). An event contract is considered an "excluded commodity," which the CEA defines as an "occurrence, extent of an occurrence, or contingency (other than a change in the price, rate, value, or level of a commodity) ... that is (I) beyond the control of the parties to the relevant contract, agreement, or transaction; and (II) associated with a financial, commercial, or economic consequence." 7 U.S.C. § 1a(19)(iv).

An entity that wishes to be a designated contract market ("DCM") regulated under the CEA must apply to the CFTC for such designation. 7 U.S.C. § 2(e), 7(a). A DCM must comply with the "core principle[s]" set forth in 7 U.S.C. § 7, as well as the regulatory framework as set out in Part 38 of Title 17 of the U.S. Code, and "any requirement that the Commission may impose by rule or regulation pursuant to section 12a(5) of this title." 7 U.S.C. § 7(d)(1)(A)(ii). Once approved, a DCM may list agreements, contracts, transactions, or swaps on the exchange, but only if such instruments satisfy the requirements of 7 U.S.C. § 7a-2(c), entitled "New contracts, new rules, and rule amendments," and only if the DCM provides a written  **\*673**  certification of such compliance, 7 U.S.C. § 7a-2(c)(1).

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Kalshi "is a regulated exchange and prediction market where users can buy and sell event contracts." ECF No. 1 ¶ 45. The CFTC has certified Kalshi as a DCM. *Id.* Kalshi offers an exchange "where individual, retail, and institutional participants can hedge their risks on event-based outcomes." *Id.* ¶ 46. These "event contracts" relate "to an array of substantive areas such as climate, technology, health, crypto, popular culture, and economics." *Id.* ¶ 47. Among this array of areas, "Kalshi offers sports-event contracts." *Id.* ¶ 48.

Congress required that the Commission play an important role in deciding the types of financial instruments that could be traded on DCMs. For "a new contract or other instrument," approval by the Commission is required, although by statute the Commission "shall approve" a new event contract or other instrument unless the Commission concludes it violates the CEA or regulations. *Id.* § 7a-2(c)(5)(B). A similar rule applies to approval of a "new rule, or rule amendment," which is not at issue in this case. *Id.* § 7a-2(c)(5)(A).

But there is also a process for DCMs to avoid pre-approval if the DCM "self-certifies," in writing, that a new contract or other instrument complies with all applicable requirements. *Id.* § 7a-2(c)(1). That is the process Kalshi used for the sporting event contracts at issue here. When a DCM invokes the self-certification process for a new event contract, it must submit a "written certification that the new contract ... complies with this chapter (including regulations under this chapter)." *Id.* The contracts are immediately effective unless and until the CFTC initiates review of any contract. *See* 7 U.S.C. § 7a-2(c)(2); 17 C.F.R. § 40.11(c).[1]

Although Congress required the Commission to approve new contracts if they comply with the CEA and applicable regulations, and allowed for self-certification, it expressed a concern that some "event contracts" could begin to be traded that would be "contrary to the public interest." *Id.* § 7a-2(c)(5)(C). So as part of the Dodd-Frank Act, Congress enacted a "Special rule for review and approval of event contracts and swaps contracts." *Id.* § 7a-2(c)(5)(C); Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010). That Special Rule requires a "public interest" review when it comes to event contracts that involve "(I) activity that is unlawful under any Federal or State law; (II) terrorism; (III) assassination; (IV) war; (V) gaming; or (IV) other similar activity determined by the Commission by rule or regulation, to be contrary to the public interest." *Id.* Congress considered contracts "based upon the occurrence,

extent of an occurrence, or contingency" of those types of events—including "gaming" and "activity that is unlawful"—to require that additional scrutiny. Congress then made clear that "[n]o agreement, contract, or transaction determined by the Commission to be contrary to the public interest under [§ 7a-2(c)(5)(C)(i)] may be listed or made available for clearing or trading on or through a registered entity." *Id.* § 7a-2(c)(5)(C)(ii). That public interest review does not supersede the self-certification process; a DCM may satisfy the Special Rule by self-certifying compliance. But in doing so the statute requires a DCM to certify that a new contract or rule is not "unlawful," does not involve terrorism, assassination, **\*674** war or gaming, and is not otherwise "contrary to the public interest." That is what happened here: Although Kalshi could have requested pre-approval from the Commission regarding whether Kalshi could lawfully conduct sports betting on its platform, *id.* § 7a-2(c)(4)(A), instead on January 24, 2025, "Kalshi self-certified and began listing sports-event contracts on its exchange," allowing users to "place positions on which teams will advance in certain rounds of the NCAA College Basketball Championship or who will win the U.S. Open Golf Championship." ECF No. 1 ¶ 49.

On April 7, 2025, the Maryland Lottery and Gaming Control Commission (MLGCC) sent Kalshi a cease-and-desist letter directing Kalshi "to immediately cease and desist offering in Maryland its event contract ... and any other contract or product that provides an investing opportunity based on predicting the outcome of any sporting league play or any sporting event." ECF No. 1-1 at 2. The MLGCC explained, "[u]nder Maryland law, a gaming activity is illegal unless it is expressly authorized by the Annotated Code of Maryland, Criminal Law Article ('Crim. Law'), Titles 12 and 13." *Id.* And "[s]ports wagering is an authorized gaming activity in Maryland that is legal only if it is offered and conducted as required by the State's Sports Wagering Law (State Government Article ("SG") § 9-1E-01, *et seq.*)." *Id.*

The MLGCC stated that event contracts based on the outcome of sporting events constitute "sports wagering," which under Maryland law is defined as "the business of accepting wagers on any sporting event by any system or method of wagering, including single-game bets, teaser bets, parlays, over-under, moneyline, pools, *exchange wagering*, in-game wagering, in-play bets, proposition bets, and straight bets." SG § 9-1E-01(j) (emphasis added). An exchange wager is "a wager in which a bettor wagers with or against another bettor through a sports wagering licensee." Code of Maryland Regulations ("COMAR") 36.10.01.02B(24). A "mobile sports wagering

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

licensee" is defined as "a sports wagering licensee who is authorized to conduct and operate online sports wagering." SG § 9-1E-01(e). Because Kalshi was engaged in sports wagering, the MLGCC explained that to operate that aspect of its business in Maryland it would have to, among other things, obtain a "sports wagering license[ ]" and comply with all state laws that apply to such licensees, including with regard to data security and advertising, including a prohibition on advertising to "individuals who are prohibited from participating in sports wagering and other at-risk individuals." SG § 9-1E-03.

Kalshi does not dispute that it does not comply with those state laws. But it has filed this lawsuit, seeking a declaration that it need not comply with those laws because they have been preempted by the Commodity Exchange Act. Kalshi also filed a motion for a temporary restraining order and/ or preliminary injunction, arguing that Kalshi is likely to succeed on the merits of its preemption claim. ECF No. 2. The parties jointly stipulated that Defendants "will refrain from seeking to enforce against Plaintiff any state laws referenced in the April 7 cease-and-desist letter pending the Court's disposition of Plaintiff's motion for a preliminary injunction." ECF No. 21 at 1. Defendants filed a response to the preliminary injunction motion on May 12, 2025, ECF No. 28, and Kalshi filed a reply on May 19, 2025, ECF No. 29. The Court held a hearing on May 28, 2025 and ordered the parties to file supplemental briefing, which the parties then filed. ECF Nos. 36, 37, 62, 63. A number of Indian **\*675** tribes and gaming associations also filed an amicus brief in this case. ECF No. 65.[2]

## II. LEGAL STANDARD

To obtain a preliminary injunction, a plaintiff must establish four factors: (1) that they are likely to succeed on the merits; (2) that they are likely to suffer irreparable harm absent relief; (3) that the balance of equities favors them; and (4) that an injunction is in the public interest. *Frazier v. Prince George's Cnty.*, 86 F.4th 537, 543 (4th Cir. 2023) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008)). A party seeking preliminary injunctive relief must satisfy all four factors. *Real Truth About Obama, Inc. v. FEC*, 575 F.3d 342, 347 (4th Cir. 2009), *vacated on other grounds*, 559 U.S. 1089, 130 S.Ct. 2371, 176 L.Ed.2d 764 (2010). And a preliminary injunction, being an "extraordinary remedy," may "only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*,

555 U.S. at 22, 129 S.Ct. 365 (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997)).

## III. LIKELIHOOD OF SUCCESS ON THE MERITS

Kalshi argues that it is likely to succeed on the merits of its claim because Maryland's gaming laws are preempted by the CEA as applied to Kalshi's sports-event contracts because Kalshi is regulated as a DCM. ECF No. 2 at 11-16. Defendants contend that (1) the sporting event contracts at issue are not "swaps" within the meaning of the CEA, and (2) even if they are covered by the CEA, the CEA does not preempt Maryland's gambling laws that apply to sports wagers. ECF No. 28 at 16-32. The Court will assume without deciding that Kalshi's sports-event contracts are in fact swaps. Nonetheless, for the following reasons, Kalshi has not established a likelihood of success on the merits of its claim that Maryland's laws regulating sports betting have been preempted by the Commodity Exchange Act.

The Supremacy Clause provides that the Constitution and other federal laws "shall be the supreme Law of the Land ... any Thing in the Constitution or Laws of any state to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. Congress therefore has the power to preempt state law. *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000). There are three types of federal preemption: (1) express preemption, (2) field preemption, and (3) conflict preemption. *Id.* "Congress may withdraw specified powers from the States by enacting a statute containing an express preemption provision." **\*676** *Arizona v. United States*, 567 U.S. 387, 399, 132 S.Ct. 2492, 183 L.Ed.2d 351 (2012) (citing *Chamber of Commerce of United States of America v. Whiting*, 563 U.S. 582, 592, 131 S.Ct. 1968, 179 L.Ed.2d 1031 (2011)).

Kalshi does not contend that the CEA expressly preempts state law. Kalshi instead relies principally on a field preemption theory. It argues that Congress, in expanding the CEA to cover swaps traded on designated contract markets, has occupied that "field" such that when online sports wagers are offered by a company like Kalshi, as opposed to by online sportsbooks like FanDuel or DraftKings, they need not comply with state gaming laws. Kalshi alternatively argues that even if field preemption does not apply, the Court should construe Maryland's gaming laws to so thoroughly conflict with the CEA that they are conflict-preempted. "[T]he purpose of Congress is the ultimate touchstone in every preemption case." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996). For the

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

following reasons, Kalshi has not shown that when Congress enacted and amended the CEA it intended to preempt state gaming laws when sports wagers are made on a platform like Kalshi's.

### A. Field Preemption

A party arguing that Congress has occupied an entire field of law must show that "Congress, acting within its proper authority, has determined" that all "conduct in [that field] ... must be regulated by its exclusive governance." *Arizona*, 567 U.S. at 399, 132 S.Ct. 2492. Field preemption applies only "[i]n rare cases," where "Congress 'legislated so comprehensively' in a particular field that it 'left no room for supplementary state legislation,' " *Kansas v. Garcia*, 589 U.S. 191, 208, 140 S.Ct. 791, 206 L.Ed.2d 146 (2020) (quoting *R.J. Reynolds Tobacco Co. v. Durham County*, 479 U.S. 130, 140, 107 S.Ct. 499, 93 L.Ed.2d 449 (1986)), or where "there is a 'federal interest ... so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.' " *Arizona*, 567 U.S. at 399, 132 S.Ct. 2492 (citing *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947)).

There is a strong presumption against preemption. "In all pre-emption cases, and particularly in those in which Congress has 'legislated ... in a field which the States have traditionally occupied,' ... [courts] 'start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.' " *Medtronic*, 518 U.S. at 485, 116 S.Ct. 2240.

Kalshi argues the presumption against preemption "does not apply to the field of regulating derivatives markets" because that is " 'an area where there has been a history of significant federal presence.' " ECF No. 29 at 14 (quoting *PPL EnergyPlus, LLC v. Nazarian*, 753 F.3d 467, 477 (4th Cir. 2014)). That argument is wrong for two reasons. First, the Supreme Court has held that courts must "start with the assumption" that federal law does not preempt in "*all* pre-emption cases." *Medtronic,* 518 U.S. at 485, 116 S.Ct. 2240 (emphasis added). Second, the question of whether the presumption "particularly" applies here (in the *Medtronic* Court's formulation) turns not on whether the federal statute can be framed as pertaining to an area of existing federal regulation, but rather whether the *state* law governs conduct that has historically been subject to state regulation (or subject to "the historic police powers of the States" as the *Medtronic* Court put it). *See Wyeth v. Levine*, 555 U.S. 555, 564 n.3,

129 S.Ct. 1187, 173 L.Ed.2d 51 (2009) ("Wyeth argues that the **\*677** presumption against preemption should not apply to this case because the Federal Government has regulated drug labeling for more than a century. That argument misunderstands the principle: We rely on the presumption because respect for the States as 'independent sovereigns in our federal system' leads us to assume that 'Congress does not cavalierly pre-empt state-law causes of action.' *Medtronic*, 518 U.S. at 485 [, 116 S.Ct. 2240] . The presumption thus accounts for the historic presence of state law but does not rely on the absence of federal regulation.").

"It is well recognized that regulating gambling is at the core of the state's residual powers as a sovereign in our constitutional scheme." *WV Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave*, 553 F.3d 292, 302 (4th Cir. 2009). The courts and Congress have long recognized states' authority to regulate gambling conducted within their borders. *See, e.g.*, *Ah Sin v. Wittman*, 198 U.S. 500, 505–06, 25 S.Ct. 756, 49 L.Ed. 1142 (1905) ("The suppression of gambling is concededly within the police powers of a state."). Gambling has been recognized as a potentially harmful "vice activity," such that states have a recognized interest in reducing "the social costs associated with" it. *Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173, 185, 119 S.Ct. 1923, 144 L.Ed.2d 161 (1999); *see also Murphy*, 584 U.S. at 458–59, 138 S.Ct. 1461 (describing history of state gambling laws). Kalshi does not seriously dispute this. *Compare* ECF No. 26 at 30 (citing various cases) *with* ECF No. 29 (responding to none of them).

Thus, the presumption against preemption applies, and thus the question presented is whether Kalshi has shown that one of Congress's "clear and manifest purpose[s]" when it enacted the Dodd-Frank Act was to preempt states' or tribes' authority to regulate gambling if a DCM were offer sports wagers on a DCM platform. Kalshi argues that Maryland's gaming laws are field-preempted as applied to Kalshi's sports-event contracts because of the statutory text, statutory purpose, the drafting history of the CEA, and the fact that there exists a "comprehensive" federal regulatory scheme for DCMs. ECF No. 2 at 11-15. There is no question that Congress had some field-preemptive intent when it enacted the CEA, and when it amended the statute pursuant to the Dodd-Frank Act in 2010. *See* ECF No. 26 at 17 (Defendants contrasting event contracts for sporting events with, for example, "purchases and sales of contracts for delivery at some future date of certain quantities of specified commodities at fixed prices," which "are the CEA's core concern") (quoting S. Rep. No. 93-1131, 1974 U.S.C.C.A.N. 5843, 5856 (1974)); CFTC Act of 1974

Committee Report, U.S. Senate Committee on Agriculture and Forestry, 93rd Cong., 2d Sess., at 11 (Nov. 15, 1974) (conference report, cited by Kalshi, stating that "[u]nder the exclusive grant of jurisdiction," the CEA "would preempt the field insofar as futures regulation is concerned"). But that does not necessarily establish that the "field" that Congress intended to "occupy" included gambling. Kalshi's burden with respect to its field preemption claim is to establish that Congress clearly and manifestly intended to strip states of their authority to regulate gambling if the company offering such wagering opportunities has been approved to sponsor a designated contracts market for commodities trading. Kalshi has not established that Congress had such clear and manifest purpose.

The Court begins with the text of the CEA. As noted above, the statute grants the CFTC "exclusive jurisdiction ... with respect to accounts, agreements ..., and **\*678** transactions" involving two types of instruments—"contracts of sale of a commodity for future delivery" and "swaps"—where such transactions are conducted on (a) "a contract market designated pursuant to section 7 of this title," (b) "a swap execution facility pursuant to section 7b-3 of this title," or (c) "any other board of trade, exchange, or market, and transactions subject to regulation by the Commission pursuant to section 23 of this title." 7 U.S.C. § 2(a)(1)(A). That "jurisdiction" provision goes on to contain the savings clause quoted above, which provides that "[e]xcept as hereinabove provided, nothing contained in this section shall (I) supersede or limit the jurisdiction at any time conferred on the Securities and Exchange Commission or other regulatory authorities under the laws of the United States or of any State, or (II) restrict the Securities and Exchange Commission and such other authorities from carrying out their duties and responsibilities in accordance with such laws." *Id.*

Kalshi argues that Congress manifested a field-preemptive intent by granting the CFTC "exclusive jurisdiction" over, among other things, "swaps" traded on a "contract market designated pursuant to section 7," and by phrasing the savings clause as stating that Congress was not preempting the "jurisdiction" of "regulatory authorities under the laws of ... any State" other than as "hereinabove provided." There is some force to this argument. The phrase "exclusive jurisdiction," which was added to the CEA in 1974, Pub. L. 93-463, 88 Stat. 1389 (H.R. 13113), Oct. 23, 1974, § 201, reflects some evidence of congressional intent to displace the authority of some state laws or regulatory authority. Congress's clearest intent in conferring "exclusive

jurisdiction" on the CFTC with regard to commodities futures (and, since 2010, swaps[3]) was to make clear that as among *federal agencies*, the CFTC would have exclusive authority, rather than the SEC. As the Supreme Court has explained, the exclusive-jurisdiction provision was intended to "consolidate federal regulation of commodity futures trading in the Commission" and to "separate the functions of the [CFTC] from those of the [SEC] and other regulatory agencies." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 386–87, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982). But Kalshi is surely correct that Congress in 1974 also conveyed some intent for the CEA to displace *some* state laws; a state presumably lacks authority to have a parallel regulatory regime for grain futures, the original commodity regulated under federal law, to take one example. *See Merrill Lynch*, 456 U.S. at 360-62, 102 S.Ct. 1825 (describing the Grain Futures Act of 1922, which steered those transactions toward exchanges designated as a "contract market" and regulated by the Secretary of Agriculture).

The existence of *some* field-preemptive intent is confirmed by the portion of the savings clause Kalshi highlights, which states that "[e]xcept as hereinabove provided," nothing in the "exclusive jurisdiction" section "supersede[s] or limit[s] the jurisdiction ... conferred on ... regulatory authorities under ... the laws of ... any State." 7 U.S.C. § 2(a)(1)(A). As Kalshi points out, providing that state laws are not superseded or limited *other than* as "hereinabove provided" suggests that Congress understood that the "exclusive jurisdiction" provision had at least *some* preemptive effect with respect to state **\*679** laws. It is theoretically possible that the reference to state law in the savings clause was included purely out of an abundance of caution. But courts presume that Congress does not include language for no reason. *Fischer v. United States*, 603 U.S. 480, 495-96, 144 S.Ct. 2176, 219 L.Ed.2d 911 (2024). And the grain futures example confirms that Defendants cannot avoid the conclusion that the Commodity Exchange Act reflects a congressional intent to preempt at least some state laws.

Kalshi would have this Court end the analysis here. And that is where the two other district courts that have considered Kalshi's preemption claims, and held that field preemption likely applies (those cases also arose on motions by Kalshi for a preliminary injunction), ended their analysis. *KalshiEX, LLC v. Hendrick*, No. 2:25-cv-00575-APG-BNW, 2025 WL 1073495, at \*6 (D. Nev. April 9, 2025); *KalshiEX LLC v. Flaherty*, No. 25-CV-02152-ESK-MJS, 2025 WL 1218313, at \*5-\*6 (D.N.J. Apr. 28, 2025).

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

But the fact that the CEA has some field-preemptive effect does not mean that the "field" Congress intended for the CEA to occupy includes state gambling laws, and specifically sports wagering laws. In assessing field preemption, courts must avoid "interpreting the scope of the preempted field too broadly." *Sikkelee v. Precision Airmotive Corp.*, 822 F.3d 680 (3d Cir. 2016); *see also Decohen v. Capital One, N.A.*, 703 F.3d 216, 224 (4th Cir. 2012) (holding that, despite broad federal laws governing banking, Congress "has not occupied the field with regard to debt cancellation agreements" and instead "le[ft] room for state regulation"). The question of whether the field that Congress intended the Commodity Exchange Act to "occupy" simply is not answered by the text of § 2. And where statutory text is ambiguous, courts turn to other tools of interpretation such as history, drafting, and purpose of the statute. *See, e.g.*, *Bostock v. Clayton County, Georgia*, 590 U.S. 644, 654, 140 S.Ct. 1731, 207 L.Ed.2d 218 (2020) ("This Court normally interprets a statute in accord with the ordinary public meaning of its terms at the time of its enactment."); *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 493, 107 S.Ct. 805, 93 L.Ed.2d 883 (1987) ("Given that the Act itself does not speak directly to the issue, the Court must be guided by the goals and policies of the Act in determining whether it in fact pre-empts an action based on the law of an affected State."). Here, the structure, context and legislative history of the CEA do not support Kalshi's argument, let alone establish that Congress clearly and manifestly intended to preempt state sports-betting laws.[4]

 **\*680**  First, the statutory Special Rule in 7 U.S.C. § 7a-2(c) itself confirms that Congress intended for at least some state laws to operate alongside the CEA, not to be preempted by it. As discussed above, Congress expressly authorized the Commission to disallow event contracts that "involve ... activity that is unlawful under ... State law." 7 U.S.C. § 7a-2(c)(5)(C)(i). That plain text clearly reflects an affirmative intent to *preserve* state laws governing whether particular conduct is lawful or unlawful. The fact that Congress expressly authorized the Commission to prohibit particular categories of transactions as contrary to the public interest *based on the fact that the conduct at issue would violate state law* severely undercuts Kalshi's suggestion that Congress intended to displace all state laws that would otherwise apply to transactions that fall within the scope of the CEA. Where "a federal statute expressly incorporates state law," a "preemption analysis is inappropriate." *Power v. Arlington Hosp. Ass'n*, 42 F.3d 851, 864 (4th Cir. 1994). Congress leaves "room for supplementary state legislation" where it expressly relies on and incorporates state laws. *Kansas*, 589 U.S. at 208, 140 S.Ct. 791.

That point is aptly illustrated by the state statutes at issue here. Under Maryland law, it is unlawful to, among other things, conduct sports wagering business without an appropriate sports wagering license. Md. Code Ann., St. Gov., § 9-1E-03(b), § 9-1E-04(b)(6)(ii); Md. Code Ann., Crim. Law § 12-104. Those state statutes govern whether conducting sports betting in Maryland is lawful or unlawful. To be sure, the Commission has not elected, at least to date, to prohibit events contracts (though it has considered doing so, Event Contracts, 89 Fed. Reg. 48968 (proposed June 10, 2024) (to be codified at 17 C.F.R. pt. 40)). But if Kalshi's preemption theory were correct, that would mean those state laws are nullities when it comes to sports wagering contracts offered on a DCM platform like Kalshi's. Insofar as the event contracts at issue constitute swaps under the CEA, which the Court assumes without deciding as noted above, they violate Maryland sports-wagering laws and thus constitute an "activity that is unlawful" under state law. 7 U.S.C. § 7a-2(c)(5)(C)(i)(I). The distinct tension between Kalshi's theory and the express language of the Special Rule confirms that Congress did not clearly and manifestly intend to preempt state laws with respect to sports wagering.

Second, the CEA's express preemption clauses, 7 U.S.C. § 16(e)(2) and (h), further confirm the absence of congressional intent to preempt state sports-betting laws. In § 16(e)(2), Congress directly considered the scope of the field it considered itself to be occupying for preemption purposes when it comes to "gaming." This is the express preemption provision that currently applies:

> This chapter shall supersede and preempt the application of any State or local law that prohibits or regulates gaming ... in the case of--
>
> > (A) an electronic trading facility excluded under section 2(e) of this title; and
> >
> > (B) an agreement, contract, or transaction that is excluded from this chapter  **\*681**  under section 2(c) or 2(f) of this title or sections 27 to 27f of this title, or exempted under section 6(c) of this title (regardless of whether any such agreement, contract, or transaction is otherwise subject to this chapter).

7 U.S.C. § 16(e)(2). Congress elected to expressly preempt *some* "State or local law[s] that prohibit[ ] or regulate[ ] gaming"—specifically those cross-referenced in § 16(e)(2),

as well as state insurance laws to the extent they govern swaps. *Id.* § 16(h). Kalshi does not dispute that the Maryland laws it requests to be ruled preempted do not fall within § 16(e)(2) or (h). Kalshi does not contend it is an "electronic trading facility excluded under section 2(e) of this title," and the sports events contracts at issue here are not covered by the cross-referenced provisions in § 16(e)(2), which instead refer to section 2(c) (which covers agreements, contracts, and transactions in foreign currency, government securities, and certain other commodities), section 2(f) (which covers qualifying hybrid instruments that are predominantly securities), sections 27 to 27f (which covers banks and banking products), and section 6(c) (which exempts certain DCMs from regulation for public interest purposes).

Congress's decision to expressly preempt state gaming laws for certain transactions and state-insurance laws for swaps—compared to its silence as to all others—is strong evidence that Congress did not intend to regulate so comprehensively as to exclude all state law. *See Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 517, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992) ("Congress' enactment of a provision defining the pre-emptive reach of a statute implies that matters beyond that reach are not pre-empted."); *see also Freightliner Corp. v. Myrick*, 514 U.S. 280, 288, 115 S.Ct. 1483, 131 L.Ed.2d 385 (1995) (explaining that where a statute expressly defines its "the pre-emptive reach," that supports an "inference"—not a "rule"—that Congress did not impliedly preempt state laws that fall outside the express preemption provision).

Kalshi argues that the Court should not draw that inference from § 16(e)(2) because just above it, in § 16(e)(1)(C), Congress expressly disclaimed any intent to "supersede or preempt" the application of state law to entities that are "required to be registered or designated" with the CFTC but "fail or refuse" to do so. 7 U.S.C. § 16(e). Thus, Kalshi argues, § 16(e)(1) "preserves concurrent state regulation for commodities and futures contracts traded *outside of DCMs*," thereby "not call[ing] into question the state's regulation of casinos or other gaming establishments, none of which are DCMs." ECF No. 2 at 12 (emphasis in original). But Kalshi reads far more into that provision than it deserves. That provision applies where a person is "required" to be registered or designated, *e.g.*, as a DCM, but "fail[s] or refuse[s]" to do so. 7 U.S.C. § 16(e)(1)(C). That is about recalcitrant exchanges that refuse to register with the CEA. It provides little if any guidance for whether Congress intended to supersede state gambling laws for transactions that are placed on contract markets that *are* registered, particularly

because it is unclear whether Congress intended for § 16(e)(1)(C) to apply to swaps anyway. *See* 7 U.S.C. § 2(d) (noting that, aside from specific provisions not including § 16(e)(1)(C), the CEA does not apply to swaps).

