| | |
|---|---|
| KALSHIEX LLC,<br><br>*Plaintiff*,<br><br>vs.<br><br>WILLIAM ORGEL, in his official capacity as Chairman of the Tennessee Sports Wagering Council; MARY BETH THOMAS, in her official capacity as the executive director of the Tennessee Sports Wagering Council; TENNESSEE SPORTS WAGERING COUNCIL; and JONATHAN SKRMETTI in his official capacity as Attorney General of Tennessee<br><br>*Defendants*. | Case No.: 3:26-cv-00034<br><br>**PLAINTIFF'S REPLY IN SUPPORT OF ITS MOTION FOR A PRELIMINARY INJUNCTION** |

**TABLE OF CONTENTS**

I. KALSHI IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIM. ..................... 1

II. KALSHI WILL SUFFER IRREPARABLE HARM ABSENT A PI, AND THE BALANCE OF EQUITIES AND PUBLIC INTEREST FAVOR KALSHI..................... 9

CONCLUSION ............................................................................................................... 10

## TABLE OF AUTHORITIES

**Cases**                                                                                **Page(s)**

*Am. Agric. Movement, Inc. v. Bd. of Trade of Chi.*,
    977 F.2d 1147 (7th Cir. 1992) ................................................................................2, 5, 9

*Armour & Co. v. Ball*,
    468 F.2d 76 (6th Cir. 1972) ..............................................................................................6

*Armstrong v. Exceptional Child Ctr., Inc.*,
    575 U.S. 320 (2015) .........................................................................................................1

*Big Lagoon Rancheria v. California*,
    789 F.3d 947 (9th Cir. 2015) ...........................................................................................2

*Bigelow v. Virginia*,
    421 U.S. 809 (1975) .......................................................................................................10

*Blue Lake Rancheria v. Kalshi Inc.*,
    2025 WL 3141202 (N.D. Cal. Nov. 10, 2025) ................................................................8

*Bob Jones Univ. v. United States*,
    461 U.S. 574 (1983) .........................................................................................................8

*Boler v. Earley*,
    865 F.3d 391 (6th Cir. 2017) ...........................................................................................1

*Chi. Mercantile Exch. v. SEC*,
    883 F.2d 537 (7th Cir. 1989) ...........................................................................................7

*Churchill Downs Tech. Init. Co. v. Mich. Gaming Control Bd.*,
    162 F.4th 631 (6th Cir. 2025) ..........................................................................4, 6, 9, 10

*Churchill Downs Tech. Init. Co. v. Mich. Gaming Control Bd.*,
    767 F. Supp. 3d 556 (W.D. Mich. 2025) .........................................................................1

*Curran v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    622 F.2d 216 (6th Cir. 1980) ...........................................................................................5

*Dickson v. Uhlmann Grain Co.*,
    288 U.S. 188 (1933) .........................................................................................................6

*Free v. Bland*,
    369 U.S. 663 (1962) .........................................................................................................6

*FTC v. Ken Roberts Co.*,
    276 F.3d 583 (D.C. Cir. 2001) .....................................................................................5, 9

*Hall v. Sec'y, Health, Ed. & Welfare*,
  600 F.2d 556 (6th Cir. 1979) ...................................................................................5

*Hughes v. Talen Energy Mktg., LLC*,
  578 U.S. 150 (2016) ..................................................................................................4

*Ingersoll-Rand Co. v. McClendon*,
  498 U.S. 133 (1990) ..................................................................................................7

*KalshiEX v. CFTC*,
  2024 WL 4164694 (D.D.C. Sep. 12, 2024) ...........................................................3, 4

*Kelly v. Carr*,
  691 F.2d 800 (6th Cir. 1980) ....................................................................................6

*Leist v. Simplot*,
  638 F.2d 283 (2d Cir. 1980) .....................................................................................5

*Mich. Corr. Org. v. Mich. Dep't of Corr.*,
  774 F.3d 895 (6th Cir. 2014) ....................................................................................1

*Oklahoma v. Castro-Huerta*,
  597 U.S. 629 (2022) ..................................................................................................4

*Pub. Serv. Co. of Colo. v. Cont'l Cas. Co.*,
  26 F.3d 1508 (10th Cir. 1994) ..................................................................................3

*Puerto Rico v. Franklin Cal. Tax-free Tr.*,
  579 U.S. 115 (2016) ..................................................................................................4