Third, although the savings clause in the exclusive-jurisdiction provision cuts both ways as discussed above, given the presumption against preemption, its ambiguity means that on balance it cuts against a finding of field preemption. A savings **\*682** clause generally "negates the inference that Congress left no room for state causes of action." *Int'l Paper Co.*, 479 U.S. at 492, 107 S.Ct. 805.

Fourth, as the Supreme Court has long recognized, states have strong interests in regulating gambling. *See, e.g.*, *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 138 S.Ct. 1461, 200 L.Ed.2d 854 (2018) (holding that the federal Professional and Amateur Sports Protection Act's restriction on states' ability to regulate sports gambling violates the anticommandeering doctrine); *WV Ass'n of Club Owners*, 553 F.3d at 302; *Ah Sin*, 198 U.S. at 505-06, 25 S.Ct. 756. The presence of those state interests not only means the presumption against preemption applies, as discussed above; it also is relevant to the application of the field preemption standard itself. It is highly unlikely that Congress would have overridden state gambling laws without at least some indication in the text and legislative history that it intended to do so.

Fifth, where courts have carefully focused on the *scope* of Congress's preemptive intent when enacting the exclusive-jurisdiction provision, they have held that that intent had limits. In *Effex Capital, LLC v. Nat'l Futures Ass'n*, for example, the Seventh Circuit held that Congress "did not manifest an intent to occupy completely the entire field of commodity futures regulation." 933 F.3d 882, 894 (7th Cir. 2019). In that case, that meant that the CEA preempted state laws only "[w]hen application of state law would directly affect trading on or the operation of a futures market." *Id.* (quoting *Am. Agric. Movement, Inc. v. Board of Trade of City of Chicago*, 977 F.2d 1147, 1156 (7th Cir. 1992)). And earlier, in *American Agriculture Movement*, the Seventh Circuit held that the "savings clause" was "designed to preserve in the futures trading context at least some state law causes of actions." 977 F.2d at 1155. There, that meant that, in the context of regulating DCMs, the CEA "did not manifest an intent to occupy completely the entire field of commodity futures regulation" and therefore it was not "impossible to comply with both state and federal law." *Effex Capital, LLC*,

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

8

933 F.3d at 882 (citing *Am. Agric. Movement, Inc.*, 977 F.2d at 1156).

Although *American Agriculture* arose before Congress added swaps to that provision in 2010, the Seventh Circuit emphasized that Congress did not intend for the Commodity Exchange Act to preempt every field of state law that would otherwise apply to transactions falling within the scope of the Act. *Id.*; *accord Kerr v. First Commodity Corp.*, 735 F.2d 281, 288 (8th Cir. 1984) ("Nothing in the Act deals expressly with the preemption question"). One district court, in reviewing the legislative history, observed that the savings clause was added to allay fears that the exclusive-jurisdiction provision "might oust the courts' jurisdiction over typical state law claims." *Patry v. Rosenthal & Co.*, 534 F. Supp. 545, 548–49 (D. Kan. 1982). And the D.C. Circuit in *FTC v. Ken Roberts Co.*, although not addressing preemption of state law, considered whether the exclusive-jurisdiction provision applied to the regulation of "instructional materials that purport to teach would-be investors how to make money investing in the commodities and securities markets" such that the CFTC had exclusive federal regulatory authority (as opposed to concurrent with the FTC). 276 F.3d 583, 589 (D.C. Cir. 2001). The *Ken Roberts* court observed that "[o]n its face, § 2(a)(1)(A) confers exclusive jurisdiction to the CFTC over a limited, discrete set of items related to the making of futures contracts"; it was "certainly not obvious that the advertising at issue in this case fits in any of these categories." *Id.*

**\*683** Sixth, when Congress enacted the exclusive-jurisdiction provision in 1974 as part of the Commodity Future Trading Commission Act, and when it expanded the provision to include swaps as part of the Dodd-Frank Act, sports betting constituted a federal crime unless expressly permitted under state law. In 1974 (indeed still today, as discussed below), the Wire Act criminalized engaging in "betting or wagering" businesses "us[ing] a wire communication facility" to transmit "bets or wagers or information assisting in the placing of bets or wagers on any sporting event or contest" where such wagering is illegal under state law. 18 U.S.C. § 1084(a)-(b). And in 2010, the Professional and Amateur Sports Protection Act (PASPA), which had been enacted in 1992, prohibited sports gambling when sponsored or promoted by a governmental entity, or by a person acting "pursuant to the law or compact of a governmental entity." 28 U.S.C.A. § 3702. It was not until 2018, when the Supreme Court issued its ruling in *Murphy* overruling PASPA, that states were permitted to legalize sports wagering within their boundaries. *Murphy*, 584 U.S. at

486, 138 S.Ct. 1461. Therefore, when Congress enacted and amended the CEA, it was highly unlikely to have intended to override state laws that regulate sports betting such as Maryland's gaming laws, because at those times it was already largely illegal federally to engage in sports gambling (under either the Wire Act in 1974 or PASPA in 2010).

Seventh, Kalshi's argument necessarily has consequences with respect to other federal laws that further confirm the implausibility of its field preemption theory. Interpreting the CEA to preempt state gambling laws when wagers are conducted on a DCM would necessarily mean that the CEA impliedly (albeit partially) overrides the Indian Gaming Regulatory Act, 25 U.S.C. § 2701 *et seq.* ("IGRA"), and § 1084 of the Wire Act, 18 U.S.C. § 1084(a)-(b). The IGRA provides a comprehensive regulatory framework for tribal governments to engage in gaming activity on their own lands. 25 U.S.C. § 2701(4); *see also* ECF No. 65 at 2-3 (tribes' amicus brief). The Wire Act similarly makes clear that "[w]hoever being engaged in the business of betting or wagering knowingly uses a wire communication facility for the transmission in interstate ... commerce of bets or wagers or information assisting in the placing of bets or wagers on any sporting event or contest ... shall be fined under this title or imprisoned not more than two years, or both." 18 U.S.C. § 1084(a). The Supreme Court has made clear there is a "strong presumption that repeals by implication are disfavored and that Congress will specifically address preexisting law when it wishes to suspend its normal operations in a later statute." *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510, 138 S.Ct. 1612, 200 L.Ed.2d 889 (2018) (cleaned up). Kalshi's proposed statutory interpretation would necessarily entail at least a partial implied repeal of the IGRA and the Wire Act.

Eighth, the limited legislative history that exists from 2010 that bears on the scope of Congress's preemptive intent cuts against preemption. Senator Feinstein expressed concern about "derivative contract[s]" being "used predominantly by speculators or participants not having a commercial or hedging interest," and so did not understand Dodd-Frank to authorize "gambling" contracts that "served no commercial purpose at all." 156 Cong. Rec. S5902, S5906-7 (daily ed. July 15, 2010) (Sen. Feinstein). Senator Lincoln opined that "an 'event contract' around sporting events" would "not serve any real commercial purpose," but instead "would be used solely for gambling." 156 Cong. Rec. S5902-01, S5907 (July 15, 2010) (statement **\*684** of Senator Lincoln). To be sure, those statements bear most directly on whether the event contracts at issue constitute swaps within the

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.
9

meaning of the CEA—which this Court does not decide. And isolated statements by particular legislators have limited evidentiary value when it comes to the meaning of a statute. *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 385, 132 S.Ct. 740, 181 L.Ed.2d 881 (2012). But those statements also reflect concern about "gambling" occurring on DCMs. That contemporaneously expressed concern makes it even less likely that Congress intended for Dodd-Frank to render obsolete state laws limiting or regulating gambling for transactions that Congress brought within the purview of the CEA pursuant to Dodd-Frank.[5]

Field preemption is a high standard, and the presumption against federal preemption is especially strong "when Congress has legislated in a field traditionally occupied by the States." *Altria Grp. v. Good*, 555 U.S. 70, 77, 129 S.Ct. 538, 172 L.Ed.2d 398 (2008). "In such cases, "[c]onsideration under the Supremacy Clause starts with the basic assumption that Congress did not intend to displace state law." *Just Puppies, Inc. v. Brown*, 123 F.4th 652, 661 (4th Cir. 2024) (quoting *Maryland v. Louisiana*, 451 U.S. 725, 746, 101 S.Ct. 2114, 68 L.Ed.2d 576 (1981)). Field preemption applies only in the "rare case[ ]" when "Congress has legislated so comprehensively that it has left no room for supplementary state legislation." *Id.* (quoting *R.J. Reynolds Tobacco Co. v. Durham Cnty.*, 479 U.S. 130, 140, 107 S.Ct. 499, 93 L.Ed.2d 449 (1986)). Here, the weight of the evidence strongly confirms that Congress did not intend for Dodd-Frank to constitute legislation not only legalizing sports betting nationwide, but displacing states' authority to regulate it, including when such betting takes place on a website of a company that happens to have been designated as a commodity futures DCM. And even if the evidence were in equipoise (which it is not), the presumption against preemption would require rejecting Kalshi's field preemption theory. In short, Kalshi has not shown a likelihood of success on the merits that the CEA has the effect of field-preempting the regulation of sports-event contracts that are traded on DCMs.

### B. Conflict Preemption

Kalshi next argues that even if field preemption does not apply, Maryland's gaming laws are preempted with respect to sports-event contracts on Kalshi's DCM platform as a matter of conflict preemption. Unlike field preemption, conflict preemption exists when the state laws at issue conflict with federal laws, such as where "compliance with both federal and state regulations is a physical impossibility," *Florida Lime &*

*Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142-43, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963), or where the state law at issue "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1941). "What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." **\*685** *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000). Assessing conflict preemption requires "a two-step process of first ascertaining the construction of the two statutes and then determining the constitutional question [of] whether they are in conflict." *H & R Block Eastern Enterprises, Inc. v. Raskin*, 591 F.3d 718, 723 (4th Cir. 2010) (quoting *Chi. & N.W. Transp. Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 317, 101 S.Ct. 1124, 67 L.Ed.2d 258 (1981)).

Kalshi argues that Maryland's gaming laws are "conflict-preempted as applied to Kalshi because they 'stand[ ] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress' as evidenced in the CEA," ECF No. 2 at 15 (quoting *Hines*, 312 U.S. at 67, 61 S.Ct. 399), and "undermine the intended purpose and natural effect of the federal scheme for regulating CFTC-designated exchanges," *id.* (citing *Crosby*, 530 U.S. at 373, 120 S.Ct. 2288), in four ways.

*First*, Kalshi argues that because Congress's purpose in enacting the 1974 amendments was to bring the futures market under a uniform set of regulations, the MLGCC's actions and enforcement of Maryland's gaming laws "clearly conflict with Congress's goal to avoid subjecting regulated exchanges to multiple conflicting legal regimes." ECF No. 2 at 16. For the reasons the Court has already explained above as to why Kalshi has failed to show that field preemption applies to this case, *see* § III.A, *supra*, Kalshi has failed to show that Congress intended for the CEA to *completely preclude* any state's gaming laws from being applied to DCMs.

*Second*, Kalshi argues that subjecting DCMs to Maryland's gaming laws would lead to "the carefully calibrated federal enforcement scheme [being] displaced by a blunt application of mandatory state criminal penalties." ECF No. 2 at 17. Kalshi primarily cites *Crosby* in support of its argument, arguing that, in *Crosby*, the Supreme Court held that conflict preemption applied because the state's regulatory scheme undermined Congress's "delegation of effective discretion" to the executive. *See Crosby*, 530 U.S. at 373-74, 120 S.Ct.

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

10

2288. Kalshi argues that, similarly, Congress "gave the CFTC a variety of tools for enforcing federal law against DCMs and entrusted the CFTC with discretion to pursue the penalties it deems most appropriate." ECF No. 2 at 17. But in *Crosby*, the Court was dealing with a federal statute regulating sanctions towards Burma, a matter of national security as to which there is a uniquely federal interest. That bears little resemblance to gambling, which states have a strong interest in regulating, as explained above. Specifically, the Court in *Crosby* noted that the state statute at issue "compromise[s] the very capacity of the President to speak for the Nation with one voice in dealing with other governments." 530 U.S. at 381, 120 S.Ct. 2288. Here, as explained above, *see* § III.A, *supra*, the regulation of gambling is precisely the kind of area of law that has been traditionally considered to be within the purview of state regulatory authority.

*Third*, Kalshi argues that "the CFTC has already authorized Kalshi's event contracts by declining to restrict them after Kalshi self-certified them." ECF No. 2 at 18. Therefore, Kalshi argues, because "the MLGCC now claims the authority to regulate Kalshi based on its assessment of state public policy," this is "in direct conflict with the CFTC's evaluation of the public interest." *Id.* But as MLGCC correctly points out, Congress was concerned with preempting only "incompatible state laws." *See* 120 Cong. Rec. 30, 464 (Sep. 9, 1974) (statement of Senator Curtis noting that the Act would only preempt state law **\*686** if it "were contrary to or inconsistent with Federal law"). Kalshi has not demonstrated how Maryland's laws would either conflict or stand as an obstacle to achieving the purposes of the CEA. For example, Kalshi could simply obtain a mobile sports wager license in Maryland, while still being able to comply with federal regulatory requirements imposed by the CEA and CFTC. Kalshi has not shown how obtaining a license in Maryland and otherwise complying with Maryland law would prevent it from complying with federal law. Maryland law also requires Kalshi to ensure there are age verification procedures for its online sports wagering platform, *see* SG § 9-1E-11; Kalshi has not shown it would be unable to comply with that requirement and also still comply with the requirements of the CEA.

*Fourth*, Kalshi argues that "the MLGCC's demands conflict with the CFTC Core Principles on which Kalshi's designation as a CFTC-approved market depends" because Core Principle 2 requires Kalshi to "provide its members, persons with trading privileges, and independent software vendors with *impartial access* to its markets and services." ECF No. 2 at 18

(citing 17 C.F.R. §§ 38.150, 38.151(b)) (emphasis in original). Kalshi argues that MLGCC's position that Kalshi must comply with Maryland law has the effect of threatening to cut off Maryland residents from accessing Kalshi's platform.

This last argument fails because the CFTC's Core Principles and Maryland's gaming laws work in tandem. The CEA and the CFTC's Core Principles seek to address the efficient functioning of the derivatives and futures markets; Maryland's gaming laws are focused on protecting the public from potential gambling issues. ECF No. 63 at 15-16. For example, the Core Principles focus on matters such as conflicts of interest, whereas Maryland's gaming statutes, for example, prohibit wagers that cannot be made impartially or prohibiting licensees from preying on persons with gambling addictions. To the extent Kalshi is arguing that Maryland's gaming laws prevent it from complying with the impartial access principle by not allowing it to offer sports-event contracts to Marylanders unless it were to obtain a license, the Court rejects that argument. Kalshi's point is not a basis for holding that conflict preemption exists and that Maryland's laws are preempted simply because *not* obtaining a license limits Kalshi's geographical access. It is Kalshi's desire not to comply with Maryland law and presumably incur some additional compliance costs—not the existence of Maryland consumer protection laws themselves—that creates the situation Kalshi professes to worry about. So long as Kalshi obtains a license and complies with Maryland sports gambling laws, those laws would not pose an obstacle to Kalshi making the sports gambling portion of its platform available to users in Maryland.

For these reasons, Kalshi has not shown that compliance with Maryland law and the CEA is an "impossibility," *Florida Lime*, 373 U.S. at 143, 83 S.Ct. 1210, or that Maryland's gaming laws stand as an "obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines*, 312 U.S. at 67, 61 S.Ct. 399. Accordingly, it has not shown a likelihood of success on its conflict-preemption theory.

## IV. CONCLUSION

A party seeking a preliminary injunction must satisfy all four *Winter* elements. *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*, 915 F.3d 197, 211 (4th Cir. 2019). Because Plaintiff has not shown a likelihood of success on the merits, the Court **\*687** does not reach the questions of whether Plaintiff has shown that it would suffer irreparable harm in the absence of an injunction or whether

the balance of equities or public interest would weigh in favor of or against a preliminary injunction. *Vitkus v. Blinken*, 79 F.4th 352, 361-62 (4th Cir. 2023) ("a district court is entitled to deny preliminary injunctive relief on the failure of any single *Winter* factor, without fully evaluating the remaining factors.").

For the foregoing reasons, because Kalshi has failed to show it has a likelihood of success on the merits, Kalshi's motion for a preliminary injunction (ECF No. 2) is DENIED. A separate order follows.

**All Citations**

793 F.Supp.3d 667, Comm. Fut. L. Rep. P 35,527

Footnotes

1    The statute provides that a *rule* that has been self-certified does not become effective until 10 days after submission of the certification. 7 U.S.C. § 7a-2(c)(2). There is no statutory waiting period for new event contracts.

2    The amicus brief was filed by the Indian Gaming Association, National Congress of American Indians, California Nations Indian Gaming Association, Arizona Indian Gaming Association, Oklahoma Indian Gaming Association, United South and Eastern Tribes Sovereignty Protection Fund, Tribal Alliance of Sovereign Indian Nations, Blue Lakes Rancheria, Chicken Ranch Rancheria of Me-Wuk Indians of California, Elk Valley Rancheria, Enterprise Rancheria of Maidu Indians of California, Guidiville Rancheria of California, Ho-Chunk Nation of Wisconsin, Jamul Indian Village of California, Kalispel Tribe of Indians, Karuk Tribe, Klamath Tribes, Lytton Rancheria of California, Middletown Rancheria of Pomo Indians of California, Morongo Band of Mission Indians, Pechanga Band of Indians, Penobscot Nation, Picayune Rancheria of Chukchansi Indians of California, Pueblo of Acoma, Puyallup Tribe, Redding Rancheria, Rincon Band of Luiseo Mission Indians, Santa Ynez Band of Chumash Mission Indians, Seminole Tribe of Florida, Shoalwater Bay Indian Tribe, Suquamish Indian Tribe of the Port Madison Reservation, Table Mountain Rancheria, White Earth Nation, and Yuhaaviatam of San Manuel Nation.

3    As noted above, the exclusive jurisdiction provision was amended to include swaps in 2010. Dodd-Frank Wall Street Reform And Consumer Protection Act, Pub. L 111-203, 124 Stat. 1376 (July 21, 2010).

4    As noted above, one of the reasons Defendants argue the CEA does not preempt Maryland law with respect to event contracts for sporting events is that those instruments are not "swaps" within the meaning of the CEA. Specifically, Defendants argue that event contracts for sporting events are not "dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated *with a potential financial, economic, or commercial consequence.*" 7 U.S.C. § 1a(47)(A)(ii) (emphasis added). As Defendants put it, "Kalshi's gaming devices do not involve the sporting event *itself*, but rather the *outcome* of the event, *i.e.*, which team will win the game," but who wins a game does not create a financial, economic or commercial consequence (other than for "the competitors themselves"), but rather the holding of the competition itself. ECF No. 26 at 19. And Kalshi itself has represented in separate litigation that "at least in general, contracts relating to *games* – again, activities conducted for diversion or amusement – are unlikely to serve any 'commercial or hedging interest.' " *Id.* (quoting Appellee's Br. at 45, *KalshiEX LLC v. CFTC*, No. 24-5205, 2024 WL 4802698, at *45 (D.C. Cir. Nov. 15, 2024)). Defendants also argue that these contracts cannot constitute swaps because if they were, then any casino or bingo hall, etc., allowing wagers to be placed based on the outcome of an event would be offering swaps outside of a CFTC-designated exchange on "any other board of trade, exchange, or market." *See* 7 U.S.C. §§ 2(e), 6(a)(1). As noted above, the Court does not decide one way or the other whether Kalshi's sporting events contracts constitute swaps, because even if they do, Kalshi must comply with state laws that would otherwise apply to those transactions.

5    On the legislative history front, Kalshi points to a 1974 Senate report and statements by two then-senators reflecting the "deletion of a CEA provision which appeared to preserve the states' authority over futures trading." *Am. Agric. Movement*, 977 F.2d at 1156; *see also* ECF No. 2 at 13. But there is no question that the CEA has *some* preemptive effect; evidence of *that* legislative intent does not help determine whether Congress intended the scope of that preemptive to encompass state gambling laws.

WESTLAW  © 2026 Thomson Reuters. No claim to original U.S. Government Works.    12

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works. 13

2025 WL 3286282
Only the Westlaw citation is currently available.
United States District Court, D. Nevada.

KALSHIEX, LLC, Plaintiff

v.

Kirk D. HENDRICK, et al., Defendants

Case No. 2:25-cv-00575-APG-BNW
|
Signed November 24, 2025

**Attorneys and Law Firms**

Grant R. Mainland, Milbank LLP, New York City, NY, Katrin Cassidy-Ginsberg, Pro Hac Vice, Nicole Valente, Pro Hac Vice, Andrew Leighton Porter, Pro Hac Vice, Nola B. Heller, Pro Hac Vice, Victor Hollenberg, Pro Hac Vice, Milbank LLP, New York, NY, Joshua Brooks Sterling, Pro Hac Vice, Neal Kumar Katyal, Pro Hac Vice, William Havemann, Pro Hac Vice, Milbank LLP, Washington, DC, Mackenzie Austin, Pro Hac Vice, Milbank LLP, Los Angeles, CA, Paul C. Williams, Dennis L. Kennedy, Bailey Kennedy, LLP, Las Vegas, NV, D. Lee Roberts, Jr., Weinberg, Wheeler, Hudgins, Gunn & Dial, LLC, Las Vegas, NV, for Plaintiff.

Minh Nguyen-Dang, Pro Hac Vice, Nicole A. Saharsky, Pro Hac Vice, Mayer Brown LLP, Washington, DC, Rory K. Schneider, Pro Hac Vice, Mayer Brown LLP, New York, NY, Devin A. Oliver, Office of the Attorney General, Carson City, NV, Jessica Whelan, Sabrena Clinton, Office of the Attorney General, Las Vegas, NV, for Defendants Kirk D. Hendrick, George Assad, Chandeni K. Sendeall, Nevada Gaming Control Board, Jennifer Togliatti, Rosa Solis-Rainey, Brian Krolicki, George Markantonis, Abbi Silver, Aaron D. Ford, Nevada Gaming Commission.

**Order Granting Motion to Dissolve Preliminary Injunction**

ANDREW P. GORDON, CHIEF UNITED STATES DISTRICT JUDGE

**\*1** KalshiEX, LLC is registered with the Commodity Futures Trading Commission (CFTC) as a designated contract market (DCM). Kalshi has established a market for sports betting. Kalshi advertised that it is the "first app for legal sports betting in all 50 states." But Kalshi is not licensed to conduct gaming in Nevada or any other state. So the Nevada gaming regulators sent it a cease-and-desist letter. Kalshi now contends that it is not taking sports bets and, even if it were, no state can regulate it because it is a DCM under the CFTC's exclusive jurisdiction. Kalshi relies on a strained reading of the already convoluted Commodities Exchange Act (CEA) in an attempt to evade state regulation. Kalshi's interpretation would require all sports betting across the country to come within the jurisdiction of the CFTC rather than the states and Indian tribes. That interpretation upsets decades of federalism regarding gaming regulation, is contrary to Congress' intent behind the CEA, and cannot be sustained.

**I. PROCEDURAL POSTURE**

In January 2025, Kalshi started listing sports-related event contracts on its exchange. The Nevada Gaming Control Board sent Kalshi a cease-and-desist letter stating that Kalshi was operating an unlicensed sports pool in violation of Nevada gaming law. Kalshi filed this lawsuit against the Board and its members in their official capacities, the Nevada Gaming Commission and its members in their official capacities, and the Nevada Attorney General (collectively, the Board) seeking declaratory and injunctive relief. Kalshi asserted that the CFTC has exclusive jurisdiction over the contracts traded on Kalshi's exchange, so the Board cannot enforce Nevada state law against Kalshi.

Kalshi moved for a preliminary injunction to preclude the Board from pursuing Kalshi for civil or criminal penalties under Nevada law based on Kalshi offering sports-related event contracts on its exchange. I granted that motion, concluding that the CFTC had exclusive jurisdiction over contracts listed on a DCM, so Nevada state gaming law was preempted. ECF No. 45.

After my preliminary injunction ruling, the District of New Jersey granted Kalshi's motion for an injunction in a similar suit. *KalshiEX LLC v. Flaherty*, No. 25-cv-02152-ESK-MJS, 2025 WL 1218313, at \*4-7 (D.N.J. Apr. 28, 2025). The New Jersey state regulatory authorities appealed, and the Third Circuit heard oral arguments on September 10, 2025. Third Cir. Case No. 25-1922. The Third Circuit has yet to issue a decision.

Meanwhile, the United States District Court for the District of Maryland denied Kalshi an injunction in similar litigation in that court, ruling that Maryland state gaming authorities were not preempted from regulating Kalshi's sports-related event

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works. 1

contracts. *KalshiEX LLC v. Martin*, No. 25-cv-1283-ABA, 793 F.Supp.3d 667, 2025 WL 2194908, at *1, 5-13 (D. Md. Aug. 1, 2025). Kalshi appealed to the Fourth Circuit, where briefing is ongoing. Fourth Cir. Case No. 25-1892.

Then in October 2025, I denied an injunction in a similar case, *North American Derivatives Exchange, Inc., d/b/a Crypto.com v. Nevada Gaming Control Board* (the *Crypto* case). In *Crypto*, I ruled that event contracts that turn on the outcomes of sporting events are not swaps and thus do not fall within the CFTC's exclusive jurisdiction. Case No. 2:25-cv-00978-APG-BNW, 2025 WL 2916151, at *11 (D. Nev. Oct. 14, 2025).

 **\*2**  Within days of my *Crypto* ruling, the Board moved to dissolve the preliminary injunction in this case, asserting that I should reach the same conclusion as I did in *Crypto*. ECF No. 142. Kalshi opposes, arguing that the Board has not set forth an adequate basis to seek dissolution and, in any event, I erred in *Crypto* and so I should not dissolve the injunction. On November 14, 2025, I held a hearing in this case jointly with a related case, *Robinhood Derivatives, LLC v. Dreitzer*, Case No. 2:25-cv-1541-APG-DJA (the *Robinhood* case). ECF Nos. 219; 220. For the reasons set forth below, I grant the motion to dissolve the preliminary injunction.