*Shaw v. Delta Air Lines, Inc.*,
  463 U.S. 85 (1983) ....................................................................................................1

*Traynor v. Turnage*,
  485 U.S. 535 (1988) ..................................................................................................8

*United States v. Brien*,
  617 F.2d 299 (1st Cir. 1980) ....................................................................................5

*United States v. Szoka*,
  260 F.3d 516 (6th Cir. 2001) ..................................................................................10

*Ex parte Young*,
  209 U.S. 123 (1908) ..................................................................................................1

**Statutes**

7 U.S.C. § 1a ...............................................................................................................2, 4

7 U.S.C. § 2 ...................................................................................................................... 4, 7, 9

7 U.S.C. § 7a-2 ....................................................................................................................... 7

7 U.S.C. § 13a-1 ..................................................................................................................... 9

7 U.S.C. § 13a-2 ..................................................................................................................... 5

7 U.S.C. §§ 25 *et seq* ............................................................................................................. 1

31 U.S.C. § 5362 .................................................................................................................... 8

Tenn. Code Ann. § 4-49-106 ................................................................................................. 7

Tenn. Code Ann. § 4-49-111 ................................................................................................. 7

## Other Authorities

17 C.F.R. § 40.11 ............................................................................................................... 7, 8

156 Cong. Rec. S5902 (July 15, 2010) ................................................................................. 5

73 Fed. Reg. 25,669 (May 7, 2008) ...................................................................................... 3

76 Fed. Reg. 44,776 (July 27, 2011) ..................................................................................... 8

77 Fed. Reg. 48,208 (Aug. 13, 2012) ................................................................................ 3, 9

89 Fed. Reg. 48,968 (June 10, 2024) ................................................................................ 3, 8

*Associated*, Oxford English Dictionary (3d ed 2011) ........................................................ 2

Brett Smiley, *Underdog Sports Preparing to Use Kalshi, Prediction Markets For Its Own Risk Management*, In Game (Oct. 22, 2025), https://perma.cc/BT4A-BK8T ............................................................................................ 2

*Contingency*, Merriam-Webster's Collegiate Dictionary (11th ed. 2003) ......................... 2

*Event*, Random House Webster's Pocket American Dictionary (5th ed. 2008) ............... 2

*Event*, Random House Webster's Unabridged Dictionary (2d ed. 2001) ......................... 2

H.R. Rep. No. 93-1383 (1974) ............................................................................................... 5

H.R. Rep. No. 106-711, pt. 2 (2000) ..................................................................................... 6

## I. KALSHI IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIM.

**Cause of Action**. Kalshi has a cause of action. "It is beyond dispute that federal courts have jurisdiction over suits to enjoin state officials" from enforcing state law that "is pre-empted by a federal statute." *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96 n.14 (1983). Under *Ex parte Young*, 209 U.S. 123, 155-56 (1908), parties have a cause of action in equity to "bring claims for prospective relief against state officials" to prevent "federal constitutional or statutory violations." *Boler v. Earley*, 865 F.3d 391, 412 (6th Cir. 2017); *see* Compl. ¶ 17 (invoking *Ex parte Young*).

Defendants' contrary argument confuses two lines of precedent. In cases like this, where a party invokes federal law as a defense to state enforcement, it undisputedly "may use *Ex parte Young* as a *shield* against the enforcement of contrary (and thus preempted) state laws," because "an existing cause of action" exists in the form of "an equitable anti-suit injunction." *Mich. Corr. Org. v. Mich. Dep't of Corr.*, 774 F.3d 895, 906 (6th Cir. 2014). By contrast, where "litigants wield *Ex parte Young* as a cause-of-action-creating *sword*," they must show that Congress intended the statute to be privately enforced. *Id.*; *see Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015) (the "power of federal courts of equity to enjoin unlawful executive action is subject to express and implied statutory limitations"). Kalshi here invokes the CEA as a *shield*. Defendants cite no case finding no cause of action in these circumstances. While Defendants claim the CEA's private right to collect damages forecloses this suit, 7 U.S.C. §§ 25 *et seq.*, nothing about that provision suggests Congress intended to withdraw the settled right to obtain an injunction against enforcement of preempted law. *See Churchill Downs Tech. Init. Co. v. Mich. Gaming Control Bd.*, 767 F. Supp. 3d 556, 569 (W.D. Mich. 2025) (rejecting a similar argument). And, as conceded (at 13), where *Ex parte Young* applies, sovereign immunity is not a defense.