## II. THE BOARD HAS PRESENTED NEW LAW AND FACTS TO SUPPORT CONSIDERING DISSOLUTION.

Kalshi argues that I should not revisit my preliminary injunction ruling because the Board has not identified a significant change in the facts or the law. The Board responds that the District of Maryland's ruling and my *Crypto* decision are new law. The Board also contends that the subject matter of numerous event contracts Kalshi has offered since I entered my injunction constitute new facts.

A party seeking to modify or dissolve an injunction "bears the burden of establishing that a significant change in facts or law warrants revision or dissolution of the injunction." *Karnoski v. Trump*, 926 F.3d 1180, 1198 (9th Cir. 2019) (quotation omitted). Here, the Board identified new law, both in the form of my *Crypto* order and the District of Maryland's order in *KalshiEX LLC v. Martin*. The Board also identified new facts. Since my preliminary injunction order, Kalshi has issued a range of new contracts that potentially are contrary to what Kalshi told me at the preliminary injunction hearing likely would not count as swaps because they have no real-world economic consequence, such as prop bets on things like whether a team will score a touchdown in a certain part of a

game or the point total over/under on a game. *See* ECF Nos. 46 at 7-8; 143-2 at 5-6. Further, under Federal Rule of Civil Procedure 54(b), I can modify an interlocutory order "at any time" before entry of a final judgment. *Credit Suisse First Bos. Corp. v. Grunwald*, 400 F.3d 1119, 1124 (9th Cir. 2005) (quotation omitted).

This is a novel and evolving area of the law, and the nuances of the parties' positions have changed as new arguments, facts, and law develop. My preliminary injunction order was issued very early in this litigation on an accelerated schedule. The law and facts have evolved in this court and others. The circumstances may change yet again when the Third and Fourth Circuits rule on the appeals pending in those courts, or when the Ninth Circuit rules on the inevitable appeal of my rulings in *Crypto*, this case, and *Robinhood*. Additionally, it would be unfair for me to not consider dissolving the injunction given that I denied an injunction under similar circumstances for one of Kalshi's competitors in *Crypto*. So, I reject Kalshi's procedural arguments, and I will consider the motion to dissolve the preliminary injunction on the merits.

## III. I GRANT THE BOARD'S MOTION TO DISSOLVE THE PRELIMINARY INJUNCTION.

The Board argues I should dissolve the injunction because Kalshi's sports-related event contracts do not fall within the statutory provision Kalshi relies on to invoke the CFTC's exclusive jurisdiction. The Board also argues that the CFTC's jurisdiction is not exclusive in any event. Further, the parties dispute whether the balance of hardships and the public interest weigh for or against an injunction.

The inquiry into whether to dissolve an injunction is "guided by the same criteria that govern the issuance of a preliminary injunction." *Karnoski*, 926 F.3d at 1198. To qualify for a preliminary injunction, a plaintiff must demonstrate: (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm, (3) the balance of hardships favors the plaintiff, and (4) an injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008). Alternatively, under the sliding scale approach, a plaintiff must demonstrate (1) serious questions on the merits, (2) a likelihood of irreparable harm, (3) the balance of hardships tips sharply in the plaintiff's favor, and (4) an injunction is in the public interest. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). But where a party seeks to dissolve an injunction, "the burden with respect to these criteria is on the party seeking dissolution." *Karnoski*, 926 F.3d at 1198.

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

**\*3** I dissolve the injunction because the Board has shown that Kalshi is not likely to succeed on the merits, although there are serious questions on the merits. The Board also has shown that the balance of hardships does not tip sharply in Kalshi's favor. Rather, the balance of hardships tips in favor of the Board, and the public interest favors dissolving the injunction.

## IV. KALSHI IS NOT LIKELY TO SUCCED ON THE MERITS, BUT THERE ARE SERIOUS QUESTIONS ON THE MERITS.

As I ruled in *Crypto*, event contracts that turn on the outcomes of sporting events are not swaps and thus do not fall within the CFTC's exclusive jurisdiction. 2025 WL 2916151, at \*11. I adopt in full my analysis in *Crypto*, so I give only a summary here. In brief, I ruled in *Crypto* that similar event contracts based on the outcome of live events are not "swaps" within the meaning of the Commodity Exchange Act (CEA), and thus do not fall within the CFTC's exclusive jurisdiction in 7 U.S.C. § 2(a). *Id.* at \*6-11. First, I have authority to construe the CEA to determine what falls within that jurisdictional provision, such as what constitutes a "swap." *Id.* Second, I interpreted the relevant provision of the CEA's definition of a swap related to event contracts. That provision states that a swap is "any agreement, contract, or transaction ... that provides for any purchase, sale, payment, or delivery ... that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). I interpreted the word "occurrence" to mean something happened. *Id.* at 8, 129 S.Ct. 365. I interpreted the word "event" to mean "a happening of some significance that took place or will take place, in a certain location, during a particular interval of time, such as a particular sporting event or an organized activity or celebration for the public or a particular group." *Id.* I rejected the proposed definition that an "event" can be an "outcome," and in the specific context of sports, I ruled that the "event" would be "the sporting event itself, not who wins it." *Id.* ("An ordinary American interpreting the word 'event' would conclude that the Kentucky Derby is an event. But who wins the Kentucky Derby is an outcome of that event, not a separate event in and of itself.").

Kalshi raises several arguments as to why I should not evaluate whether Kalshi's contracts qualify as swaps, why it believes I erred in *Crypto*, and why I should consider other parts of the CEA to conclude that Kalshi's sports-based event contracts fall within the CFTC's exclusive jurisdiction. I address each in turn.

### *A. The Administrative Procedure Act is not the Board's only avenue to litigate whether Kalshi's sports-related event contracts fall within the CFTC's exclusive jurisdiction.*

Kalshi argues that the only mechanism for the Board to challenge the CFTC's action or inaction in relation to the listing of event contracts on a CFTC-designated exchange like Kalshi's is through a claim under the Administrative Procedures Act (APA). The Board responds that courts routinely review statutory language to conduct a preemption analysis without requiring that be done through an APA claim. They also argue that an APA claim requires final agency action, and the CFTC has not taken final agency action with respect to the event contracts that Kalshi and other exchanges have been listing.

**\*4** Under the APA, "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review." 5 U.S.C. § 704; *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 808, 144 S.Ct. 2440, 219 L.Ed.2d 1139 (2024) ("Unless another statute makes the agency's action reviewable ..., judicial review is available only for final agency action." (quotation omitted)); *Prutehi Litekyan: Save Ritidian v. United States Dep't of Airforce*, 128 F.4th 1089, 1107 (9th Cir. 2025) (stating the APA "limits review to final agency action" (quotation omitted)). No one has pointed to anything in the CEA that makes the CFTC's action or inaction on a listed contract subject to judicial review. And the CFTC has recently made clear that it has taken no final, definitive position on these contracts. CFTC Letter No. 25-36 (Sept. 30, 2025). The CFTC indicated that it is aware of the controversy surrounding these event contracts, including the various related lawsuits. *Id.* at 1-2. In footnote 4 of that letter, the CFTC stated that it "has not, to date, been requested to take or taken any official action to approve the listing for trading of sports-related event contracts on any DCM .... *Id.* at 2 n.4. The CFTC also stated:

> All sports-related event contracts that are currently listed for trading on DCMs have been listed pursuant to self-certifications filed by the relevant DCM ... and the Commission has not, to date, made a determination regarding whether any such contracts involve an activity enumerated or prohibited under ... 7 U.S.C. § 7a-2(c)(5)(C)(i) or Commission regulation 40.11(a), 17 CFR 40.11(a).

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

*Id.* Consequently, there has been no final agency action so the APA provides no avenue for relief.

Nor is the CFTC's inaction on these contracts a basis to channel a suit solely through the APA. Where a person sues over an agency's failure to act, "the APA expressly authorizes a court to 'compel agency action unlawfully withheld or unreasonably delayed.' " *Plaskett v. Wormuth*, 18 F.4th 1072, 1081 (9th Cir. 2021) (quoting 5 U.S.C. § 706(1)). A "claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a discrete agency action that it is required to take." *Id.* (quoting *Norton v. Southern Utah Wilderness All.*, 542 U.S. 55, 63-64, 124 S.Ct. 2373, 159 L.Ed.2d 137 (2004)). But here, the CEA does not require the CFTC to act on self-certifications. *See* 7 U.S.C. § 7a-2(c)(1). Rather, the self-certified contracts go forward unless the CFTC acts to prohibit them. *See id.* Alternatively, the registered entity can ask the CFTC for pre-approval or the CFTC can initiate a review. *See id.* §§ 7a-2(c)(5)(B), (c)(5)(C). That is consistent with the CFTC's letter indicating that it has not acted to approve or disapprove any of the self-certified contracts because nothing in the CEA requires it to do so.

Kalshi relies on *Big Lagoon Rancheria v. California* to argue that the Board must file suit under the APA and not "use a collateral proceeding to end-run the procedural requirements governing appeals of administrative decisions." 789 F.3d 947, 953-54 (9th Cir. 2015) (en banc) (quotation omitted). But in *Big Lagoon*, the federal Bureau of Indian Affairs, had made final decisions to take land into trust for an Indian tribe and to include a tribe on a list of recognized Indian tribes. *Id.* at 950-51. The Ninth Circuit held that challenges to the Bureau of Indian Affairs' decisions to take land into trust and to recognize an Indian tribe are "garden-variety" APA claims that must be brought under the APA and not as a defense in a separate case. *Id.* at 953-54 (quoting *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 220, 132 S.Ct. 2199, 183 L.Ed.2d 211 (2012)). Here, the CFTC has not made a final decision regarding Kalshi's listing of sports-related event contracts, nor was it required to do so. Challenging the CFTC's inaction under these circumstances is not "a garden-variety APA claim." *Big Lagoon*, 789 F.3d at 953 (quotation omitted). Therefore, *Big Lagoon* is distinguishable and does not prohibit the Board's action where the relevant federal agency has not and is not required to have taken final action.

 **\*5** Further, regardless of whether the CFTC took final action, I disagree that the Board's only route for relief is

through the APA. Concluding that a defense to Kalshi's preemption argument must be brought solely through the APA puts the cart before the horse. To decide if something falls within the CFTC's jurisdiction to potentially preempt state law, courts must interpret the CEA because the CEA specifically defines that jurisdiction. Additionally, Congress, through the CEA, defined what is a swap, and nothing in the CEA gives the CFTC the exclusive power to interpret the statutory language defining words like "swap." *See Crypto*, 2025 WL 2916151, at *6, 11.

Kalshi (and Robinhood in the related case) assert that the CEA expressly delegates to the CFTC the exclusive power to decide whether products listed on a DCM qualify as swaps or other regulated derivatives. They contend the CEA does so through the provisions that delegate to the CFTC the authority to oversee the listing of new contracts, including through the self-certification process. They note that under 7 U.S.C. § 7a-2(c)(5)(B), Congress directed that the CFTC "shall approve a new contract ... unless the [CFTC] finds that the new contract ... would violate [the CEA or the CFTC's regulations]." But that speaks to what the CFTC must do, not what a court can or must do. It also refers to the CFTC's "approval" of a contract, not the CFTC's inaction on a self-certification. A registered entity can seek the CFTC's prior approval of a contract, and the CFTC can conduct a post-listing review. *See* 7 U.S.C. §§ 7a-2(c)(4), (c)(5)(C). Thus, § 7a-2(c)(5)(B) provides that if the CFTC reviews a listing, either pre- or post-listing, it must approve the contract unless it finds the listing violates the CEA or CFTC regulations.

That does not explicitly confine all statutory interpretations of the CEA's language, including its definition of a word like "swap," to the CFTC with no room for court interpretation except through an APA action. For example, if a DCM chose to run on its exchange an auction for real property it had no authority to auction off, no one would conclude that is a swap or a commodity within the CEA's meaning. Yet according to Kalshi, a DCM could run the auction, hope the CFTC does not notice, and no one else could do anything about it except file an APA suit against the CFTC (not against the DCM) even though an auction of real property plainly does not fall within the CFTC's exclusive jurisdiction under 7 U.S.C. § 2(a). I disagree. A DCM cannot insulate itself from state regulation through self-certification where its conduct does not fall within the CFTC's exclusive jurisdiction provision.

Kalshi brought this suit to obtain injunctive relief, arguing that state law is preempted. Courts routinely evaluate statutory

WESTLAW  © 2026 Thomson Reuters. No claim to original U.S. Government Works.    4

language to determine whether state law is preempted and the scope of any preemption. *See, e.g.*, *Virginia Uranium, Inc. v. Warren*, 587 U.S. 761, 767, 139 S.Ct. 1894, 204 L.Ed.2d 377 (2019) (examining "arguments about the [Atomic Energy Act's] preemptive effect much as [the Court] would any other about statutory meaning, looking to the text and context of the law in question and guided by the traditional tools of statutory interpretation"); *Wyeth v. Levine*, 555 U.S. 555, 566-81, 129 S.Ct. 1187, 173 L.Ed.2d 51 (2009); *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 443-44, 125 S.Ct. 1788, 161 L.Ed.2d 687 (2005) ("That [a preemption clause in a federal statute] may pre-empt judge-made rules, as well as statutes and regulations, says nothing about the scope of that pre-emption."). I therefore reaffirm my position in *Crypto* that in evaluating Kalshi's preemption arguments and the Board's defenses against preemption, I can interpret the statutory language to determine what falls within the CFTC's jurisdiction in the first place.

**\*6** That does not mean, as Robinhood argues in the related case, that the CFTC cannot regulate the listing of event contracts on DCMs if those contracts do not meet the statutory definition of the word "swap." Under 7 U.S.C. § 7(d)(1), to "be designated, and maintain a designation, as a contract market," a DCM must comply with the CEA and CFTC regulations. The CFTC thus can regulate a DCM under § 7(d)(1), even if it does not have exclusive jurisdiction under § 2(a).

### B. Kalshi is not likely to succeed in showing that its sports-related contracts are swaps.

As relevant here, the CEA defines a "swap" as an "agreement, contract, or transaction ... that provides for any purchase, sale, payment, or delivery ... that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C.A. § 1a(47)(A)(ii). I reaffirm my holding in *Crypto* that the word "event" in this definition means "a happening of some significance that took place or will take place, in a certain location, during a particular interval of time, such as a particular sporting event or an organized activity or celebration for the public or a particular group," and does not mean an outcome. 2025 WL 2916151, at \*8. And I adopt my preliminary conclusion in *Crypto* that "contingency" means a contingent event. *Id.* at \*8 n.9. And like the contracts in *Crypto*, Kalshi's event contracts are based on the outcomes of sporting events or on things that happen during a sporting event. Thus, they are not swaps within the CEA's meaning.

In my *Crypto* order, I did not address the part of the swap definition that the event or contingency must be "associated with a potential financial, economic, or commercial consequence." *Id.* at \*9, n.11. I do so now.

At the November 14, 2025 hearing before me, Kalshi argued that this language means "the event itself has to have potential financial, commercial, or economic consequence. It can't be an event that makes another financially consequential event more or less likely to occur." ECF No. 219 at 19. But by Kalshi's own argument, financial consequences of games based on their impact on downstream externalities like hotel room rentals, food sales, advertising dollars, or the fact that people bet on it cannot suffice because a game only makes room rentals, food sales, advertising, or bets more or less likely to occur. Later in the hearing, Kalshi argued that the potential financial consequences must be "extrinsic to the parties to the contract." *Id.* at 42, 129 S.Ct. 365. That would include anything imaginable about a potential downstream financial consequence, including that two other people who are not parties to the contract might bet on it.

Just like Kalshi's interpretation of the other words in the statute, its interpretation of potential financial consequences knows no limiting principle. Congress did not define a swap as a contract on anything that happens or could happen. So interpreting the statutory terms to include everything anyone can conjure up as a subject to bet on, or that might have some conceivable financial consequence if one is creative enough, is not a reasonable interpretation of the statute.

Like the words "event" and "contingency," I must give these words a reasonable and coherent meaning within the statutory context that does not lead to absurdities. I conclude that the phrase "associated with a potential financial, economic, or commercial consequence" means that the event or contingency is itself inherently joined or connected[1] with a potential financial, economic, or commercial consequence. This means that the event or contingency itself has some potential financial, economic, or commercial consequence without looking at externalities like potential downstream financial consequences such as parties extrinsic to the event betting on it. And it does not include consumer transactions that have not historically been known to be swaps, such as sports wagers.

**\*7** My interpretation is supported by the surrounding statutory text, legislative context, the CFTC's post-enactment guidance, and federalism principles. The other subparts of the

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

"swap" definition in § 1a(47)(A) refer almost exclusively to financial measures, indices, or instruments. Subpart (i) refers to a transaction that is "for the purchase or sale, or based on the value, of 1 or more interest or other rates, currencies, commodities, securities, instruments of indebtedness, indices, quantitative measures, or other financial or economic interests or property of any kind." Subpart (iii) similarly refers to the "exchange ... of 1 or more payments based on the value or level of 1 or more interest or other rates, currencies, commodities, securities, instruments of indebtedness, indices, quantitative measures, or other financial or economic interests or property of any kind ...."[2] The fourth subpart refers to a contract "that is, or in the future becomes, commonly known to the trade as a swap." The fifth part refers to a "security-based swap agreement" that has "a material term ... based on the price, yield, value, or volatility of any security ...." Finally, the sixth part covers any contract "that is any combination or permutation" of contracts in the other five parts. *See also* 17 C.F.R. § 1.3 (defining swap to have the meaning set forth in the CEA and including "particular products" like cross-currency swaps, currency options, and foreign exchange rate agreements). Reading subpart (ii) in context of the surrounding subparts supports the conclusion that "associated with a potential financial, economic, or commercial consequence" means that the event or contingency must be inherently associated with a potential financial consequence, not just that the event or contingency may have some potential downstream financial consequence. *See Yates v. United States*, 574 U.S. 528, 543, 135 S.Ct. 1074, 191 L.Ed.2d 64 (2015) (referring to the principal that "a word is known by the company it keeps ... to avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving unintended breadth to the Acts of Congress" (simplified); *Beecham v. United States*, 511 U.S. 368, 371, 114 S.Ct. 1669, 128 L.Ed.2d 383 (1994) ("That several items in a list share an attribute counsels in favor of interpreting the other items as possessing that attribute as well."). Thus, externalities like whether people bet on the event or contingency, or whether the event's occurrence or nonoccurrence causes downstream financial consequences, are not sufficient.[3]

This is consistent with the congressional purposes behind the Dodd-Frank Wall Street Reform and Consumer Protection Act that added swaps to the CEA. Pub. L. No. 111–203, 124 Stat. 1376 (2010) ("Dodd-Frank"). Dodd-Frank was a "direct and comprehensive response to the financial crisis that nearly crippled the U.S. economy beginning in 2008." S. Rep. 111-176, 2, 29-30 (Apr. 30, 2010).[4] A "major contributor

to the financial crisis was the unregulated over-the-counter ("OTC") derivatives market" that was "explicitly exempted" from the CFTC's jurisdiction and posed a "systemic threat" to the U.S. economy. *Id.* Congress thus aimed Dodd-Frank at systemic risks in the financial sector that undermined U.S. financial stability, and the Act's language should be interpreted through that lens.

**\*8** This view is further supported by the CFTC's rulemaking after Congress added swaps to the CEA. The CFTC determined that certain consumer agreements, contracts, and transactions would not be considered swaps "when entered into by consumers ... primarily for personal, family, or household purposes."[5] *Further Definition of "Swap," "Security-Based Swap," and "Security-Based Swap Agreement"; Mixed Swaps; Security-Based Swap Agreement Recordkeeping*, 77 Fed. Reg. 48208-01, 48246, 2012 WL 3257776 (Aug. 13, 2012). The CFTC stated that in determining whether consumer transactions are swaps, it would consider factors such as whether the contracts at issue (1) "do not contain payment obligations, whether or not contingent, that are severable from the agreement, contract, or transaction"; (2) "are not traded on an organized market or over-the-counter"; and (3) "[i]nvolve an asset of which the consumer is the owner or beneficiary, or that the consumer is purchasing, or they involve a service provided, or to be provided, by or to the consumer." *Id.* at 48247. Sports wagers do not contain payment obligations that are severable from the contract itself. They are not (until Kalshi and other DCMs started offering them) traded on organized markets. They involve a service provided to the consumer as entertainment. And sports wagers have not historically been considered swaps. *See id.* at 48248 (stating that the CFTC and SEC "do not intend to suggest that many types of consumer and commercial arrangements that historically have not been considered swaps are within the swap or security-based swap definitions.").

During the November 14, 2025 hearing, Kalshi stated that the CFTC has expressed that there are "some customary consumer transactions that you would expect to happen off exchange." ECF No. 219 at 35. I agree that sports bets are in that category. Kalshi characterizes its sports-related event contracts in various ways, but at bottom, they are sports wagers. As Justice Potter Stewart famously said about pornography in his concurrence in *Jacobellis v. State of Ohio*, "I know it when I see it." 378 U.S. 184, 197, 84 S.Ct. 1676, 12 L.Ed.2d 793 (1964). These are sports wagers and everyone who sees them knows it. That includes Kalshi, who

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

has advertised itself as the "first app for legal sports betting in all 50 states." *See Martin*, Case No. 1:25-cv-01283-ABA, ECF No. 28-2 at 3.[6] Kalshi has not disputed that is how it advertised itself, nor has it successfully distinguished its arguments here from its own plain words.

Finally, my interpretations comport with the traditional balance between state and federal regulation of gaming. In contrast, Kalshi's proposed reading upends that regime with no expressed congressional intent to do so, with no federal gaming regulator to replace the states' regulatory infrastructures, and contrary to the expressed congressional intent that CFTC exchanges should not become sports gambling venues. *See Crypto*, 2025 WL 2916151, at *6. I noted in my *Crypto* order that the broad interpretation of swaps that Crypto (and Kalshi and Robinhood) are promoting "would sweep nearly all sports wagering into the CFTC's exclusive jurisdiction even though the states historically have regulated gambling through their police power." *Id.* at *9. That is so because "nearly every sports bet would be a transaction in which payment is dependent on the outcome of a sporting event and is associated with a potential financial, economic, or commercial consequence." *Id.* (footnote omitted). That "cannot be a proper reading of the statute because that would mean that all sports wagering must be done on a DCM, and not at casinos, as the CEA forbids nearly all swap dealing and trading unless done on a DCM, except for certain market participants, none of whom are casinos or the average sports bettor." *Id.* (footnote omitted). As I stated in *Crypto*, "[h]ad Congress intended such a sea change in the regulatory landscape, it surely would have said so. The CEA's language and legislative history show that Congress did not intend such a change and, to the contrary, did not want gambling to take place on CFTC-designated exchanges." 2025 WL 2916151, at *10 (simplified).

 **\*9** Kalshi argues that wagers at sportsbooks are not swaps falling within the CFTC's jurisdiction because the CEA covers products traded on an exchange, and "once a gambler places a bet with a sportsbook in Nevada, neither the gambler nor the sportsbook can sell that bet to anyone else on any organized exchange." ECF No. 184 at 17. I have no evidence before me that sports wagers are not tradeable. But even if they are not, being tradeable is not included in the CEA's definition of a swap. Instead, the CEA defines a swap and states that if something is a swap, it must be traded on an exchange. *See* 7 U.S.C. §§ 1a(47) (defining swap); 2(e) (making it "unlawful for any person, other than an eligible contract participant, to enter into a swap unless the swap

is entered into on, or subject to the rules of, a board of trade designated as a contract market under section 7 of this title"). And while the CFTC has stated that it will consider whether an instrument is traded on an exchange as a factor to distinguish consumer contracts from swaps, it is not the only factor the CFTC identified. *Further Definition of "Swap," "Security-Based Swap," and "Security-Based Swap Agreement"; Mixed Swaps; Security-Based Swap Agreement Recordkeeping*, 77 FR 48208-01, 48247 (Aug. 13, 2012). Further, Kalshi's proposed distinction becomes self-fulfilling, circular, and inconsistent with the statutory text. Kalshi essentially argues that if contracts are not traded on an exchange, then they are not swaps that must be traded on an exchange. But the CEA states that all swaps must be traded on an exchange. Additionally, the CFTC has prohibited DCMs from listing contracts that involve gaming. 17 C.F.R. § 40.11(a)(1). By Kalshi's logic, Kalshi's gaming contracts should not count as swaps because the CFTC prohibited them from being traded on an exchange.

The Board thus has met its burden to show that Kalshi is not likely to succeed in showing that Kalshi's sports-related contracts are swaps because those contracts are based on the outcome of sports events or are based on things that take place during an event (such as a coin flip) but that are not events or contingencies themselves within the CEA's meaning. Additionally, although a sports game might be inherently associated with a potential financial consequence (people pay to attend), discrete moments or acts during a sports game like a coin flip or whether there is a fumble are not inherently associated with potential financial, economic, or commercial consequences within the CEA's meaning.

Although Kalshi critiques my interpretations, Kalshi's proposed reading is worse because it has no limiting principle, has similar semantic and superfluity problems it identifies in my interpretation, and goes against congressional intent. Kalshi argues that Congress defined "swap" broadly, but a "statute's meaning does not always turn solely on the broadest imaginable definitions of its component words." *Epic Systems Corp. v. Lewis*, 584 U. S. 497, 523, 138 S.Ct. 1612, 200 L.Ed.2d 889 (2018) (simplified). In interpreting the statute, I must construe the words in context and avoid absurdities. *Marinello v. United States*, 584 U. S. 1, 7-8, 138 S.Ct. 1101, 200 L.Ed.2d 356 (2018); *Arizona State Bd. For Charter Sch. v. U.S. Dep't of Educ.*, 464 F.3d 1003, 1008 (9th Cir. 2006). Perhaps here, like the cases Justice Stewart mentions in *Jacobellis*, I am "faced with the task of trying to define what may be indefinable." 378

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works. 7

U.S. at 197, 84 S.Ct. 1676. But if everything a person can conceive of happening is an event or contingency, and if every downstream economic consequence someone can conjure up makes that event or contingency associated with a potential financial, commercial, or economic consequence, the words lose all meaning or render superfluous the rest of the swap definition. *See United States v. Lopez*, 514 U.S. 549, 565, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995) (rejecting a "rationale [that] lacks any real limits because, depending on the level of generality, any activity can be looked upon as commercial").