**Swaps**. Defendants are wrong (at 15-16) that Kalshi's sports-event contracts are not

swaps.[1] A swap is a contract that "provides" for payment based on the occurrence "of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). "Associated" means "connect[ed]." *See Associated*, Oxford English Dictionary (3d ed 2011). A swap thus requires an event connected to a potential financial, economic, or commercial consequence. Kalshi's contracts fit easily within this definition; they have financial consequences for team sponsors, advertisers, television networks, franchises, local communities, and more. They also have economic consequences for sportsbooks, some of which turned to Kalshi's contracts to hedge their financial risks.[2]

Relying on a recent decision by the District of Nevada, Defendants contend (at 15-16) that an "outcome" is not an "event" or "contingency" that may underlie a swap. Not so. Dictionaries define "event" to mean "outcome." *Event*, Random House Webster's Unabridged Dictionary (2d ed. 2001). "Event" also means "[s]omething that happens." *E.g.*, *Event*, Random House Webster's Pocket American Dictionary (5th ed. 2008). President Trump winning the 2024 presidential election was an outcome, but also an event. And "contingency" includes "something liable to happen as an adjunct to or result of something else." *Contingency*, Merriam-Webster's Collegiate Dictionary (11th ed. 2003). That definition easily encompasses outcomes. Defendants' argument would contravene precedent recognizing that "event contracts" are "based on the outcome of a

---

[1] To begin, the CEA bars states from second-guessing whether instruments traded on a DCM qualify as swaps or other derivatives. Kalshi's contracts undisputedly trade on a DCM, and the CEA therefore reserves the authority to regulate these contracts exclusively for the CFTC. If states could regulate on-DCM trades merely by claiming that they are not derivatives, states could "directly affect trading on or the operation of a futures market"—exactly what Congress "preempted." *Am. Agric. Movement, Inc. v. Bd. of Trade of Chi.*, 977 F.2d 1147, 1156-57 (7th Cir. 1992); *see Big Lagoon Rancheria v. California*, 789 F.3d 947, 954 (9th Cir. 2015) (collateral attack on agency decision would be "the sort of end-run" that Congress prohibited).

[2] Brett Smiley, *Underdog Sports Preparing to Use Kalshi, Prediction Markets For Its Own Risk Management*, In Game (Oct. 22, 2025), https://perma.cc/BT4A-BK8T.

contingent event." *KalshiEX v. CFTC*, 2024 WL 4164694, at *1 (D.D.C. Sep. 12, 2024); *see Pub. Serv. Co. of Colo. v. Cont'l Cas. Co.*, 26 F.3d 1508, 1514-15 (10th Cir. 1994) (an "event" is "the outcome or consequence of anything"). It would also contravene the CFTC's longstanding view that an event contract may be based on "the outcome of a game in which one or more athletes compete." 89 Fed. Reg. 48,968, 48,975 (June 10, 2024); 73 Fed. Reg. 25,669, 25,669-70 (May 7, 2008) (event contracts may be based on "outcome[s]"). And it would pose intractable interpretive difficulties, because almost any event can be recharacterized as an outcome of a different event.

Defendants also claim (at 17) that sports events have no "inherent" connection with financial consequences. But Defendants invent this "inherent" requirement. Sports events have *actual*, *significant* financial consequences, and thus readily meet the swap definition requiring only *potential* consequences. And Defendants seek to bar *all* Kalshi sports contracts, requiring them to make an impossible showing that *no* sports events are associated with financial consequences.[3]

Contrary to Defendants' claim (at 22) the CFTC recognizes sports contracts as swaps. *See* 89 Fed. Reg. at 48,972, 48976 (contracts involving the "outcome" of a "sports game" are "agreements, contracts, transactions, or swaps in excluded commodities" subject to CFTC jurisdiction). Defendants invoke (at 22) a CFTC/SEC rule defining "swap," but this rule supports Kalshi. Though "consumer and commercial transactions" that "are not traded on an organized market" are not swaps, such transactions are swaps if they *are* "traded on organized markets"— which Defendants gloss over. 77 Fed. Reg. 48,208, 48,217-18 (Aug. 13, 2012). Defendants misconstrue a CFTC advisory (at 6-7), noting that the CFTC has not conducted a public-interest

---

[3] Defendants misconstrue Kalshi's comments in a prior litigation (at 17 n.12). Those statements did not concern whether sports contracts are swaps—it was undisputed that they were—but instead whether they would be subject to the Special Rule. And Kalshi clarified that "there may be some games that do have extrinsic consequences." Valente Decl. Ex. 7, at 74:15-16.