Kalshi's position also does not comport with what Congress was trying to achieve when it added swaps to the CEA. Congress was bringing risky financial products out of the shadows that had threatened the stability of the entire U.S. financial sector, and which had catastrophic ripple effects on the U.S. and world economies during the financial crisis of 2007-2008. Congress was not enabling nationwide gambling on CFTC-designated exchanges. "[I]nterpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available." *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575, 102 S.Ct. 3245, 73 L.Ed.2d 973 (1982). It is absurd to think that Congress intended for DCMs to turn into nationwide gambling venues on every topic under the sun to the exclusion of state regulation and with no comparable federal regulator[7] without ever mentioning that was the goal when Congress added swaps to the CEA in 2010.

### C. Kalshi has not shown a likelihood of success that excluded commodities fall within the CFTC's exclusive jurisdiction under § 2(a).

**\*10** Kalshi argues that even if its contracts are not swaps, they are "excluded commodities" subject to the CFTC's regulation.[8] The Board responds that excluded commodities also require an associated financial consequence and, in any event, excluded commodities do not fall within the statutory provision that Kalshi asserts gives the CFTC exclusive jurisdiction, 7 U.S.C. § 2(a)(1)(A).

Section 2(a)(1)(A) states that the CFTC:

shall have exclusive jurisdiction ... with respect to accounts, agreements ..., and transactions involving swaps or contracts of sale of a commodity for future delivery ..., traded or executed on a contract market designated pursuant to section 7 of this title or a swap execution facility

pursuant to section 7b-3 of this title or any other board of trade, exchange, or market, and transactions subject to regulation by the Commission pursuant to section 23 of this title.

Section 1a(9) defines a commodity to mean various products like wheat, cotton, and rice, "all other goods and articles" (with some exceptions not relevant here), and "all services, rights, and interests ... in which contracts for future delivery are presently or in the future dealt in." The CEA separately defines an excluded commodity to mean:

(i) an interest rate, exchange rate, currency, security, security index, credit risk or measure, debt or equity instrument, index or measure of inflation, or other macroeconomic index or measure;

(ii) any other rate, differential, index, or measure of economic or commercial risk, return, or value that is—

(I) not based in substantial part on the value of a narrow group of commodities not described in clause (i); or

(II) based solely on one or more commodities that have no cash market;

(iii) any economic or commercial index based on prices, rates, values, or levels that are not within the control of any party to the relevant contract, agreement, or transaction; or

(iv) an occurrence, extent of an occurrence, or contingency (other than a change in the price, rate, value, or level of a commodity not described in clause (i)) that is—

(I) beyond the control of the parties to the relevant contract, agreement, or transaction; and

(II) associated with a financial, commercial, or economic consequence.

7 U.S.C. § 1a(19).[9]

**\*11** First, the relevant portion of the excluded commodity definition requires the "occurrence, extent of an occurrence, or contingency" to be "associated with a financial, commercial, or economic consequence." Thus, an event contract that does not satisfy the swap definition's requirement for a potential financial consequence also does not fit within the excluded commodity definition. The CFTC has often referred to excluded commodities as intangible financial commodities, thus suggesting that the CFTC also reads the phrase "associated with" to require the event or

WESTLAW  © 2026 Thomson Reuters. No claim to original U.S. Government Works.

contingency to inherently have a financial consequence.[10] Kalshi argues that if its sports-based event contracts do not qualify as excluded commodities, then the special rule in 7 U.S.C. § 7a-2(c)(5)(C) does not work with respect to contracts involving gaming. But a contract on whether the World Series of Poker will occur this year would be such a contract. The World Series of Poker has inherent financial consequences because the host (Caesars Entertainment) charges entrance fees to participants. And it involves gaming.

Further, even if Kalshi's contracts are deemed excluded commodities, § 2(a) does not state that the CFTC has exclusive jurisdiction over excluded commodities, which are defined separately from commodities. Congress could have included excluded commodities in § 2(a) but it did not. *See S.E.C. v. McCarthy*, 322 F.3d 650, 656 (9th Cir. 2003) ("Congress's explicit decision to use one word over another in drafting a statute is material."). Given the subject matter of excluded commodities, that distinction makes sense. The CFTC does not have exclusive jurisdiction over interest or exchange rates, currencies, securities, or macroeconomic indicators. Nor does it have exclusive jurisdiction over the subject matter in the special rule related to excluded commodities, such as activity that is unlawful under federal or state law, terrorism, assassination, war, or gaming. *See* 7 U.S.C. 7a-2(c)(5)(C).

Although an "excluded commodity" could be thought of as a subset of "commodity," substituting "excluded commodity" for "commodity" in § 2(a) does not grammatically or logically make sense. Excluded commodities do not involve things that are "contracts of sale of a commodity for future delivery." 7 U.S.C. § 2(a). Interest rates, exchange rates, credit risks, inflation indexes and measures, and other macroeconomic indexes or measures are not sold "for future delivery." Nor are occurrences, extents of occurrences, or contingencies that are beyond the control of the parties to the relevant contract and associated with a financial consequence sold for "future delivery." It is not logical to state that Kalshi is offering contracts of sale of a sports event (or its outcome) for future delivery. Thus, Kalshi's gaming contracts do not qualify as "contracts of sale of commodities for future delivery" under § 2(a).

 **\*12** Ruling that the CFTC does not have exclusive jurisdiction over excluded commodities under § 2(a) does not oust the CFTC from regulating excluded commodities. The CFTC would still have jurisdiction over DCMs who list such agreements under § 7(d)(1), just not exclusive jurisdiction

under § 2(a). Thus, the Board has established that Kalshi is not likely to succeed in showing that Kalshi's contracts fall within the CFTC's exclusive jurisdiction under § 2(a) even if they are excluded commodities.

### *D. Kalshi has shown serious questions on the merits.*

Although I conclude Kalshi has not shown a likelihood of success, it has raised serious questions on the merits. The issues in this and similar cases are complex, novel, and evolving. Kalshi has raised serious questions about how to properly interpret the statutory language, to divine congressional intent, and to resolve the tension between what constitutes state-regulated gambling versus federally regulated derivatives. I therefore address the other factors regarding whether to grant a TRO under the sliding scale approach of *Alliance for the Wild Rockies*.

## V. THE BALANCE OF HARDSHIPS DOES NOT TIP SHARPLY IN KALSHI'S FAVOR AND THE PUBLIC INTEREST DOES NOT FAVOR AN INJUNCTION.

Because Kalshi has shown serious questions on the merits, the Board must show that the balance of hardships does not tip sharply in Kalshi's favor. It also must show that the public interest does not favor the injunction. The Board has met its burden on these factors.

Kalshi's concerns are essentially that it will not be able to profit from the trades, and that it suffers some reputational harm if it cannot offer those contracts to Nevada residents or must close out contracts involving Nevada residents. Kalshi also asserts that it risks its DCM designation if it does not offer its products nationwide.

Kalshi's harms are largely monetary. Kalshi may not be able to recover damages from the defendants if it turns out that it can offer these contracts without violating Nevada law, which is a factor to consider in balancing the hardships. But Kalshi's monetary harm is weighed against the State of Nevada's financial interests in tax revenues and Kalshi's competitors'[11] financial interests in fair competition.

Kalshi's monetary harm can be mitigated through geofencing, which regulated entities in this jurisdiction employ. Although Kalshi contends that it risks losing its DCM designation if it geofences, there is no evidence before me that the CFTC would take adverse action against Kalshi for complying with court orders and state law while the various lawsuits play out. To the contrary, it appears the CFTC would not act against

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

registered entities in these circumstances. For several months after the Board announced that it sent Kalshi a cease-and-desist letter, Robinhood did not offer its Nevada customers the option of trading on Kalshi's exchange. *See Robinhood*, ECF No. 8 at 3-4. There is no evidence that the CFTC threatened Robinhood's status as a registered entity for doing so. And recently, Crypto reached an agreement with the Board while the appeal in its case plays out. *See Crypto*, ECF No. 110. Although it is not clear from the record what that agreement is, there is no evidence that the CFTC has acted or threatened to act against Crypto for satisfying the Nevada regulators while that case is on appeal. Additionally, I find it difficult to credit Kalshi's fear given its apparent willingness to risk its DCM status by listing contracts involving gaming (however one defines it) in the face of the CFTC's regulation that prohibits DCMs from doing so. *See* 17 C.F.R. § 40.11(a).

 **\*13**  The CFTC has recently directed DCMs like Kalshi and FCMs like Robinhood to warn customers about the various lawsuits and risks they pose. CFTC Letter No. 25-36 (Sept. 30, 2025). As a result, Kalshi's customers are on notice that offering gaming contracts implicates the CFTC's regulation, that the legal landscape under which Kalshi is operating could change, and that customers' contracts could be disrupted. If customers continue trading in Kalshi's products, they, like Kalshi, are proceeding at their own risk. Kalshi could have proceeded cautiously until this and other lawsuits played out, but instead it greatly expanded its offerings, so it has to some extent created or amplified its own harm.

Balanced against Kalshi's harms are substantial irreparable harms to the Board, the State of Nevada, the gaming industry in this state, and the public interest. First, the Nevada Legislature made findings, and it is self-evident to anyone who lives in Nevada, that the "gaming industry is vitally important to the economy of the State and the general welfare of the inhabitants." Nev. Rev. Stat. (NRS) § 463.0129(a). The Nevada Legislature also found that a "comprehensive regulatory structure, coupled with strict licensing standards, will ensure the protection of consumers, including minors" and problem gamblers. NRS § 463.745. The Nevada Legislature also found that the success of legal gaming is dependent on public confidence and trust, and that public trust can be maintained only through strict regulation of those involved in the gaming industry in this state. NRS §§ 463.0129(b), (c).

The defendants thus have strong interests in regulating gaming in Nevada. Indeed, they are statutorily charged with

doing so under Nevada law. The defendants and the public have an interest in prohibiting gaming in Nevada that is not subject to the same rigorous regulations and oversight as the licensed entities in this state, including gaming involving individuals who are under the age of 21 or problem gamblers. Whatever one's views are on gambling, there is no question that some segment of the population will suffer from problem gambling, but neither DCMs nor the CFTC is equipped to address those issues the same way state gaming regulators and licensed entities are.[12] The CFTC admits it is not a gaming regulator. *See supra* n.6. Allowing Kalshi to continue offering sports-related event contracts to 18-year-olds, even though the CFTC issued a regulation that prohibits DCMs like Kalshi from listing gaming contracts, is not in the public interest. *See* 17 C.F.R. § 40.11(a).[13]

 **\*14**  I must also consider, as part of the public interest, the interests of the gaming industry in this state. Licensed gaming companies have invested millions of dollars to comply with state regulations only to supposedly find out that they could have just become CFTC-registered exchanges to offer sports gambling nationwide for anyone over the age of 18 without complying with Nevada's gaming regulatory regime or paying taxes in this state. If Kalshi's view is adopted, there is a not-insignificant chance that the regulated entities in this state will abandon their current model and become DCMs, unleashing even more unregulated gambling and devastating the Nevada economy and related tax revenues. Indeed, recently, two of the "largest sports betting operators in the U.S., FanDuel and DraftKings, agreed ... to not seek licensing in Nevada in order to focus efforts on launching prediction markets in other states." *DraftKings, FanDuel Agree to Abandon Nevada in Favor of Prediction Markets*, The Nevada Independent, Nov. 12, 2025, available at https://thenevadaindependent.com/article/draftkings-fanduel-agree-to-abandon-nevada-in-favor-of-prediction-markets.[14]

The traditional police powers of the states, which are considerable and longstanding, particularly in this state which has led the nation in gaming regulation and enforcement for decades, weigh heavily against Kalshi's harms. As I mentioned in my *Crypto* order, had Congress intended to upset the balance between state and federal gaming regulation and turn CFTC-designated markets into nationwide casinos for anyone over the age of 18 with no comparable federal regulator, it surely would have made that intent more explicit.

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works. 10

I therefore find that the balance of hardships does not tip sharply in Kalshi's favor. Rather, the balance of hardships and the public interest weigh in favor of the defendants and of dissolving the preliminary injunction.

## VI. CONCLUSION

I THEREFORE ORDER that the defendants' motion to dissolve the preliminary injunction **(ECF No. 142) is GRANTED**. The preliminary injunction at ECF No. 45 is dissolved and no longer in force or effect.

### All Citations

Slip Copy, 2025 WL 3286282

Footnotes

1 The parties in *Robinhood* agree that "associated with" means joined or connected to, although they dispute what that means in terms of the degree of association between the event or contingency and the financial consequences called for in the statute. *See* 2:25-cv-01541-APG-DJA, ECF Nos. 25 at 9-10; 47 at 4. Kalshi did not specifically define "associated with," but like Robinhood, it argues for an expansive understanding of the overall phrase to mean essentially any potential financial consequence from the event.

2 Subpart (iii) also identifies "commonly known" transactions of this sort, such as interest rate swaps, foreign exchange swaps, and the like. Admittedly, a few of the specifically identified swaps in subpart (iii) do not directly reference a financial instrument or measure, such as a weather swap or an emissions swap. But Congress could have concluded that such swaps are so closely related to financial consequences or were already so commonly traded as swaps as to include them within the definition. Additionally, weather (and its impacts on agriculture, among other things) and emissions are linked to the national interest in a way that the outcome of a sporting event or how many points a particular team scores are not.

3 In litigation between Kalshi and the CFTC, Kalshi distinguished election contracts from those involving gaming by stating that games and events like horse racing or boxing matches "are staged purely for entertainment and to facilitate betting. They have no independent significance; their outcomes carry no economic risks." *KalshiEX, LLC v CFTC*, ECF No. 17-1 at 40 (D.D.C. 1/25/2024) (the *D.C. Kalshi* case). Kalshi also stated at oral argument in front of the D.C. district court that a game has "no inherent economic significance.... Contracts that involve games are probably not the type of contracts that we want to be listed on an exchange, because they don't have any real economic value to them. But again, what's tying that together is the existence of the game because the game is the thing that doesn't have intrinsic economic significance." ECF No. 40 at 15. Kalshi reiterated this position to the D.C. Circuit, arguing that "a game doesn't have economic consequences outside of the game itself." D.C. Cir. Case No. 24-5205, Stay OA Tr. at 63:14-15.

Kalshi also told me at the April 8, 2025 TRO hearing that a coin flip would not be a swap because it does "not have independent real-world consequences" and that would not change just because people bet on it. ECF No. 46 at 7. Kalshi has changed its tune and now self-certifies to the CFTC that not only a game but things that happen during a game have potential financial consequences. *See, e.g.*, ECF No. 152-8 at 2, 14.

4 Dodd-Frank is another name for The Restoring American Financial Stability Act of 2010. *See Laborers' Loc. v. Intersil*, 868 F. Supp. 2d 838, 848 (N.D. Cal. 2012).

5 The CFTC did not specifically identify sports wagers as consumer contracts that are not swaps, but that may be explained by the fact that the CFTC had already issued its regulation at 17 C.F.R. § 40.11(a) that prohibits DCMs from listing contracts involving gaming. *See Provisions Common to Registered Entities*, 76 FR 44776-01, 44785, 2011 WL 3099850 (July 27, 2011).

6 I can consider the exhibits in the Martin case because I can consider hearsay "in deciding whether to issue a preliminary injunction" or TRO. *Johnson v. Couturier*, 572 F.3d 1067, 1083 (9th Cir. 2009).

7 The CFTC has stated that "in the United States, gambling is overseen by state regulators with particular expertise, and governed by state gaming laws aimed at addressing particular risks and concerns associated with gambling. **The Commission is not a gaming regulator**. The CEA and Commission regulations are focused on regulating financial instruments and markets, and do not include provisions aimed at protecting against gambling-specific risks and concerns,

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works. 11

including customer protection concerns inherent to gambling. **Permitting event contracts involving gaming, as proposed to be defined, to trade on CFTC-regulated markets would in effect permit instruments commonly understood as bets or wagers on contests or games to avoid these legal regimes and protections.** Gambling is a rapidly evolving field, and the Commission does not believe that it has the statutory mandate nor specialized experience appropriate to oversee it, or that Congress intended for the Commission to exercise its jurisdiction or expend its resources in this manner." *Event Contracts*, 89 FR 48968-01, 48982-83 (June 10, 2024) (internal footnotes omitted, emphasis added). Although the CFTC made this statement in the context of a proposed rule that was never finalized, the CFTC's statements express its view on its own expertise (or lack thereof) in this area. The importance of strict gaming regulation has been highlighted by the recent arrests of high-profile players and coaches related to illegal gambling allegations in professional baseball and basketball. *See Two Current Major League Baseball Players Charged in Sports Betting and Money Laundering Conspiracy*, https://www.justice.gov/usao-edny/pr/two-current-major-league-baseball-players-charged-sports-betting-and-money-laundering; *31 Defendants, Including Members and Associates of Organized Crime Families and National Basketball Association Coach Chauncey Billups, Charged in Schemes to Rig Illegal Poker Games*, https://www.justice.gov/usao-edny/pr/31-defendants-including-members-and-associates-organized-crime-families-and-national.

8  Kalshi also asserts, without elaboration, that its contracts are "futures" or "options." ECF No. 184 at 14. Section 2(a) does not use the word "futures" standing alone. Rather, it refers to "contracts of sale of a commodity for future delivery." Kalshi does not analyze how its contracts fit this statutory language. As for options, the Ninth Circuit has indicated that "an option means the contract whereby the creator (or writer) of the option grants to the purchaser 'the right, for a specified period of time, to either buy or sell the subject of the option at a predetermined price.' " *Commodity Futures Trading Comm'n v. White Pine Tr. Corp.*, 574 F.3d 1219, 1226 (9th Cir. 2009) (quoting 1 Derivatives Regulation § 1.02[10]). Kalshi does not explain how its contracts fit this definition either.

9  Kalshi and Robinhood note that the word "event" does not appear in the definition of an excluded commodity. But the word "event" also does not appear in the special rule for public interest review in 7 U.S.C. § 7a-2(c)(5)(C)(i). The special rule is not limited to swaps because it also refers to contracts, agreements, and transactions. And in the special rule, although the word "swaps" appears in the opening clause along with agreements, contracts, and transactions, it is dropped in the clause that states that the CFTC may determine that such "agreements, contracts, or transactions are contrary to the public interest if the agreements, contracts, or transactions involve" one of the enumerated subjects. No one has suggested that the CFTC cannot conduct a public interest review of swaps under the special rule even though the word was omitted in the phrase giving the CFTC the authority to conduct the public interest review. And unlike the swap definition, the excluded commodity definition does not include the word "potential" in relation to the financial consequence. All this shows is that the CEA has some drafting peculiarities that courts must interpret as best they can.

10  *See, e.g.*, *Position Limits for Derivatives*, 78 FR 75680-01, 75749 (Dec. 12, 2013) ("Initially, the Commission limited its approval of position accountability to financial instruments (i.e., excluded commodities) that had a high degree of liquidity."); *id.* at 75762, n.730 (stating that the excluded commodity definition "includes financial products such as interest rates, exchange rates, currencies, securities, credit risks, and debt instruments as well as financial events or occurrences"); *Position Limits for Derivatives*, 81 FR 96704-01, 96742 (Dec. 30, 2016) ("In 1987, the Commission provided interpretive guidance regarding the bona fide hedging definition and risk management exemptions for futures in financial instruments (now termed excluded commodities)."); *Effective Date for Swap Regulation*, 76 FR 42508-01, 42511, n.27 (July 19, 2011) ("The term 'excluded commodity' is defined ... to include, among other things, financial instruments such as a currency, interest rate, or exchange rate, or any economic or commercial index based on prices, rates, values, or levels that are not within the control of any party to the transaction."); *Effective Date for Swap Regulation*, 76 FR 65999-01, 66000 (Oct. 25, 2011) (referring to excluded commodities as "generally, financial, energy and metals commodities"); *Significant Price Discovery Contracts on Exempt Commercial Markets*, 73 FR 75888-01, 75889 (referring to excluded commodities as "primarily financial commodities but also commodities such as weather").

11  This includes Nevada-licensed entities and Crypto.

12  *See* NRS § 463.350(1)(a) (prohibiting gambling for persons under 21 years old); NRS § 463.151(2) (State maintains a list of persons who may not participate in gambling); Nev. Gaming Control Reg. 5.17(2) (requiring licensees to post "written materials concerning the nature and symptoms of problem gambling" and toll-free number for the National Council on

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Problem Gambling or a similar Board-approved entity); *id.* 5.17(4) requiring licensees to implement a program to allow patrons to self-limit access to credit, check cashing, or direct mail marketing of gaming opportunities by that licensee).

Kalshi argues that § 40.11(a) does not categorically prohibit gaming-related contracts because under § 40.11(c), the CFTC can do a case-by-case review of self-certified contracts. *See* ECF No. 184 at 16. But § 40.11(a) states in unambiguous language that a "registered entity shall not list for trading or accept for clearing on or through the registered entity ... [a]n agreement, contract, transaction, or swap based upon an excluded commodity, as defined in Section 1a(19)(iv) of the Act, that involves, relates to, or references terrorism, assassination, war, gaming, or an activity that is unlawful under any State or Federal law" or an agreement, contract, transaction, or swap based on an excluded commodity that "involves, relates to, or references an activity that is similar to" the enumerated activities. Section 40.11(c) reflects the practical reality that if a DCM nevertheless lists a contract that involves an enumerated activity or something similar to an enumerated activity, the CFTC may review it. The idea that the CFTC could not categorically prohibit contracts on things like terrorism or assassination and instead must review each and every contract individually is dubious, particularly where a DCM who believes their contract is not contrary to the public interest can seek pre-approval from the CFTC. *See* 17 C.F.R. § 40.3(a).

As mentioned previously, I can consider hearsay in deciding whether to issue a preliminary injunction. Additionally, the Board confirmed at the November 14, 2025 hearing that FanDuel and DraftKings have voluntarily abandoned their Nevada licensing applications. ECF No. 219 at 89.

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2025 WL 2916151
United States District Court, D. Nevada.

NORTH AMERICAN DERIVATIVES
EXCHANGE, INC., Plaintiff

v.

The State of Nevada on Relation of
the NEVADA GAMING CONTROL
BOARD, et al., Defendants

Case No. 2:25-cv-00978-APG-BNW
|
Signed October 14, 2025

**Attorneys and Law Firms**

Bradley T. Austin, Snell & Wilmer L.L.P., Las Vegas, NV, Nowell D. Bamberger, Pro Hac Vice, Matthew C. Solomon, Pro Hac Vice, Cleary Gottlieb Steen & Hamilton LLP, Washington, DC, for Plaintiff.

Sabrena Clinton, Jessica Whelan, Nevada Attorney General's Office, Las Vegas, NV, Nicole A. Saharsky, Pro Hac Vice, Minh Nguyen-Dang, Pro Hac Vice, Mayer Brown LLP, Washington, DC, Rory K. Schneider, Pro Hac Vice, Mayer Brown LLP, New York, NY, for Defendants State of Nevada on Relation of the Nevada Gaming Control Board, George Assad, Chandeni K. Sendall, Aaron D. Ford, Mike Dretizer.

**Order (1) Denying Motion for Judgment on Pleadings, (2) Denying Motion for Preliminary Injunction, and (3) Granting in Part Motion to Strike**

ANDREW P. GORDON, CHIEF UNITED STATES DISTRICT JUDGE

**\*1** Plaintiff North American Derivatives Exchange, Inc. d/b/a Crytpo.com (Crypto) is a Commodity Futures Trading Commission (CFTC) designated contract market (DCM). Earlier this year, Crypto began offering event contracts that turn on the outcome of sporting events. The Nevada Gaming Control Board deemed these contracts to be sports wagering subject to Nevada's gaming laws and sent Crypto a cease-and-desist letter. Crypto brought this suit to permanently enjoin the Nevada Gaming Control Board, its members in their official capacities, and the Nevada Attorney General from pursuing civil or criminal enforcement against Crypto for offering event contracts in Nevada. Crypto contends that its contracts are legal under federal law and that Nevada law is preempted due to the CFTC's exclusive jurisdiction over transactions on DCMs.

Crypto moves for a preliminary injunction to preclude the defendants from pursuing civil or criminal remedies against it. Crypto also moves for judgment on the pleadings and to strike the defendants' affirmative defenses. The defendants oppose, arguing that Crypto is not likely to succeed on the merits because the Commodity Exchange Act (CEA) does not preempt Nevada gaming laws and, in any event, Crypto's sports wagers are not "swaps" and thus do not fall within the CFTC's exclusive jurisdiction. Additionally, the defendants argue that Crypto cannot meet the other factors to support preliminary injunctive relief. The defendants contend that judgment on the pleadings is premature because fact issues remain, and they argue that the motion to strike should be denied, except for one affirmative defense that they concede is now moot. Several Indian tribes and Indian gaming associations move for leave to file an amicus brief.[1] Crypto does not oppose granting leave for the amicus brief to be filed and responded to the amicus brief on the merits.

I deny the motion for judgment on the pleadings because, based on the pleadings, Crypto's event contracts are not "swaps" falling within the CFTC's exclusive jurisdiction. I deny the motion for preliminary injunction because Crypto has not met its burden to show that it is likely to succeed in demonstrating that its event contracts based on the outcome of live events are swaps that fall within the CFTC's exclusive jurisdiction. I grant in part the motion to strike, with leave to amend. Finally, I grant the amici leave to file the amicus brief.

**I. BACKGROUND**
The CFTC regulates financial derivative markets. "A derivative is a financial instrument or contract whose price is directly dependent upon (i.e.[,] derived from) the value of one or more underlying assets—for example, commodities (like corn and wheat), securities, or debt instruments." *KalshiEX LLC v. Commodity Futures Trading Comm'n*, No. 23-3257 (JMC), 2024 WL 4164694, at \*1 (D.D.C. Sept. 12, 2024) (quotation omitted). Derivatives "provide a way to transfer market risk or credit risk between two counterparties." *Id.* (quotation omitted). Event contracts are a form of derivative in which the "payoff is based on a specified event, occurrence, or value." *Id.* at \*2 (quotation omitted). "These contracts

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works. 1

usually pose a yes-or-no question. The buyer of the event contract, for example, may take a 'yes' position on whether the underlying event will happen," and the "seller implicitly takes the opposite, or 'no,' position." *Id.* The contract prices fluctuate because they are based on the current probability that the relevant event will occur. *Id.*

 **\*2**  An entity like Crypto must apply to and receive designation from the CFTC to become a DCM. 7 U.S.C. §§ 2(e), 7(a); 17 C.F.R. §§ 38.1, 38.3(a). Until the year 2000, a DCM had to get the CFTC's preapproval to list contracts by convincing the CFTC that its contracts satisfied an economic purpose test and were not contrary to the public interest. *KalshiEX LLC*, 2024 WL 4164694, at \*2 (quotation omitted). But Congress amended the CEA in 2000 to allow DCMs to self-certify that their contracts comply with the law and regulations with no prior CFTC review. *Id.*[2]; *see also* 7 U.S.C. § 7a-2(c)(1); 17 C.F.R. § 40.2.