- 3 -
Case 3:26-cv-00034    Document 41    Filed 01/26/26    Page 8 of 17 PageID #: 467

review of sports contracts—a clear acknowledgement that these contracts are indeed subject to CFTC jurisdiction. Dkt. 35-2, at 2, n.4.[4]

**Express Preemption**. The CEA grants the CFTC "exclusive jurisdiction" to regulate derivatives trading on DCMs. The grant of "exclusive jurisdiction" to a federal agency preempts state intrusion on the same "regulatory turf." *Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150, 163 (2016). Defendants' contention (at 23) that Kalshi does not argue for "express preemption" is false. *See* PI Mot. 10 (Congress preempted state regulation "both expressly in the text of the CEA and implicitly"). Defendants' contention (at 25) that *Oklahoma v. Castro-Huerta*, 597 U.S. 629 (2022), rejected preemption in a similar case is equally false. The Court rejected preemption only because the federal statute there did "not make federal jurisdiction exclusive." *Id.* at 643-44.

Defendants invoke a presumption against preemption, but where a statute "contains an express pre-emption clause, [courts] do not invoke any presumption." *Puerto Rico v. Franklin Cal. Tax-free Tr.*, 579 U.S. 115, 125 (2016). Defendants argue (at 23) the presumption applies because states generally regulate gambling, but the Sixth Circuit recently rejected a similar argument, explaining that because "the regulation of *interstate* gambling isn't a traditional area of state regulation," a "presumption against preemption doesn't apply." *Churchill Downs Tech. Init. Co. v. Mich. Gaming Control Bd.*, 162 F.4th 631, 641 n.5 (6th Cir. 2025). The same is true here.

**Field Preemption**. Overwhelming evidence confirms that Congress preempted the field of regulating trading on DCMs. The CEA gives the CFTC "exclusive jurisdiction" over

---

[4] Kalshi's sports contracts are also "future[s]" or "option[s]" in excluded commodities, which are subject to exclusive CFTC jurisdiction. 7 U.S.C. § 2(a)(1)(A). The events underlying Kalshi's contracts are "excluded commodities" because they are an "occurrence" or "contingency" that is "beyond the control of the parties" to the contract and "associated with" a financial consequence. *Id.* § 1a(19)(iv)(I); *see KalshiEX*, 2024 WL 4164694, at *2 ("Event contracts are subject to regulation under the CEA as 'excluded commodities.'").

derivatives transactions on a DCM. 7 U.S.C. § 2(a)(1)(A). And Congress intended to "preempt the field." H.R. Rep. No. 93-1383, at 35 (1974).[5] Congress defined the "jurisdiction of states" to *exclude* the right to regulate DCMs. *See* 7 U.S.C. § 13a-2(1). For 50 years, courts have concluded that "the CEA preempts the application of state law." *Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980); *Curran v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 622 F.2d 216, 232 (6th Cir. 1980) (Congress "vested exclusive jurisdiction over commodities futures trading with the CFTC"); *United States v. Brien*, 617 F.2d 299, 310 (1st Cir. 1980) (the CFTC occupies "the entire field of commodities futures regulation"); *Am. Agric.*, 977 F.2d at 1156-57 (state laws that "would directly affect trading on or the operation of a futures market . . . [are] preempted"); *FTC v. Ken Roberts Co.*, 276 F.3d 583, 591 (D.C. Cir. 2001) (CFTC jurisdiction is "exclusive with regard to the trading of futures *on organized contract markets*"). And the CFTC has stated that, "due to federal preemption, event contracts never violate state law when they are traded on a DCM." Appellant Br. at *27, *KalshiEX LLC v. CFTC*, 2024 WL 4512583 (D.C. Cir. Oct. 16, 2024).