In 2010, Congress amended the CEA again by enacting a special rule for event-based contracts in "excluded commodities." 7 U.S.C. § 7a-2(c)(5)(C); *see also* 7 U.S.C. § 1a(19)(iv) (defining excluded commodity, as relevant here, to mean "an occurrence, extent of an occurrence, or contingency ... that is ... beyond the control of the parties to the relevant contract, agreement, or transaction; and ... associated with a financial, commercial, or economic consequence"). Under this special rule, DCMs can still self-certify and immediately begin offering event contracts, or they can request the CFTC's preapproval. *KalshiEX LLC*, 2024 WL 4164694, at \*3; *see also* 17 C.F.R. §§ 40.2, 40.3. But under the special rule, Congress delegated to the CFTC to determine whether an agreement, contract, transaction, or swap in "excluded commodities that are based upon the occurrence, extent of an occurrence, or contingency" is contrary to the public interest. 7 U.S.C. § 7a-2(c)(5)(C)(i) (footnote omitted). Among the types of contracts Congress expressly included in this public interest review are contracts that "involve" terrorism, war, assassination, gaming, and "activity that is unlawful under any Federal or State law." *Id.* Under the CEA, "[n]o agreement, contract, or transaction determined by the Commission to be contrary to the public interest under clause (i) may be listed or made available for clearing or trading on or through a registered entity." 7 U.S.C § 7a-2(c)(5)(C)(ii).

The CFTC subsequently conducted a public interest review under 7 U.S.C. § 7a-2(c)(5)(C)(i) and adopted a regulation that prohibits DCMs from listing event contracts that involve, relate to, or reference gaming or an activity that is unlawful

under any State or Federal law. Specifically, 17 C.F.R. § 40.11(a) states:

> (a) Prohibition. A registered entity shall not list for trading or accept for clearing on or through the registered entity any of the following:
>
>> (1) An agreement, contract, transaction, or swap based upon an excluded commodity, as defined in Section 1a(19)(iv) of the Act, that involves, relates to, or references terrorism, assassination, war, gaming, or an activity that is unlawful under any State or Federal law; or
>>
>>  **\*3**  (2) An agreement, contract, transaction, or swap based upon an excluded commodity, as defined in Section 1a(19)(iv) of the Act, which involves, relates to, or references an activity that is similar to an activity enumerated in § 40.11(a)(1) of this part, and that the Commission determines, by rule or regulation, to be contrary to the public interest.

In addition to this general prohibition on the front end, the CFTC's regulation provides a review process through which it can determine on the back end whether an event contract that was listed despite the prohibition involves a prohibited activity. Under 17 C.F.R. § 40.11(c), the CFTC

> may determine, based upon a review of the terms or conditions of a submission under § 40.2 [(self-certification)] or § 40.3 [(preapproval)], that an agreement, contract, transaction, or swap based on an excluded commodity, as defined in Section 1a(19)(iv) of the Act, which may involve, relate to, or reference an activity enumerated in § 40.11(a)(1) or § 40.11(a)(2), be subject to a 90-day review.

The CFTC can approve or disapprove a contract following that review. 17 C.F.R. § 40.11(c)(2).

When adopting this regulation, the CFTC acknowledged that "the term 'gaming' requires further clarification and that the term is not susceptible to easy definition." *Provisions Common to Registered Entities*, 76 Fed. Reg. 44776, 44785 (July 27, 2011) (to be codified at 17 C.F.R. pt 40). The CFTC noted that it had "solicited public comments on the best approach for addressing the potential gaming aspects of some event contracts and the potential pre-emption of state laws." *Id.* (simplified). The CFTC indicated that it would continue to consider comments it received "and may issue a future rulemaking concerning the appropriate regulatory treatment of event contracts, including those involving gaming." *Id.*

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

(simplified). But "[i]n the meantime, the Commission has determined to prohibit contracts based upon the activities enumerated in Section 745 of the Dodd-Frank Act[3] and to consider individual product submissions on a case-by-case basis under § 40.2 or § 40.3." *Id.*

Crypto is a CFTC-registered DCM. ECF No. 15-2 at 3. On January 30, 2025, Crypto self-certified to the CFTC that it would start offering event contracts based on "live presentation industry events." ECF No. 15-3 at 2-3. Crypto described the event contracts as swaps. *Id.* at 2, 5. According to Crypto's self-certification, live presentation industry events "not only have an outcome that determines a leader, an achievement, an accomplishment, a champion, a title holder or a winner of a particular live presentation industry event, but more importantly the outcome of a live presentation industry event has a substantial economic and commercial impact on business and individuals ...." *Id.* at 3, 5. The term "industry event" refers to events in the performing arts, spectator sports, and related industries. *Id.* at 5.

Crypto advised the CFTC that certain persons were prohibited from trading these event contracts, including the players, coaches, agents, staff, employees, management, and owners, as well as these persons' immediate family and household members. *Id.* at 6. Crypto identified various financial impacts of live industry events, including advertising, ticket and food sales, employment related to the event, ancillary impacts such as hotel rentals and taxi rides, and tax implications. *Id.* at 8-9. Crypto asserted that the event contracts are "designed to manage the risk of a variety of market participants, whose business face economic consequences based on the outcome of a respective Industry Event, and to enable price discovery for related commercial enterprises." *Id.* at 9.

**\*4** The CFTC thus far appears not to have acted against Crypto or other DCMs who have offered similar event contracts that are based on the outcome of sporting events. Instead, various state entities, like the Nevada Gaming Control Board (Board), have attempted to regulate Crypto and other DCMs who are offering sports-based event contracts. That led Crypto and other DCMs to file suits seeking injunctions against state regulation based on the argument that because they are CFTC-designated exchanges, only the CFTC can regulate them and state laws are preempted.

And that is what happened in this case. On May 20, 2025, the Board sent Crypto a letter stating that the Board was "aware that Crypto.com has been offering, and continues to offer,

event-based wagering contracts in Nevada on sporting events on its exchange," and that "offering event-based wagering contracts is unlawful in Nevada, unless and until approved as licensed gaming by the Nevada Gaming Commission." ECF No. 15-4 at 2. According to the Board, Crypto was operating as an unlicensed sports pool and thereby violating Nevada law, including Nevada criminal law. *Id.* at 3. The Board stated that if Crypto continued to offer event contracts after receipt of this letter, that conduct would be "considered willful violations of Nevada law." *Id.*

Crypto thereafter filed this lawsuit and moved for a preliminary injunction seeking to enjoin the Board and the Nevada Attorney General from pursuing civil and criminal penalties against Crypto. In another case involving a different DCM, I granted an injunction based on my preliminary conclusion that the Board was likely field preempted from regulating the event contracts offered by that DCM, KalshiEX, LLC (Kalshi). *KalshiEX, LLC v. Hendrick*, No. 2:25-CV-00575-APG-BNW, 2025 WL 1073495, at \*6 (D. Nev. Apr. 9, 2025). The District of New Jersey reached a similar conclusion. *KalshiEX LLC v. Flaherty*, No. 25-CV-02152-ESK-MJS, 2025 WL 1218313, at \*5 (D.N.J. Apr. 28, 2025). But the District of Maryland concluded the opposite and held that Maryland state gaming laws were not preempted and therefore the Maryland state gaming authorities could regulate event contracts on Kalshi's exchange. *KalshiEX LLC v. Martin*, No. 25-CV-1283-ABA, —— F. Supp. 3d ——, 2025 WL 2194908, at \*13 (D. Md. Aug. 1, 2025). Both the District of New Jersey and District of Maryland's orders have been appealed. *KalshiEX LLC v. Flaherty*, No. 25-1922 (Third Cir.); *KalshiEX LLC v. Martin*, No. 25-1892 (Fourth Cir.). The Third Circuit heard oral arguments on September 10, 2025, but has not yet issued a decision. The Fourth Circuit appeal is still in briefing.

Despite my prior ruling in *Hendrick*, I reach a different conclusion in this case. For the reasons discussed below, I deny Crypto's motion for judgment on the pleadings and for a preliminary injunction.

**II. CRYPTO'S EVENT CONTRACTS BASED ON THE OUTCOME OF LIVE EVENTS ARE NOT SWAPS FALLING WITHIN THE CFTC'S EXCLUSIVE JURISDICTION.**

"A judgment on the pleadings is properly granted when, taking all the allegations in the non-moving party's pleadings as true, the moving party is entitled to judgment as a matter of law." *Fajardo v. Cnty. of Los Angeles*, 179 F.3d 698, 699 (9th

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

3

Cir. 1999). When, as here, the plaintiff moves for judgment on the pleadings, I look to the defendants' allegations in their answer. *See Nat'l Lifeline Ass'n v. Batjer*, No. 21-15969, 2023 WL 1281676, at *2 (9th Cir. Jan. 31, 2023) ("Because [the plaintiff] moved for judgment on the pleadings, this court looks to the allegations in the Defendants' pleadings, here their answer.").

 **\*5**  To qualify for a preliminary injunction, a party must demonstrate: (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm, (3) the balance of hardships favors the movant, and (4) an injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Alternatively, under the sliding scale approach, the plaintiff must demonstrate (1) serious questions on the merits, (2) a likelihood of irreparable harm, (3) the balance of hardships tips sharply in the plaintiff's favor, and (4) an injunction is in the public interest. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011).

Under the Supremacy Clause, "state laws that conflict with federal law are without effect," meaning they are preempted by federal law. *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008) (simplified). The "ultimate touchstone" in preemption analysis is congressional purpose. *Id.* (quotation omitted). "Congress may indicate pre-emptive intent through a statute's express language or through its structure and purpose." *Id.*

Absent an express preemption clause, federal law may preempt state law where Congress has occupied the field or where state laws conflict with federal law. Field preemption occurs when it "can be inferred from a framework of regulation so pervasive that Congress left no room for the States to supplement it or where there is a federal interest so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Arizona v. United States*, 567 U.S. 387, 399 (2012) (simplified). Conflict preemption occurs when "compliance with both federal and state regulations is a physical impossibility," or "where the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* (quotation omitted). I assume that the States' "historic police powers" are not preempted "unless that was Congress's "clear and manifest purpose." *Id.* at 400. Regulation of gambling has long been considered to "lie at the heart of the state's police power." *Artichoke Joe's California Grand Casino v. Norton*, 353 F.3d 712, 740 (9th Cir. 2003) (quotation omitted).

I begin with the "plain meaning of [the CEA's] language." *United States v. Lillard*, 935 F.3d 827, 833 (9th Cir. 2019). Title 7 U.S.C. § 2(a)(1)(A) provides:

> The Commission [CFTC] shall have exclusive jurisdiction ... with respect to accounts, agreements ..., and transactions involving swaps or contracts of sale of a commodity for future delivery ..., traded or executed on a contract market designated pursuant to section 7 of this title .... Except as hereinabove provided, nothing contained in this section shall (I) supersede or limit the jurisdiction at any time conferred on the Securities and Exchange Commission or other regulatory authorities under the laws of the United States or of any State, or (II) restrict the Securities and Exchange Commission and such other authorities from carrying out their duties and responsibilities in accordance with such laws. Nothing in this section shall supersede or limit the jurisdiction conferred on courts of the United States or any State.

As I stated in *Hendrick*, "Section 2's plain and unambiguous language grants the CFTC exclusive jurisdiction over accounts, agreements, and transactions involving swaps or contracts of sale of a commodity for future delivery that are traded or executed on exchanges that the CFTC has designated under section 7." 2025 WL 1073495, at *5 (internal footnotes omitted). "The second sentence in section 2—which states that nothing in section 2 supersedes 'other regulatory authorities' under state law—does not give states regulatory authority over swaps traded on CFTC-designated exchanges because that language is limited by the phrase '[e]xcept as hereinabove provided.' " *Id.* "Section 2's first sentence supersedes the SEC and state regulatory authorities' jurisdiction for transactions involving swaps on a CFTC-designated exchange." *Id.* "The remainder of the second sentence preserves the SEC and states' regulatory authority over exchanges or transactions that are not covered by the CFTC's exclusive jurisdiction." *Id.* "For example, [state regulators] could pursue an entity that offered sports event contracts that were not listed on a CFTC-designated exchange." *Id.*

 **\*6**  But to fall within the CFTC's exclusive jurisdiction under 7 U.S.C. § 2(a)(1)(A), the listed item must be a "swap[ ] or contract[ ] of sale of a commodity for future delivery ... traded or executed on" a DCM. Crypto does not assert that the event contracts at issue are contracts for the sale of a commodity for future delivery. Rather, Crypto contends that the event contracts qualify as swaps. *See* ECF Nos. 1 at 3; 15-3 at 2, 5.

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works. 4

Preliminarily, I have authority to interpret the CEA, including its definition of "swap." Crypto argues that the legislative history shows that Congress intended the CFTC, not courts or state regulators, to decide what is a swap and whether that swap is contrary to the public interest under the special rule. *See* 156 Cong. Rec. S5902-01, S5906 (July 15, 2010) (Sen. Lincoln stating that the "Commission [(CFTC)] needs the power to, and should, prevent derivatives contracts that are contrary to the public interest because they exist predominantly to enable gambling through supposed 'event contracts' "). But the CEA does not expressly delegate to the CFTC the exclusive power to decide what is a swap. *Compare Batterton v. Francis*, 432 U.S. 416, 430-31 (1977) (evaluating a statute that expressly "authorize[d]" the Secretary of Health, Education, and Welfare the power to define a statutory term through statutory language: "unemployment (as determined in accordance with standards prescribed by the Secretary)" (simplified)), *with* 7 U.S.C. § 2(a)(1)(A) (granting the CFTC "exclusive jurisdiction" over "accounts, agreements ..., and transactions involving swaps ... traded or executed on a contract market designated" by the CFTC). "It is emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 1 Cranch 137, 177, 2 L. Ed. 60 (1803); *see also Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 402 (2024) ("Congress expects courts to handle technical statutory questions."). Nothing in the CEA takes statutory interpretation away from courts. *See* 7 U.S.C. § 2(a)(1)(A) ("Nothing in this section shall supersede or limit the jurisdiction conferred on courts of the United States or any State"). I therefore have the power to interpret the statute. While agency interpretations and fact finding carry weight, I have been presented with no agency fact finding or reasoned interpretation regarding whether these contracts are swaps. *See Loper Bright Enters.*, 603 U.S. at 394, 402.As relevant here, the CEA defines swaps as "any agreement, contract, or transaction ... that provides for any purchase, sale, payment, or delivery ... that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). The CEA does not define "occurrence" or "event," so I "interpret the words consistent with their ordinary meaning at the time Congress enacted the statute." *Wisconsin Cent. Ltd v. United States*, 585 U.S. 274, 277 (2018) (simplified). I may refer to dictionaries from the relevant time to aid in this analysis. *See id.*; *Schindler Elevator Corp. v. U.S. ex rel. Kirk*, 563 U.S. 401, 407 (2011). However, the fact that "a definition is broad enough to encompass one sense of a word does not establish that the word is ordinarily

understood in that sense." *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 568-69 (2012). Where dictionaries distinguish between the most common usages and rare or obsolete usages, that may suggest that, "although acceptable," the rare or obsolete usages "might not be common or ordinary." *Id.* "Statutory language, however, cannot be construed in a vacuum. It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 101 (2012) (quotation omitted).

**\*7** Various dictionaries from before the 2010 amendment to the CEA that added swaps to the CFTC's exclusive jurisdiction define "occurrence" as "[s]omething that happens or takes place." Black's Law Dictionary (9th ed. 2009).[4] Dictionaries define "event" in various ways, including "a happening or occurrence, esp. when important," "a particular contest or item in a program (the pole vault, high jump and other events)," or "any organized activity, celebration, etc. for members of the general public or a particular group." Webster's New College Dictionary (2009). Most indicate that an event is an occurrence "of some importance" or similar language. Random House Dictionary of the English Language (Second ed. 1987).[5] Although some dictionaries suggest "event" could mean "outcome,"[6] Webster's and Merriam-Webster's noted this definition of event is an "archaic" use of the word. Webster's New College Dictionary (2009) (definition of event); Merriam-Webster's Collegiate Dictionary (11th Ed. 2003) (definition of event).

Dictionaries often identify "event" as a synonym for "occurrence," but make distinctions between the two. For example, Webster's stated that "occurrence is the general word for anything that happens or takes place," while "an event is an occurrence of relative significance, especially one growing out of earlier happenings or conditions." *Id.* (under definition of "occurrence"). Merriam-Webster's stated that an occurrence "may apply to a happening without intent, volition, or plan," while an event "usu. implies an occurrence of some importance." Merriam-Webster's Collegiate Dictionary (11th Ed. 2003) (under the definition of "occurrence").[7]

**\*8** Although definitions for both occurrence and event refer to a happening and are often referred to as synonyms, Congress chose different words for occurrence and event in the definition of a swap, and I must ascribe some significance

Case 3:26-cv-00034 Document 34-1 Filed 01/20/26 Page 32 of 63 PageID #: 358

to that decision. *See S.E.C. v. McCarthy*, 322 F.3d 650, 656 (9th Cir. 2003) ("It is a well-established canon of statutory interpretation that the use of different words or terms within a statute demonstrates that Congress intended to convey a different meaning for those words."). I thus cannot interpret occurrence and event to both mean anything that happens. The ordinary meaning of the word occurrence is something happened, and that is consistent with the surrounding words of nonoccurrence and extent of the occurrence. Those words mean something happened, did not happen, or happened to an extent. For example, in the context of sports,[8] a boxing match could either take place (occurrence), not take place (nonoccurrence), or go only three rounds (extent of the occurrence).

The ordinary meaning of event is a happening of some significance that took place or will take place, in a certain location, during a particular interval of time, such as a particular sporting event or an organized activity or celebration for the public or a particular group. And the ordinary meaning of event in terms of sports would be the sporting event itself, not who wins it. Indeed, Webster's notes that equating an event with an outcome or result is an archaic use of the word "event," not the ordinary meaning. An ordinary American interpreting the word "event" would conclude that the Kentucky Derby is an event. But who wins the Kentucky Derby is an outcome of that event, not a separate event in and of itself.[9]

 **\*9**  Crypto's live presentation industry event contracts are not swaps because, as Crypto self-certified to the CFTC, these contracts turn on the outcome of the live event, not on the "occurrence, nonoccurrence, or the extent of the occurrence" of a live event. *See* ECF Nos. 1 at 3-4 ("At issue here are 'Sports Event Contracts,' with return profiles dependent on the outcome of a live sporting event."); 15-3 at 3 (Crypto self-certifying that the event contracts at issue relate to the "impacts of the outcome of an event in the live presentation industry"), 5 (stating that the payment criterion "is determined by the outcome of the Industry Event"). According to Crypto's self-certification, it is not offering event contracts on, for example, whether the Kentucky Derby (the event) will take place (occur, not occur, or extent of occurrence) but on who will win it (the outcome). Crypto's self-certified contracts therefore are not "swaps" within the CFTC's exclusive jurisdiction.

Crypto's proposed reading of the statute knows no limiting principle because anything could be defined as an event.

Although Crypto argues that Congress intentionally defined swaps broadly, the words Congress chose must have content. If everything can be defined as an event, the statutory words either have no meaning or have such a broad meaning that they would render superfluous other portions of the CEA's definition of a swap. *See Corley v. United States*, 556 U.S. 303, 314 (2009) (A "statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." (simplified)). For example, section 1a(47)(iii) includes credit default swaps within the definition of a swap. A "credit default swap is a bilateral financial contract in which a protection buyer makes periodic payments to the protection seller, in return for a contingent payment if a predefined credit event occurs in the reference credit." *Aon Fin. Prods., Inc. v. Societe Generale*, 476 F.3d 90, 96 (2d Cir. 2007) (quotation omitted). In other words, a credit default swap is a contract that provides for payment dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event (a default) associated with a potential financial, economic, or commercial consequence (credit). Because a credit default swap could fit the definition of a swap in 7 U.S.C. § 1a(47)(A)(ii) the way Crypto reads that section, there would be no need for Congress to define a swap to include credit default swaps in 7 U.S.C. § 1a(47)(A)(iii).

Crypto's position, that its live presentation event contracts are swaps, would sweep nearly all sports wagering into the CFTC's exclusive jurisdiction even though the states historically have regulated gambling through their police power. According to Crypto's arguments and self-certification to the CFTC,[10] nearly every sports bet would be a transaction in which payment is dependent on the outcome of a sporting event and is associated with a potential financial, economic, or commercial consequence.[11] That cannot be a proper reading of the statute because that would mean that all sports wagering must be done on a DCM, and not at casinos, as the CEA forbids nearly all swap dealing and trading unless done on a DCM, except for certain market participants, none of whom are casinos or the average sports bettor.[12] The factual distinctions Crypto makes between itself and a typical casino sports book do not distinguish Crypto's event contracts from sports wagers at Nevada casinos when considered under the statutory definition of a swap. But casinos have openly operated sports books and accepted sports wagers on the outcomes of sporting events in this state and others both before and after the 2010 amendments to the CEA.[13] And no one, including Congress and the CFTC, has suggested

WESTLAW  © 2026 Thomson Reuters. No claim to original U.S. Government Works.   6

those bets are "swaps" that had to be conducted on a DCM. At the hearing I held on the pending motions, Crypto stated that the "CFTC has never taken the position and we have never taken the position that all gaming [wagers] are swaps regulated by the CFTC." ECF No. 104 at 51. But Crypto does not explain why that is not the necessary implication of its position. Because if the statutory definition of swaps covers contracts on the outcome of sporting events that have a potential financial or economic consequence, and all swaps must be done a DCM absent exceptions not applicable to casinos and the average sports bettor, then all sports betting must be done on a DCM.

**\*10** Had Congress intended such a sea change in the regulatory landscape, it surely would have said so. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) ("Congress, we have held, does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes."). The CEA's language and legislative history show that Congress did not intend such a change and, to the contrary, did not want gambling to take place on CFTC-designated exchanges. As discussed above, Congress enacted the special rule granting the CFTC authority to determine whether swaps contracts in excluded commodities are contrary to the public interest. 7 U.S.C. § 7a-2(c)(5)(C)(i). Among the types of contracts that Congress stated can be subject to this public interest review are contracts that "involve ... gaming." *Id.* § 7a-2(c)(5)(C)(i)(V). And Congress set forth in the CEA that if the CFTC determines that a contract is contrary to the public interest under this rule, then that contract may not be "listed or made available for clearing or trading on or through a registered entity." *Id.* § 7a-2(c)(5)(C)(ii); *see also* 7 U.S.C. § 7a-2(c)(5)(B) ("The Commission shall approve a new contract or other instrument unless the Commission finds that the new contract or other instrument would violate this chapter (including regulations)."). The CFTC made that public interest determination on a blanket basis when it promulgated 17 C.F.R. § 40.11(a), which prohibits DCMs from listing a swap based on an excluded commodity that "involves, relates to, or references ... gaming," or "an activity that is similar to" gaming. And it provided a mechanism for the CFTC to review and delist a self-certified contract that runs afoul of that prohibition.[14]

The CFTC's decision to prohibit DCMs from listing gaming contracts is consistent with congressional intent to "prevent gambling through futures markets." 156 Cong. Rec. S5902-01, S5906 (July 15, 2010) (statement of Sen. Lincoln). Legislators commented specifically on sports wagers on events like the Super Bowl or the Kentucky Derby as the type of "supposed 'event contracts' " that the CFTC had "the power to, and should, prevent ... because they exist predominantly to enable gambling." *Id.* at S5906-07 ("It would be quite easy to construct an 'event contract' around sporting events such as the Super Bowl, the Kentucky Derby, and Masters Golf Tournament. These types of contracts would not serve any real commercial purpose. Rather, they would be used solely for gambling.").

With this congressional intent in mind, the CFTC stated when promulgating its regulations that "the term 'gaming' requires further clarification and that the term is not susceptible to easy definition." *Provisions Common to Registered Entities*, 76 Fed. Reg. 44776, 44785 (July 27, 2011) (to be codified at 17 C.F.R. pt 40). So the CFTC "solicited public comments on the best approach" for addressing the "potential gaming aspects of some event contracts and the potential pre-emption of state laws." *Id.* (quotation omitted). The CFTC ultimately decided "to prohibit contracts based upon the activities enumerated in [the special rule] and to consider individual product submissions on a case-by-case basis under § 40.2 or § 40.3." *Id.* The CFTC specifically stated that its "prohibition of certain 'gaming' contracts is consistent with Congress's intent to prevent gambling through the futures markets and to protect the public interest from gaming and other events contracts." *Id.* at 44786 (simplified).

**\*11** "Pre-emption fundamentally is a question of congressional intent." *Eng. v. Gen. Elec. Co.*, 496 U.S. 72, 78-79 (1990). Congress did not intend for gaming to be conducted on DCMs, and it defined swaps and enacted the special rule to achieve this intent. Thus, based on the statutory language and Congressional intent, Crypto's contracts on the outcome of live events are not "swaps" that fall within the CFTC's exclusive jurisdiction in 7 U.S.C. § 2(a)(1)(A). Crypto's motions for judgment on the pleadings and for a preliminary injunction depend on its argument that the CFTC has exclusive jurisdiction over its event contracts as swaps on a DCM. Crypto is not likely to prevail on its argument that the CFTC has exclusive jurisdiction over Crypto's event contracts, so I deny its motions for judgment on the pleadings and for a preliminary injunction.

Because Crypto must show that all four *Winter* factors support granting an injunction, I need not address the remaining factors. But given my ruling that Crypto has not shown it

is likely to succeed, the analysis of those factors changes from what I determined in *Hendrick*. Allowing Crypto to offer sports wagers guised as swaps on its exchange unfettered by state regulation imposes substantial hardships on the defendants, who are statutorily charged with the "dut[y] to preserve public confidence and trust in licensed gaming." *State Gaming Control Bd. v. Breen*, 661 P.2d 1309, 1310 (Nev. 1983) (citing Nev. Rev. Stat. § 463.0129(1)(c)). And the public has an interest in ensuring that unlicensed sports wagering does not occur on CFTC-designated exchanges, as that would be contrary to the CEA, congressional intent, CFTC regulations, and Nevada law.

## III. I GRANT IN PART THE MOTION TO STRIKE, WITH LEAVE TO AMEND.

Crypto moves to strike the defendants' affirmative defenses for various reasons, including that they are denials of Crypto's allegations, not affirmative defenses; they either do not apply or fail as a matter of law; or they lack factual support.