Defendants would rewrite the CEA to make the CFTC's jurisdiction exclusive *except for state gambling laws*. But this is a policy-driven quest to "discover a congressional intent, under the guise of statutory construction, which is contrary to the clear language of the statute itself." *Hall v. Sec'y, Health, Ed. & Welfare*, 600 F.2d 556, 561 (6th Cir. 1979). And history refutes Defendants' claim (at 26-29) that Congress would not have intended to preempt state gambling

---

[5] Defendants deem the legislative history "irrelevant" (at 28) because it predates Dodd-Frank. But the 1974 history shows that Congress intended the CFTC's "exclusive jurisdiction" to preempt state law and thus shows that when Congress added "swaps" to the CFTC's jurisdiction in Dodd-Frank, it knew it was preempting state law as to swaps. Defendants cite (at 6, 21) statements made in 2010 by Senator Lincoln, but these statements undermine Defendants' argument, as they recognize that the Special Rule would restore "the CFTC's" authority to regulate gaming contracts. 156 Cong. Rec. S5902, S5906 (July 15, 2010). As Senator Lincoln informed the Third Circuit, "Congress intended for the CFTC alone to make that determination." Members of Congress Br. 16, *KalshiEX LLC v. Flaherty*, No. 25-1922 (3d Cir.).

laws. Before the CEA, many states regulated futures trading as unlawful "gambling in grain." *Dickson v. Uhlmann Grain Co.*, 288 U.S. 188, 198 (1933); *see* Kalshi Br. at A1-16, *KalshiEX LLC v. Martin*, No. 25-1892 (4th Cir.) (listing dozens of pre-CEA state laws regulating futures trading as a type of gambling). Congress clearly intended to preempt these gambling laws in 1974.

Defendants invoke (at 26) Section 16, but it strongly supports Kalshi. Congress enacted Section 16(e)(2) to preempt states from applying their gaming laws to transactions *exempted* from the CEA's on-DCM requirement, just as states were already preempted from applying state laws to on-DCM transactions. *See* H.R. Rep. No. 106-711, pt. 2, at 71 (2000) (the "current" CEA already "supersedes and preempts" state laws as to on-DCM transactions, and Section 16(e)(2) clarified that it "supersedes and preempts State gaming and bucket shop laws" as to exempt transactions as well). Each of the transactions cross-referenced in Section 16(e)(2) *need not occur on DCMs*, which is why Congress had to specify that state laws are preempted.

**Conflict Preemption**. If any "state law regulating future[s] trading" is "inconsistent with federal law," federal law must govern. *Kelly v. Carr*, 691 F.2d 800, 804 n.12 (6th Cir. 1980). Defendants' proposed state-by-state regulation of DCMs is plainly inconsistent with the CEA's uniform nationwide regulation. Defendants argue to the contrary principally by invoking state police power, but the Sixth Circuit recently rejected an identical argument. *See Churchill Downs*, 162 F.4th at 640-41. State law must yield to conflicting federal law no matter how "clearly within a State's acknowledged power" it resides. *Free v. Bland*, 369 U.S. 663, 666 (1962).

Defendants contend (at 29-31) that Tennessee law would "work in tandem" with federal law. But the CEA seeks "to prescribe uniform standards." *Armour & Co. v. Ball*, 468 F.2d 76, 83 (6th Cir. 1972). State-by-state regulation is anathema to that intent and would result in the "total chaos" Congress sought to avoid. Mot. at 12. Many cases find conflict preemption where state

regulation is "at odds with the goal of uniformity that Congress" intended. *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 142 (1990). Defendants have no response.

Defendants argue (at 33) that Kalshi could get a Tennessee gaming license. But that would be impossible. Licensure would require Kalshi to offer contracts only to people "physically" within Tennessee—impossible for a nationwide exchange. Tenn. Code Ann. § 4-49-111. Defendants argue (at 31) that the CEA's "impartial access" requirement would not bar this state-by-state patchwork, but a DCM accepting trades only from one state would plainly violate the CEA—transforming one nationwide market into 50 state markets and facilitating manipulation and distortions. And because licensure is discretionary, the Commission could bar licenses even for DCMs that comply with the CEA—another clear conflict. *Id.*; *see also id*. § 4-49-106.

**Special Rule**. The Special Rule is fatal to Defendants' position. While Defendants contend (at 1) that "gaming" contracts are not subject to the CFTC's jurisdiction, the Special Rule provides that contracts involving "gaming" are indeed "event contracts" subject to CFTC jurisdiction. 7 U.S.C. § 7a-2(c)(5)(C)(i). Far from authorizing 50 states to enforce their laws against DCMs, the Special Rule gives only "the Commission" the power to regulate contracts via public-interest review. *Id.* Defendants' agreement (at 6) that the CFTC has jurisdiction to regulate Kalshi's contracts is fatal to their argument, because where "the CFTC has jurisdiction, its power is exclusive." *Chi. Mercantile Exch. v. SEC*, 883 F.2d 537, 548 (7th Cir. 1989). In fact, Defendants previously asked the CFTC to bar sports contracts—an admission of CFTC jurisdiction. Dkt. 1-1.