Under Rule 12(f), I "may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f); *see also Quintara Biosciences, Inc. v. Ruifeng Biztech, Inc.*, 149 F.4th 1081, 1089 (9th Cir. 2025). The purpose of a Rule 12(f) motion to strike "is to avoid the expenditure of time and money that must arise from litigating spurious issues." *Sidney-Vinstein v. A.H. Robins Co.*, 697 F.2d 880, 885 (9th Cir. 1983). I "view the pleading under attack in the light most favorable to the pleader." *Cardinale v. La Petite Acad., Inc.*, 207 F. Supp. 2d 1158, 1162 (D. Nev. 2002).

### A. I deny the motion to strike the defendants' denials that Crypto is a DCM on which sports event contracts are listed.

Crypto argues that I should strike the defendants' denials in their answer that Crypto is a DCM and that sports contracts are traded on it. Crypto argues that these facts can be verified through its filings with the CFTC and thus are not subject to reasonable dispute. The defendants respond that their denials are not proper subjects for a motion to strike and the way for Crypto to test the defendants' denials is through dispositive motions after discovery. The defendants also argue that they should not have to take Crypto's word for it that it is a DCM properly listing sports event contracts.

I deny this portion of Crypto's motion because the defendants' denials are not insufficient defenses, immaterial,

or impertinent. Crypto's preemption argument fails if it is not a DCM or did not properly list event contracts subject to the CFTC's exclusive jurisdiction. *See Quintara Biosciences*, 149 F.4th at 1089 (explaining that immaterial means the matter "has no essential or important relationship to the claim for relief or the defenses being pleaded," and impertinent means "statements that do not pertain, and are not necessary, to the issues in question" (simplified)). The denials are not redundant or scandalous, and Crypto does not contend that they are. Consequently, I deny this portion of the motion to strike.

### B. I deny the motion to strike affirmative defense one.

**\*12** The defendants' first affirmative defense alleges that Crypto's complaint fails to state a claim. ECF No. 38 at 16. Although failure to state a claim is merely a denial of Crypto's ability to state its claim, Federal Rule of Civil Procedure 12(h)(2)(A) provides that failure to state a claim may be raised in the answer. I therefore deny the motion to strike this defense.

### C. I deny the motion to strike affirmative defenses two, three, four, and five because the motion seeks to litigate the merits of the defenses rather than to strike them.

The defendants' second, third, fourth, and fifth affirmative defenses are that Crypto's claims are barred by Eleventh Amendment immunity, official act immunity, discretionary act immunity, and the Tenth Amendment. ECF No. 38 at 16. Crypto relies on my rulings in *Hendrick* to argue that these defenses fail and should be stricken. The defendants respond that *Hendrick* did not resolve the defenses as they may apply in this case and that my order in that case is not final.

I deny the motion to strike. If Crypto wants a ruling on these defenses, it should file a dispositive motion addressing them in the context of this case, rather than moving to strike them.

### D. I strike the affirmative defenses asserting judicial and collateral estoppel because the answer does not give fair notice of the grounds for them.

The defendants' sixth and seventh affirmative defenses assert that Crypto's claims are barred by judicial and collateral estoppel. *Id.* Crypto argues that it does not have sufficient notice of the factual bases for these defenses. The defendants respond that some courts have held that pleading "estoppel" alone is sufficient to provide fair notice.

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

8

An affirmative defense is sufficiently pleaded if it gives the plaintiff fair notice of the nature of the defense. *See Simmons v. Navajo Cnty., Ariz.*, 609 F.3d 1011, 1023 (9th Cir. 2010). The fair notice standard "only requires describing the defense in general terms." *Kohler v. Flava Enters., Inc.*, 779 F.3d 1016, 1019 (9th Cir. 2015) (quotation omitted). It does not "require a detailed statement of facts." *Vanguard Dealer Servs., LLC v. Cervantes*, No. 2:21-cv-01121-JAD-EJY, 2023 WL 3852404, at *3 (D. Nev. June 6, 2023) (quotation omitted). For example, the Ninth Circuit held that a plaintiff received fair notice of the nature of a statute of limitations defense because the amended answer stated only that the "plaintiff's claims are barred by the applicable statute of limitations," but the defendant attached a memorandum of points and authorities that mentioned the specific statutory section on which the defendant relied. *Wyshak v. City Nat. Bank*, 607 F.2d 824, 827 (9th Cir. 1979); *see also Kohler*, 779 F.3d at 1019 (declining to "disturb the district court's finding" that an answer gave fair notice of a defense that the store gave "substantially equivalent" access to the disabled plaintiff where the answer stated that the defendant complied with the Americans with Disabilities Act (ADA) by having "alternate methods of accessibility" even though alternative methods of accessibility "stem[s] from a distinct portion of the ADA apart from the equivalent facilitation" (quotation omitted)).

Here, the defendants' answer gives no hint as to how either doctrine would apply to Crypto. Although the defendants need not give a detailed statement of facts to support their invocation of these defenses, they must at least give fair notice of the grounds for them. Because they have not done so, I strike the judicial and collateral estoppel defenses. But I grant the defendants leave to amend. *See* Fed. R. Civ. P. 15(a)(2) (stating that "[t]he court should freely give leave [to amend] when justice so requires").

**E. I strike the unclean hands affirmative defense because the answer does not give fair notice of the grounds for it.**

 **\*13** The defendants' eighth affirmative defense is that Crypto's claims are barred by the unclean hands doctrine. ECF No. 38 at 16. Crypto argues that this defense does not give fair notice of the grounds for asserting it. And it contends that even if the defense was adequately pleaded, the doctrine should not apply because enjoining the defendants from prosecuting Crypto serves the public interest where state law is preempted. The defendants respond that whether Crypto's alleged unclean hands prevents it from obtaining injunctive relief is a disputed question that cannot be resolved through a motion to strike.

I grant the motion to strike this defense because, like the defendants' estoppel defenses, the answer gives no indication how the defense applies to Crypto in this case. But I grant leave to amend because the defendants may be able to properly plead this defense. Crypto's argument that enjoining the defendants from prosecuting Crypto serves the public interest is a merits argument that is based on disputed questions of fact and law, so I do not address it in ruling on a motion to strike.

**F. I grant in part the motion to strike affirmative defenses nine, eleven, twelve, and thirteen and construe them as denials of Crypto's claims rather than affirmative defenses.**

The defendants' ninth affirmative defense asserts that Crypto cannot show irreparable harm. ECF No. 38 at 16. Their eleventh, twelfth, and thirteenth defenses assert that Congress did not intend the CEA to preempt state gaming laws, the Nevada gaming laws do not conflict with the CEA, and there is a presumption against preemption in areas of traditional state regulation. *Id.* at 16-17.

Crypto argues that I should strike these defenses because they are mere denials of Crypto's allegations, not affirmative defenses. The defendants respond that this is not a basis to strike the defenses and Crypto does not identify any prejudice from being required to respond.

I agree with Crypto that these are denials, not affirmative defenses. But I do not strike them. Instead, I construe them as denials.

**G. I grant the motion to strike the tenth affirmative defense because, although Crypto's conduct may bear on the balance of the equities in Crypto's request for injunctive relief, the defense has no factual content.**

The defendants' tenth affirmative defense is that Crypto failed to mitigate any alleged harm. ECF No. 38 at 16. Crypto contends this defense does not apply because Crypto is not seeking money damages so it had no duty to mitigate. The defendants respond that Crypto's conduct bears on whether it is entitled to injunctive relief.

The defendants have clarified that this defense refers to Crypto's conduct and how that may impact the balance of the equities in determining whether an injunction is appropriate. But like some of the defendants' other defenses, it has no factual content to give Crypto fair notice of the defense.

WESTLAW  © 2026 Thomson Reuters. No claim to original U.S. Government Works.   9

Indeed, Crypto assumed it was a defense based on the failure to mitigate damages, which does not apply in this case where Crypto seeks only injunctive relief. I therefore strike it, with leave to amend.

**H. I strike the fourteenth affirmative defense because the defendants acknowledge it is moot.**

The defendants' fourteenth affirmative defense asserts any affirmative defense advanced by the intervenors in this case. ECF No. 38 at 17. The defendants concede this defense is moot because intervenor Nevada Resort Association has not pleaded any additional defenses. *See* ECF Nos. 50-2; 64 at 4. I therefore strike this defense.

**I. I grant the motion to strike the fifteenth defense that seeks to incorporate all affirmative defenses enumerated in Federal Rule of Civil Procedure 8 because it is conclusory and seeks to incorporate defenses that plainly do not apply.**

 **\*14** The defendants' fifteenth affirmative defense seeks to assert "the affirmative defenses enumerated in Rule 8 of the Federal Rules of Civil Procedure." ECF No. 38 at 17. Crypto argues this defense does not give fair notice and seeks to incorporate defenses that do not apply in this case. The defendants argue that Crypto has not shown that this defense causes it any prejudice.

I strike this affirmative defense because it improperly seeks to incorporate every defense in Rule 8(c) with no factual basis. That does not give fair notice. If this were proper, all any defendant would have to do is state that they assert every possible affirmative defense and call it a day. The defendants do not attempt to explain how several of the defenses in

Rule 8 could even apply in this situation, such as accord and satisfaction, arbitration and award, or statute of frauds. *See* Fed. R. Civ. P. 8(c). Crypto should not have to guess which of these 18 defenses the defendants are asserting or the grounds for asserting them. I therefore strike this defense, with leave to amend.

**IV. CONCLUSION**

I THEREFORE ORDER that North American Derivative Exchange, Inc.'s motion for a preliminary injunction **(ECF No. 15) is DENIED**.

I FURTHER ORDER that North American Derivative Exchange, Inc.'s motion for judgment on the pleadings **(ECF No. 42) is DENIED**.

I FURTHER ORDER that North American Derivative Exchange, Inc.'s motion to strike **(ECF No. 43) is GRANTED in part** as set forth in this order.

I FURTHER ORDER that the defendants may file an amended answer by November 4, 2025.

I FURTHER ORDER that the motion for leave to file an amicus brief **(ECF No. 74) is GRANTED**.

I FURTHER ORDER the clerk of court to substitute as a defendant the current chairman of the Nevada Gaming Control Board, Mike Dreitzer, for former chairman Kirk Hendrick under Federal Rule of Civil Procedure 25(d).

**All Citations**

Slip Copy, 2025 WL 2916151, Comm. Fut. L. Rep. P 35,564

---

Footnotes

1    The amici are the Indian Gaming Association, California Nations Indian Gaming Association, Arizona Indian Gaming Association, Washington Indian Gaming Association, Oklahoma Indian Gaming Association, National Congress of American Indians, the Native American Finance Officers Association, Tribal Alliance of Sovereign Indian Nations, San Manuel Gaming and Hospitality Authority, United South and Eastern Tribes Sovereignty Protection Fund, and 24 federally recognized Indian Tribes. ECF No. 74 at 1-2.

2    Under the CEA, a DCM can self-certify to the CFTC that the listed contract complies with the CEA and the CFTC's regulations. 17 C.F.R. § 40.2. The CFTC can thereafter request additional "evidence, information or data that demonstrates that the contract meets, initially or on a continuing basis, the requirements of the Act or the Commission's regulations or policies thereunder." 17 C.F.R. § 40.2(b). The CFTC can stay a listing of a contract under certain circumstances, including if the CFTC initiates proceedings for filing a false certification. 17 C.F.R. § 40.2(c). Alternatively, a DCM can request the CFTC pre-approve a contract before listing it. 17 C.F.R. § 40.3.

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works. 10

3    Section 745 of the Dodd-Frank Wall Street Reform and Consumer Protection Act includes the special rule for event contracts in excluded commodities enumerated in 7 U.S.C. § 7a-2(c)(5)(C)(i). PL 111-203, 124 Stat. 1376 (July 21, 2010).

4    *See also* Webster's New College Dictionary (2009) (defining occurrence as "the act or fact of occurring" or "something that occurs; event; incident"); Random House Dictionary of the English Language (Second ed. 1987) (defining occurrence as "something that happens; event; incident"); The American Heritage Dictionary of the English Language (4th ed. 2000) (defining occurrence to mean "[s]omething that takes place"); Merriam-Webster's Collegiate Dictionary (11th Ed. 2003) (defining occurrence as "something that occurs; the action or instance of occurring").

5    The American Heritage Dictionary of the English Language (4th ed. 2000) (defining event as "[s]omething that takes place; an occurrence"; a "significant occurrence or happening"; a "social gathering or activity"; the "final result; the outcome"; a "contest or an item in a sports program"); Merriam-Webster's Collegiate Dictionary (11th Ed. 2003) (defining event as "outcome"; "the final outcome or determination of a legal action"; "a postulated outcome, condition, or eventually (*in the event that* ...)"; "something that happens: occurrence"; a "noteworthy happening", a "social occasion or activity", and "any of the contests in a program of sports"); Random House Dictionary of the English Language (Second ed. 1987) ("something that happens or is regarding as happening; an occurrence, esp. one of some importance"; "the outcome, issue, or result of anything: *The venture had no successful event.*"; "something that occurs in a certain place during a particular interval of time"; and "[a]ny of the contests in a program made up of one sport or of a number of sports"). In discussing synonyms for "event," Random House stated that an event "is usually an important happening" whereas an occurrence is "something that happens, often by surprise." The American Heritage Dictionary likewise distinguished occurrence versus event, stating that "[o]ccurrence and happening are the most general" and "[e]vent usually signifies a notable occurrence." The American Heritage Dictionary of the English Language (4th ed. 2000) (under the definition for occurrence). And Merriam-Webster's made a similar distinction, stating that an event "usu. implies an occurrence of some importance." Merriam-Webster's Collegiate Dictionary (11th Ed. 2003) (under the definition of occurrence).

6    The American Heritage Dictionary of the English Language (4th ed. 2000) (defining event to include the "final result; the outcome"); Merriam-Webster's Collegiate Dictionary (11th Ed. 2003) (defining event to include "outcome"); Random House Dictionary of the English Language (Second ed. 1987) (defining event to include "the outcome, issue, or result of anything: *The venture had no successful event.*").

7    In discussing synonyms for "event," Random House stated that an event "is usually an important happening" whereas an occurrence is "something that happens, often by surprise." The American Heritage Dictionary likewise distinguished occurrence versus event, stating that "[o]ccurrence and happening are the most general" and "[e]vent usually signifies a notable occurrence." The American Heritage Dictionary of the English Language (4th ed. 2000) (definition for occurrence).

8    The definition of a swap was not written specifically for sports. I thus am not interpreting the statutory terms solely or primarily as they apply to sports. But sports provide a useful illustration of the terms and are particularly relevant in this case where Crypto is offering sports-based contracts.

9    At the hearing, Crypto suggested that the outcome of a sporting event could count as a contingency, even if it is not an event. ECF No. 104 at 50-52. I do not consider this argument because it was raised for the first time in reply argument at the hearing. I do not definitively decide in this order what "contingency" in the swap definition means because the parties have not addressed it. But I at least preliminarily conclude that a contingency does not mean every potential happening, and every event with a potential outcome is not a contingency. Looking at the statutory definition of a swap, event and contingency are grouped together and so should be read in context together. *See Util. Air Regul. Grp. v. E.P.A.*, 573 U.S. 302, 320 (2014) (stating that it is a "fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme" (quotation omitted)); *Schreiber v. Burlington N., Inc.*, 472 U.S. 1, 8 (1985) ("[I]t is a familiar principle of statutory construction that words grouped in a list should be given related meaning." (quotation omitted)). And many dictionaries define contingency to include a contingent event. *See* Merriam-Webster's Collegiate Dictionary (11th ed. 2003) (defining contingency to include "a contingent event or condition"); The American Heritage Dictionary of the English Language (4th ed. 2000) (defining contingency to include "[a]n event that may occur but that is not likely or intended; a possibility"); Webster's New College Dictionary (defining contingency to include "some thing or event which depends on or is incidental to another"); Random House Dictionary of the English Language (Second ed. 1987) (defining contingency to include "a contingent event"). Thus, I preliminarily

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works. 11

conclude that a contingency in the swap definition means a contingent event. For example, the Stanley Cup Finals automatically has four games (events) and may have more games (contingent events) if one team does not win the first four games. So a contingency would be whether a game 5 of the Stanley Cup Finals will occur, because that is contingent on who wins the first four games. But a contingency is not who wins that game because that is an outcome, not a contingency.

10  *See* ECF No. 15-3 at 3, 8-12.

11  I need not and do not address in this order whether a particular event contract has a potential financial, economic, or commercial consequence within the CEA's meaning.

12  *See* 7 U.S.C. § 2(e) ("It shall be unlawful for any person, other than an eligible contract participant, to enter into a swap unless the swap is entered into on, or subject to the rules of, a board of trade designated as a contract market under section 7 of this title."); *id.* at § 1a(18) (defining "eligible contract participant" to include certain financial institutions, insurance companies, investment companies, commodity pools, governmental entities, regulated securities brokers or dealers, futures commission merchants, regulated floor brokers or traders, and individuals who have millions of dollars invested on a discretionary basis); *id.* at § 6d(a) (making it unlawful to be a futures commission merchant unless the person is registered with the CFTC); *id.* at § 1a(28)(A)(i)(I)(aa)(CC) (defining futures commission merchant to mean a person or entity that is "engaged in soliciting or in accepting orders for ... a swap"); *id.* at § 7b-3(a)(1) ("No person may operate a facility for the trading or processing of swaps unless the facility is registered as a swap execution facility or as a designated contract market under this section."); *id.* § 6s(a)(1) ("It shall be unlawful for any person to act as a swap dealer unless the person is registered as a swap dealer with the Commission."); *id.* § 1a(49) (defining a "swap dealer" to mean "any person who ... holds itself out as a dealer in swaps; ... makes a market in swaps; ... regularly enters into swaps with counterparties as an ordinary course of business for its own account; or ... engages in any activity causing the person to be commonly known in the trade as a dealer or market maker in swaps"). The CEA provides exceptions from being a swap dealer for "an insured depository institution ... to the extent it offers to enter into a swap with a customer in connection with originating a loan with that customer;" a person who "enters into swaps for such person's own account, either individually or in a fiduciary capacity, but not as a part of a regular business;" and persons the CFTC exempts due to their de minimis quantity of swap dealing "in connection with transactions with or on behalf of its customers." *Id.* §§ 1a(49)(A), (C), (D).

13  *See Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 462 (2018).

14  As part of the self-certification process, Crypto had to certify its contracts complied with the CEA and CFTC regulations. 17 C.F.R. § 40.2(a)(3)(iv). Although Crypto's certification addressed some of the CFTC's Core Principles, it did not address Core Principle 1. ECF No. 15-3 at 17 (deeming it "Not applicable (designation granted)"). Core Principle 1 requires DCMs to comply with "[a]ny requirement that the Commission may impose by rule or regulation pursuant to section 8a(5) of the Act." 7 C.F.R. § 38.100(a)(2). Section 8a(5) of the CEA grants the CFTC the authority "to make and promulgate such rules and regulations as, in the judgment of the Commission, are reasonably necessary to effectuate any of the provisions or to accomplish any of the purposes of this chapter." 7 U.S.C. § 12a(5); *First Commodity Corp. of Bos. v. Commodity Futures Trading Comm'n*, 676 F.2d 1, 5 (1st Cir. 1982). Crypto did not explain in its self-certification how its event contracts based on the outcome of sporting events comply with the CFTC's regulation in 17 C.F.R. § 40.11(a) that prohibits DCMs from listing contracts that involve, relate to, or reference gaming.

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2025 WL 1218313
Only the Westlaw citation is currently available.
United States District Court, D. New Jersey.

KALSHIEX LLC, Plaintiff,

v.

Mary Jo FLAHERTY, et al., Defendants.

Case No. 25-cv-02152-ESK-MJS
|
Signed April 28, 2025

**Attorneys and Law Firms**

Gurbir S. Grewal, Milbank LLP, New York, NY, for Plaintiff.

Emily Marie Bisnauth, Liza Fleming, Stephen Ehrlich, Vivek N. Mehta, Office of the Attorney General, Trenton, NJ, for Defendants.

Kevin Harry Marino, John D. Tortorella, Marino, Tortorella & Boyle, P.C., Chatham, NJ, for Amicus Casino Association of New Jersey, Inc.

**OPINION**

KIEL, United States District Judge

 **\*1**  **THIS MATTER** is before the Court on plaintiff KalshiEX LLC's (Kalshi) motion for a temporary restraining order and preliminary injunction. (ECF No. 2 (Kalshi Mot.).)[1] For the following reasons, the motion will be GRANTED.

### I. BACKGROUND

Kalshi is a financial services company principally located in New York that operates a derivatives exchange and prediction market. (ECF No. 1 (Compl.) p. 4.) Defendant New Jersey Division of Gaming Enforcement (the Division) is an independent state agency within the New Jersey Attorney General's office that promulgates rules and regulations for the licensing and operating of gaming in New Jersey, enforces state gaming laws and regulations, and monitors casino operations for compliance and conducts related investigations. (*Id.* pp. 4, 5.) Defendant Mary Jo Flaherty is sued in her official capacity as interim director of the Division. (*Id.* p. 4.) Defendant New Jersey Casino Control Commission (the Commission) is an independent state

agency that licenses casinos and related key employees. (*Id.* p. 5.) Defendants James T. Plousis, Alisa Cooper, and Joyce Mollineux are sued in their official capacities as chairman, vice chair, and commissioner of the Commission, respectively. (*Id.*) Defendant Matthew J. Platkin is sued in his official capacity as Attorney General of New Jersey. (*Id.*)

### A. <u>Event Contracts</u>

A derivative is a financial instrument or contract with a price that is directly dependent on the value of one or more underlying assets. *KalshiEX LLC v. Commodity Futures Trading Comm'n*, Case No. 23–03257, 2024 WL 4164694, at \*1 (D.D.C. Sept. 12, 2024), *stay denied*, 119 F.4th 58 (D.C. Cir. 2024). An event contract is a specific type of derivative with a payoff based on a specified event, occurrence, or value. *Id.* at \*2. These contracts are generally binary, the buyer may take a "yes" position that the specified event will take place whereby the seller implicitly takes the "no" position. *Id.* The contract specifies the value to be paid and may be purchased or sold at any time prior to its expiration date. *Id.* When the contract expires, the seller must pay the buyer if the event occurs and the buyer is not paid if the event does not occur. *Id.*

The Commodity Exchange Act (CEA) was enacted in 1936 to regulate transactions on commodity futures exchanges. Derek Fischer, Note, *Dodd-Frank's Failure to Address CFTC Oversight of Self-Regulatory Organization Rulemaking*, 115 Colum. L. Rev. 69, 69 (2015). In 1974, Congress established the Commodity Futures Trading Commission (CFTC), which has since maintained authority over futures trading. *Id.* at 70. The 1974 amendments to the CEA were prompted, at least in part, by concerns that states might regulate futures markets—resulting in conflicting regulatory requirements—in light of increased commodities trading and other exigencies of the time. *Am. Agric. Movement, Inc. v. Bd. of Trade of City of Chicago*, 977 F.2d 1147, 1156 (7th Cir. 1992); *see also Fed. Trade Comm'n v. Ken Roberts Co.*, 276 F.3d 583, 590–91 (D.C. Cir. 2001) ("[T]he statute's legislative history repeatedly emphasizes that the CFTC's jurisdiction was 'to be exclusive with regard to the trading of futures *on organized contract markets.*' ") (quoting S. Rep. No. 93–1131, at 23 (1974)).

 **\*2**  In 2010, Congress amended the CEA through the Dodd-Frank Act and provided the CFTC oversight over swaps. *DTCC Data Repository (U.S.) LLC v. U.S. Commodity Futures Trading Comm'n*, 25 F. Supp. 3d 9, 12 (D.D.C. 2014).

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Under the CEA, a "swap" includes an agreement, contract, or transaction "that provides for any purchase, sale, payment, or delivery (other than a dividend on an equity security) that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(a)(ii). An "excluded commodity" includes an occurrence, extent of an occurrence, or contingency that is beyond the control of the parties and is associated with a financial, commercial, or economic consequence. *Id.* at § 1a(19)(iv).

An entity seeking to be designated as a contract market must submit an application and relevant materials to the CFTC. 7 U.S.C. § 7(a); 17 C.F.R. § 38.3(a). The application must include information sufficient to demonstrate compliance with various core principles. 17 C.F.R. § 38.3(a)(2). It is unlawful for any person, other than an eligible contract participant, to enter into a swap if it is not entered on, or subject to the rules of, a board of trade designated as a contract market. 7 U.S.C. § 2(e). Absent limited exceptions, the CFTC possesses exclusive jurisdiction over futures, options, and swaps traded on designated contract markets. Dave Aron & Matt Jones, *States' Big Gamble on Sports Betting*, 12 UNLV Gaming L.J. 53, 63 (2021) (citing 7 U.S.C. § 2(a)(1)(A)).

A designated contract market may seek CFTC approval for any new contract. 7 U.S.C. § 7a–2(c)(4). Alternatively, a designated contract market may list a new contract and submit a certification that the contract complies with the CEA. *Id.* § 7a–2(c)(1); Saule T. Omarova, *License to Deal: Mandatory Approval of Complex Financial Products*, 90 Wash. U. L. Rev. 63, 109 (2012) (same). The CEA contains a "[s]pecial rule" pertaining to event contracts, meaning "the listing of agreements, contracts, transactions, or swaps in excluded commodities that are based upon the occurrence, extent of an occurrence, or contingency ... by a designated contract market or swap execution facility ...." 7 U.S.C. § 7a–2(c)(5)(C)(i). Under the special rule, the CFTC may determine that an agreement, contract, or transaction is contrary to the public interest if it involves an activity that is unlawful under federal or state law, terrorism, assassination, war, gaming, or a similar activity. *Id.*; *see also* Michael P. Vandenbergh, Kaitlin Toner Raimi & Jonathan M. Gilligan, *Energy and Climate Change: A Climate Prediction Market*, 61 UCLA L. Rev. 1962, 1994 (2014) (noting the CFTC's jurisdiction over event contracts and authority to determine whether they are contrary to the public interest). In such cases, the CFTC must take final

action within 90 days absent an extension. 7 U.S.C. § 7a–2(c)(5)(C)(iv).