Defendants argue (at 25-26) that Section 2(a)'s grant of exclusive jurisdiction divides authority between the CFTC and SEC rather than preempting state law. But the statute "supersede[s]" state authorities as well. 7 U.S.C. § 2(a)(1)(A). Defendants also wrongly claim (at 29-30 & n.16) that a CFTC regulation bans sports contracts. 17 C.F.R. § 40.11. While subsection

- 7 -

(a) prohibits contracts involving enumerated categories, subsection (c) permits the CFTC to review such contracts on a case-by-case basis. *See id*. § 40.11(c). The CFTC has recognized as much. *See* 76 Fed. Reg. 44,776, 44,785-86 (July 27, 2011) (DCMs "may always" self-certify contracts, and Section 40.11 operates to allow review "on a case-by-case basis"); *see* 89 Fed. Reg. at 48,970-71 (the CFTC "interprets [the Special Rule] to contemplate that the Commission engage in a two-step inquiry" rather than a blanket ban). Even if Section 40.11 were a blanket ban on sports contracts, it would not help Defendants; it would provide grounds for enforcement action against Kalshi under the CEA, but it would not give states the right to regulate Kalshi's contracts.

**Implied Repeal**. Defendants suggest (at 27) that Kalshi's position would "impliedly repeal" several federal statutes. Not at all. Four years before Dodd-Frank, Congress enacted UIGEA to prohibit use of the internet to facilitate certain bets and wagers unlawful under state law, while making clear that the term "bet or wager" "does not include" "any transaction conducted on" a DCM. 31 U.S.C. § 5362(1)(E)(ii). UIGEA confirms Congress's understanding that on-DCM transactions fall outside federal gambling statutes like IGRA and the Wire Act. *See Bob Jones Univ. v. United States*, 461 U.S. 574, 587 n.10 (1983) (later statutes are "entitled to great weight" in resolving the meaning of undefined terms in prior statutes addressing the same subject matter). Rather than effecting an implied repeal, Kalshi's interpretation comports with the duty to reconcile federal statutes that are "are capable of co-existence." *Traynor v. Turnage*, 485 U.S. 535, 548 (1988). Another district court recently rejected an IGRA challenge to Kalshi's contracts on these exact grounds. *Blue Lake Rancheria v. Kalshi Inc.*, 2025 WL 3141202 (N.D. Cal. Nov. 10, 2025). While Defendants cite (at 18) the now-invalidated Professional and Amateur Sports Protection Act, that statute was fully consistent with the CEA's preemption of state gambling laws and its delegation to the CFTC to prohibit gaming contracts it deems contrary to the public interest.

**Absurd Results**. Defendants falsely claim (at 19) that Kalshi's position would mean that "*all* sports wagering would necessarily" fall within the CFTC's exclusive jurisdiction. The savings clause makes clear that, except for the grant of exclusive jurisdiction to the CFTC over *on-DCM* trading, "nothing" in Section 2 shall "restrict" state authorities "from carrying out their duties and responsibilities in accordance with [state] laws." 7 U.S.C. § 2(a)(1)(A). Furthermore, "consumer and commercial transactions" that "are *not traded on an organized market*" are not swaps. 77 Fed. Reg. at 48,247 (emphasis added). Thus, the CEA does not prevent state authorities from regulating sportsbooks, and confirming CFTC jurisdiction here does not implicate the major questions doctrine. By contrast, if the CFTC's exclusive jurisdiction does not preempt state law, then state gambling regulators would be free to regulate not just sports contracts, but *all* on-DCM trading— a radical proposition at odds with a half-century of precedent.

Nothing about Kalshi's argument would bar federal regulators from pursuing illegal conduct. *E.g.*, 7 U.S.C. § 13a-1(f) (permitting referral to Attorney General). Nor, contrary to Defendants' fanciful hypothetical (at 27), would Kalshi's position bar states from punishing dog fighting or the like. The CEA preempts state laws only if they "directly affect trading on or the operation of a futures market," *Am. Agric.*, 977 F.2d at 1156, but does not preempt other "agencies in their regulatory realms," *Ken Roberts Co.*, 276 F.3d at 591. States may criminalize underlying conduct like dog fighting, but they may not regulate trading on DCMs.