**B. Kalshi and the Cease-and-Desist Letter**

The CFTC certified Kalshi as a designated contract market in 2020. (Compl. p. 10.) On January 24, 2025, Kalshi self-certified and began listing sports-related contracts such as those buying or selling positions on which team will advance in a given round of a college basketball tournament. (*Id.* p. 11.) The CFTC has not reviewed or prohibited Kalshi's sports-related contracts despite possessing the authority to do so. (*Id.*)

On March 27, 2025, the Division sent a cease-and-desist letter to Kalshi's chief executive officer, Tarek Mansour. (ECF No. 1–1 (Mar. 27, 2025 Letter).) The Division asserted that Kalshi was listing unauthorized sports wagers in violation of both the New Jersey Sports Wagering Act (Sports Wagering Act) and New Jersey Constitution. (*Id.* p. 2.) The Sports Wagering Act prohibits entities other than sports wagering licensees—or an applicant or internet sports pool operator acting on behalf of a licensee—from offering sports wagering. N.J. Stat. Ann. § 5:12A–11(c). A violation constitutes a crime of the fourth degree subject to a fine of up to $100,000. *Id.* The New Jersey Constitution further permits wagering on professional, college, and amateur sport and athletic events, but not "on a college sport or athletic event that takes place in New Jersey or on a sport or athletic event in which any New Jersey college team participates regardless of where the event takes place." N.J. Const. art. iv, § 7, ¶ 2(D).

**\*3** The Division demanded Kalshi to immediately cease and desist the offering of any sports wagering to New Jersey residents and to void any existing wagers. (Mar. 27, 2025 Letter p. 2.) The Division provided Kalshi until 11:59 p.m. on March 28, 2025 to confirm that it had ceased sports wagering activities in New Jersey and voided existing wagers subject to enforcement for failure to comply. (*Id.* p. 3.) Kalshi and the Division were unable to reach an agreement. (Compl. pp. 12, 13.) Kalshi then filed the instant complaint alleging that the threat of enforcement under the New Jersey Constitution and Sports Wagering Act encroaches upon the CFTC's exclusive jurisdiction and is preempted under the Supremacy Clause. (*Id.* pp. 14, 15.) Kalshi seeks declaratory and injunctive relief. (*Id.* pp. 15, 16.)

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

The pending motion followed, wherein Kalshi advised that the parties had agreed to maintain the status quo until April 7, 2025. (Kalshi Mot. p. 4.) I scheduled a hearing. (ECF No. 4.) The parties submitted a joint letter on April 1, 2025 stating that the Division had further extended the compliance deadline to April 30, 2025, seeking adjournment of the motion hearing, and setting forth a proposed briefing schedule. (Apr. 1, 2025 Letter.) I granted the parties' requests (ECF No. 9) and the parties completed motion practice, (ECF No. 15 (Defs.' Opp'n Br.), ECF No. 17 (Kalshi Reply Br.)).

## II. PRELIMINARY INJUNCTION MOTIONS

To obtain a preliminary injunction, the movant must demonstrate both a likelihood of success on the merits and that it will more likely than not suffer irreparable harm without relief. *Mallet and Co. Inc. v. Lacayo*, 16 F.4th 364, 380 (3d Cir. 2021). If the two threshold factors are met, the court moves on to the two remaining factors—whether granting the requested relief will result in an even greater harm to the nonmovant or other interested party and whether the public interest favors relief—and balances the four factors together. *Id.* When the nonmovant is the government, the third and fourth factors merge. *Shelley v. Metzger*, 832 F. App'x 102, 104 (3d Cir. 2020).

A court may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). "While, the posting of a bond is rarely discretionary, '[t]he amount of the bond is left to the discretion of court.' " *Marine Elec. Sys., Inc. v. MES Fin., LLC*, 644 F. Supp. 3d 84, 96 (D.N.J. 2022) (alteration in original) (quoting *Hoxworth v. Blinder, Robinson & Co.*, 903 F.2d 186, 210 (3d Cir. 1990)); *see also Boynes v. Limetree Bay Ventures LLC*, 110 F.4th 604, 611 (3d Cir. 2024) ("We have held that posting a bond is 'almost mandatory'; any exceptions are 'rare.' " (quoting *Frank's GMC Truck Ctr., Inc. v. Gen. Motors Corp.*, 847 F.2d 100, 103 (3d Cir. 1988))).

## III. DISCUSSION

### A. Likelihood of Success on the Merits

To establish a likelihood of success on the merits, the movant "must show that 'there is "a reasonable chance, or probability, of winning," ' " which does not require a "more-likely-than-not showing of success on the merits." *Mallet and Co. Inc.*,

16 F.4th at 380 (quoting *In re Revel AC*, 802 F.3d 558, 568 (3d Cir. 2015) and *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 n. 3 (3d Cir. 2017)). The parties' arguments related to Kalshi's likelihood of success on the merits turn on whether the CEA and CFTC's jurisdiction over designated contract markets preempt the New Jersey Constitution and Sports Wagering Act to the extent that the Division threatens enforcement.

### 1. Preemption and Party Arguments

Under the Supremacy Clause, the constitution and laws of the United States "shall be the supreme Law of the Land." U.S. Const. art. VI, cl. 2. The three general classes of preemption are express preemption, field preemption, and conflict preemption. *Pennsylvania v. Navient Corp.*, 967 F.3d 273, 287 (3d Cir. 2020). Express preemption, as the name implies, takes place when Congress expressly preempts state law within the statute's language. *Id.* Field preemption applies "when Congress does not expressly preempt state law but where " 'federal law leaves no room for state regulation and that Congress had a clear and manifest intent to supersede state law" in that field.' " *Id.* (quoting *Sikkelee v. Precision Airmotive Corp.*, 822 F.3d 680, 688 (3d Cir. 2016)). Lastly, conflict preemption occurs "when a state law conflicts with federal law such that compliance with both state and federal regulations is impossible, or when a challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of a federal law.' " *Id.* (quoting *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992)).

 **\*4** Kalshi asserts that field preemption applies because the text of the CEA makes clear that the CFTC has exclusive jurisdiction over accounts, agreements, and transactions traded on designated contract markets. (Kalshi Mot. p. 14.) This interpretation is supported by the CEA's purported purpose and drafting history. (*Id.* pp. 15–17.) The CEA's comprehensive regulatory scheme further demonstrates an intent to foreclose concurrent state jurisdiction, according to Kalshi. (*Id.* pp. 17, 18.)

Kalshi also contends that conflict preemption applies. (*Id.* pp. 18–22.) Congress's amendments to the CEA in 1974 were intended to bring futures markets under a uniform set of regulations and the Division's actions conflict with that goal. (*Id.* p. 19.) The CFTC had authority to review and determine whether Kalshi's sports-related contracts are contrary to the public interest but did not act. (*Id.* pp. 20,

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

21.) Kalshi claims that subjecting it to New Jersey law would undermine congressional calibration of force and conflict with the CFTC's evaluation of the public interest. (*Id.*) Abruptly closing its sports-related contracts could further place Kalshi in tension with CFTC core principles requiring impartial access to trading privileges and reduction of risk of price distortion and market disruption. (*Id.* pp. 21, 22.)

Defendants counter that the CEA's exclusive-jurisdiction provision does not cover the sports-related contracts at issue because they are not associated with a potential financial, economic, or commercial consequence and state law still applies to contracts that do not fall within CFTC's exclusive jurisdiction. (Defs.' Opp'n Br. pp. 25–27.) Even if the exclusive-jurisdiction provision applies, defendants argue that its purpose was to separate CFTC and Securities and Exchange Commission (SEC) functions. (*Id.* pp. 27, 28.) The savings clauses within 7 U.S.C. § 2(a)(1)(A) and reference to state law in the special rule for event contracts evidence intent not to occupy the field. (*Id.* pp. 28–31.) Had Congress sought to preempt state law, it would have done so. (*Id.* p. 32.)

Kalshi's conflict preemption argument stands on shakier ground, according to defendants. (*Id.* pp. 37–44.) The Sports Wagering Act complements the CEA in ensuring financial integrity of transactions and protecting participants from abuse. (*Id.* p. 38.) Absent a small set of contracts related to collegiate athletics, Kalshi may continue to offer its sports-related contracts so long as it obtains New Jersey licensure. (*Id.* pp. 39, 42, 43.) The CEA's special rule for event contracts expressly recognizes the applicability of state law and New Jersey's stronger protections relating to sports wagers do not stand as an obstacle to the CEA's regulation of event contracts, according to defendants. (*Id.* pp. 40–42.)

## 2. <u>Analysis</u>

Earlier this month, a court in the District of Nevada considered a substantially similar motion for preliminary injunction involving Kalshi. In that case, Kalshi sought to enjoin the Nevada Gaming Commission, Nevada Gaming Control Board, and their members from enforcing Nevada law against its event contracts, particularly those involving sports and election results. *KalshiEX, LLC v. Hendrick*, Case No. 25–00575, 2025 WL 1073495, at *1–2 (D. Nev. Apr. 9, 2025). Faced with similar preemption arguments as those presented here, the court first concluded that the plain language of 7 U.S.C. § 2(a)(1)(A) grants the CFTC exclusive jurisdiction

over accounts, agreements, and transactions involving swaps or contracts of sale of a commodity for future delivery traded or executed on designated exchanges. *Id.* at *5. Though the paragraph's second sentence provides that state regulatory authority is not superseded, that sentence must be read in the context of the first, which supersedes SEC and state authority over contracts on designated exchanges. *Id.* The second sentence therefore merely preserves SEC and state authority over contracts that are not subject to the CFTC's exclusive jurisdiction. *Id.*

 **\*5** Even if express preemption did not apply, the exclusive-jurisdiction language reflects an intent to occupy the field and the defendants cited no authority to the contrary. *Id.* at *6. As field preemption applied and the CFTC had not disapproved of the sports-related contracts, the defendants were unable to impose civil or criminal penalties against Kalshi. *Id.* Even if the sports-related contracts constituted gaming, it would not have subjected Kalshi to state gaming law, according to the court, but rather the CFTC's public-interest review. *Id.*

Defendants acknowledge the District of Nevada result but argue that the court failed to consider various CEA provisions in depth. (Defs.' Opp'n Br. p. 36.) Defendants specifically reference the threshold applicability of the exclusive-jurisdiction provision, the savings clauses, the special rule's reference to state law, and the CEA's narrow express-preemption provisions. *Id.*

To begin, that 7 U.S.C. § 16 contains express preemption provisions does not foreclose implied preemption elsewhere within the CEA. "[I]mplied preemption may exist even in the face of an express preemption clause." *Bruesewitz v. Wyeth Inc.*, 561 F.3d 233, 239 (3d Cir. 2009); *see also* Aron & Jones, *supra*, at 59 ("[E]ven though [7 U.S.C. § 16(e)(2)] is an express preemption provision, that alone does not end the preemption analysis of the CEA versus states sports betting."). My task is to look deeper.

Second, and to the partial contrary, the District of Nevada expressly considered the first savings clause of 7 U.S.C. § 2(a)(1)(A). It concluded that the clause "does not give states regulatory authority over CFTC-designated exchanges because that language is limited by the phrase '[e]xcept as hereinabove provided.' [7 U.S.C. § 2(a)(1)(A)'s] first sentence supersedes the SEC and state regulatory authorities' jurisdiction for contracts on a CFTC-designated exchange." *Hendrick*, 2025 WL 1073495, at *5. I agree with that construction. The second savings clause's reference to state

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.   4

courts' jurisdiction says little about preemption of state regulation of designated contract markets. Of course state courts may retain jurisdiction over claims such as private fraud actions. *See* Kenneth B. Sills, 12A Tex. Jur. 3d Commodity Exchanges § 8 (2025) ("In a private action for damages based on misrepresentation and deceptive trade practices in connection with futures contracts, the [CFTC] has neither exclusive nor primary jurisdiction with respect to such claims, and the jurisdiction of the [CFTC] is not exclusive of the jurisdiction of state courts to adjudicate such claims; thus, a claimant is not required to exhaust his or her administrative remedies prior to the commencement of suit."); Stacy L. Davis, John Kimpflen, J.D., & Karl Oakes, 7 Fed. Proc., L. Ed. § 13:68 (2025) ("[T]he availability of the reparations forum at the CFTC does not bar state court jurisdiction of commodities fraud actions based on state law.")

As for the special rule for event contract's reference to state law, the District for the District of Columbia persuasively addressed this issue in an illustration last year. Addressing the CFTC's position that Kalshi's contracts concerning control of Congress involved unlawful activity because it is illegal in many states to stake money on an elections' outcome, the court noted that many states also define unlawful gambling as staking money on an contingent outcome. *KalshiEX LLC*, 2024 WL 4164694, at *12. Event contracts are, by definition, staking money on the outcome of a contingent event and under the CFTC's logic the special rule would apply to any event contract. *Id.* Thus the only workable interpretation of the special rule is that "unlawful under any Federal or State law" refers to the underlying event rather than the act of staking money on that event. *Id.* This logic is sound to me at this stage. Furthermore, even if "unlawful" refers to state gambling laws or "gaming" refers to the contracts at issue here, that would subject Kalshi to the review of the CFTC —not state regulators. *See Hendrick*, 2025 WL 1073495, at *6 ("[E]ven if Kalshi's sports contracts involve 'gaming,' that would not subject Kalshi to state gaming laws. Rather, it would subject Kalshi to the special rule that allows the CFTC to conduct a public interest review.").

**\*6** Finally, I am persuaded that Kalshi's sports-related event contracts fall within the CFTC's exclusive jurisdiction and am unconvinced by defendants' arguments to the contrary. Defendants argue that sporting events are without potential financial, economic, or commercial consequence. On the record before me, I disagree. *See* Aron & Jones, *supra*, at 79–80 (noting the use of similar language in defining a swap and event contract under the CEA and stating that sports bets may

meet the requirement of a potential financial, commercial, or economic consequence). Kalshi references a few recent examples of the economic impact of sporting events in television, advertising, and local communities. (Kalshi Reply Br. pp. 8, 9.)

The special rule for event contracts states that no agreement, contract, or transaction determined by the CFTC to be contrary to the public interest may be made available on a registered market. *See* 7 U.S.C. § 7a–2(c)(5)(C)(ii). Therefore, at this stage, Kalshi's sports-related event contracts evidence—by their very existence—the CFTC's exercise of its discretion and implicit decision to permit them. *See* Vandenbergh, *et al.*, *supra*, at 1994 (noting that the CFTC has jurisdiction over event contracts and that the Dodd-Frank Act provided it with the authority to determine whether an event contract may be approved for trading via the special rule). "[T]o the extent that swaps, futures, or options are traded on [designated contract markets], state law would appear to be preempted by the CFTC's exclusive jurisdiction." Aron & Jones, *supra*, at 64.

Because I conclude that Kalshi has demonstrated a reasonable chance of prevailing—which in this case means proving that at the very least field preemption applies—I do not consider whether conflict preemption may also apply. I move on then to the irreparable harm prong.

**B. Irreparable Harm**

"[T]o show irreparable harm a plaintiff must demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial." *Ramsay v. Nat'l Bd. of Med. Exam'rs*, 968 F.3d 251, 262 (3d Cir. 2020) (alteration in original) (quoting *Acierno v. New Castle Cnty.*, 40 F.3d 645, 653 (3d Cir. 1994)). Such harm must be likely absent injunctive relief. *Id.*

Kalshi submits that the Division's threatened enforcement is likely to cause it irreparable harm if its motion is not granted. (Kalshi Mot. pp. 22–24.) If Kalshi does not comply with the Division, it faces credible threat of civil and criminal liability. (*Id.* p. 22.) One of Kalshi's partners has already chosen not to move forward with listing Kalshi event contracts in New Jersey due to a similar cease-and-desist letter it received from New Jersey authorities. (ECF No. 2–1 (Sottile Decl.) p. 14.) If it chooses to comply with the Division, Kalshi would forego business within New Jersey without the potential of recouping

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

financial losses if it prevails. (Kalshi Mot. p. 22.) Kalshi does not currently have the need or means to geolocate users and doing so would cost Kalshi an estimated tens of millions of dollars annually, again with no guarantee of recoupment. (*Id.* pp. 22, 23; Sottile Decl. pp. 6, 7.) No matter what it does, Kalshi claims that it will face reputational harms associated with either being perceived as violating New Jersey law or ending its business in New Jersey and undermining user confidence. (Kalshi Mot. pp. 23, 24.)

Defendants respond that potential liability does not constitute irreparable harm because Kalshi's claims may be raised as affirmative defenses. (Defs.' Opp'n Br. p. 45.) Further, economic injuries are insufficient and Kalshi can continue with all but a small portion of its sports-related event contracts so long as it obtains New Jersey licensure and complies with the Sports Wagering Act. (*Id.* pp. 45–47.)

 **\*7**  Absent from defendants' argument is reference to Kalshi's asserted reputational harms. The loss of business and goodwill may constitute irreparable injury. *Marine Elec. Sys., Inc.*, 644 F. Supp. 3d at 95; *see also Guardian Life Ins. Co. of Am. v. Estate of Cerniglia*, 446 F. App'x 453, 456 (3d Cir. 2011) ("Grounds for irreparable injury include loss of control of reputation, loss of trade, and loss of good will." (quoting *Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 726 (3d Cir. 2004))). The declaration of Kalshi's head of markets states that the prospect of facing civil or criminal enforcement or complying and compromising the integrity of its contracts imperils the reputation Kalshi has cultivated over several years. (Sottile Decl. pp. 14, 15.) This is virtually the same "Hobson's choice" discussed in *Hendrick*. *See* 2025 WL 1073495, at \*7. I am particularly persuaded by the representation that a similar cease-and-desist letter has already led one partner to decline to list Kalshi event contracts in New Jersey. (Sottile Decl. p. 14.) Therefore, I find that—at minimum—Kalshi has identified harms to its reputation and goodwill that are both likely without injunctive relief and not able to be remedied following trial.

## C. Balance of Interests

The parties' arguments as to the public and defendants' combined interests unsurprisingly boil down to their positions on the merits. Kalshi submits that because New Jersey law is preempted here, there is no public interest in enforcement. (Kalshi Mot. pp. 24, 25.) Defendants respond that states are harmed when they are enjoined from enforcing their laws and

that New Jersey has an especially strong interest in regulating gambling. (Defs.' Opp'n Br. pp. 48, 49.) Revenues collected from gambling help support senior citizens and treatment for gambling addiction and a finding for Kalshi will encourage copycats to similarly evade state law. (*Id.* pp. 49, 50.)

Because I found above that Kalshi has established a likelihood of success in demonstrating that New Jersey law is preempted as applied to its sports-related contracts, I also conclude that the interests favor injunction. "[T]he public interest [is] not served by the enforcement of an unconstitutional law." *N.J. Retail Merchants Ass'n v. Sidamon-Eristoff*, 669 F.3d 374, 389 (3d Cir. 2012) (second alteration in original) (quoting *Am. Civ. Liberties Union v. Ashcroft*, 322 F.3d 240, 247 (3d Cir. 2003)). Defendants' fear over copycats is also at least somewhat mitigated by the CEA's application process and related requirements. *See* 7 U.S.C. § 7(a); 17 C.F.R. § 38.3(a).

As far as any lost state revenue, such arguments are at least partially the product of the obvious tension between event contracts and sports wagering. Limited to Kalshi's alleged continuing violations of New Jersey law, Kalshi—as noted in *Hendrick*—proceeds at its own peril. *See* 2025 WL 1073495, at \*8. Aside from any action the CFTC may take, a finding of likelihood of success on the merits here does not prejudge a finding for defendants through dispositive motion practice or trial. *See Bruni v. City of Pittsburgh*, 824 F.3d 353, 361 n. 11 (3d Cir. 2016) (noting the "entirely different" standards governing motions for preliminary injunction and summary judgment). If defendants are proven correct, they may proceed with enforcement actions—thereby recouping at least some deprived revenues and vindicating any police power restrained by this decision in the process.

To find that the interests disfavor Kalshi—especially after determining that it has met its burden on the merits—would mean leaving it subject to state enforcement or obligating it to shift its business practices, consequences that are not cleanly undone. The balancing of the factors here caution me to keep the toothpaste in the tube. Kalshi's motion will therefore be granted.

## D. Bond

Finally, Kalshi argues that defendants will not suffer any nonspeculative harm by not proceeding with enforcement efforts against it and thus no security is necessary. (Kalshi Mot. p. 25.) Alternatively, if I determine that security is

WESTLAW  © 2026 Thomson Reuters. No claim to original U.S. Government Works.  6

needed, Kalshi asks that it be de minimis. (*Id.*) Defendants' opposition brief does not reference security.

**\*8** Though I have discretion in setting the amount of bond, I do not find that my discretion extends to not setting one at all in this instance. *See Marine Elec. Sys., Inc.*, 644 F. Supp. 3d at 96; *see also Tilden Recreational Vehicles, Inc. v. Belair*, 786 F. App'x 335, 343 (3d Cir. 2019) (noting that district courts must set bond even when the parties do not raise the issue and that waiver of the bond requirement applies to narrow circumstances in which compliance with the preliminary injunction poses no risk of monetary loss for the opponent).

The court in *Hendrick* determined that a de minimis security was warranted and set the bond at $10,000 with the parties having an opportunity to advocate for the sum to be increased or decreased. 2025 WL 1073495, at *8. I find that that amount

is in insufficient under the instant circumstances and instead determine that a bond of $100,000 is appropriate. This sum is intended to mirror that of the maximum fine of a violation under the Sports Wagering Act. *See* N.J. Stat. Ann. § 5:12A–11(c). If either party seeks an adjustment to this sum, they may do so by filing a letter of no more than three double-spaced pages on the docket.

### IV. CONCLUSION

For the foregoing reasons, Kalshi's motion for a preliminary injunction will be GRANTED. An appropriate order accompanies this opinion.

**All Citations**

Slip Copy, 2025 WL 1218313

Footnotes

1    Kalshi stated in its moving brief that if I am able to resolve its motion for a preliminary injunction prior to the then-applicable compliance deadline of April 7, 2025, a temporary restraining order would be unnecessary. (Kalshi Mot. p. 4.) The parties thereafter agreed to extend the compliance deadline to April 30, 2025. (ECF No. 6 (Apr. 1, 2025 Letter).) Because I am filing this decision while the status quo remains in effect, I do not consider whether a temporary restraining order is warranted.

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW  © 2026 Thomson Reuters. No claim to original U.S. Government Works.

47

**COMMONWEALTH OF MASSACHUSETTS**

SUFFOLK, ss.

**SUPERIOR COURT
CIVIL ACTION
NO. 2584CV02525**

**COMMONWEALTH OF MASSACHUSETTS**

<u>vs.</u>

**KALSHIEX, LLC**

## <u>MEMORANDUM OF DECISION AND ORDER ON PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION AND DEFENDANT'S MOTION TO DISMISS</u>

The defendant, KalshiEX, LLC ("Kalshi"), operates a nationwide "prediction" market derivatives exchange, on which traders can purchase either a "yes" or "no" position on "event contracts," including the outcome of sporting events. If the correct resulting position is chosen, the trader receives a payment. Kalshi's event contract exchange is registered as a "Designated Contract Market" ("DCM") with the Commodity Futures Trading Commission ("CFTC"), but is not licensed to offer sports wagering in Massachusetts. On September 12, 2025, the Commonwealth filed a complaint seeking a declaration that Kalshi is operating in violation of Massachusetts's sports wagering law, G.L. c. 23N ("Sports Wagering Law"), as well as monetary and injunctive relief. Presently before the court is the Commonwealth's motion for a preliminary injunction and Kalshi's motion to dismiss on federal preemption grounds. After a hearing on December 9, 2025, and consideration of the materials submitted, the Commonwealth's motion is **ALLOWED**, and Kalshi's motion is **DENIED**.

### LEGAL AND FACTUAL BACKGROUND

The following undisputed facts are taken from the Complaint and submitted record, with further facts reserved for later discussion.

1. <u>Kalshi's Business</u>

Kalshi is a Delaware limited liability company with a principal place of business in New York City. It allows Massachusetts consumers to purchase its event contracts on its website and through its mobile application ("app"), which is available to both Android and Apple smartphone users. Kalshi event contracts are also offered on Robinhood, a stock-trading platform that is also accessible via a webpage and mobile app. Kalshi's trades operate so that the combined investment cost from both sides of an event contract (the yes and no positions) equal a dollar, with the correct position receiving the one-dollar-payout after the event occurs. Before the event occurs, the price for the yes or no position fluctuates, depending on the likelihood of each outcome. Kalshi has an affiliated entity that places buy and sell orders, ensuring that both yes and no contracts can be purchased for any given event at all times. It also has an affiliated clearinghouse under common ownership that finalizes and settles contracts and issues payouts.

Kalshi launched its platform in 2021, with event contracts focused on topics including inflation, the consumer price index, unemployment, and macroeconomic benchmarks. In October 2024, Kalshi began offering political event contracts, which invited users to take positions on issues such as which party would control Congress, or whether a presidential candidate would win a particular swing state. In January 2025, Kalshi began offering sports-related event contracts. Examples included predicting the winner of New England Patriots games, or the Women's Tennis Association tournament. Sports-related event contracts quickly became the majority of Kalshi's trading volume (about seventy percent between February 25, 2025, and May 17, 2025), and it profited more from its sports-related event contracts than licensed sports wagering platforms Draftkings and Fanduel during that same timeframe. In August and September 2025, Kalshi added contracts for the number of touchdowns a given

2

player will score in a game, how much a given team will win by, the overall total score in a game, and on various combinations of sports outcomes.

The manner in which Kalshi's contracts are offered mirrors other digital gambling experiences, including through continuous feedback and engagement loops that are modeled after operant conditioning and slot machine dynamics, leaderboard rankings, and countdown clocks. Users may also create profiles and avatars to publicly compete with other users on Kalshi's site. Kalshi borrows gambling terminology, using the term "football spread" when referring to a point spread contract. A point spread bet is a defined sports wager in Massachusetts. See G.L c. 23N, §3. Likewise, over/under, proposition, and parlay contracts are now being offered, which likewise are defined sports wagers under G.L c. 23N, §3. Prior to March 2025, Kalshi referred to itself in advertisements as "the first nationwide legal sports betting platform," and its CEO has referred to its offerings as "bets." It now describes itself as a "regulated exchange dedicated to trading," where "investments [are] directly tied to the outcome of specific events."

As of June 2025, Kalshi has about two million users nationwide, and is valued at over two billion dollars.