## II. KALSHI WILL SUFFER IRREPARABLE HARM ABSENT A PI, AND THE BALANCE OF EQUITIES AND PUBLIC INTEREST FAVOR KALSHI.

The Sixth Circuit in *Churchill* held that evidence of loss of "competitive position and goodwill" "suffices" to demonstrate irreparable harm because "courts can't easily compensate" them. 162 F.4th at 643. This is the exact, unrebutted evidence before the Court. *See* Sottile Decl. ¶¶ 11-60. If Kalshi is correct on the merits, requiring Kalshi to spend tens of millions of dollars

- 9 -

to implement geofencing and force Tennessee residents out of open positions would subject Kalshi to harms it could not recoup if it were to prevail.

Defendants claim (at 33) enforcement would be limited to sports contracts and there is no certainty that "Tennessee users will quit Kalshi all together." But the C&D Letter threatens criminal sanctions based on *all* Kalshi event contracts. Dkt 8-1. And the harm is irreparable even if it does not bankrupt Kalshi. While Defendants argue (at 33-34) that Kalshi cannot claim its users' harm, Kalshi *itself* will suffer undeniable harm, and "harm to others" may be considered in a PI analysis. *United States v. Szoka*, 260 F.3d 516, 523 (6th Cir. 2001). Nothing about Kalshi's harms are (at 32-35) "self-inflicted" or the product of "unclean hands." In *every* preemption case, a party violates state law on the ground that federal law governs. And Kalshi's conduct here is especially reasonable given that it relied on PIs issued in April 2025, coupled with the SWC's silence to Kalshi for a year after it began offering sports contracts.[6]

Defendants contend (at 35) an injunction would undermine the public interest in enforcing state gaming laws. The Sixth Circuit rejected the same argument in *Churchill*, noting that "Michigan didn't lose its ability to regulate gambling," except as preempted by federal law, and that it is "always in the public interest" to "enjoin[] the enforcement of a law that violates constitutional rights." 162 F.4th at 643.[7]

## CONCLUSION

For the foregoing reasons, the Court should grant a preliminary injunction.

---

[6] Defendants cite (at 33) an agreement another DCM reached in Nevada, but that DCM did not geofence. It instead restricted Nevada residents from accessing sports contracts, regardless of where those residents are located at the time. That agreement, if compelled, would violate the dormant Commerce Clause. *Bigelow v. Virginia*, 421 U.S. 809, 823 (1975).

[7] Defendants' request for a nearly $900,000 bond is unreasonable, especially given that they failed to engage with Kalshi for nearly a year after Kalshi began offering sports contracts. Kalshi does not wish the bond amount to be a barrier to an injunction, but believes no further bond is warranted.

Dated this 26th day of January, 2026.

    Respectfully submitted,

    /s/ *Britt K. Latham*
    Britt K. Latham
    Robert E. Cooper, Jr.
    Courtney A. Hunter
    **BASS, BERRY & SIMS PLC**
    21 Platform Way South, Suite 3500
    Nashville, Tennessee 37203
    Telephone: (615) 742-6200
    Facsimile: (615) 742-6293
    blatham@bassberry.com
    bob.cooper@bassberry.com
    courtney.hunter@bassberry.com

    and

    Neal Katyal (admitted *pro hac vice*)
    Joshua B. Sterling (admitted *pro hac vice*)
    William E. Havemann (admitted *pro hac vice*)
    **Milbank LLP**
    1101 New York Avenue NW
    Washington D.C. 20005
    Telephone: 202-835-7500
    Facsimile: 202-263-7586

    Grant R. Mainland (admitted *pro hac vice*)
    Andrew L. Porter (admitted *pro hac vice*)
    Nicole D. Valente (admitted *pro hac vice*)
    **Milbank LLP**
    55 Hudson Yards
    New York, NY 10001
    Telephone: 212-530-5000
    Facsimile: 212-530-5219

    *Attorneys for Plaintiff*

- 11 -
Case 3:26-cv-00034  Document 41  Filed 01/26/26  Page 16 of 17 PageID #: 475

## CERTIFICATE OF SERVICE

I certify that on January 26, 2026, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.

*/s/ Britt K. Latham*