2. CFTC Regulation of Kalshi

In 2020, the CFTC registered Kalshi as a DCM. The CFTC is an independent federal agency charged under the Commodity Exchange Act ("CEA") with regulating derivative markets, including those that offer events contracts. 7 U.S.C. § 2(a)(1). Consistent with the above description of Kalshi's business, "[a]n event contract is a derivative contract for which the 'payoff is based on a specified event, occurrence, or value'—for example, the level of snowfall from a certain storm or the dollar amount of hurricane damage." *KalshiEX LLC* v. *Commodity*

Case 3:26-cv-00034     Document 34-1     Filed 01/20/26     Page 49 of 63 PageID #: 375

*Futures Trading Comm'n*, 119 F.4th 58, 61 (D.C. Cir. 2024), quoting CFTC, Contracts & Products: Event Contracts, https://perma.cc/4FPT-L2SN. "Businesses and individuals can use event contracts to hedge against economic risk." *Id.* (citation omitted). See *KalshiEX LLC* v. *Martin*, 793 F. Supp. 3d 667, 671 (D. Md. 2025) ("*Martin*").

Under the CEA, only federally regulated exchanges can offer event contracts. 7 U.S.C. § 2(e). As an alternative to the CFTC's pre-approval of a particular event contract, under the CEA, a DCM may self-certify to the CFTC that a contract it seeks to offer complies with the CEA and the CFTC's regulations. 7 U.S.C. § 7a-2(c)(1); 17 C.F.R. § 40.2. However, since 2010, the CEA has included a "Special Rule" under which the CFTC can review and prohibit specific types of event contracts if it determines those contracts are "contrary to the public interest." 7 U.S.C. § 7a-2(c)(5)(C)(i). In particular, the Special Rule provides:

> In connection with the listing of agreements, contracts, transactions, or swaps in excluded commodities that are based upon the occurrence, extent of an occurrence, or contingency . . . by a designated contract market . . ., the [CFTC] may determine that such agreements, contracts, or transactions are contrary to the public interest if the agreements, contracts, or transactions involve: (I) activity that is unlawful under any Federal or State law; (II) terrorism; (III) assassination; (IV) war; (V) gaming; or (VI) other similar activity determined by the [CFTC], by rule or regulation, to be contrary to the public interest.

*Id.* By regulation, the CFTC has ninety days to determine whether to prohibit a DCM's proposed event contract under the Special Rule. 17 C.F.R. § 40.11(c). During this review, the DCM cannot list or trade the contract. 17 C.F.R. § 40.11(c)(1).

Kalshi self-certified to the CFTC each of its sports event contracts. The CFTC has taken no regulatory action against Kalshi under the Special Rule as to any of these contracts. However, on September 30, 2025, certain CFTC divisions issued a "Staff Advisory" to all DCMs and certain other regulated entities, "to be prepared for all foreseeable conditions that may result from facilitating the trading and clearing of sports-related event contracts for customers, market

4

participants, and clearing members." The letter further "caution[ed] . . . DCMs . . . that State regulatory actions and pending and potential litigation, including enforcement actions, should be accounted for with appropriate contingency planning, disclosures, and risk management policies and procedures." As relevant to this case, further explanation and discussion of the CEA's jurisdiction over, and regulation of, DCMs will be set forth below.

3. Sports Wagering in Massachusetts

Following the United States Supreme Court's decision in *Murphy* v. *National Collegiate Athletic Ass'n*, 584 U.S. 453 (2018), Massachusetts enacted the Sports Wagering Law in 2022. See G.L. c. 23N; *Murphy*, 584 U.S. 453 (holding that the federal Professional and Amateur Sports Protection Act's restriction on states' ability to regulate sports gambling violates the anticommandeering doctrine). The Sports Wagering Law defines sports wagering as: "the business of accepting wagers on sporting events or portions of sporting events," while "wager" is defined as a sum of money or thing of value risked on an uncertain occurrence." G.L. c. 23N, § 3. An entity's eligibility to accept sports wagers in the Commonwealth is conditioned on state licensure by the Massachusetts Gaming Commission ("MGC"), under a regulatory framework promulgated pursuant to the Sports Wagering Law, G.L. c. 23N. See 205 Code Mass. Regs. §§ 202-258. Both the application for licensure, and any license granted, are subject to fees. G.L. c. 23N, §§ 6, 7. An apportioned fee is also collected for the state's Public Health Trust Fund, to support efforts combating compulsive gambling and to aid in understanding the social and economic effects of gambling. G.L. c. 23N, §§ 15(e), 23. If licensure is granted, the MGC levies a twenty percent excise tax on sports wagering adjusted gross receipts for mobile wagers. G.L. c. 23N, § 14.

Case 3:26-cv-00034    Document 34-1    Filed 01/20/26    Page 51 of 63 PageID #: 377

A licensed sports wagering operator in Massachusetts is subject to several obligations under the statutory and regulatory framework, including: 1) implementing responsible gambling features; 2) reporting suspected illegal activity; 3) preventing certain individuals from wagering on sporting events, including those related to the event and the sports wagering operator; 4) preventing underage sports wagering through the use of electronic age and identity verification; 5) offering users betting limits, as well as employing other methods to promote responsible gaming; and 6) complying with the Massachusetts voluntary self-exclusion program, which allows gamers to exclude themselves from casino gambling and sports wagering. See G.L. c. 23N, §§ 4(d)(2), 11, 13(d); 205 Code Mass. Regs. §§ 248.16, 256.07. Kalshi has not applied for a Massachusetts sports wagering license, and is not licensed in the state to offer sports wagering.

3. Present Action

On September 12, 2025, the Commonwealth commenced this action. The Complaint asserts a single claim for violation of G.L. c. 23N, § 5(a), based on Kalshi's alleged operation of a sports betting platform in Massachusetts without a license. On the same day, the Commonwealth filed a motion for a preliminary injunction "seeking to enjoin Kalshi from offering and accepting sports wagers while this action is pending, unless and until it obtains a license from the MGC."[1]

## DISCUSSION

### I. Commonwealth's Motion for Preliminary Injunction

Before issuing a preliminary injunction, the court "must determine that the plaintiff has shown a likelihood of success on the merits of the case at trial." *Commonwealth* v. *Mass.*

---

[1] Massachusetts is not the only state seeking enforcement action against Kalshi. Attorneys General from Nevada, New Jersey, Maryland, Ohio, Illinois, Montana, and Arizona, have sent cease and desist letters to Kalshi seeking to end its unlicensed operation in those states, as well.

6

*CRINC*, 392 Mass. 79, 87 (1984), citing *Packaging Indus. Group, Inc.* v. *Cheney*, 380 Mass. 609, 617 (1980). "If the plaintiff is the Attorney General, the judge must then determine that the requested order promotes the public interest, or, alternatively, that the equitable relief will not adversely affect the public." *Commonwealth* v. *Fremont Inv. & Loan*, 452 Mass. 733, 741 (2008) (citation omitted).

## A. Likelihood of Success on the Merits

In its opposition to the Commonwealth's motion, Kalshi does not argue that its sports-related event contracts do not meet the definition of sports wagering in the Commonwealth. Neither does it challenge the Commonwealth's assertion that it is operating in Massachusetts without a license. Rather, consistent with its litigation strategy in other states that have challenged its operation, Kalshi argues that the Commonwealth's attempt to regulate its exchange through the state's Sports Wagering Law is preempted by federal law. As explained below, I disagree.

### 1. The Law of Preemption

Under the Supremacy Clause of the United States Constitution, Congress has "the power to preempt state law," which it may exercise either expressly or impliedly. *Capron* v. *Office of Attorney Gen. of Massachusetts*, 944 F.3d 9, 20-21 (1st Cir. 2019), quoting *Arizona* v. *United States*, 567 U.S. 387, 399 (2012). "Express preemption occurs only when a federal statute explicitly confirms Congress's intention to preempt state law and defines the extent of that preclusion." *Grant's Dairy--Maine, LLC* v. *Commissioner of Maine Dep't of Agric., Food & Rural Res.*, 232 F.3d 8, 15 (1st Cir. 2000), citing *English* v. *General Elec. Co.*, 496 U.S. 72, 78-79 (1990). Implied preemption can occur in one of two ways: field preemption or conflict preemption. *Massachusetts Ass'n of HMO* v. *Ruthardt*, 194 F.3d 176, 179 (1st Cir. 1999).

7

"Field preemption occurs when a federal regulatory scheme is so pervasive as to warrant an inference that Congress did not intend the states to supplement it. . . . Conflict preemption takes place either when compliance with both state and federal regulations is impossible or when state law interposes an obstacle to the achievement of Congress's discernible objectives." *Grant's Dairy--Maine, LLC*, 232 F.3d at 15 (1st Cir. 2000) (citations omitted). Only implied preemption is at issue in this case.

Implied preemption analysis rests on two fundamental principles. *Wyeth* v. *Levine*, 555 U.S. 555, 565 (2009). First, "the purpose of Congress is the ultimate touchstone." *Id.*, quoting *Medtronic, Inc.* v. *Lohr*, 518 U.S. 470, 485 (1996). Congressional intent is informed by examining the federal law at issue, as well as Congress's history of regulating in that area. *Id.* at 566; *Crosby* v. *National Foreign Trade Council*, 530 U.S. 363, 373 (2000).

Second, every preemption case starts with the presumption that Congress did not intend to displace state law. *Wyeth*, 555 U.S. at 565. Because this presumption rests on "respect for the States as independent sovereigns in our federal system," *id.* at 565 n.3 (internal quotation marks omitted), it is especially strong in areas where states traditionally wield police powers. *Id.* at 565. See *English*, 496 U.S. at 79; *New York Pet Welfare Ass'n, Inc.* v. *New York*, 850 F.3d 79, 86-87 (2d Cir. 2017). The regulation of gambling falls squarely within a state's "core," historic police powers. *Abdow* v. *Attorney Gen.*, 468 Mass. 478, 489 (2014). Accordingly, the presumption guides the court's analysis in this case. See *Robinhood Fin. LLC* v. *Secretary of Commonwealth*, 492 Mass. 696, 717 (2023) (Because State securities laws . . . fall within a field of "'traditional' [S]tate regulation," the assumption guides our analysis"), quoting *Oneok, Inc.* v.

8

*Learjet, Inc.*, 575 U.S. 373, 374 (2015).[2] "The party asserting preemption bears the burden of establishing it." *Stephens v. Target Corp.*, 694 F. Supp. 3d 1136, 1141 (D. Minn. 2023).

### 2. Field Preemption

Kalshi argues that the Sports Wagering Law is field-preempted as applied to Kalshi's sports-related event contracts under the CEA's statutory text, and due to its statutory purpose, its drafting history, and the "comprehensive" federal regulatory scheme for DCMs. As stated in *Martin*, "Kalshi's burden with respect to its field preemption claim is to establish that Congress clearly and manifestly intended to strip states of their authority to regulate gambling if the company offering such wagering opportunities has been approved to sponsor a [DCM] for commodities trading." 793 F. Supp. 3d at 677. Consistent with the court's conclusion in *Martin*, applying the presumption to the facts here, Kalshi fails to meet its burden.

Beginning with statutory text, under the CEA, the CFTC has "exclusive jurisdiction" over all "transactions involving swaps" and "future delivery contracts" that are "traded or executed on a contract market designated" by the CFTC. 7 U.S.C. § 2(a)(1)(A). A savings clause further states: "[e]xcept as herein provided, nothing contained in this section shall . . . supersede or limit the jurisdiction . . . conferred on . . . other regulatory authorities under the laws of the United States or any State." *Id.* The United States Supreme Court has explained that the CEA's exclusive jurisdiction provision was intended to "consolidate federal regulation of commodity

---

[2] Citing *United States v. Locke*, 529 U.S. 89, 108 (2000), Kalshi nevertheless asserts that the presumption against preemption does not apply in this case because the federal government has a significant history of legislating in the field of futures and derivatives markets. In determining Congress's intent to preempt, however, the relevant frame of reference is the targeted state law — here, the Sports Wagering Law. After *Locke*, the United States Supreme Court clarified that "the presumption against preemption is not triggered only if there is a significant history of extensive federal regulation *to the exclusion of state regulation.*" *Massachusetts Ass'n of Private Career Sch. v. Healey*, 159 F. Supp. 3d 173, 215 (D. Mass. 2016) (emphasis added), quoting and discussing *Wyeth*, 555 U.S. at 565 n.3. As stated, states have historically regulated local gambling through their police powers. See, e.g., *Marvin v. Trout*, 199 U.S. 212, 224 (1905). For the same reasons, the Maryland District Court likewise concluded that the presumption applies. See *Martin*, 793 F. Supp. 3d at 676-677.

9

futures trading in the [CFTC]" and to "separate the functions of the [CFTC] from those of the [SEC] and other regulatory agencies." *Merrill Lynch, Pierce, Fenner & Smith, Inc.* v. *Curran*, 456 U.S. 353, 386-387 (1982) ("*Merrill Lynch*"). When originally enacted in 1974, the exclusive jurisdiction provision concerned only future delivery contracts; in 2010, the Dodd-Frank Wall Street Reform And Consumer Protection Act ("Dodd-Frank") added swaps to the CFTC's exclusive jurisdiction. See 7 U.S.C. § 2(a); Pub. L 111-203, 124 Stat. 1376 (July 21, 2010). For purposes of this decision, I assume without deciding that Kalshi's event contracts are swaps.

Kalshi argues that the CFTC's exclusive jurisdiction over transactions involving swaps, as confirmed by the "except as hereinabove provided" language in the savings clause, must mean that Congress intended to preempt state sports gaming laws that would otherwise require licensure of DCMs. But its view of the relevant field of preemption is overly broad, particularly in light of the presumption against preemption. Although I agree that the exclusive jurisdiction provision evidences an intent to preempt *some* state law, I disagree that it extends as far as state gaming laws. While it would make sense for Congress to displace a state's targeted attempt to regulate a derivative market, for example, or to clarify the roles of separate federal agencies, as addressed in *Merrill Lynch*, that logic does not suggest Congress intended to displace traditional state police powers, such as gambling regulation — particularly in the absence of the express language so stating.

As the court recognized in *Martin*, "in assessing field preemption, courts must avoid 'interpreting the scope of the preempted field too broadly.'" 793 F. Supp. 3d at 679, quoting *Sikkelee* v. *Precision Airmotive Corp.*, 822 F.3d 680, 689 (3d Cir. 2016). See generally, *Martin ex rel. Heckman* v. *Midwest Exp. Holdings, Inc.*, 555 F.3d 806, 809 (9th Cir. 2009) (aviation

preemption analysis looks "to the pervasiveness of federal regulations in the specific area covered by the tort claim or state law at issue"). That none of the CEA preemption cases Kalshi cites in support of its exclusive jurisdiction argument concern state gambling regulation, or the CEA's preemption of other equivalent historical state police powers, speaks to its overbroad view of relevant preemptory field. See, e.g., *Leist v. Simplot*, 638 F.2d 283, 285 (2d Cir. 1980) (concerning the existence of private right of action under CEA).

A lack of preemption here is further supported by looking at the CEA as a whole. The Special Rule, as quoted *supra*, which also was added by Dodd-Frank, Pub. L 111-203, 124 Stat. 1376 (July 21, 2010), provides the CFTC with the authority to prohibit event contracts that "involve . . . activity that is unlawful under . . . State law." 7 U.S.C. § 7a-2(c)(5)(C)(i). This language "reflects an affirmative intent to *preserve* state laws governing whether particular conduct is lawful or unlawful. The fact that Congress expressly authorized the [CFTC] to prohibit particular categories of transactions as contrary to the public interest *based on the fact that the conduct at issue would violate state law* severely undercuts Kalshi's suggestion that Congress intended to displace all state laws that would otherwise apply to transactions that fall within the scope of the CEA." *Martin*, 793 F. Supp. 3d at 680 (emphasis in original).

The CEA's express preemption provision, 7 U.S.C. § 16(e), also reflects Congress's intended scope of preemption. That provision expressly states that the CEA preempts state gaming regulations as to certain types of operations, see *id.*,[3] which Kalshi does not argue apply

---

[3] 7 U.S.C.A. § 16(e)(2) provides:

> This chapter shall supersede and preempt the application of any State or local law that prohibits or regulates gaming or the operation of bucket shops (other than antifraud provisions of general applicability) in the case of--
> (A) an electronic trading facility excluded under section 2(e) of this title; and
> (B) an agreement, contract, or transaction that is excluded from this chapter under section 2(c) or 2(f) of this title or sections 27 to 27f of this title, or exempted under section 6(c) of this title (regardless of whether any such agreement, contract, or transaction is otherwise subject to this chapter).

11

here. The statute does not, however, provide that the CEA preempts state gaming laws of general application, *or state sports wagering laws.* That Congress chose to explicitly preempt only some state gaming laws indicates an intent to limit the scope of preemption to only those expressly stated areas.[4] See *Martin*, 793 F. Supp. 3d at 681.

Finally, my conclusion is consistent with "the traditional balance between state and federal regulation of gaming." *KalshiEX, LLC* v. *Hendrick*, 2025 WL 3286282, at *8 (D. Nev. 2025) ("*Hendrick*"). See *Martin*, 793 F. Supp. 3d at 682 ("the Supreme Court has long recognized, states have strong interests in regulating gambling"), citing *Murphy*, 584 U.S. 453. As the Nevada District Court observed in ruling against Kalshi in similar litigation, if indeed Congress had intended "such a sea change" in the regulatory landscape of gambling regulation, surely it would have said so explicitly. *Hendrick*, 2025 WL 3286282, at *8 (citation omitted). Moreover, in adding swaps to the CEA in 2010,

> Congress was bringing risky financial products out of the shadows that had threatened the stability of the entire U.S. financial sector, and which had catastrophic ripple effects on the U.S. and world economies during the financial crisis of 2007-2008. Congress was not enabling nationwide gambling on CFTC-designated exchanges. "[I]nterpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available." *Griffin* v. *Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982). It is absurd to think that Congress intended for DCMs to turn into nationwide gambling venues on every topic under the sun to the exclusion of state regulation and with no comparable federal regulator without ever mentioning that was the goal when Congress added swaps to the CEA in 2010.

*Hendrick*, 2025 WL 3286282, at *9.[5] This conclusion is further strengthened by the fact that the 2010 Dodd-Frank amendments occurred at a time when federal law prohibited nearly all state-

---

[4] For the same reasons stated in *Martin*, I reject Kalshi's argument that § 16(e)(2) somehow means the opposite based on a distorted reading of the prior subsection. See 793 F. Supp. 3d at 681.

[5] Although *Henrick* reached its decision by concluding that Kalshi's sports event contract were not "swaps" under the CEA, rather than through a preemption analysis, Congressional intent was integral to that conclusion, — i.e., "what Congress was trying to achieve when it added swaps to the CEA." 2025 WL 3286282, at *9.

12

level regulated sports betting, prior to the Supreme Court's 2018 ruling in *Murphy*. See *Martin*, 793 F. Supp. 3d at 683. Nothing in the 2010 legislative history of the CEA suggests that *any* member of Congress envisioned or intended that predictive market "swaps" would include the sports event contracts offered by Kalshi, or intended CFTC authority over swaps to displace state police power to regulate gaming. See Senate Report 111-176.

For these reasons, Kalsi has failed to establish that Massachusetts's Sports Wagering Laws are field preempted by the CEA.[6]

### 3. Conflict Preemption

As already noted, "[a] state law is preempted by conflict preemption when 'it is impossible for a private party to comply with both state and federal requirements' or where state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Triumph Foods, LLC* v. *Campbell*, 742 F. Supp. 3d 63, 72 (D. Mass. 2024), S.C., 156 F.4th 29 (1st Cir. 2025), quoting *English*, 496 U.S. at 79. "What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." *Maine Forest Prod. Council* v. *Cormier*, 51 F. 4th 1, 6 (1st Cir. 2022), quoting *Crosby*, 530 U.S. at 373. The presumption against preemption likewise applies to conflict preemption. *Robinhood Fin. LLC*, 492 Mass. at 717.

Kalshi's various conflict preemption arguments are all variations on a theme — allowing Massachusetts to impose its sports gambling regulations and licensing scheme on Kalshi would lead to "chaos" disrupting Congress's intent to have the CFTC uniformly regulate and enforce derivatives markets. For many of the reasons already discussed, the arguments are unavailing. Requiring Kalshi to become licensed to offer its sports related event contracts in Massachusetts

---

[6] I likewise find persuasive the several other reasons the *Martin* court discussed in concluding that the CEA does not preempt state gaming laws. See 793 F. Supp. 3d at 682-684.

13

neither displaces federal derivatives regulations or enforcement efforts, nor frustrates Congress's purpose in consolidating regulatory power in the CFTC. The Sports Wagering Law is an exercise of traditional state police power. It imposes an *additional* regulatory burden on an event contract platform that seeks to offer sports related event contracts, in service of the public health. It is not a competing attempt to regulate derivatives markets, or an outright ban on event contracts in the state. That both systems may operate in harmony demonstrates a lack of frustration to Congress's intent. See *Zuri-Invest AG* v. *Natwest Fin. Inc.*, 177 F. Supp. 2d 189, 197 (S.D.N.Y. 2001) ("There can be no implied conflict preemption when the federal and state laws co-exist in harmony"); *Vanlaningham* v. *Campbell Soup Co.*, 492 F. Supp. 3d 803, 806 (S.D. Ill. 2020) (same). See also *Martin*, 793 F. Supp. 3d at 686 ("Kalshi has not shown how obtaining a license in Maryland and otherwise complying with Maryland law would prevent it from complying with federal law").[7] The undercurrent to Kalshi's argument is that it would prefer to avoid the burden and expense of state licensure. That is an insufficient reason, however, to overcome the strong presumption against conflict preemption in this case.[8]

Because Kalshi has failed to establish that the CEA preempts the Sports Wagering Law, the Commonwealth is likely to succeed on the merits of its single claim that Kalshi requires licensure under G.L. c. 23N to offer sports-related event contracts in the Commonwealth.

---

[7] Kalshi cites a November 13, 2025, letter the MGC sent to licensed sports betting operators in support of its conflict preemption argument. I agree with the Commonwealth, however, that the letter does not state an intention to prohibit sports-related event contracts in Massachusetts. See Valente Ex. 5. Because it is a problem of its own making, Kalshi's ability to comply with federal regulations due to the disruption the issuance of an injunction would cause likewise has no bearing on the conflict preemption analysis.

[8] Kalshi raised the same conflict preemption arguments it raises here in *Martin*. 793 F. Supp. 3d at 685-686. I concur in the *Martin* court's analysis and rejection of each of those arguments. See *id.*

## B. Public Interest

"Because the Attorney General, in the name of the Commonwealth, brings this case to carry out her statutory mandate to enforce [the Sports Wagering Law, see G.L. c. 23N, 4(g),] it is necessary to consider whether the preliminary injunction order promotes the public interest." *Fremont Inv. & Loan*, 452 Mass. at 751. As detailed above, the Sports Wagering Law and its related regulations require vetting and licensure through the MGC, and the payment of taxes and fees, partly to support public health measures related to gambling. The MGC also oversees and supervises licensed, operating entities for compliance with state laws and regulations. Licensed entities must undertake measures to avoid unlawful wagers, underage betting, and to aid in preventing gambling addiction. There is no real question that licensure, and the consequent oversight, of sports wagering operations in the state serve both public health and safety, and the Commonwealth's financial interest. Seeking enforcement against non-complying entities also serves the public interest of fair competition and equal oversight among all sports wagering operations in the state.

Kalshi's opposition centers on its claim that compliance with an injunction will harm Massachusetts Kalshi users, risk its DCM status and reputation, and pose burdensome feasibility challenges. On the first point, the Commonwealth states in its brief that it is not seeking to unwind existing event contracts that Massachusetts users have purchased. I agree that the injunctive relief ordered will be forward-looking only, which will minimize disruption but require Kalshi to begin complying with Massachusetts law.

On the remaining points, even assuming they are relevant to the analysis, Kalshi's argument is not compelling. First, Kalshi knowingly proceeded in Massachusetts and other states that require sports wagering entities to be licensed, even after the CFTC warned it to be

15

cautious in light of ongoing state enforcement efforts. Thus, any hardship it faces in removing its non-compliant Massachusetts offerings is of its own making. There can be little question that Kalshi well understood that its business model—especially once it began offering bets on sporting events—came into direct conflict state enforcement regimes; Kalshi chose to take that risk head-on. Second, compliance with state regulations is a typical challenge many federally regulated, nationwide companies face as part of their normal business operations because of our federal system. I am therefore unconvinced that compliance with a preliminary injunction in this case poses an unusual degree of hardship for Kalshi to overcome, or will be fatal to its business or CFTC designation. See *Hendrick*, 2025 WL 3286282, at *12-*13 (noting, in the context of a public interest analysis, that "there is no evidence before [the court] that the CFTC would take adverse action against Kalshi for complying with court orders and state law while the various lawsuits play out," citing a lack CFTC enforcement action against another CFTC designated entity that limited its offerings based on location following state enforcement action).

Accordingly, upon weighing the competing arguments, requiring Kalshi to be licensed to offer its sports-related event contracts in Massachusetts serves the public interest.

## C. Conclusion

Because the Commonwealth has succeeded both in demonstrating that it is likely to succeed on the merits of its claim that Kalshi requires licensure under G.L. c. 23N, and that such licensure will serve the public interest, its motion for a preliminary injunction is **ALLOWED**.

## II. Kalshi's Motion to Dismiss

Because Kalshi's motion to dismiss is predicated entirely on its preemption argument, which fails for the reasons outlined above, that motion also fails. Accordingly, the motion to dismiss is **DENIED**.

## ORDER

For the foregoing reasons, the Commonwealth's motion for a preliminary injunction is **ALLOWED**. Kalshi's motion to dismiss is **DENIED**. The Commonwealth is entitled to a preliminary injunction prohibiting Kalshi from offering sports-related event contracts in the absence of the required license under the Sports Wagering Law. At the hearing both parties discussed, but did not resolve, certain details of the Commonwealth's requested injunction, including how to prohibit new contracts without impacting already existing contracts. For that reason, I will enter a preliminary injunction consistent with this decision on the following schedule: i) not later than January 21, 2026 at 4:00 p.m. the Commonwealth shall submit a proposed preliminary injunction consistent with this decision; ii) not later than January 23, 2026 at 10:00 a.m., Kalshi may submit a response to the Commonwealth's proposed order; iii) if either side requests to be heard or if I determine a hearing is necessary, a hearing will take place on Friday, January 23, at 12:00 noon, after which I will enter a preliminary injunction. Any motion to stay may also be raised in this time period. If both parties wish to confer with respect to the terms of the preliminary injunction and request to extend these deadlines, they may notify the clerk and I will respond promptly to any such joint request.

**So ordered.**

Christopher K. Barry-Smith
Justice of the Superior Court

DATE: January 20, 2026

17